IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

ROBERT SOKOLOVE, DAVID McCARTHY,:      CIVIL ACTION
WILLIAM SHIELDS, and CITIZENS      :
FOR REHOBOTH BEACH, a political :
action subcommittee,                    :
                                        :
            Plaintiffs,         :
                                        :
       v                        :
                                        :
CITY OF REHOBOTH BEACH, and        :
GREGORY FERESE, an individual      :
and as Manager of the City of      :
Rehoboth Beach, Delaware,          :
                                        :
            Defendants.          .      NO.  05-514  (KAJ)

- - -

Wilmington, Delaware
Tuesday, July 26, 2005 at 10:00 a.m.
PRELIMINARY INJUNCTION HEARING

- - -

BEFORE:          HONORABLE KENT A. JORDAN, U.S.D.C.J.

- - -

APPEARANCES:


          WOLF BLOCK SCHORR and SOLIS-COHEN, LLP
          BY:  TODD C. SCHILTZ, ESQ., and
               SHAWN P. TUCKER, ESQ.

               Counsel for Plaintiffs


          OBERLY, JENNINGS & RHODUNDA, P.A.
          BY:  WILLIAM J. RHODUNDA, JR., ESQ.

               and


                         Brian P. Gaffigan
                         Registered Merit Reporter

```
 1    APPEARANCES:  (Continued)

 2

 3         BROWN SHIELS BEAUREGARD & CHASANOV
           BY:    WALTER W. SPEAKMAN, JR.
 4                (Dover, Delaware)

 5              Counsel for Defendants

 6                  - oOo -

 7              P R O C E E D I N G S

 8         (REPORTER'S NOTE:  The following telephone

 9    conference was held in chambers, beginning at 10:00 a.m.)

10              THE COURT:  Good morning.  Please be seated.

11         MR. RHODUNDA:  Good morning, Your Honor.

12              THE COURT:  This is the time we've set for

13    expedited hearing on the motion for preliminary injunction

14    filed by the plaintiffs in this matter.  Mr. Schiltz.

15              MR. SCHILTZ:  Good morning, Your Honor.  Todd

16    Schiltz from Wolf Block Schorr and Solis-Cohen here on

17    behalf of plaintiffs Robert Sokolove, Dave McCarthy, William

18    Shields and Citizens for Rehoboth Beach.  With me at counsel

19    table is Shawn Tucker, my partner, as well as Robert

20    Sokolove, Your Honor.

21              THE COURT:  All right.  Before we start,

22    we'll do the rest of the introductions; all right?  So,

23    Mr. Rhodunda.

24              MR. RHODUNDA:  Good morning, Your Honor.  Yes,

25    I'm here on behalf of the City of Rehoboth Beach;
```

1    Mr. Ferrese, acting as City Manager.  Mr. Walter Speakman is

2    to my immediate right.

3              MR. SPEAKMAN:  I'm a City Solicitor, Your Honor.

4              THE COURT:  All right.  Thank you, Mr. Speakman.

5              Okay.  Go ahead.

6              MR. SCHILTZ:  Your Honor, I think the first

7    order of business is a little housekeeping.  We'd ask the

8    witnesses be sequestered, and some of the defendants'

9    witnesses remain in the courtroom.

10             THE COURT:  Okay.  While we're going to take

11   evidence, do you have a position, Mr. Rhodunda?

12             MR. RHODUNDA:  We don't object to that, Your

13   Honor.

14             THE COURT:  All right.

15             MR. SPEAKMAN:  You have to leave.

16             (Sequestered witnesses leave courtroom.)

17             MR. SCHILTZ:  The second order of housekeeping,

18   Your Honor, is a witness that the plaintiffs intend to

19   present testimony regarding, Melissa Cargnino,

20   C-A-R-G-N-I-N-O.  She is an attorney, Your Honor.  She had a

21   commitment this morning, but my understanding is she is

22   going to make it here as fast as humanly possible.  We

23   expect her hopefully between 11:30 and 12:00.  She has

24   approximately five minutes at most of testimony to give.

25   She had another commitment and on such short notice, she

1    could not break it.

2            THE COURT:  I understand.  You are the folks

3    who asked for an expedited an emergency hearing so we're

4    accommodating you and your client.  And if it's possible for

5    us to take her evidence, I think we want to do that but I'm

6    not going to make everybody stay for -- we'll just see how

7    things go.  If we're done and we wrap the hearing, we wrap

8    the hearing.

9            MR. SCHILTZ:  I understand, Your Honor.

10            First of all, we wanted to thank the Court for

11   scheduling this on such short notice.  We recognize it's an

12   imposition.

13            Your Honor, we're obviously here, would you want

14   a short opening, Your Honor, or would you rather move

15   straight to the evidence?

16            THE COURT:  No, I read your papers so let's go

17   ahead and get to the evidence.

18            MR. SCHILTZ:  Very well, Your Honor.  Plaintiffs

19   call their first witness, Robert Sokolove.

20            THE COURT:  Okay.

21                         -  -  -

22                   PLAINTIFFS' TESTIMONY

23            ... ROBERT D. SOKOLOVE, having been placed

24            under oath at 10:09 a.m. as a witness, was

25              examined and testified as follows ....

Sokolove - direct

1                      - - -

2              THE WITNESS:  Good morning, Your Honor.

3                   DIRECT EXAMINATION

4    BY MR. SCHILTZ:

5    Q.      Mr. Sokolove, where do you reside?

6    A.      4 Norfolk Street, Rehoboth Beach, Delaware.

7    Q.      Does Rehoboth Beach have an upcoming election?

8    A.      Yes, sir.

9    Q.      What the date?

10   A.      August 13th of this year.

11   Q.      Are you running for office in that election?

12   A.      Yes, sir.

13   Q.      For what office?

14   A.      Mayor.

15   Q.      Can you tell me who your opponent is?

16   A.      Sam Cooper.  He is the incumbent.

17   Q.      How long has he been an incumbent?

18   A.      Fifteen years.

19   Q.      Have you taken any steps to advertise your candidacy?

20   A.      Yes, sir, I have.

21   Q.      Can you tell me how?

22   A.      I've done a number of things.  We have a mailer that

23   has gone out to some individuals, but that's kind of hit or

24   miss because it's a beach community so you are not quite

25   sure whether you hit people at home or whether they're at

Sokolove - direct

1    their beach house.

2                    We have done some door-to-door campaigning, but

3    again that I somewhat hit or miss.  And perhaps of

4    significance I guess to this case, we've purchased and

5    placed signs, campaign signs on various parts of the

6    community.

7    Q.    Can you describe those signs?

8    A.    They're yellow background, blue writing.  Mine say

9    Bob Sokolove For Mayor.  They're about two feet by -- about

10   two feet by two feet.  They stand about two and-a-half to

11   three feet off the ground, depending on how deep you get

12   them into the ground.  They're on a little metal post.  I

13   guess that describes them.

14   Q.    Do any of the signs that you purchased have anything

15   other than Robert Sokolove for Mayor?

16   A.    Yes, there are other signs, Your Honor, that have

17   three candidates names on them that say Bob Sokolove For

18   Mayor, David McCarthy and Bill Shields For Commissioner.

19   So, in other words, some of the signs are just mine, some of

20   the signs have all three of our names and there are yet

21   another set of signs that have only Bill Shields' name on

22   them and another set that have only David McCarthy's name on

23   them.

24   Q.    And, sir, when you refer to Mr. McCarthy and

25   Mr. Shields, those are the other individual plaintiffs in

1    this matter?

2    A.      Yes, sir.

3    Q.      And they are running in connection with the August

4    13th election?

5    A.      That is correct.

6    Q.      And the office again that they're running for?

7    A.      They're running for Commissioner.

8    Q.      How many seats are open for City Commissioner?

9    A.      There are two seats open for Commissioner.

10    Q.      Who are their opponents?

11    A.      There is an individual by the name of Ron Patterson

12    and another gentleman by the name of Dennis Barbour.

13    Q.      Are Mayor Cooper, Mr. Barbour and Mr. Patterson

14    affiliated in any manner to the best of your knowledge?

15    A.      I suppose in an informal sense.  However, various

16    entities, there is a group in town called Save Our City.

17    They have taken out, for example, full page advertisements

18    in the local newspapers and they support the three of them

19    as a slate.  Virtually every set of campaign signs -- not

20    every but the vast majority of campaign signs on various

21    properties where you see one of their signs, you see all

22    three.  So you will see a Barbour, a Patterson and a Mayor

23    Cooper sign, three different colors, three different types

24    of signs all located together throughout the city.

25    Q.      Has Mayor Cooper endorsed the two candidates -- I

Sokolove - direct

1    apologize.   Is it Mr. Barbour?

2    A.      Barbour.  B-A-R-B-O-U-R.

3    Q.      And Mr. Patterson.  Has Mayor Cooper endorsed either

4    of those candidates, to the best of your knowledge?

5    A.      I haven't heard much from Mayor Cooper at all but the

6    other two have endorsed the Mayor and basically in all of

7    their written material and verbal material say they're

8    running under the kind of the platform set out by the Mayor.

9    Q.      We're obviously here today about signs in the

10   Rehoboth Beach community.  Who placed -- strike that.  And

11   you've testified that your campaign signs and the campaign

12   signs of Mr. McCarthy and Mr. Shields are placed in the

13   community.  Who placed those signs?

14   A.      Various individuals placed them.  Sometimes it's the

15   homeowner themselves or a shop owner, but the vast majority

16   of the signs in question in this case that have been taken,

17   I personally put in the ground.

18   Q.      When did you place -- and it's a poor question.

19   Strike that again.  When was the first time you placed signs

20   in the ground?

21   A.      Well, the first time signs went in the ground in the

22   city would be approximately three and-a-half weeks ago.

23   That would be the very first time that signs were put in the

24   ground in various locations around the city.  However, the

25   vast majority of them went in approximately July 5th on.

Sokolove - direct

1    Q.      The signs that you generally described as being at

2    issue here today, did those signs go in about that time?

3    A.      Yes, sir.

4    Q.      Can you tell me where those signs were placed?

5    A.      Well, I began -- my wife and I own a restaurant on

6    Lake Avenue in Rehoboth Beach.  Lake Avenue is a fairly --

7    especially in the summer, it's a fairly heavily travelled

8    thoroughfare because it actually gets you out on the main

9    drag, Rehoboth Avenue easier than having to go through

10   Rehoboth Avenue so it kind of bypasses.  Since our

11   restaurant is right there, since we know the ladies that own

12   three properties down the street, we know a whole series of

13   business and commercial and residential property owners up

14   and down Lake Avenue.  So the vast majority of the signs

15   that are at issue today were in and around Lake Avenue and

16   some surrounding public areas at the end of Lake Avenue.

17   Q.      To the best of your ability, could you describe the

18   public areas that you are referring to, Mr. Sokolove?

19   A.      Yes.  The public areas really come in, I suppose,

20   three different categories.  One is what the City is calling

21   their right-of-way or in some instances they're calling it

22   City property.  It's areas along the street that go between

23   the street up to the point of what you might call someone's

24   front walk.  So you have the street, then the curb, then you

25   have the grassy area, then you have the sidewalk, then you

Sokolove - direct

1   have the grass again.

2              Many of the signs at issue that I put up went up

3   to the grassy area, the main part of the front lawn.  Other

4   signs that we're talking about were placed in the -- some, I

5   actually placed right in the front yard of the properties

6   themselves, in the middle of the yard.  Clearly, private

7   property.

8              THE COURT:  Let me stop you.  It's my

9   understanding, you say when signs were removed, they were

10   removing signs from private property?

11              THE WITNESS:  Yes, sir, in addition to public.

12   Yes, sir.

13              THE COURT:  Give me an estimate of how many of

14   the signs were taken.

15              Sorry to take over here --

16              MR. SCHILTZ:  No, Your Honor.

17              THE COURT:  -- but I have question I have to be

18   specific about.

19              How many signs total were taken?  And I

20   understand there were two occasions so give me of the first

21   one.

22              THE WITNESS:  The total number, so far, would

23   approximate about 35 signs.  Some of those signs were taken,

24   removed to the City, the City Offices.  I got them back, put

25   them up again and then they were taken again.  So the large

Sokolove - direct

1  number would be approximately 35.  Of those, I can give you

2  virtually an exact number, Your Honor.

3                One, two, three, four, five, six -- at least six

4  of the signs.  And some, on two occasions, were taken

5  directly off of private property.

6                THE COURT:  All right.

7                THE WITNESS:  Including my own.

8                THE COURT:  Okay.  Tell me, there are six

9  properties.  Describe to me those six properties.

10                THE WITNESS:  There weren't six properties.

11                MR. SCHILTZ:  Your Honor, I apologize for

12  interrupting.  I have an exhibit which may help the Court,

13  parties and the witness with respect to this.

14                THE COURT:  Good.

15                MR. SCHILTZ:  For the record, Plaintiffs'

16  Exhibit 1.  Your Honor, this is information that was

17  compiled from the Answers to Interrogatories that we

18  provided to the defendants yesterday.

19                THE COURT:  All right.

20                MR. SCHILTZ:  May I approach, Your Honor?

21                THE COURT:  You may freely approach.

22                (Documents passed forward.)

23                MR. SCHILTZ:  And for the record, Plaintiffs'

24  Exhibit 1 relates to what I'll call the first instance of

25  removal, Your Honor.

Sokolove - direct

1          THE COURT:  Okay.  This is Plaintiffs' 1 for

2     identification; right?

3          MR. SCHILTZ:  Obviously, Your Honor.  Correct.

4     BY MR. RHODUNDA:

5     Q.     Mr. Sokolove, can you identify what Plaintiffs'

6     Exhibit 1 is?

7     A.     Yes, it's a list of the campaign signs, most of which

8     had just my name on them, some of which also included the

9     other two candidates, Mr. Shields and Mr. McCarthy.  This is

10    a list of the signs that were taken some time prior to 11:00

11    a.m. on Saturday, July 9th, 2005.

12         MR. SCHILTZ:  Your Honor, Plaintiffs' Exhibit 2

13    for identification.

14         (Documents passed forward.)

15    BY MR. SCHILTZ:

16    Q.     Mr. Sokolove, can you identify the information on

17    Plaintiffs' Exhibit 2?

18    A.     Yes, sir.  These are -- this is a list of the

19    campaign signs that were taken between 6:00 p.m. and 11:30

20    p.m. on that same Saturday, July 9th.

21    Q.     Okay.  Mr. Sokolove, I want to back up a little bit

22    before we get into more detail about the removal of those

23    signs and their placement?

24         Prior to the placement of your campaign signs,

25    the campaign signs identified on Plaintiffs' Exhibit 1 and

Sokolove - direct

1    Plaintiffs' Exhibit 2, did you or any of your

2    representatives have any communications with the City of

3    Rehoboth regarding placement of signs?

4    A.      Yes.

5    Q.      Can you describe that, please?

6    A.      Well, we were concerned that in a very, very short

7    election period; and again particularly because it's hit

8    and miss trying to reach voters in a beach community like

9    Rehoboth Beach, you can reach a lot of people but not

10   necessarily voters.  So we were very concerned that there

11   would be any location whatsoever that the City would deem

12   inappropriate as a location for placement of signs.  So we

13   hired an attorney, who was also assisting also on other

14   campaign matters, such as working with, you know, the

15   financial side, making sure the filings are correct for the

16   campaign, donations that came in.  We asked this attorney to

17   please contact the City Manager's Office to determine where,

18   if anywhere, the City believed or deemed it inappropriate to

19   place campaign signs.

20   Q.      And what response did you receive?

21   A.      The response was that there was only one place in the

22   City that the City would prefer, not mandated but that we

23   not place campaign signs and that was right down the middle

24   of Rehoboth Avenue.  And there was even a rationale given

25   for that, and that is because under the new streetscape

Sokolove - direct

1    program that went in, there are a series of new plantings

2    down the middle, down the median strip, and we were told

3    that the City would prefer that we not put our signs there

4    because it could impact the new landscaping that was there.

5            Other than that, we were absolutely given no

6    restriction anywhere else in the City.  None.

7    Q.    Do you know if Mr. Murphy made any -- excuse me --

8    Mr. Ferrese made any representations regarding whether the

9    City would remove the signs?

10   A.    At that time, no.  There was no representation

11   whatsoever.

12           THE COURT:  Well, who made the representation?

13   You said the City came back and said.  Do you know who?

14           THE WITNESS:  Mr. Ferrese had a discussion with

15   our attorney, Melissa.  I cannot pronounce her last name.

16   BY MR. SCHILTZ:

17   Q.    Cargnino?

18   A.    That would be the attorney, yes.

19           THE COURT:  All right.

20   BY MR. SCHILTZ:

21   Q.    Mr. Sokolove, you mentioned that you own a restaurant

22   with your wife on Lake Avenue; is that correct?

23   A.    Yes, sir.

24   Q.    When did you purchase that restaurant?

25   A.    In October.  The actual purchase took place in

15

Sokolove - direct

1    October of 2004.

2    Q.      Have you renovated the restaurant?

3    A.      Yes.

4    Q.      Did you talk to the City priority renovating your

5    restaurant?

6    A.      Absolutely.

7    Q.      What did you talk to them about?

8    A.      Well, there were a lot of questions.  It was an

9    existing building and Lake Avenue is a very, it's a very

10   complex street from a land-use standpoint.  You have both

11   business and residences on a street.  You have some areas

12   where there are sidewalks.  You have some areas where there

13   is no sidewalks.  You have utility poles that are on both

14   sides of the street across.  It was very unclear to us as we

15   were getting ready to renovate what land we even owned.

16           But, more importantly, Your Honor, there has

17   been for some time a proposed Lake Avenue redevelopment

18   plan, a plan to fix the street up.  And I was told that it

19   would involve new street, new curbs, new gutters perhaps and

20   one of my concerns, having nothing to do with this election

21   because I had no anticipation for running for anything at

22   this time, was if we did some work to the front of the

23   building, would it be impacted by any renovations on the

24   street?

25           In that context, I had at least one and I'm not

Sokolove - direct

1    certain, there may have been a second discussion with David

2    Murphy who is the Chief Building Inspector for the City.

3    And my primary concern in discussing the street with Mr.

4    Murphy was, what land do I own?  Where can we come out to?

5    Where do we come out to?  What could we expand out to the

6    front?  What couldn't we expand?

7              And one comment that struck me then in the

8    context of the restaurant was Mr. Murphy said, to use his

9    words, he said, quote, it's a really screwed up street.  And

10   I'd said, what do you mean?  He said, well, you've got

11   certain areas on the street where it would appear that the

12   properties come out into the street.  You have other areas

13   where perhaps even a parking meter may be up on private

14   property.  As he put it to me, it's very unclear.  It's very

15   difficult to tell on the street where the property lines

16   are.

17             And that was in the context not of my campaign,

18   which hadn't crossed my mind, it was in the context of the

19   street itself.

20             THE COURT:  All right.  I want to interrupt

21   again, Mr. Schiltz.

22             Is there more foundation you think you need for

23   those two documents?

24             MR. SCHILTZ:  No, Your Honor.  I'd like to move

25   them into evidence.

Sokolove - direct

1          MR. SPEAKMAN:  No objection, Your Honor.

2          THE COURT:  All right.  They're admitted without

3   objection.

4   *    *    *  (Plaintiffs' Exhibit Nos. 1 and 2 were received

5   into evidence.)

6          THE COURT:  I want to ask a couple things about

7   them.

8          MR. SCHILTZ:  I was getting there ultimately,

9   Your Honor, but you are welcome to proceed at your --

10          THE COURT:  All right.  First, what is the 59

11   Lake Avenue?  What is that address?

12          THE WITNESS:  The restaurant is called 59 Lake,

13   and it's located on 59 Lake Avenue.

14          THE COURT:  So that is your restaurant; right?

15          THE WITNESS:  Yes, sir.

16          THE COURT:  I'm not sure I understand your

17   testimony.  What is your testimony with respect to small

18   roman numeral one and small roman numeral two in the list

19   of properties on Plaintiffs' Exhibit 1 and Plaintiffs'

20   Exhibit 2?  Are you saying that these signs were on your

21   property or not on your property?

22          THE WITNESS:  If you go to the roman numeral

23   one, where it says the four signs removed, they were

24   clearly, in roman numeral one, those are on my property.

25          THE COURT:  All right.

18

Sokolove - direct

1    THE WITNESS:  And as to roman numeral two, I

2    believe that they're on my property.  The City, I think,

3    believes that they were in the public right-of-way so it's,

4    it's unclear.  It's even unclear who owns the property.  I

5    think they're on mine but perhaps I'm wrong.

6    THE COURT:  All right.  Any other of the

7    properties listed on here where you feel confident that

8    signs were on private property?

9    THE WITNESS:  Yes, sir.  Excuse me.  Let me make

10    sure I'm correct here.  Actually, on this list, the answer

11    would be no.

12    THE COURT:  Okay.

13    BY MR. SCHILTZ:

14    Q.    Well, just for clarity on the record, when you say

15    this list, which list are you referring to?  Which exhibit

16    number?

17    A.    Well, either exhibit.

18    THE WITNESS:  I'm sorry.  I'm wrong.  I'm

19    wrong, Your Honor.  If you go to Exhibit 1, here it is.  If

20    you go to Exhibit 1, roman numeral 4, 1-B, where it says two

21    signs removed, one from the property owner's front lawn, and

22    roman numeral five as well -- three, four and five.  Those

23    are where they were taken directly from the front lawn.

24    They were put smack in the middle of the yard between the

25    sidewalk and the building.

Sokolove - direct

1          Now, that was the earlier removal.  I kind of

2     ran out of signs later that day.  They didn't go back there

3     later that day.

4          THE COURT:  So you got your signs back from the

5     City but you decided not to put them back in the same

6     location?

7          THE WITNESS:  Well, what had happened is in the

8     interim, the owners themselves had obtained, I'm not sure

9     from where, but had obtained three more of my signs and they

10    already had put them up in their front yards again but

11    closer back up against their own buildings.  So by placing

12    them back in the middle of the yard, that would have been

13    three signs per yard and I thought that was a bit much.  A

14    little bit of an overkill.

15          THE COURT:  All right.  Thanks.

16          Mr. Schiltz.

17    BY MR. SCHILTZ:

18    Q.    I want to focus your attention back on your

19    conversation with Mr. Murphy when you were dealing with your

20    renovations briefly.  As I understand your testimony, he

21    told you that the property lines on Lake Avenue were not

22    consistent; is that correct?

23    A.    I don't know if he used that word but that was the

24    meaning.  What he was saying is it was difficult to

25    determine where the property lines were at times because

Sokolove - direct

1   sometimes a sidewalk would begin, then it wouldn't be there,

2   then it would pick up on the next property but not on a

3   parallel line.

4   Q.    Did you have a sense of what documentation, if any,

5   Mr. Murphy was relying upon to reach that, make those

6   statements?

7   A.    My conclusion was that he was relying on various

8   pieces of documentation, property survey lines and perhaps

9   information that the City culled from its own records.

10          MR. SCHILTZ:  I don't want to belabor the point,

11  Your Honor.  If Your Honor has a clear understanding of

12  which signs we're contending were removed from private

13  property and which were from public right-of-way, I won't go

14  back through these Exhibits 1 and 2.

15          THE COURT:  Well, I think I understand the

16  witness's testimony.  If you think there is something more

17  you need to elicit, that's fine.

18          MR. SCHILTZ:  Your Honor, at this time I'd like

19  to mark Plaintiffs' Exhibit 3.

20          (Documents passed forward.)

21  BY MR. SCHILTZ:

22  Q.    Mr. Sokolove, can you identify Plaintiffs' Exhibit 3?

23  A.    Yes.  It is an article in the Cape Gazette which is

24  the primary for pay.  There is two newspapers, Your Honor,

25  that are local newspapers.  The Coast Press and the Cape

Sokolove - direct

1    Gazette.  The Cape Gazette is the local publication which,

2    while you don't subscribe, you pay to receive and it's an

3    article that is in that newspaper on or about 7/12 of this

4    year.

5    Q.    Mr. Sokolove, can you turn to the second page of that

6    exhibit?

7    A.    Yes, sir.

8    Q.    The very bottom of the second page, there is a

9    reference to an individual named Inez Conover.  I-N-E-Z

10   C-O-N-O-V-E-R?

11   A.    Yes.

12   Q.    Do you see that reference?

13   A.    I do.

14   Q.    Who is Inez Conover?

15   A.    She and her partner, Kathleen Bailey, own three older

16   Victorian-type houses just down the street on Lake Avenue

17   from my restaurant.  They are the owners of three bed and

18   breakfasts located within those properties and each one has

19   a cute little; namely, Seawitch, Bewitched and Bedazzled.

20   Q.    Are those the bed and breakfasts that are referenced

21   at Roman three, four and five on Plaintiffs' Exhibit 1 and

22   Plaintiffs' Exhibit 2?

23   A.    Yes, sir.

24   Q.    And you see there that she is quoted as saying --

25             THE COURT:  Well --

Sokolove - direct

1              MR. SCHILTZ:  Your Honor --

2              MR. RHODUNDA:  The article speaks for itself.

3              MR. SCHILTZ:  Your Honor, I move it to be

4    admitted.

5              THE COURT:  Go ahead.  Yes?

6              MR. SCHILTZ:  I move for its admission.

7              THE COURT:  Okay.  And do you have a position on

8    whether this article should or could be admitted or not,

9    Mr. Rhodunda?  Do you have an objection?

10             MR. RHODUNDA:  I'm sorry, Your Honor.

11             THE COURT:  He has moved the article as

12   Plaintiffs' 3.  Do you have an objection?

13             MR. RHODUNDA:  We don't, Your Honor.  No.

14             THE COURT:  No objection.  It's admitted without

15   objection.

16   *    *    *  (Plaintiffs' Exhibit No. 3 was received into

17   evidence.)

18             MR. SCHILTZ:  Thank you, Your Honor.

19   BY MR. RHODUNDA:

20   Q.    Let's get to the heart of the case, Mr. Sokolove.

21   Were there other candidates signs close to any of the signs

22   that are identified or -- strike that.

23             Tell me the proximity of any candidates signs to

24   any of the signs that were removed in Plaintiffs' Exhibit 1

25   and Plaintiffs' Exhibit 2.

Sokolove - direct

1    A.    Well, there are, Your Honor, throughout the city but

2    specifically in an around Lake Avenue, there are the kind of

3    incumbent slate that -- well, not the incumbent.   The Mayor

4    and Mr. Patterson and Mr. Barbour's three signs as a group

5    located in various places throughout the city that are in

6    generically exactly the same kind of locations as where my

7    signs were taken.   So, in other words, where my signs may

8    have been, you know, near the street where it meets grass,

9    because there is no sidewalk, I had signs taken right off of

10   Lake Avenue in those circumstances.

11          Even today, this morning, I rode by at least,

12   just on my way out to my house, two sets of their signs that

13   are in exactly the same type of location.

14          There are signs that are in an area outside of

15   the -- it's a hair salon establishment on at least three

16   occasions but two that I know of for certain.   The City took

17   my signs right out of the landscaping of that establishment.

18   It's clearly their land.   They care for it.   They have a

19   little rock wall that they built and all these plantings.

20   They even have a little fountain.   One of my signs was in

21   there, it was taken.

22          Yet as I rode by this morning, I found a

23   Mr. Patterson, a Mr. Barbour and a Mayor Cooper sign sitting

24   in landscaping in exactly the same kind of proximity to

25   where my signs were, only theirs remain.   Up and down --

24

Sokolove - direct

1           THE COURT:  In different properties, you are

2   saying?

3           THE WITNESS:  In different properties, exactly

4   the same kind of situation.  So, in other words, wherever my

5   signs were taken, for whatever theory, whether it's public

6   property, private property, right-of-way, in landscaping,

7   on the grass, mine were summarily and regularly taken, the

8   theory being -- well, whatever the theory was.  Whereas even

9   as we sit here today, those same exact locations are being

10  used by the Mayor in other signs.

11          THE COURT:  Are you saying the same exact

12  location?  Because you shifted.

13          THE WITNESS:  I'm sorry.  The same type.  I

14  misspoke.  The same type of location.  However, there are

15  even instances right on Lake Avenue where, in the same area

16  adjacent to the street, their signs are there right now,

17  mine were taken from there right on Lake Avenue.

18          THE COURT:  All right.

19  BY MR. SCHILTZ:

20  Q.     Can you tell the Court where that was?

21  A.     That is right at the end of Lake Avenue, right before

22  it reaches Rehoboth Avenue.  There is -- I'm sorry.  There

23  is a --

24          THE COURT:  Let me ask you this.  Let me

25  interrupt you and say take a look at Plaintiffs' 1 and

Sokolove - direct

1    Plaintiffs' 2.

2            THE WITNESS:  Yes, sir.

3            THE COURT:  And tell me what, whether you can

4    tell me in relation to any of these listed locations,

5    whether they're signs for Mayor Cooper or the two candidates

6    for City Commissioner?

7            THE WITNESS:  No.  On these locations, Your

8    Honor, there were not primarily because, for the most part,

9    these are private properties and the owners, maybe one

10   of them, by the way, would not prefer to have the other

11   candidate signs.  So, in other words, these, Plaintiffs'

12   Exhibit No. 1 and 2 are not good examples of situations

13   where the signs are in exactly same location.

14           THE COURT:  All right.  Then go ahead and

15   describe for me where it is that your signs were moved then,

16   Mayor Cooper's or the City Commissioner signs, candidates

17   for City Commissioner campaign signs are now on display.

18           THE WITNESS:  Well, for example, right at the

19   end of Lake Avenue, right where it meets close to Rehoboth

20   Avenue, their signs are sitting right out near the street.

21   The same exact scenario where my signs were a little further

22   down Lake Avenue right outside my restaurant, exactly the

23   same scenario.  There are situations throughout the city

24   where you will see their signs sitting in a landscaping

25   area.

Sokolove - direct

1          THE COURT:  What do you mean?  You need to be

2     very precise with me.

3          THE WITNESS:  Yes, sir.  One example, I believe

4     it's on Stockley Street, there are signs that have all three

5     candidates that are literally just inside.  You go from the

6     street to the grassy area to the sidewalk.  Then you go to

7     the grass in the yard.  And there will be, for example, a

8     landscape timber, and right there abutting the landscape

9     timber will be a sign of the Mayor, Mr. Patterson and

10    Mr. Barbour.  Conversely -- and they stay there.  They're

11    still there now.

12          Conversely, on that same street, I had a sign

13    literally across the street in the same type of location,

14    you go from the street to the curb to the sidewalk -- I'm

15    sorry -- the grassy area to the sidewalk, to the other

16    grassy area, and inside the landscaping, I had my sign.

17    That was removed.  I am told it was removed because it's in

18    the right-of-way.

19          I do not understand the decision.  There is no

20    distinction.

21          THE COURT:  All right.

22    BY MR. SCHILTZ:

23    Q.    Focusing on the first time your signs were removed by

24    the City of Rehoboth, can you tell me how it was you learned

25    that the signs were removed?

Sokolove - direct

1    A.    The first time, the restaurant owner who actually

2    parks his car behind the municipal center, he apparently has

3    I guess a leased spot behind the municipal center, happened

4    to be walking to his car on Saturday morning.  And as he

5    walked by the City Services Building that includes some

6    pickup trucks for the Code Enforcement Officers area, he

7    looked in the back of the truck and he just happened to

8    notice a large pile of my signs sitting in the back of the

9    City truck.  He, this individual, then called Mr. Hill who

10   is somebody who has been working with us.

11          MR. RHODUNDA:  Excuse me, Your Honor, just for a

12   moment.  If the witness could maybe speak closer to the

13   microphone?

14          THE WITNESS:  I'm sorry.  I didn't want to talk

15   too loud into it.

16   A.    He then called Mr. Hill, who he knew was working with

17   the campaign.  Mr. Hill, in turn, went out to the site and

18   observed the signs, called me and called the Rehoboth Beach

19   Police.

20   BY MR. SCHILTZ:

21   Q.    Can you give me Mr. Hill's full name?

22   A.    Joseph Hill.

23          MR. SCHILTZ:  Your Honor, I'd like to approach

24   with Plaintiffs' Exhibit 4.  I do not have copies of these.

25   They are photographs and given the nature of this

Sokolove - direct

1    proceeding, we weren't able to get duplicates in such short

2    notice, Your Honor.  I will --

3              THE COURT:  Show them to oppose counsel first.

4              MR. SCHILTZ:  -- show them to opposing counsel.

5              (Counsel reviews photographs.)

6              THE WITNESS:  Your Honor, may I get some water?

7              THE COURT:  Sure.

8              THE WITNESS:  Thank you.

9              MR. RHODUNDA:  Your Honor, we have no objection

10   to the admission of the photographs.

11             THE COURT:  All right.  What do you have them

12   marked as?

13             MR. SCHILTZ:  Plaintiffs' Exhibit 4, Your Honor.

14             THE COURT:  Collectively?

15             MR. SCHILTZ:  They are Plaintiffs' Exhibit 4,

16   yes.

17             THE COURT:  You do need to -- why don't you do

18   me a favor and admit them separately as 4 A-B-C, separately.

19   You might mark them on the back, okay?

20             MR. SCHILTZ:  Yes, Your Honor.

21             THE COURT:  Thanks.

22             MR. SCHILTZ:  For the record, they're 4-A

23   through 4-E.

24             THE COURT:  Thank you.

25             THE WITNESS:  Your Honor, do you want these

29

Sokolove - direct

1   exhibits or should I leave them here?

2          THE COURT:  Just hold on to them, if you would,

3   sir.

4          MR. RHODUNDA:  Your Honor, if it will help, we

5   will stipulate that we took down signs.

6          THE COURT:  I don't know that that will help but

7   I'm glad to have that on the record.  As of right now, I'm

8   trying to figure out exactly where these signs were.

9          MR. RHODUNDA:  Exactly.  The pictures speak for

10  themselves.  They're in the back of the truck.  We stipulate

11  we took signs down.

12         THE COURT:  All right.

13  BY MR. SCHILTZ:

14  Q.    Can you describe those pictures, sir, what they

15  represent?

16  A.    Yes, Your Honor.  These were pictures that were

17  taken during the late morning of July 9th.  They are each

18  photographs of my signs and signs of Mr. McCarthy and Mr.

19  Shields in the back of the Rehoboth Beach Building

20  Inspector's truck.  The signs that are in the back are the

21  signs that indeed were taken off of my property, the

22  properties of the three bed and breakfasts that I described

23  earlier.  They're basically the signs or some of the signs

24  that were taken up and down Lake Avenue on the morning of

25  July 9th.

30

Sokolove - direct

1          THE COURT:  All right.

2   BY MR. SCHILTZ:

3   Q.      Did you retrieve those signs from the City, sir?

4   A.      Yes, I did.

5   Q.      Were there any other signs in the back of the vehicle

6   when you retrieved your signs?

7   A.      On this particular day, there were a couple.  In

8   fact, I think one of the photographs, you can see it

9   slightly.  There were a couple of old -- there was an old

10  realtor sign that was rusted in the back of the truck that

11  I was told by a City person that has been there for awhile.

12  Q.      Were there any other political candidates signs mixed

13  in with yours, sir?

14  A.      No, sir.

15  Q.      You mentioned that the police were called in

16  connection with the incident; is that right?

17  A.      Yes, sir.

18  Q.      Did the police prepare a report that you received?

19  A.      Yes, they did.

20          MR. SCHILTZ:  Marking Plaintiffs' Exhibit 5 for

21  identification.

22          (Documents passed forward.)

23          MR. RHODUNDA:  I intend to object to this

24  document unless the plaintiffs would like to call testimony

25  on all these issues rather than testimony be heard and not

Sokolove - direct

1    just an official police report be admitted.

2                THE COURT:  So I understand you to be making a

3    hearsay objection.

4                MR. RHODUNDA:  Yes.

5                THE COURT:  All right.  We have a hearsay

6    objection.

7                MR. SCHILTZ:  Your Honor, it's in my opinion

8    it's a statement of a party opponent and it's admissible.

9                THE COURT:  Well --

10               MR. SCHILTZ:  It's made --

11               THE COURT:  This statement may be of a party

12   opponent but whose statement is on here?  In other words, if

13   I understand Mr. Rhodunda's objection, it wasn't to the fact

14   that this police officer, whose name I guess is Patrolman

15   Cleveland, could say what the witness said.  It's that

16   Patrolman Cleveland isn't here to say it.  Have I got you

17   right?  Did I understand your objection?

18               MR. SPEAKMAN:  Yes, Your Honor.

19               MR. SCHILTZ:  But, Your Honor, I believe it's

20   statement of a party opponent and therefore it's admissible

21   on that basis.

22               THE COURT:  Okay.  I'm not getting people to

23   meet head on.

24               MR. SCHILTZ:  No, I --

25               THE COURT:  The assertion is not that Patrolman

Sokolove - direct

1    Cleveland, were he on the stand, couldn't say what he heard

2    directly, it's that Patrolman Cleveland isn't on the stand.

3    So you've got two layers of hearsay.

4                 MR. SCHILTZ:  I understand.  What you are

5    suggesting, it's not admissible to prove the truth that

6    Mr. Ferrese said what he said.  However --

7                 THE COURT:  I'm not suggesting it.  That's what

8    your opponent is saying.

9                 MR. SCHILTZ:  Well, I'm not -- Your Honor, first

10   of all, I believe it can be admitted to show the state of

11   mind of Officer Cleveland who obviously is the individual

12   and who took the report.  And it also frankly can be

13   admitted to show the state of mind of my client, Your Honor,

14   and what his understanding is of whether or not it was

15   appropriate to remove these signs.

16                 THE COURT:  Why is the state of mind of the

17   patrolman or of your client relevant?

18                 MR. SCHILTZ:  Well, Your Honor, they're being

19   offered not for the truth of the matter asserted but for the

20   state of mind of my client which is an exception to the

21   hearsay rule.

22                 THE COURT:  I'm not disagreeing.  I'll asking

23   you --

24                 MR. SCHILTZ:  So now you're asking why --

25                 THE COURT:  I'm asking why it's relevant.  In

33

1   other words, what is relevant about this except for the

2   truth of the matter?  If you can tell me that, that would

3   help.

4             MR. SCHILTZ:  It's relative to -- one moment,

5   Your Honor.  I apologize.

6             THE COURT:  Sure.

7             (Counsel confer.)

8             MR. SCHILTZ:  Your Honor, I do note that the

9   defendants have a police report that they are going to try

10  to introduce, I assume, and --

11            THE COURT:  I don't know.

12            MR. SCHILTZ:  I will withdraw.

13            THE COURT:  I guess we'll deal with that when we

14  deal with that.

15            MR. SCHILTZ:  Your Honor, I think the entire

16  document, first of all, is relevant to show what transpired

17  that morning, clearly.  And that is clearly relevant to

18  these proceedings.  It's not being offered for the truth of

19  the matter asserted, but --

20            THE COURT:  All right.  You know what?  I'm

21  sustaining the objection because when you state the document

22  is relevant to what had transpired that morning, what you

23  are telling me is the truth of the matter asserted is what

24  is significant.  So without Patrolman Cleveland here, you

25  have one layer of hearsay you are not getting through and

Sokolove - direct

1    you are not giving me an exception to the hearsay rule that

2    would get you through it, so I'm sustaining it.  Of course,

3    that doesn't prevent you, sir, from using this document in

4    cross-examining Mr. Ferrese, if you choose to do that.

5    So it's not that this document doesn't have any utility

6    but I will sustain the objection to it being admitted

7    as a substantive piece of evidence based on the hearsay

8    objection.

9              Okay.  Please proceed.

10   BY MR. SCHILTZ:

11   Q.    Mr. Sokolove, in the days after your signs were

12   removed, did you have discussions with City representatives

13   regarding their removal?

14   A.    Yes, I did.

15   Q.    And who did you speak with?

16   A.    Well, the day of the removal, I actually spoke to the

17   individual who acknowledged that he removed the signs.  That

18   would be Mr. Walter Onizuk who is the City's Code

19   Enforcement Officer.  And subsequent to that, I spoke to Mr.

20   Murphy who is the Chief Building Inspector for the City.  I

21   spoke to Detective O' Bier, O-'-B-I-E-R.  I spoke to

22   Patrolman Cleveland.  I believe her first name is Sally

23   Cleveland.  I spoke to -- I guess that's who I spoke to

24   within the City.

25   Q.    Did you ever speak to the Chief of Police?

Sokolove - direct

```
 1   A.      Yes.  I'm sorry.  And the Chief of Police.

 2   Q.      And what is his name?

 3   A.      His name is Keith Banks.

 4   Q.      Can you tell me circumstances under which you spoke

 5   to Mr. Onizuk?

 6   A.      Well --

 7           THE COURT:  I'm sorry to interrupt.  You know

 8   what?  I want to go back to this document and I want to take

 9   a break long enough for us to look at the public records

10   exception to Rule 803.  Usually police reports come up in

11   the context of criminal cases but sometimes in a personal

12   injury case.  Let me read you the exception.  It says:

13           Records, reports, statements or data compilation

14   in any form of public offices or agencies setting forth the

15   activities of the office or agency or matters observed

16   pursuant to duty imposed by law as to which matters there

17   was a duty to report, excluding, however, in criminal cases

18   matters observed by police officers and other law

19   enforcement personnel.

20           MR. SCHILTZ:  Your Honor, I ask that it be

21   admitted pursuant to that exception to the hearsay rule and

22   thank you for the citation.

23           THE COURT:  Do you have a position on that,

24   Mr. Rhodunda?

25           MR. RHODUNDA:  Your Honor, we're not going to
```

1  object.  We'll put in our police report.  The whole police

2  report can come in.  That's not a problem.  Actually, just

3  from a perspective of where we're going today, we certainly

4  look forward to speaking with the witness.  And I just don't

5  know, has the Court allotted the entire day or more for this

6  hearing?  Because the more they go into all this extraneous

7  stuff we think the longer we'll be here.  That's fine, but I

8  don't know what the Court allotted to this since we were

9  weren't really advised of that.

10       THE COURT:  Well, yes, I haven't allotted a

11  whole day, I can't give you the whole day but I have got and

12  will plan to give you until at least 1:00 o'clock to try to

13  get a full record here.  And I'm hoping three hours is

14  enough to get the record here.

15       MR. SCHILTZ:  I understand.

16       THE COURT:  If we need to deal with time

17  constraints -- here is the short of it.  I'm not going to

18  make a decision without you having an opportunity to put

19  the evidence on you think is important for your client,

20  Mr. Rhodunda.

21       MR. RHODUNDA:  And they have attached a bunch of

22  affidavits that state these things.  If they would like to

23  repeat all that stuff, that's fine, but they have affidavits

24  from their client on a variety of issues and from Mr. Hill

25  on issues.  Mr. Ferrese was not -- is going to testify.

Sokolove - direct

1   They could call him, we could call him.  But we do have a

2   substantial amount of evidence we want to put in to counter

3   certainly everything you heard.

4                  THE COURT:  Then I hear objection is withdrawn.

5                  MR. RHODUNDA:  Withdrawn, Your Honor.

6                  THE COURT:  Okay.  Exhibit 5 is admitted.

7   *    *    *  (Plaintiffs' Exhibit No. 5 was received into

8   evidence.)

9   BY MR. SCHILTZ:

10  Q.    Can you again, sir, describe your circumstances under

11  which you ran into Mr. Onizuk?

12  A.    Well, Your Honor, after the morning incident when I

13  was informed that my signs had been taken, they were down at

14  the City Offices, I was able to get them back.  I was out

15  trying to campaign that day, got interrupted by that, came

16  back, got my signs back.  And then late in the afternoon,

17  right before 6:00 o'clock, given that it was a Saturday, a

18  lot of people in town, I personally went and put those signs

19  and a few more that I had right back out again, right back

20  on Lake Avenue, right on my own property, right on the

21  property of the three bed and breakfasts in very much the

22  same areas that they had been before, because, frankly, I

23  viewed, and I, in talking with the officer, I viewed what

24  had been done as improper, perhaps even illegal, taking them

25  off of my property, so I saw no reason not to.  I didn't

Sokolove - direct

1    hesitate to put them right back where they were.  I thought

2    at best it must be a mistake, at worst it's malicious.  So I

3    just went, put the signs back at about between 5:30 and just

4    before 6:00 o'clock.

5         Then my valet parking guys, at about 10:30,

6    quarter to 11:00 at night, came into my restaurant and said,

7    as they said, there is a guy out in front from the City in a

8    City truck.  He parked right in front of the restaurant and

9    he was going up and down Lake Avenue taking the signs down

10   again, all over again, same signs and a few more.

11        So when I was able to get out of the restaurant,

12   at about 11:30 or so, I had a client in, a gentleman I'm

13   working with out of Memphis.  He and I walked on over to the

14   City Offices, Building Inspector's Office, really I thought,

15   I went there just to go pick up my signs again, pull them

16   out of the truck.  And I noticed up in what we call or what

17   I call the trailer, which is where they're working out of,

18   one of these modular units, there is a light on.

19        So I knocked on the window and a Mr. Onizuk, who

20   is the Code Enforcement Officer, was there.  So I motioned

21   for him to come on out and he did.  And it seemed evident to

22   me that there he is, at near midnight now, near his truck

23   and the truck is filled again, even more so than the first

24   time with signs.

25        So I asked Mr. Onizuk, who I know -- I didn't

Sokolove - direct

1    ask him "did you," I said why did you take all of my signs

2    again?  And he said, because I was told to do it.  And I

3    said, Walter, why are you doing it?  Why are you doing it?

4    And he said, well, because I was instructed to.  And I said,

5    well, they're political signs and I see no basis whatsoever

6    for taking my signs.  And he said, well, I think there is.

7    So we went into his office and I said, could you just show

8    me on what basis?  Why are you taking the signs, please?

9            He then opened up, Your Honor, the code book

10   and he pointed to the section that is designated as to

11   signs and it's a very, very detailed section.  It starts

12   with definitions.  And it starts with A.  And the first

13   sign, my recollection, is advertising.  And it defines what

14   an advertising sign is, and then a banner sign, and then a

15   commercial sign, and it goes right through the alphabet.

16   And interestingly what is missing in this whole laundry list

17   of signs, is political signs.

18           And I said to Mr. Onizuk, I said, you know, am I

19   missing something here?  Is there a reason where there is a

20   laundry list of signs regulated and defined by the City but

21   not political signs?  And his response to me was, well, I

22   guess you are right.  I said, why are you taking them then?

23   This is just wrong.  This is the second time you have done

24   it now today.  Why are you taking them?  And he said, well,

25   I was instructed to do it by Mr. Murphy, who is his boss.

Sokolove - direct

1    And I said, why would Mr. Murphy instruct you to do it?  And

2    he said, because Mr. Ferrese told him that that is what

3    needs to be done.

4           So I said to Mr. Onizuk, I said, Walt, it's

5    wrong.  You know, it's my opinion that these are, you know,

6    they should be protected by the First Amendment.  You are

7    taking them off of public land, you are taking them off of

8    private land, you took them right out of my flower pot and

9    this just has to stop.  And he made a comment to me about,

10   well, you know, I guess when you get elected Mayor you are

11   going to fire me.  And I said, Walter, come on, that is not

12   what this is about.  What this is about is you guys have got

13   to stop taking my signs all over the City.  And that is how

14   that discussion went that night.

15   Q.    Okay.  You've mentioned a couple times right to free

16   speech.  Do you have any legal training?

17   A.    Yes, sir, I do.

18   Q.    What is that?

19   A.    I'm a lawyer by training.

20   Q.    I'd like to hand the witness what is Plaintiffs'

21   Exhibit 6.  Would you identify that for the record, sir?

22   A.    Yes, sir.  This is Article Seven, Section 270-56

23   which is what is known throughout the City as the signs

24   regulation.  And I would, I would point out, for example,

25   when it was time for me to open my restaurant, I sat down

1   with the City and when it came time to discuss what kind of

2   sign we could place or not place at our restaurant, this was

3   the section.

4           MR. RHODUNDA:   I have objection to this exhibit,

5   Your Honor.   This is the zoning code that applies to private

6   property, not public property.   The ordinance that was being

7   enforced here was regarding public property, so this is

8   really irrelevant.   Our position is we took no signs from

9   private property.   All the signs we took were from public

10  right-of-ways and public property.   This is the zoning

11  ordinance, does not apply to those areas.   To the extent

12  they looked at them that night, it's irrelevant to why

13  they're here today.

14          THE COURT:   I'll tell you what, I'm going to

15  admit it just because it will be easier for me to have it.

16  The point is it's a legal document.   It's an ordinance.   It

17  doesn't actually need to be -- make a cite to it and I could

18  have to figure out how to find it.

19          MR. SCHILTZ:   I thought it was easier to hand it

20  to your Honor.

21          THE COURT:   So just as a matter of convenience,

22  it's not substantive evidence, it's the local code.   If it

23  doesn't apply, it doesn't apply and you will have your

24  chance.

25          MR. RHODUNDA:   I was hoping to avoid a lot of

Sokolove - direct

1    dialogue on the zoning code plus private property.  If I

2    can't, that's fine.

3                  THE COURT:  Plaintiffs' 6 is admitted.

4    *    *    *  (Plaintiffs' Exhibit No. 6 was received into

5    evidence.)

6                  MR. SCHILTZ:  I am trying to --

7                  THE COURT:  We're now at 11:00 o'clock.

8                  MR. SCHILTZ:  Your Honor, I am speeding things

9    along.

10   BY MR. SCHILTZ:

11   Q.    You have mentioned conversations with Mr. Onizuk, Mr.

12   Murphy, Mr. O'Bier, Officer Cleveland and Officer Banks

13   subsequent to the removal of your signs.  During any of

14   those conversations, did any of those individuals point you

15   to any City ordinance which they believed allowed them to

16   remove your signs?

17   A.    Ultimately, when I met with Sgt -- I'm sorry --

18   Detective O'Bier, I met with him because he actually called

19   me into his office.  He said he is investigating the signs

20   being taken.  That was my job, to determine whether, amongst

21   other things, whether any criminal offense had taken place.

22   When I went into his office, he actually pointed to two

23   different things.  He pointed to what appeared to be an

24   overall sign ordinance or, I'm sorry, an overall sign ban

25   that made reference to something involving public property.

Sokolove - direct

1    He said to me that he was told by Mr. Ferrese that this is

2    what controls here.  He then handed me -- already

3    preunderlined, I'm not underlining.  He had a highlighter

4    and he handed me this highlighted document, Your Honor, that

5    showed how a placement of signs, the improper placement of

6    signs could subject me to fines between $100 and $500 per

7    sign that had already been highlighted.  And he handed it to

8    me.  And I said, detective, I mean, you know, I was here to

9    talk about my signs being taken.  Is this -- am I being

10   threatened that I am now going to be fined for putting signs

11   up?  And I think his word were something to the effect,

12   well, you know, I was just told to pass this on to you and

13   just kind of left it at that.

14                THE COURT:  All right.

15                MR. SCHILTZ:  I'm handing the witness

16   Plaintiffs' Exhibit 7.

17                (Documents passed forward.)

18   BY MR. SCHILTZ:

19   Q.    Mr. Sokolove, does Plaintiffs' Exhibit 7 contain one

20   of the ordinances you were referring to with respect to

21   conversation with Mr. O'Bier?

22   A.    Yes, this is the 74-16 is what he handed to me as the

23   basis for why, I guess the basis for why, my putting up

24   signs, why the City had the right to take my signs down.

25   Q.    Did Officer O'Bier or any of other representatives of

Sokolove - direct

1  the City that you referred to here ever advise you of the

2  manner in which City ordinance Section 74-16 was enforced by

3  the City?

4  A.    No, quite the contrary.  With anyone, anyone, City

5  officials, non-City officials, past and present, City

6  Commissioners, I have begged, I have asked to try to find

7  out what, what is the policy here?  Where is -- how do we do

8  this in the City?  What am I doing wrong?  Where can I look

9  to?  And nobody has been able to advise me how either 74-16

10 has been in the past either enforced or how it's been

11 enforced.   I've been able to get nothing of a substantive

12 response from anybody.

13 Q.    And I assume that you got no substantive response on

14 the issue of how its enforced with respect to signs on

15 public property or rights-of-way; is that correct?

16 A.    Absolutely.

17 Q.    Okay.  Now, sir, you're aware, are you not, there

18 were depositions taken in this matter yesterday; isn't that

19 correct?

20 A.    Yes, sir.

21 Q.    And you're aware that Mr. Onizuk testified

22 essentially that the City applies a rule of thumb; isn't

23 that correct?

24 A.    Yes, I was there during that deposition.

25 Q.    And the rule of thumb is if a sign appears between a

Sokolove - direct

1   curb and a sidewalk, that's not allowed, that's somehow the

2   City right-of-way; is that right?

3   A.      That's what I heard, yes.

4   Q.      It has to be removed from that area?

5   A.      That's what he said yesterday.  That's the first time

6   I heard that standard.

7   Q.      And if there is no sidewalk, they somehow look to see

8   if there is a telephone pole or a utility pole around and go

9   from the back side of that to determine where marking line

10  is between the public right-of-way and the private property;

11  isn't that correct?

12  A.      I heard that as well.

13  Q.      And if there is no sidewalk or curb or utility pole,

14  then there is no private right-of-way, isn't that correct?

15  A.      That is correct.  I heard that as well.

16          THE COURT:  No private or no public

17  right-of-way?

18          MR. SCHILTZ:  Excuse me.  There is no public

19  right-of-way if there is no curb, sidewalk or pole, so you

20  can put the sign anywhere, Your Honor.

21          THE COURT:  Do you want to ask him?

22  BY MR. SCHILTZ:

23  Q.      Is that correct, sir?

24  A.      That is what he said yesterday.  And again, that is

25  the first time I heard any standard articulated at all in

Sokolove - direct

46

1    trying to get an answer.  But, yes, that is what he said

2    yesterday.

3    Q.    And you never heard that before?

4    A.    No, sir.

5    Q.    And you asked, didn't you?

6    A.    Yes, very much so.  In fact, that was the whole point

7    of going to Mr. Ferrese from the very beginning, to avoid

8    all of this.

9    Q.    And in fact, you had these various communications

10   orally with City representatives and you had your attorneys

11   write them letters, didn't you?

12   A.    That is correct.

13              (Documents passed forward.)

14              MR. SCHILTZ:  Your Honor, I'm handing the

15   witness what we marked as Plaintiffs' Exhibit 8 and

16   Plaintiffs' Exhibit 9.

17   BY MR. SCHILTZ:

18   Q.    Sir, can you identify these two exhibits?

19   A.    Yes, sir.  These are two letters written by an

20   attorney working on behalf of the campaign, a gentleman by

21   the name of Eugene Lawson, and each was written on behalf of

22   the campaign and the individual candidates, myself and

23   Mr. McCarthy, Mr. Shields.  One was -- well, both of them,

24   were self-explanatory, go to the point of, look, we tried to

25   find out what the rules are.  You couldn't articulate the

Sokolove - direct

1    rules.   Now signs are being taken out and, you know, what is

2    going on here?

3              MR. SCHILTZ:   Your Honor, I moved the admission

4    of Plaintiffs' Exhibits 8 and 9.

5              MR. SPEAKMAN:   No objection, Your Honor.

6              THE COURT:   They're admitted without objection.

7    *    *    *   (Plaintiffs' Exhibit Nos. 8 and 9 were received

8    into evidence.)

9    BY MR. SCHILTZ:

10   Q.     Sir, could you briefly state whether or not you

11   believe the City is acting in a manner that is consistent

12   with the policy that Mr. Onizuk articulated yesterday during

13   his deposition?

14   A.     Well, with all due respect, that is a little bit of a

15   difficult question because as I understood Mr. Onizuk, I

16   mean I'm not sure that what he was articulating, what he

17   was calling a policy, I'm not sure it's a policy because at

18   one point he described these various scenarios and then at

19   other times he said something like I'm not sure what I

20   would do there, but I probably wouldn't take it under

21   those circumstances, and then at other times, he would

22   speak inconsistently.   So to be perfectly honest, I'm not

23   sure, I'm not even sure after listening yesterday that any

24   reasonable person could understand what the policy is.

25   Q.     Thank you.   Sir, what is your objective in bringing

Sokolove - cross

1   this lawsuit?

2   A.      Your Honor, it's really simple.  I've got this very,

3   very narrow window of time and from the heart, all I'm

4   trying to do, I'm trying to get my signs out so people who

5   come into town who are voters will recognize my name.  It's

6   purely, purely First Amendment, period.  I have no other.  I

7   don't enjoy being here.  This is wasting.  It's wasting a

8   lot of time, to be perfectly honest.  I should be out

9   campaigning.

10                  THE COURT:  All right.

11                  MR. SCHILTZ:  I have no further questions.

12                  THE COURT:  Okay.  Mr. Rhodunda.

13                  MR. RHODUNDA:  Yes.  Thank you, Your Honor.

14                          CROSS-EXAMINATION

15  BY MR. RHODUNDA:

16  Q.      Good morning, Mr. Sokolove.

17  A.      Good morning, sir.

18  Q.      You have read the ordinance 74-16; is that correct?

19  A.      Yes, sir.

20  Q.      And that ordinance specifically prohibits any person

21  from maintaining or posting any private advertisement,

22  poster or sign upon any beach, strand, public boardwalk,

23  park sidewalk, street or other public property or way within

24  the City limits; is that correct?

25  A.      That is what it says.