Hill - direct

1    basically the same thing?

2    A.       Basically the same thing, yes.

3    Q.       Exhibit 15.  Can you identify where that is located?

4    A.       This is at 53 Columbia Avenue, I believe, in

5    Rehoboth.

6    Q.       Can you turn to the next exhibit, 16?

7    A.       That's on Rehoboth Avenue at City Hall.

8    Q.       What does it portray?

9    A.       Convention Center Sign.

10   Q.       City of Rehoboth Convention Center with an arrow

11   pointing to the center.  Tell me approximately how tall that

12   is?

13   A.       Probably 30 feet.

14   Q.       And that is on Rehoboth Avenue?

15   A.       Yes.

16   Q.       Rehoboth Avenue is the main commercial avenue in the

17   City of Rehoboth?

18   A.       Yes.

19   Q.       Can you turn to Exhibit 16?

20   A.       Yes.

21   Q.       This is a for sale sign?

22   A.       For sale sign in Schoolview.  It's either at the

23   corner of New Castle Extended or Lee Street at the

24   intersection of Bay Road and State Road.

25   Q.       Turn to 17.  Tell me what that is.

Hill - direct

1    A.     This is at the corner of Third Street and Lake

2    Avenue, next door to the Bad Hair Day.  That's the house

3    that is under construction.

4    Q.     Is that a North Star Heating and Cooling sign?

5    A.     Yes.

6    Q.     And is there a -- there is a utility pole, is there

7    not?

8    A.     Yes.

9    Q.     And can you describe, where is the utility pole?

10    A.     The utility pole is a temporary pole, and there is a

11    street sign, a 4x4 post to the right of the sign.  And I

12    believe it has about the parking.

13    Q.     Turn to Plaintiffs' Exhibit 17.

14            MR. RHODUNDA:  18?

15            MR. TUCKER:  18.

16    A.     This is the tot lot at Lake Gerar.

17            MR. TUCKER:  That's 18?

18            MR. SCHILTZ:  This is 18.

19            MR. TUCKER:  Yes.

20            MR. SCHILTZ:  I'm sorry, Your Honor.  I'll

21    correct the record.

22    BY MR. SCHILTZ:

23    Q.     Is that marked as Plaintiffs' Exhibit 18?

24    A.     No, 19.

25    Q.     Pardon me?

Hill - direct

1    A.       This is 19, the tot lot.

2                   THE COURT:  You may have named 16 twice.

3                   MR. SCHILTZ:  May I, for the record, Your Honor?

4                   THE COURT:  Yes.

5                   MR. SCHILTZ:  Plaintiffs' Exhibit 16 is the City

6    of Rehoboth Beach sign.  Plaintiffs' Exhibit 17 is the for

7    sale sign by skip Klaus, Plaintiffs' Exhibit 18 is the North

8    Star Heating and Cooling sign, Plaintiffs' Exhibit 19 is the

9    tot lot sign at Gerar Park.

10   BY MR. SCHILTZ:

11   Q.       Is that correct?

12   A.       Lake Gerar Park, yes.

13   Q.       Turn to Plaintiff Exhibit 20.  Can you identify that,

14   sir, where is that is located?

15   A.       Village Improvement Association.  It's at the corner

16   of Grenoble Street and Lakeview.

17   Q.       That is behind the sidewalk, is it not?

18   A.       It's on public property.

19   Q.       Who owns the parking lot behind the sidewalk?

20   A.       The parking lot is zoned.  The property is owned by

21   the City of Rehoboth with the lease to the Village

22   Improvement Association.

23   Q.       Turn to Plaintiffs' Exhibit 21.  And can you tell me

24   where the sign is located?

25   A.       At the corner of 2nd and Oaks Street in Rehoboth.

Hill - direct

1     Q.     Plaintiffs' 22.

2     A.     At the corner of Second Street and Henlopen Avenue.

3     Q.     Plaintiffs' 23?

4     A.     It's located in Lake Gerar Park.

5     Q.     And Plaintiffs' 24?

6     A.     It's on Sixth Street in Rehoboth.

7     Q.     Were you present when each of these pictures were

8     taken?

9     A.     Yes.

10     Q.     By each of these pictures, I'm referring to

11     Plaintiffs' Exhibit 12 through 24?

12     A.     Yes.

13     Q.     As well as Plaintiffs' Exhibit 11?

14     A.     Yes.

15     Q.     Are they a true and accurate representation of the

16     scene as it existed at that time?

17     A.     Yes.

18              MR. SCHILTZ:  I have no further questions, Your

19     Honor.

20              THE COURT:  All right.  Mr. Rhodunda.

21              Oh, we previously admitted these documents, I

22     believe, but let's be specific.  12 through 24?  You are

23     seeking their admission; right?

24              MR. SCHILTZ:  Absolutely, Your Honor.

25              THE COURT:  All right.

Hill - cross

1             MR. RHODUNDA:  No objection.

2             THE COURT:  No objection, right?

3             MR. RHODUNDA:  Right.

4             THE COURT:  Admitted with no objection.

5    *    *    *  (Plaintiffs' Exhibit Nos. 12 through 24 were

6    received into evidence.)

7                      CROSS-EXAMINATION

8    BY MR. RHODUNDA:

9    Q.      Mr. Hill, are you a campaign supporter of the

10   plaintiffs' group?

11   A.      I'm helping the campaign, yes.

12   Q.      Do you know when these political signs were put in

13   the locations where you photographed them?

14   A.      I don't know exactly when they were put in that

15   location, no.

16   Q.      And do you know that they were removed by this date?

17   A.      These signs?

18   Q.      The political signs.

19             THE COURT:  Removed by what date, sir?

20             MR. RHODUNDA:  By today.

21   A.      As of yesterday, they were still there.

22   BY MR. RHODUNDA:

23   Q.      All of them?

24   A.      The only ones that had been moved were ones at

25   Commissioner Henry DeWitt's house.  They were moved from

Hill - cross

1    Dover Street around to Columbia Avenue.

2    Q.    Now, did you drive and look at each and every one of

3    these locations?

4    A.    Yes, I looked at them yesterday and I looked at them

5    the day before.

6    Q.    Now, do you still have the exhibits in front of you

7    right now?

8    A.    Yes.

9    Q.    Did you have Exhibit 12 in front of you?

10   A.    Yes.

11   Q.    And --

12   A.    Wait a minute.  I'm sorry.  I'm sorry.

13          THE COURT:  You can't have all of them because I

14   have three of them.

15          MR. SCHILTZ:  Just for clarity on the record,

16   can we have where they start and end?  Is it 10 through 25,

17   these pictures?

18          THE COURT:  Yes.

19          MR. SCHILTZ:  Thank you.

20   BY MR. RHODUNDA:

21   Q.    Exhibit 12, do you have that in front of you?

22          THE COURT:  I'll tell you what.  If it will be

23   helpful, you can go ahead and question him from up there,

24   all right?

25          MR. RHODUNDA:  Thank you, Your Honor.

Hill - cross

1          THE COURT:  Mr. Hill, I'm going to have the

2    attorney step right up there and show you the exact picture

3    he is looking at; all right?

4    BY MR. RHODUNDA:

5    Q.      Exhibit 12, do these three signs appear to be behind

6    the telephone pole?

7    A.      They appear to be, yes.

8    Q.      Exhibit 13, does this sign appear to be behind the

9    telephone pole line down the street?

10   A.      It does, but there is no sidewalk here.

11   Q.      I understand that.  But is it behind the telephone

12   pole?

13   A.      It appears to be.

14   Q.      Now, Exhibit 14, there is a telephone pole here?

15   A.      It appears to be.  And here is the property line

16   survey stake right there.

17   Q.      So there is a Dennis Barbour and Ron Patterson sign?

18   A.      Yes, on public property.

19   Q.      Do you believe those signs are still there today?

20   A.      I think one of them was there yesterday, but I'm

21   pretty sure this sign was there yesterday.

22   Q.      Was it the same location or was it moved back behind

23   the property line which looks like six inches behind it?

24   A.      I'm not going to say.

25   Q.      So it very well could have been moved behind the

Hill - cross

1    property line; is that right?

2    A.      It could be.

3    Q.      Exhibit 15 shows two Barbour signs and a Ron

4    Patterson sign?

5    A.      Uh-huh.

6    Q.      They appear to be behind?

7    A.      That's correct.  I don't believe that is the property

8    line at all.

9    Q.      Do you have some sort of plot plan?

10   A.      I can look at the corner of Second Street and

11   Columbia Avenue and tell.

12   Q.      Based on what?

13   A.      Based on what?  At most corners on Rehoboth, they

14   have a corner, it's like a sidewalk.  The sidewalk doesn't

15   go all the way down the street.  I don't know exactly what

16   they're called, but I think if you look at the corner of

17   Second and Columbia, you can pretty much tell.

18   Q.      This picture does not show a sidewalk at all?

19   A.      No.

20   Q.      It does not show a telephone pole, does it?

21   A.      No.

22   Q.      Okay.  So if you are using as a guidepost sidewalks

23   and telephone poles, you can't see them in this picture?

24   A.      That is correct.

25   Q.      Exhibit 17 is near Bad Hair Day business which is

Hill - cross

1   right at this location right here; correct?

2   A.      It's on this side, yes.

3   Q.      Do you know how long this North Star sign was located

4   here?

5   A.      It's been there quite awhile.

6   Q.      Was it there yesterday?

7   A.      I didn't go by there yesterday but I believe it was

8   there the day before.

9   Q.      Now, you were involved with finding some signs or

10  locating some signs behind the police department area where

11  the Public Works Shop is; correct?

12  A.      I found six political signs in the back of the

13  Building Inspector's pickup truck.

14  Q.      And there were the other real estate signs, auction

15  signs and other signs?

16  A.      There was one real estate sign, there was a Pep Air

17  sign and I think there was one or two auction signs.

18  Q.      And I believe when you testified about your

19  experience in the City of Rehoboth regarding political

20  signs, you drive around the city a lot, apparently took many

21  photographs.  You are familiar with how the city looks

22  today?

23  A.      Yes.

24  Q.      Are there any political signs at any parks today?

25  A.      I haven't seen any political signs at any parks.

Hill - cross

1    Q.    Did you see any signs between the sidewalk and the

2    curb anywhere in the City of Rehoboth?

3            THE COURT:  Today?

4            MR. RHODUNDA:  Today, yes.

5    A.    Today, I didn't.  I left Rehoboth very early this

6    morning.

7    BY MR. RHODUNDA:

8    Q.    How about yesterday?

9    A.    I would say there are signs in the public

10   right-of-way, public property in the city of Rehoboth as of

11   yesterday.

12   Q.    Between the curb and the sidewalk, did you see any

13   signs for any candidates?

14   A.    Not between any curb and sidewalk, but I did see

15   signs on public property in the city of Rehoboth Beach

16   yesterday.

17   Q.    Now, what type property are you talking about?

18   A.    I'm talking about off my street, Henlopen Avenue,

19   there are signs in the public property from Surf Avenue all

20   the way to the west end of Henlopen Avenue, and the same on

21   Columbia.

22   Q.    Are there telephone poles along the street?

23   A.    There are poles on one side and not on the other

24   side.

25   Q.    Are the signs on the side with the telephone poles or

Hill - cross

1   not telephone poles?

2   A.      They're on the street side of the telephone poles.

3   Q.      Do you have pictures of those?

4   A.      No, I do not.

5   Q.      Now, your testimony is, based on your past political

6   run for office, you indicate that you placed some signs in

7   the public right-of-way and I think you said the day before

8   the election you placed them at the end of the streets; is

9   that correct?

10  A.      Friday afternoon I did, yes.

11  Q.      And that was just for one day, presumably?

12  A.      Exactly.  The election day.

13  Q.      Did you place your signs in public parks?

14  A.      I don't recall putting them in the lake area, no.

15          THE COURT:  Let me interrupt, Mr. Rhodunda.

16          Is your testimony that the only time you put

17  signs up in the public rights-of-way was the day before the

18  election?

19          THE WITNESS:  No, I think I put signs up on

20  public property, but at the end of the streets I did it on

21  the Friday before the election day.

22          THE COURT:  All right.

23          THE WITNESS:  Because the election was on

24  Saturdays and signs were removed on Sunday.

25          THE COURT:  All right.  And when you say the

Hill - cross

1   signs were removed, did you remove the signs?

2           THE WITNESS:  Yes.

3   BY MR. RHODUNDA:

4   Q.     And you indicate that you would not place them in a

5   City park; is that correct?

6   A.     I did not place them in the lake area, to my

7   knowledge.

8   Q.     Did you place any signs like in the Rehoboth library

9   area?

10  A.     No, I did not.

11  Q.     And how about Town Hall?  Did you have campaign signs

12  announcing your campaign?

13  A.     Not at City Hall.

14          MR. RHODUNDA:  May I have a moment, Your Honor?

15          THE COURT:  Yes.

16          (Pause.)

17  BY MR. RHODUNDA:

18  Q.     Just one more follow-up question.  Mr. Hill, you have

19  had the City take down your signs that were in the public

20  right-of-way before, haven't you?

21  A.     Have I had the City take them down?

22  Q.     Yes.

23  A.     Yes, Mr. Ferrese ordered Mel Craig to take down one

24  of my signs on Rodney Street because it was between the

25  sidewalk and the curb.

Hill - cross

1    Q.      When did he do that?

2    A.      It was in the fall of 2003, I believe.  It was

3    2000 -- probably in late -- in the early fall of 2003.  It's

4    when I had the property for sale.  Two times.

5    Q.      Two times?

6            THE COURT:  What kind of sign was that?

7            THE WITNESS:  Tit was a real estate for sale

8    sign.  There were two signs on that particular street.  One

9    was taken, one was left.

10           MR. RHODUNDA:  Thank you.

11           MR. SCHILTZ:  I have no questions, Your Honor.

12           THE COURT:  All right.  Thank you, sir.  You may

13   step down.

14           You rest?

15           MR. SCHILTZ:  We rest our case-in-chief, reserve

16   right to bring a rebuttal witness, if necessary.  I don't

17   anticipate it, but ...

18           THE COURT:  All right.  Mr. Rhodunda.

19           MR. RHODUNDA:  Yes, Your Honor.  We'd like to

20   call Mr. Ferrese.

21                          - - -

22              DEFENDANTS' TESTIMONY

23   ... GREGORY JAMES FERRESE, having been placed

24        under oath at 12:40 p.m. as a witness, was

25          examined and testified as follows ....

Ferrese - direct

1                        - - -

2                THE COURT:  Mr. Rhodunda, I think your

3    co-counsel wants to speak with you.

4                MR. SPEAKMAN:  It's a hearing problem, Your

5    Honor.

6                        DIRECT EXAMINATION

7    BY MR. RHODUNDA:

8    Q.      Thank you.  Mr. Ferrese, could you please indicate to

9    the Court what your position is with the City of Rehoboth?

10   A.      Yes.  I've been City Manager for the City of Rehoboth

11   Beach since 1983.

12   Q.      What are your responsibilities in that position?

13   A.      I am the Chief Administrative Officer for the City of

14   Rehoboth Beach, and I answer to the Mayor and Commissioners

15   of Rehoboth Beach.  All departments are under the direction

16   of the City Manager.

17   Q.      Now, are you familiar with the provisions of Section

18   74-16, the subject of this litigation?

19   A.      Yes, sir.

20   Q.      Do you know what year that passed?

21   A.      I would say earlier than 1976.

22   Q.      The current ordinance was passed in 1995 but it's

23   your belief there was a previous provision that was similar

24   to that?

25   A.      Yes.

Ferrese - direct

1    Q.    What is the purpose behind Section 74-16?

2    A.    The City does not permit any signs and I'm talking

3    about --

4                MR. TUCKER:  Objection, Your Honor.  If this is

5    getting into legislative history regarding the purpose

6    behind the statute that was adopted by the legislative body,

7    then I guess Mr. Rhodunda can produce that.  I'm not sure if

8    this witness is qualified to talk about legislative history.

9                THE COURT:  You take your crack at him on

10   cross-examination; all right?  I guess I'll listen to the

11   man who had been City Manager for 22 years.

12               MR. RHODUNDA:  Thank you, Your Honor.

13   A.    Well, the purpose of the ordinance prohibits all

14   signs, not just political signs.  And I think everybody is

15   discussing political signs but we remove open house signs,

16   auction signs, garage sale signs, all types of signs between

17   the sidewalk and curb which is a City right-of-way and also

18   on the City-owned property.

19   Q.    Is that enforcement effort done regularly throughout

20   the course of the year?

21   A.    It's done regularly.  It's done by different

22   departments.  It's also done -- when I see it myself, I'd

23   radio the Public Works Director and ask him to remove the

24   sign or on occasion I'll remove it myself.

25   Q.    What is it specifically about signs that the City

Ferrese - direct

1   would want to ban signs from being on public property?

2   A.      We pride ourselves at Rehoboth Beach, as everybody is

3   aware, of the cleanliness and beauty of the town.   And by

4   having all types of signs in the City right-of-way, on City

5   property, just clutters up the town.   It's an eyesore.   The

6   residents don't want it.

7   Q.      Now, is there a policy about how you determine City

8   property in the right-of-way?

9   A.      Between the sidewalk and curb.   Where there is no

10  sidewalk and curb, we use the utility poles.

11  Q.      And how long has that policy gone back in time?

12  A.      For a long time.

13  Q.      And has that policy been applied to the types of

14  signs you previously identified, political signs and all the

15  other commercial signs that you identified?

16  A.      All types of signs.

17  Q.      Now, with regard to the events that have been

18  discussed on July 7th, July 9th, the removal of signs

19  belonging to Mr. Sokolove, when did you first get involved

20  and have knowledge about the removal of those signs?

21  A.      It was Saturday morning around 11:30 a.m. on July

22  9th.   During the summertime, Administrative Offices at City

23  Hall are open every Saturday from 8:30 until noon and I work

24  myself every Saturday, so it was around 11:30 a.m. on July

25  9th.

117

Ferrese - direct

1    Q.      Did you ever give any directions to remove signs

2    belonging to Mr. Sokolove?

3    A.      No.

4    Q.      Now, you were present for the testimony of

5    Ms. Cargnino; is that correct?

6    A.      Yes.

7    Q.      Well, you previously saw her affidavit that was

8    submitted by plaintiffs' attorneys; is that correct?

9    A.      Yes.

10   Q.      Now, did you speak with her regarding the placement

11   of political signs?

12   A.      Yes.

13   Q.      And what did you tell her?

14   A.      I told her that we do not prohibit -- we prohibit

15   placement of political signs on City-owned property, and I

16   said in the right-of-way.

17   Q.      Well, her testimony is that you said, the only place

18   you said that you couldn't put them was in some fresh, newly

19   landscaped areas.  Is that even conceivable to you that you

20   would say that?

21   A.      As far as landscaped areas in the Rehoboth Avenue, I

22   told her also there we do not permit any signs there.  And

23   we do, on numerous occasions, have real estate signs, open

24   house signs.  We remove them.

25   Q.      Now, in regard to what areas you are speaking about

Ferrese - direct

1    now?

2    A.    Everywhere in the city and also on Rehoboth Avenue

3    where we just spent over $20 million to renovate Rehoboth

4    Avenue from the canal all the way up to the boardwalk.

5    Q.    So when she says and testifies that you indicated to

6    her she could only place the signs -- that the only

7    prohibited place was streetscape public areas, is that a

8    correct statement?

9    A.    I told her.  And I'm familiar with the ordinance.

10   I've been there a long time.  And I've been involved in

11   removal of signs for a long time.  And I told her that we do

12   not permit signs on City-owned property and in the

13   right-of-way also..

14   Q.    Now, you've had a chance to go and look at these

15   signs that were photographed by the plaintiffs' witness

16   Mr. Hill; is that correct?

17   A.    Yes, I went yesterday morning personally myself.

18          MR. RHODUNDA:  May I approach the witness, Your

19   Honor?

20          THE COURT:  Freely.

21          MR. RHODUNDA:  Your Honor, may I approach the

22   witness?  He had this with him, about the various pictures?

23          MR. SCHILTZ:  I'm sorry?

24          THE COURT:  Yes.

25          (Counsel confer.)

Ferrese - direct

1          MR. RHODUNDA:  Without objection, I'm going to

2    hand this package to the witness.

3          THE COURT:  That's fine.

4          (Documents passed forward.)

5    BY MR. RHODUNDA:

6    Q.    I've handed you this document because I know you have

7    taken some notes because you actually visited the sites with

8    these signs; is that correct?

9    A.    Yes, sir.

10   Q.    And I believe they're still in order with how they

11   were submitted with the memorandum, but I'd like to go to

12   particularly Exhibit 12 first.  It shows three signs:  one

13   sign for Mayor Cooper, one for Dennis Barbour and one for

14   Ronald Patterson.  Now, these pictures were taken on July

15   18th and July 20th, 2005 according to Mr. Hill.  When did

16   you go look at this location?

17   A.    Yesterday morning.

18   Q.    And were these three signs for Mr. Cooper, Barbour

19   and Patterson at that location at that time?

20   A.    Yes.

21   Q.    Okay.  And were those signs within the bounds that

22   the City has for indicating whether it's private property

23   and public right-of-way?

24   A.    As long as they're in line with the utility pole or

25   behind the utility pole, we will not touch the signs at all.

Ferrese - direct

1    We will not remove them.  Those are the instructions.

2             THE COURT:  Why don't you show me the picture

3    that you are questioning him about.

4             MR. RHODUNDA:  I'm sorry?

5             THE COURT:  I'll need to see that picture.

6             (Documents passed forward.)

7             THE COURT:  All right.

8    BY MR. RHODUNDA:

9    Q.    Exhibit 13 is a Dennis Barbour sign.  And did you go

10   visit that location?

11   A.    I went yesterday morning to look at all these

12   locations.

13   Q.    Okay.  And based on your review of the situation, is

14   that a legal sign?

15   A.    Yes, it's in line with the telephone pole or it looks

16   to me it's even behind it.

17   Q.    Exhibit 14 has a Dennis Barbour and Ron Patterson

18   sign on it.  Did you visit that location?

19   A.    Yes.

20   Q.    And what did you find at that location?

21   A.    I found that the Barbour sign was moved to behind the

22   property line and that the Patterson sign is in line with

23   the telephone pole on Lee Street.

24   Q.    So now they're legally conforming signs?

25   A.    They're legally conforming signs.  Our intent all

Ferrese - direct

1    along is to be as lenient as possible on signs, but we do

2    have an ordinance against it.  And as I stated earlier, we

3    just do not permit them in the public right-of-way or on

4    City-owned property, but we try to be as lenient as we can.

5    Q.    Now, Exhibit 15 has two Barbour signs and one

6    Patterson?

7    A.    And we wouldn't remove the signs because they're

8    behind the parking space.  You can see the landscaping tie

9    there and there is a parking space right in front of it.

10   When you park your car there, you wouldn't even see the

11   signs so we wouldn't touch them.

12   Q.    So they're located off the road and behind the

13   parking lot?

14   A.    Yes, they are.

15        THE COURT:  Let me ask you a question.  We're

16   looking at the same picture, Photograph 15?

17        MR. RHODUNDA:  Yes, Your Honor.

18        THE WITNESS:  Yes.

19        THE COURT:  And it looks -- and you are telling

20   me that this Dennis Barbour sign in the middle is behind the

21   tie?

22        THE WITNESS:  Yes.  And as of yesterday, I was

23   there, and all three are behind the landscaping tie.

24        THE COURT:  Okay.

25        THE WITNESS:  All three.

122

Ferrese - direct

1          THE COURT:  I mean, I'm just trying to interpret

2    the photograph.

3          MR. RHODUNDA:  Sure.

4          THE COURT:  Is that the metal crossbar of the

5    sign?

6          MR. RHODUNDA:  I believe that is the

7    landscaping.

8          THE WITNESS:  That is a landscaping tie, Your

9    Honor.

10         THE COURT:  No, not the full wooden thing.  I'm

11   asking about a gray mark, right there.  Let me ask the

12   witness.  You may not be able to see it, but -- and I'm

13   almost reluctant to.

14         THE WITNESS:  Your Honor, I might add, too, when

15   this hit the newspapers, all the politicians came in and

16   start the removing their signs.

17         THE COURT:  Okay.

18         THE WITNESS:  As of yesterday, they were all

19   behind that landscaping tie.

20         THE COURT:  All right.  So let me make sure I

21   got your testimony.  You are not saying that in this picture

22   it's necessarily behind, but when you saw it yesterday it

23   was behind; is that right?

24         THE WITNESS:  Yes, yesterday.

25         THE COURT:  All right.

1    THE WITNESS:  That's when I reviewed all these

2  pictures, yesterday.

3  BY MR. RHODUNDA:

4  Q.    Exhibit 16 is a real estate sign.  And did you go to

5  the location of that real estate sign?

6  A.    Right, I went yesterday.

7  Q.    Is that sign at that location?

8  A.    That sign does not exist.

9  Q.    Exhibit 17 shows a North Star construction sign and

10  a --

11    MR. SCHILTZ:  What number, Bill?  I'm sorry.

12    MR. RHODUNDA:  That's 17.

13    MR. TUCKER:  I think on a housekeeping issue,

14  Your Honor, we may have the numbers a little bit confused.

15    MR. RHODUNDA:  Okay.

16    (Counsel confer.)

17    MR. RHODUNDA:  No. 18.  I'm sorry, Your Honor.

18  BY MR. RHODUNDA:

19  Q.    What did you find when you went to that location?

20  A.    The location described is on Lake Avenue.  I went on

21  Lake Avenue and I could not locate this sign.

22  Q.    Okay.  Thank you.  How often are there elections in

23  the City of Rehoboth?

24  A.    Every year.

25  Q.    Every year.  And what types, what candidates are

Ferrese - direct

1    running on a yearly basis?

2    A.    They run for Commissioner and also I think it's every

3    three years that the Mayor is up for re-election, and this

4    is the first Mayor I worked for.

5    Q.    And typically, do candidates during these elections

6    have campaign signs?

7    A.    In Rehoboth, typically campaign signs are not put in

8    the public right-of-way or on City parks as these ones are.

9    Q.    But do they typically have campaign signs as part of

10   their strategy for running for office?

11   A.    Yes, but you have to remember also in Rehoboth they

12   don't run Republican or Democrat.  It's not a big deal like

13   it is in other communities.  They just run leading vote

14   getter, so it's a low key election.  They don't come off

15   with a lot of dinners and advertising but they do put up

16   political signs and they do advertise in the local

17   newspapers and that's about it.  They don't have all kinds

18   of dinners and fund raisers.

19   Q.    How many registered voters are there in the City of

20   Rehoboth?

21   A.    There is about 1,300.

22   Q.    1,300.  And are you familiar with the zoning map of

23   the City of Rehoboth?

24   A.    I'm familiar with the commercial residential area,

25   yes, sir.

Ferrese - direct

1    Q.    And when it comes to the types of properties that

2    abut the streets of the City of Rehoboth, could you give an

3    estimate in your experience in being with the City of

4    Rehoboth over 20 years, how much of that would it consist of

5    private property abutting the various roads of the City of

6    Rehoboth?

7    A.    Most of that property is located in the commercial

8    zone district where they're allowed to build up to the

9    property line.  And I would say when you look at the overall

10   picture of Rehoboth Beach, you are talking about not more

11   than five percent.

12   Q.    Okay.  I'm talking about what is the percentage of

13   privately owned property in the City of Rehoboth, commercial

14   or residential?

15   A.    The majority is residential, but I really don't know

16   the percentage rate, no.

17   Q.    But if we just take the parts out of the question, is

18   it true or not, just tell me from your knowledge of the

19   zoning map, did the City parks, City-owned lands take up a

20   lot of these areas abutting streets or is it overwhelmingly

21   private residents and private commercial properties?

22   A.    It's overwhelmingly private residential, but we do

23   have some nice parks in our city.

24                 (Counsel confer.)

25                 MR. RHODUNDA:  Your Honor, may I have a moment

Ferrese - direct

1  to mark the exhibit?

2                    THE COURT:  Yes.

3                    (Pause.)

4                    MR. RHODUNDA:  Any objection to this coming in?

5                    MR. TUCKER:  No objection.

6                    MR. RHODUNDA:  Without objection, I'd like to

7  present this as an exhibit as 3.  Thank you.

8                    THE COURT:  That's fine.  Do you want to

9  question him on it?  What is it marked as?

10                   MR. RHODUNDA:  Yes.

11                   THE COURT:  What is it marked as for

12  identification?

13                   THE DEPUTY CLERK:  Three.

14                   MR. RHODUNDA:  It's marked as Exhibit 3 without

15  objection.

16                   THE COURT:  So you are going to move it now?

17                   MR. RHODUNDA:  Yes.

18                   THE COURT:  All right.

19                   MR. RHODUNDA:  And there is no objection.

20                   THE COURT:  Defense 3 is admitted without

21  objection.

22  *    *    *  (Defendants' Exhibit No. 3 was received into

23  evidence.)

24                   THE COURT:  Would you identify what it is,

25  please?

Ferrese - direct

1          MR. RHODUNDA:  Yes.  This is the zoning map of

2    the City of Rehoboth Beach.

3          THE COURT:  All right.

4          MR. RHODUNDA:  Thank you.

5    BY MR. RHODUNDA:

6    Q.    Mr. Ferrese, I'm putting a map in front of you that

7    is entitled the zoning map of the City of Rehoboth Beach,

8    Defense Exhibit 3.  Are you familiar with the various zoning

9    maps of the City of Rehoboth Beach?

10   A.    Yes.

11   Q.    This map is dated 1996, last updated.  What does this

12   map show?

13   A.    Well, what you highlighted in yellow just shows to me

14   the boardwalk and our park area.  It also shows the types of

15   zoning, R1, R2, C1.  But what you highlighted is where our

16   parks are located.

17   Q.    And I want to make sure I captured all of the public

18   parks that are in the City of Rehoboth.

19   A.    Did you put Silver Lake on?  I don't see it.

20         MR. RHODUNDA:  Can I mark on that?

21   A.    That's accurate.

22   BY MR. RHODUNDA:

23   Q.    And on this map, R1, R2 -- the R districts are

24   residential zoning districts?

25   A.    Yes.

Ferrese - direct

1    Q.    And the C districts are commercial districts, aren't

2    they?

3    A.    Yes.

4    Q.    Now, are residential districts and commercial

5    districts all private land property?

6    A.    Yes.

7            MR. RHODUNDA:  Would the Court like to examine

8    this?

9            THE COURT:  I would.

10            (Documents passed forward.)

11    BY MR. RHODUNDA:

12    Q.    And I believe you testified previously that the areas

13    that were highlighted were the public land properties; is

14    that right?

15    A.    Yes, our parks.  City-owned property.

16    Q.    Mr. Ferrese, you had previously indicated the rule of

17    thumb the City followed regarding the signs and trying to

18    determine the right-of-way areas which are right along the

19    roadways and I believe you indicated that between the curb

20    and sidewalk was a right-of-way area and also between the

21    telephone pole and the roadway.  What is the City's policy

22    if you have a questionable situation because there happens

23    to not be a telephone pole or sidewalk to engage the

24    decision by?

25    A.    Well, where there isn't a telephone, a utility pole,

Ferrese - direct

1    then we use the parking space, on the other side of the

2    parking space.  That's mostly on Columbia Avenue, as the one

3    that you saw at 53 Columbia where they put it behind the

4    landscaping tie.

5            I said earlier, where the property line ends,

6    where the owner's property ends, from that location to the

7    street is the right-of-way, and on Columbia Avenue and

8    Henlopen Avenue, that right-of-way is very wide.  I think

9    Mr. Hill testified 20-some feet.  But as I stated earlier,

10   we try to be fair.  So what do we use?  We use the utility

11   poles.  And if there isn't any, we use the parking spaces.

12   Q.    Now, you previously indicated that there is an

13   election every year in Rehoboth?

14   A.    Yes.

15   Q.    Have your policies regarding the enforcement of the

16   sign ordinance changed at all in the last five years?

17   A.    Last year we took, under my orders to the Building

18   and Licensing Department, they removed two political signs.

19   And those, they are not Commissioners of Rehoboth.  Richard

20   Sargent's sign was removed, Patrick Gossett's sign was

21   removed.  And what did they do?  They put them where they

22   were supposed to put them.

23           In this situation, not one    time did

24   Mr. Sokolove call me.  He ran around to all my department

25   heads but never came to my office to discuss this.

Ferrese - direct

1    Q.    Well, when you received a letter from Mr. Lawson that

2    has been admitted as an exhibit, did those letters request

3    the City's policy or did they threaten litigation?

4    A.    To be honest with you, I didn't respond to

5    Mr. Lawson's letters because I've been threatened to be

6    arrested over this.  I've been threatened quite a bit over

7    this.  And I didn't respond to them because I felt that this

8    was headed to court, and that is exactly where we are today.

9    So I didn't respond to Mr. Lawson's letters.

10                First of all, I'm not an attorney.  I discussed

11   it with our City Solicitor and I felt we have an ordinance.

12   I've always abided by the ordinance for my 23 years here and

13   I'm not going to respond to it.  And I did not order any

14   signs removed on private property.  I have never ordered

15   that.

16   Q.    Now, in the police report, and I believe in the

17   newspaper, there is some reference to you indicating the

18   sign should not have been removed.  What kinds of signs were

19   you speaking about when you were making a statement like

20   that?

21   A.    I was told by the police officer that some of the

22   signs were removed on private property.  And I told her,

23   that Saturday morning on July 9th, if that was the case,

24   that they should not have been removed on private property.

25   I told her leave the two pictures here.  And I would like to

Ferrese - direct

1    state the two pictures that are in the presence of Scott

2    O'Bier the detective right now had not only political signs,

3    they had Pep Air Conditioning signs and they had Emergit

4    (phonetic) auction signs in the back of that pickup truck.

5    The employee was doing his job and I instructed her to leave

6    the pictures here, I would look into it.  It was Saturday at

7    11:30 and I looked into it Monday morning.

8              MR. RHODUNDA:  I believe the pictures are

9    actually part of the police report that has already been

10   admitted as the two photographs in the back of the pickup

11   truck.

12             THE COURT:  They're not appended to the exhibit

13   that has been admitted.  So if you want them, you will need

14   to give them to me.

15             MR. RHODUNDA:  Okay.  I'm sorry.  I thought we

16   had gone and provided those.  I'm sorry, Your Honor.

17             THE COURT:  Well, it depends on which police

18   report you are talking about.  When you say 11:30 a.m., I

19   assumed that you were -- or I heard your witness say 11:30

20   a.m., I assumed he was speaking about the police report

21   written by Corporal Cleveland.

22             THE WITNESS:  That's correct.

23             THE COURT:  And if that is the one you are

24   talking about, there is nothing attached to it.

25             MR. RHODUNDA:  Right.  That report is actually a

Ferrese - direct

1    short summary report, but Mr. DeBier's report, actually the

2    thicker one, has a number of attachments and included some

3    photocopies of the two photographs taken of the back of the

4    truck that show the a variety of signs the witnesses just

5    testified about.

6              THE COURT:  That is what you are referring to?

7              MR. RHODUNDA:  That's correct, yes.

8              THE COURT:  All right.

9              MR. RHODUNDA:  May I have a moment, Your Honor?

10             THE COURT:  Yes.

11             (Pause.)

12    BY MR. RHODUNDA:

13    Q.    Mr. Ferrese, did you give any directions to any City

14    employees to remove any political signs of any political

15    candidates?

16    A.    I did not give any directions whatsoever.

17    Q.    In regard to the Sokolove signs, were you even aware

18    that the signs were even taken down on July 7th?

19    A.    I was not aware the signs were taken down until

20    11:30 a.m., July 9th when the police officer showed me the

21    signs and said Mr. Hill wanted to see me in the parking lot.

22    Q.    Have you ever in your tenure as being in your

23    position ever directed the removal of any particular

24    candidate's signs?

25    A.    Only if they were on what I said earlier, never on

Ferrese - cross

```
 1    private property, period.

 2                  MR. RHODUNDA:  Thank you.

 3                  THE COURT:  Are you concluded with your

 4    questioning, sir?

 5                  MR. RHODUNDA:  Yes.  I'm sorry, Your Honor.

 6                  THE COURT:  All right.  You may cross-examine.

 7                  MR. TUCKER:  Thank you, Your Honor.

 8                           CROSS-EXAMINATION

 9    BY MR. TUCKER:

10    Q.    Mr. Ferrese, I understand Mr. Rhodunda handed you a

11    copy of the complaint that you had some handwritten notes in

12    when you started; is that correct?

13    A.    Yes.

14    Q.    And did you use that document to refresh your

15    recollection when you were on the witness stand today, sir?

16    A.    No, I knew what was in the document.  I didn't have

17    to refresh my memory.  I know that I went yesterday morning

18    and I know that some of these locations that you put down

19    here are wrong.

20    Q.    Okay.  My only question, sir, is did you use that

21    document to refresh your recollection to come to court today

22    while you were on the witness stand?

23    A.    Yes.

24                  MR. TUCKER:  May I please see that document,

25    Your Honor?
```

Ferrese - cross

1        THE COURT:  Yes, you may.

2        MR. TUCKER:  Thank you.

3        (Document passed back.)

4        MR. TUCKER:  Thank you.  Just one moment, Your

5    Honor.

6        (Pause.)

7    BY MR. TUCKER:

8    Q.      Now, Mr. Ferrese, you indicated you report directly

9    to the Mayor and to the City Commissioners; is that correct,

10   sir?

11   A.      Yes, there are seven of them.

12   Q.      And the Mayor is up for re-election, we established

13   that, in August?

14   A.      Yes.

15   Q.      And are you helping him in any of his election

16   activity?

17   A.      No, I'm a member of the International City Managers

18   Association.  It's a violation of our bylaws.

19   Q.      Have you made any contributions to his campaign?

20   A.      No.

21   Q.      Have you been engaged in any absentee ballot work?

22   A.      No.

23   Q.      Now, Mr. Rhodunda was referring you to some pictures

24   that were taken on the evening of July 9th out of a City

25   Police vehicle.  Do you recall him asking you about those

Ferrese - cross

1    pictures?

2    A.      Yes, sir.

3              MR. TUCKER:  Your Honor, may I have this marked

4    Plaintiffs' for Identification No. 26?

5              Any objection?

6              MR. RHODUNDA:  No objection.

7              MR. TUCKER:  I'd also ask this be moved into

8    evidence.

9              THE COURT:  Please identify it.

10             MR. TUCKER:  It's going to be Plaintiffs' 26,

11   Your Honor.

12             THE COURT:  I'm sorry.  I mean describe it.

13             MR. TUCKER:  Yes.  I apologize, Your Honor.

14   These are two pictures of signs in the back of a City Police

15   vehicle that were produced by the City yesterday.

16             THE COURT:  All right.

17   *   *   *  (Plaintiffs' Exhibit No. 26 was received into

18   evidence.)

19             MR. TUCKER:  May I approach the witness, Your

20   Honor?

21             THE COURT:  You may.

22             (Documents passed forward.)

23   BY MR. TUCKER:

24   Q.   Mr. Ferrese, can you look at Plaintiffs' Exhibit 26

25   that has been admitted into evidence and tell us if you

Ferrese - cross

1    recognize that?

2    A.      Yeah, those are the pictures that the police officer

3    showed me on Saturday, July 9th.

4    Q.      Okay.  And do you see Mr. Sokolove's signs there?

5    A.      Yes.

6    Q.      And some of those signs also have Mr. Shields' name

7    and Mr. McCarthy's name; is that correct?

8    A.      Yes.

9    Q.      Do you see any of Mayor Cooper's signs?

10   A.      His signs weren't put up then, sir.

11   Q.      What?

12   A.      His signs were put up after July 11th.

13   Q.      We'll get to that with another witness,  sir, but if

14   that is your testimony, so be it.

15           Did you see any of Mayor Cooper's signs?

16   A.      You asked me the question.

17           THE COURT:  Whoa, whoa, whoa.  This is how it

18   has to work, Mr. Ferrese.

19           THE WITNESS:  Pardon?

20           THE COURT:  This is how it has to work.  You

21   listen to the question, you answer only the question asked.

22   You don't interrupt; okay?

23           THE WITNESS:  All right.

24           THE COURT:  Go ahead.

25   BY MR. TUCKER:

Ferrese - cross

1    Q.    Mr. Ferrese, I'll ask my question again.  Do you see

2    any of Mayor Cooper's signs?

3    A.    No.

4    Q.    Do you see any signs of Mr. Ron Patterson or

5    Mr. Barbour, if I'm pronouncing his name correctly?

6    A.    No.

7    Q.    Now, these pictures were taken by a City Police

8    Officer; is that correct?

9    A.    Yes.

10   Q.    Okay.  And according to her report that is admitted

11   into evidence, you took them into your personal possession;

12   is that correct?

13   A.    I asked for them, yes.

14   Q.    Okay.  How often do you take pictures that have been

15   taken by a City Police Officer in your own personal custody?

16   A.    Sir, I did not know there was an investigation going

17   on.  There were signs picked up.  They're making an

18   accusation that the signs were picked up on private

19   property.  They were picked up by a City employee and as

20   City Manager, it's my duty to look into it so I asked for

21   the pictures.

22   Q.    A police officer was present; correct?

23   A.    Yes.  She did not say I can't have them.

24   Q.    She did not lead you to believe there was an

25   investigation going on by this police officer into the

Ferrese - cross

1    taking of these signs?

2    A.      No, not whatsoever.  No investigation on Saturday,

3    July 9th, because in the back of the pickup signs there were

4    other signs, Pep Air Conditioning and Emergit Auction signs.

5    There weren't just political signs.

6              MR. TUCKER:  Your Honor, may I approach the

7    witness?

8              THE COURT:  You may freely approach.

9              MR. TUCKER:  Thank you.

10   BY MR. TUCKER:

11   Q.      Sir, I'm going to show you Plaintiffs' Exhibit 5

12   which is a copy of the police report which is already in

13   evidence that that police officer prepared.  Are you

14   familiar with that document?

15   A.      Yes, sir.

16   Q.      Okay.  What is the title of that document?

17   A.      A field service report.

18   Q.      Okay.

19              MR. TUCKER:  May I approach the witness?

20              THE COURT:  Yes.

21   BY MR. TUCKER:

22   Q.      What is the title below that regarding crimes and

23   associated information?  Is that what it says?

24   A.      Yes.

25   Q.      Wasn't it your understanding that she was

Ferrese - cross

1    investigating the possibility of theft of signs from private

2    property?

3    A.      No.   That, if you look at the time of that, it's

4    after she talked to me.   I talked to her at 11:30 in the

5    morning.   Nobody told me there was an investigation going

6    on.   I didn't even know Monday there was an investigation

7    going on.

8    Q.      And you are the City Manager in charge of the police

9    department; is that correct?

10   A.      Yes, but they don't tell me investigations that are

11   going on.   That's for sure.

12   Q.      Just so we're clear, you're talking to a City Police

13   Officer about some signs that have been taken and you don't

14   believe an investigation is going on?

15   A.      Correct.

16   Q.      Would you agree with me based on the report that we

17   received from your City Police Officer there was an

18   investigation going on?

19   A.      Evidently after, yes, sir.   I told you before that

20   there was an investigation and Scott O'Bier even did an

21   investigation on it.   And I told you before, I was being

22   threatened of being arrested over it.   But on July 9th, at

23   11:30 a.m., I knew nothing about this.

24   Q.      And can you tell the Court how many times in your

25   long history as City Manager that you have taken pictures

Ferrese - cross

1   from City Police Officers who have been called about

2   complaints in your own personal custody?

3   A.      I can't recall how many times.

4   Q.      More than once?

5   A.      When a police officer brings a picture in and makes

6   an accusation that it's on private property and one of our

7   employees did it, I would ask for the picture.  They don't

8   have to give it to me but I would ask for it and that's what

9   I did in this case.  I don't see where I did anything wrong.

10  Q.      Her report indicates I had taken two Polaroid photos

11  of the signs that were in the back of the vehicle and

12  Mr. Ferrese held on to them.  Is that what happened?

13  A.      I asked for them.

14          THE COURT:  Okay.  Here is what has got to

15  happen.  Whatever evidentiary value you think you have

16  gotten out of him having the pictures, it's done.  Let's go

17  to another topic unless there is something else about this

18  that you really need to get.

19          MR. TUCKER:  I understand, Your Honor.  Time is

20  short.  I'll move on.

21  BY MR. TUCKER:

22  Q.      When Mr. Rhodunda showed you various pictures that

23  he marked and admitted into evidence and that also we have

24  marked and admitted into evidence, and I would like to show

25  you what has been marked as Plaintiffs' 10 which shows three

Ferrese - cross

1   election signs, one for Mr. Patterson, one for Mr. Cooper,

2   one for Mr. Barbour and ask if you recognize that picture?

3   A.    Can I have my notes back, sir?

4   Q.    Do you need your notes to help you recognize that

5   picture?

6   A.    No, not to recognize the picture but I would like to

7   refer to it.

8            THE COURT:  Well, you know what?

9            THE WITNESS:  I mean I recognize the picture,

10   Your Honor.

11            THE COURT:  All right.  Then just answer his

12   questions.

13            THE WITNESS:  Yes, I recognize the picture.

14   BY MR. TUCKER:

15   Q.    Now, you testified about a policy about how signs

16   that are between a utility pole and the street are removed

17   under your policy, sir; is that correct?

18   A.    Yes.

19   Q.    Now, those signs or at least two of those signs,

20   wouldn't you agree, are between the utility pole and the

21   road?

22   A.    Yes.

23   Q.    Okay.  Those signs --

24   A.    The date the pictures were taken, you are correct.

25   Q.    So Mayor Cooper's sign -- which is one of them;

Ferrese - cross

1    correct?

2    A.    Yes.

3    Q.    And Mr. Barbour's sign, at least those two signs are

4    in an area that you have testified to in your policy would

5    be removed but they weren't removed; is that correct?

6    A.    On that day, they weren't.

7    Q.    What day were they removed?

8    A.    I have to get my notes, sir.

9         MR. RHODUNDA:  To speed things up, it may be

10   help the witness to refer to the document, because I'm going

11   to just go back up there and give it to him.

12        THE COURT:  Well, you are entitled to do that

13   but they're also entitled to cross-examine, so I'm going to

14   let them cross-examine and then I'll let you do your

15   redirect.

16        MR. RHODUNDA:  Thank you.

17        MR. TUCKER:  Thank you, Your Honor.

18   BY MR. TUCKER:

19   Q.    I'm handing you a copy of the complaint with the

20   pictures at least in black and white attached.  Can you tell

21   me when the signs were removed?

22   A.    Those signs, as of yesterday, were not at the

23   location that you put.  You put on Lee Street.  I went to

24   Lee Street.  There were no signs there.  If these signs are

25   existing where this looks to me like another street, it's

143

Ferrese - cross

1  not Lee Street, these signs are illegal, you are correct.

2  Q.    And they were not removed by the City despite the

3  policy articulated in Court today; correct?

4  A.    You're incorrect, sir.  I do not know when the signs

5  were put up.  After the City removed the signs, when the

6  City removed the signs on a Thursday and a Saturday, it hit

7  the media and I don't recall if the Building and Licensing

8  Department has been around removing signs since that day

9  until we got this issue resolved today.

10  Q.    Is it your testimony, sir, that your employees under

11  your management have not gone out and done any sign

12  enforcement since this hit the newspaper?

13  A.    I'm not aware of our employees other than one other

14  time removing other candidates signs and Mr. Sokolove's

15  signs.  One other time I'm aware.  Since this hit the

16  newspaper on the Monday after July 9th until this day, only

17  one other time am I aware of it.

18  Q.    And who was that employee?

19  A.    From what I can understand, it was the Building and

20  Licensing Department but I don't know which employee.

21  Q.    Okay.  So it's your testimony there has been one

22  sweep since this issue hit the paper the Monday after 7/9?

23  A.    Yes.

24  Q.    Which was a Saturday.

25  A.    After 7/11.

Ferrese - cross

1    Q.    Okay.  One sweep after 7/11?

2    A.    Yes, sir.

3    Q.    And that's it?

4    A.    That's all I can recall, sir.

5    Q.    And according to the affidavit, that picture was

6    taken after that date.  Do you understand that?  The picture

7    that is in front of you right now.

8    A.    If your question is -- I'm going to tell you right

9    now it's illegal.

10         THE COURT:  No, hold.  Hold.  Mr. Ferrese, stop.

11   Stop.

12         You need to be specific, sir.  When you say

13   after that date, I don't know what you are asking; all

14   right?  So maybe the witness doesn't know what you are

15   asking.

16         MR. TUCKER:  Very well, Your Honor.  I

17   apologize.

18   BY MR. TUCKER:

19   Q.    Mr. Ferrese, you heard Mr. Hill testify here today;

20   correct?

21   A.    Yes, sir.

22   Q.    And you heard him testify that he took pictures in

23   the City on July 18th and July 20th; correct?

24   A.    Yes, sir.

25   Q.    And I'm going to represent to you that that is one of

Ferrese - cross

1   the pictures that is in the packet that Mr. Hill took; okay?

2   A.      (Nodding yes.)

3   Q.      That picture was either taken, based on Mr. Hill's

4   testimony, either on the 18th or the 20th of July.  Can we

5   agree that is after July 11th?

6   A.      Definitely.

7   Q.      So there was one sweep, and we can say that those two

8   signs that you have admitted were in the public right-of-way

9   were not removed by City employees; correct?

10  A.      They were not removed.

11          THE COURT:  And what day was the day of the

12  sweep, sir?

13          THE WITNESS:  Your Honor, I can't recall what

14  day because, today, I mean we were talking two weeks later

15  but there was only one sweep.

16          THE COURT:  Some time after July 11th, one

17  sweep?

18          THE WITNESS:  Yes.

19          THE COURT:  But you don't know when?

20          THE WITNESS:  No, and all candidates were taken,

21  removed, not just Mr. Sokolove's.  Mr.  McCarthy's and

22  Mr. Shields'.

23          THE COURT:  Okay.  Fine.

24  BY MR. TUCKER:

25  Q.      And these are Mayor signs, an incumbent; right?

Ferrese - cross

1   A.      Yes.

2                   THE COURT:  You really have to move on, please.

3                   MR. TUCKER:  Yes.

4                   THE COURT:  You now have hit that point at least

5   four times.  I just don't have time for you to repeat.

6   BY MR. TUCKER:

7   Q.      Now, you heard the testimony of Ms. -- and I'm going

8   to take a crack at her last name -- Cargnino's testimony?

9   A.      Yes.

10  Q.      And you have seen her affidavit; correct?

11  A.      Yes.

12  Q.      Now, it seems to me that there is only two

13  explanations, sir, for the great disparity between her

14  testimony and yours?

15                  THE COURT:  Okay.  I'm going to object.  Ask a

16  question.  Please don't give us an editorial comment.  Okay?

17                  MR. TUCKER:  I apologize, Your Honor.

18  BY MR. TUCKER:

19  Q.      Is Melissa's job at stake regarding the outcome of

20  this election, Mr. Ferrese, as far as you know?

21  A.      I don't understand your question.

22  Q.      Let me ask it this way.  Is your job at stake if

23  there is a change in administration?

24  A.      No.

25  Q.      It's not?

Ferrese - cross

1    A.    No.

2    Q.    Okay.

3    A.    There has been accusations in the paper made that I'm

4    going to get fired, but they better read the City charter.

5    Q.    So you don't believe if a new administration comes in

6    that could be a bad thing possibly for you?

7    A.    Sir, I've been there 23 years.  I worked under

8    numerous Commissioners, I worked under three Mayors.  They

9    need four votes to fire me and they need justification to

10   fire me.  One Mayor can not come in and fire me and all my

11   department heads.  The department heads work for the City

12   Manager.  The Commissioners and the Mayor can fire me.  They

13   need four votes.  They have to do it at a public meeting.

14   I'm entitled to a hearing.  And if a Mayor comes in and

15   thinks he is going to fire me, he is one vote.  Okay?  Read

16   the charter.

17   Q.    I'm familiar with the charter, sir.  And if there

18   were four votes after this election because of a change,

19   that is a possibility; isn't that fair?

20   A.    Yes, sir.

21   Q.    Now, you articulated this policy about the utility

22   pole, you articulated a policy about sidewalks.  You also

23   mentioned a policy about parking spots.  Where can I find

24   that in writing?

25   A.    That's a policy between me and the departments.  The