Ferrese - cross

1    City Ordinance clearly states that you are not allowed to

2    have them in the right-of-way.  And as I testified earlier,

3    we are very lenient.  The right-of-way on a lot of our

4    streets is very long.  So we've come up with a policy years

5    ago.  It is not in writing, sir.

6    Q.    If I hand you the City Code, there is nothing in

7    writing on that; correct?

8    A.    You're right.

9              THE COURT:  I think he just established it's not

10   in writing.

11   BY MR. TUCKER:

12   Q.    And regarding the zoning map that Mr. Rhodunda showed

13   you --

14             THE COURT:  It's up here.

15             MR. TUCKER:  Thank you.

16   BY MR. TUCKER:

17   Q.    I'm putting it before you again, Mr. Ferrese.  The

18   City official zoning map; correct?

19   A.    Yes, sir.

20   Q.    In the legend you referred to on direct by

21   Mr. Rhodunda, you referred to the zoning designations that

22   are in the legend; correct?

23   A.    Yes.

24   Q.    Is there also a reference in that legend to street

25   right-of-way lines?

Ferrese - cross

1    A.    No.

2    Q.    There is not?

3    A.    I don't -- I don't recall.

4    Q.    Take a look at it.

5    A.    Can you show me where?  I don't have my glasses.  I'm

6    sorry.

7    Q.    I'm sorry.  Take your time.

8         THE COURT:  I'm sorry.  Do you need glasses to

9    be able to read that, sir?

10        THE WITNESS:  Well, it says street right-of-way.

11   He's right.  It's on there.

12   BY MR. TUCKER:

13   Q.    Now, there is a designation for what a street

14   right-of-way is; correct?  In that legend?

15   A.    In the legend, yes, sir.

16   Q.    Now, is that the zoning map that is available if any

17   citizen goes to the City to buy a map?

18   A.    Yes.

19   Q.    Okay.  Can you tell the Court where on that entire

20   zoning map the City right-of-way is designated?

21   A.    I don't think you are going to see that on a zoning

22   map, on this map.

23   Q.    Is there another map that I can buy from the City

24   that would designate that for me?

25   A.    No, but it spells it out in the City Code.

Ferrese - cross

1    Q.      We'll get to that.  Now, Mr. Ferrese, wouldn't you

2    agree that you could have a utility pole in the public

3    right-of-way that's located in the middle of the public

4    right-of-way?

5    A.      Yes.

6    Q.      Okay.  So if you use the utility pole as your

7    measuring stick to insure you were removing signs only from

8    the public right-of-way, you may not be removing signs from

9    the public right-of-way if the utility pole is in the middle

10   of the public right-of-way; isn't that so?

11   A.      No, we're removing it from the public right-of-way.

12   Q.      Doesn't that create another area potentially that is

13   also public right-of-way that you are not removing any signs

14   from under your policy?

15   A.      I don't understand your question, sir.  I'm sorry.

16   Q.      Okay.  Let me try again.  You have a public

17   right-of-way.  Let's say it's 10 feet wide, hypothetically.

18   Okay?

19   A.      Yes.

20   Q.      There is a utility pole that is five feet into that

21   public right-of-way.  It's possible; right?

22   A.      Yes, it's possible.

23   Q.      Probably not unlikely?

24   A.      It's possible.

25   Q.      Okay.  Somebody puts their sign up behind the utility

Ferrese - cross

1    pole, okay?  Maybe a foot behind it; right?

2    A.     Yes.

3    Q.     It's still in the public right-of-way?

4    A.     Yes, sir.

5    Q.     But you are not going to remove it?

6    A.     Right.

7    Q.     And unless somebody knows about your policy, if they

8    put a sign up on the other side of that utility pole, theirs

9    is going to get removed but somebody else's isn't?

10   A.     That's right, sir.

11   Q.     Even though they're both in the public right-of-way?

12   A.     Yes, sir.  It exists today.

13   Q.     And when there is no utility pole and there is no

14   sidewalk, what does somebody do then?

15   A.     Well, when there is no utility pole and no sidewalk,

16   usually the property line does come, the property line of

17   the owner comes to the street.  But I said earlier that we

18   use the parking spaces as the right-of-way.  Remember I told

19   you earlier the parking space, there is a landscaping tie or

20   whatever.  That's the other side of the parking space and I

21   told you earlier we try to be as lenient as possible.

22          If we wanted to be stringent, Mr. Tucker, we

23   could go all the way back to the property line which would

24   be 30 feet from the sign, you would never see the sign, but

25   we're trying to be as cooperative as possible.  All they

Ferrese - cross

1   have to do is if they could come in and talk to me about it.

2   Q.    Mr. Ferrese, doesn't the police report, Plaintiffs'

3   Exhibit 5, note that Mr. Sokolove attempted to reach you but

4   couldn't reach you on 7/9?  Isn't that mentioned in the

5   police report?

6   A.    I don't know how he tried to reach me.  Nobody called

7   my house, sir, and I have an answering machine.  I leave

8   work at 12:00 o'clock and I go home.  I have an answering

9   machine at my house.  Nobody called my house, not a police

10  officer or Mr. Sokolove.

11  Q.    Are you aware that when you were interviewed in that

12  police report you didn't dispute he tried to reach you?

13  A.    To be honest with you, sir, I never read Cleveland's

14  police report and I never read O'Bier's investigative

15  report, sir.  I never read it.

16  Q.    Would it surprise you if I told you it's in the

17  report, that it specifically says my client, Mr. Sokolove

18  tried to reach you and you weren't available?

19  A.    I'm available, sir.  I have a phone.

20  Q.    Now, Mr. Rhodunda also mentioned two letters that

21  were sent by Mr. Lawson regarding concerns over the City's

22  enforcement over this sign that you did not respond to;

23  correct?

24  A.    I did not respond.

25  Q.    And you said you had a discussion with the City

Ferrese - cross

1   Solicitor?

2   A.      Yes.

3   Q.      And the reason you said you didn't respond is because

4   you thought this was becoming litigious; correct?

5   A.      Possibly.

6   Q.      Did ask you the City Solicitor to write a letter

7   explaining the City's position on its unwritten policy so

8   this was clear?

9   A.      No, I did not.

10          MR. TUCKER:  I'm sorry, Your Honor.  I'll get

11  through these pictures quickly.

12          THE COURT:  Do you have any idea, Mr. Tucker,

13  how much longer you expect to be?

14          MR. TUCKER:  Probably another ten minutes.

15  BY MR. TUCKER:

16  Q.      Sir, I'm going to show you Plaintiffs' Exhibit 22

17  which is a picture of Second Street and Henlopen street,

18  picture 20 which is the Village Improvement Association sign

19  as well as Plaintiffs' 16 which is the City Convention

20  Center sign.

21          Now, Mr. Ferrese, on Plaintiffs' Exhibit 22, can

22  you tell us what that picture depicts?

23  A.      That's a street sign designating Second Street and

24  Henlopen Avenue and there is an Art League informational

25  sign attached to it.

Ferrese - cross

1    Q.    What is the Art League?

2    A.    It's located in Henlopen Acres.  It's not in the City

3    of Rehoboth Beach and people have to go through the City of

4    Rehoboth Beach to get to the Art League.  I'm not a member.

5    I don't know what they do, to be honest with you,

6    Mr. Tucker.

7    Q.    Are they a City organization?

8    A.    No.

9    Q.    And that is a City pole?

10   A.    Yes.

11   Q.    And that is located in the right-of-way; correct?

12   A.    Yes, sir.

13   Q.    Okay.  Is that sign a violation of the City's Code?

14   A.    No.

15   Q.    Is that sign a violation of your policy?

16   A.    No.

17   Q.    Why not?

18   A.    First of all, the sign was put up there before I

19   arrived 23 years ago.  And it's a directional sign.  It's a

20   nonprofit organization.  It's in the City right-of-way and

21   we allow that sign only on that pole.

22   Q.    Would you agree that your sign code says that no

23   private signs are allowed in the right-of-way?  Can we agree

24   on that?

25   A.    Yes.

Ferrese - cross

1    Q.    Okay.  Can you point me, in your code, to any

2    grandfather provision whatsoever of any kind in your zoning

3    code or your general municipal code that creates a

4    grandfathering provision for existing signs?

5    A.    I don't have the code book but signs are

6    grandfathered, sir.  I don't have the code book.

7    Q.    Where is that provision at?

8    A.    It's in the zoning code of the City of Rehoboth

9    Beach.

10   Q.    Okay.

11   A.    If a sign was put up prior to an ordinance being

12   adopted, it's grandfathered.  I don't know when the Art

13   League signs went up.  All I can testify is they were up

14   prior to my arrival.  The Art League asked they be replaced

15   because the signs were rusty during my tenure and I allowed

16   the Art League to put new signs up and replace the old ones.

17   Q.    And approximately how many of those signs exist

18   throughout the city, sir?

19   A.    I have no idea.

20   Q.    Would it surprise you if I said more than 50?

21   A.    I have no idea.

22            MR. TUCKER:  Your Honor, I believe the sign

23   code which is in the zoning code is in the record.  And I

24   guess it will speak for itself with regard to the City

25   grandfathering provision.

Ferrese - cross

1           THE WITNESS:  Can I add to that, Your Honor?

2           THE COURT:  You've got to wait for questions and

3  then, of course, Mr. Rhodunda will have a chance to ask you

4  questions on redirect, Mr. Ferrese.

5  BY MR. TUCKER:

6  Q.    Now you mentioned plot plans, sir, that the City gets

7  when people make applications throughout the city to do

8  certain development provisions; is that correct?

9  A.    I don't recall that I mentioned it during my

10  testimony.

11  Q.    Do you remember Mr. Rhodunda handing you a plot plan

12  that you asserted came from Mr. Sokolove's property when it

13  had been developed under a prior owner?

14  A.    No, he didn't hand me that.  I don't recall.

15           MR. TUCKER:  I'm sorry, Your Honor.  I thought

16  this had been marked.

17           Okay.  I'm sorry.  It was marked for

18  identification as Defendants' 2 For Identification but was

19  not moved into evidence.

20           THE COURT:  This is what?

21           MR. TUCKER:  This is a picture of a plot plan

22  that Mr. Rhodunda had been referring to earlier along Lake

23  Avenue.

24           THE COURT:  Well, it will have to be marked as

25  something else for identification because Defense Exhibit 2

Ferrese - cross

1    is a stack of photographs.

2                    MR. SCHILTZ:  26 or 27?

3                    THE DEPUTY CLERK:  27.

4                    THE COURT:  I sincerely hope I'm not going to be

5    getting back into the property line aspect of this case.

6                    MR. TUCKER:  No, Your Honor.

7                    THE COURT:  Go ahead.

8    BY MR. TUCKER:

9    Q.     Mr. Ferrese, do you recognize that document?

10   A.     Yes.

11   Q.     Do you remember Mr. Rhodunda asking you about that

12   document?

13   A.     No.

14   Q.     Okay.  Are you familiar with what that document is?

15   A.     To me, it just shows the property lines and lot

16   numbers.

17   Q.     Do you have any knowledge as to whether or not the

18   City keeps those on record for properties throughout the

19   City?

20   A.     The Building and Licensing Department does that.

21   Q.     Do you know if any attempt was made to look at

22   documents such as those when deciding not to remove certain

23   signs that were questionable under your policy?

24   A.     I'm not aware of any.

25   Q.     Is there any policy related to that?

Ferrese - cross

1    A.        Pardon me?

2    Q.        Is there any policy related to checking public

3    records regarding your questionable signs?

4    A.        You would have to ask the Building and Licensing,

5    sir.

6    Q.        Are you not aware of any?

7    A.        I'm not aware.

8    Q.        Now, Mr. Ferrese, you also mentioned about using

9    parking spots in the absence of a parking lot or utility

10   pole as a benchmark to determine your right-of-way as an

11   inspector; correct?

12   A.        Yes.

13   Q.        Do either Mr. Murphy or Mr. Onizuk know that policy?

14   A.        Mr. Murphy knows it and I'm sure he told Bob Walter

15   and Steve.  They're both employees in the Building and

16   License Department.

17   Q.        That parking spaces are used?

18   A.        Yes.

19   Q.        As a marker?

20   A.        Yes.  Or you said there isn't any utility poles, yes.

21   Q.        Mr. Ferrese, would it surprise you if we learned that

22   for the first time about this policy yesterday during

23   depositions?

24   A.        It would surprise me.

25   Q.        It does surprise you?

Ferrese - cross

1   A.      Yes, it would surprise me.

2   Q.      If you or Mr. Speakman or somebody from the City had

3   written to our clients and explained this policy, do you

4   think maybe this could have been avoided today?

5   A.      I think that once the signs were removed on Saturday,

6   July 9th, that if Mr. Sokolove would have contacted me

7   Monday morning and went over everything, yes, this could

8   have been resolved easily, but for one reason or another, it

9   did not occur.

10  Q.      But you received letters from his attorney asking for

11  clarifications on these points; correct, sir?

12  A.      I received letters asking for clarifications on the

13  points and also threatening letters of litigation.

14  Q.      Doesn't the letter indicate, it's already in

15  evidence, that if they don't get a response it's only in

16  that case they would file something in court?

17          THE COURT:  Okay.  At this point, I

18  understand -- I think I understand where you are going with

19  this.  And in fact, I'll be talking to both sides here in a

20  minute about sensible resolutions, but --

21          MR. TUCKER:  I'll move on.

22          THE COURT:  -- I think I have your point,

23  Mr. Tucker.

24          MR. TUCKER:  I'll move on, Your Honor.

25  BY MR. TUCKER:

160

Ferrese - redirect

1  Q.    Mr. Ferrese, is it fair to say that if you are an

2  incumbent in the City, and you know about this unwritten

3  policy, you have an advantage when it comes to putting out

4  your signs?

5  A.    That's not fair to say, sir.  I've been here

6  23 years.  This is the first time I've ever experienced

7  something like this.  All the incumbents, if they feel they

8  put the sign in wrong location and it was removed, they

9  would move it back where it's supposed to be, sir.  It's as

10  simple as that.

11  Q.    You don't think this creates an unfair situation; is

12  that your testimony?

13  A.    You asked me a question, I gave you an answer.  I do

14  not.

15          MR. TUCKER:  Thank you, Your Honor.

16          THE COURT:  All right.  Any redirect?

17          MR. RHODUNDA:  May I have one moment, Your

18  Honor?

19          THE COURT:  Sure.

20          (Pause.)

21                  REDIRECT EXAMINATION

22  BY MR. RHODUNDA:

23  Q.    Mr. Ferrese, I just have a few follow-up questions

24  for you.  You were shown some pictures by the plaintiffs'

25  lawyers and you were asked questions about whether they

Ferrese - redirect

1    constituted violations or not regarding Mayor signs; is that

2    correct?

3    A.      Yes, sir.

4    Q.      Were any complaints made to you about the locations

5    of those signs?

6    A.      No.

7    Q.      And those little signs, Art League, do they have an

8    arrow on them pointing the way to the Art league?

9    A.      Yes, sir.

10   Q.      Is Art League hard to find otherwise?  Is it hard?

11   A.      It's a nonprofit organization located in Henlopen

12   Acres, a bunch of artists.  I don't know their function.

13   Q.      And the Convention Center sign, does that have an

14   arrow on that that points to the Convention Center?

15   A.      I can't recall.  To be honest with you, there is a

16   Convention Center sign in front of City Hall designating the

17   Convention Center.  It's on City property.

18             MR. RHODUNDA:  I don't have any further

19   questions, Your Honor.

20             THE COURT:  Okay.  Mr. Ferrese, thank you.  You

21   may step down, sir.

22             MR. RHODUNDA:  Thank you, Your Honor.

23             MR. TUCKER:  Just one follow-up.

24             THE COURT:  No, we do direct-recross-redirect.

25   We're done.

1                    Okay.  Do we have any other witnesses?

2                    MR. RHODUNDA:  Your Honor, we do have Mr.

3     Onizuk, Mr. Murphy here.  Now, they were deposed yesterday.

4     I'd be happy to provide the deposition support and just

5     argue based on what they were deposed on rather than calling

6     them as witnesses, unless the Court feels that their

7     enforcement of this ordinance is something the Court wants

8     to hear.

9                    THE COURT:  Mr. Schiltz?

10                   MR. SCHILTZ:  May I confer with my clients, Your

11    Honor?

12                   THE COURT:  Yes.

13                   (Pause.)

14                   MR. SCHILTZ:  Your Honor, we have no objection

15    to supplementing the record by designations from the

16    testimony of Mr. Onizuk and Mr. Murphy.

17                   THE COURT:  All right.  Fine.  Thank you.

18                   Then I take it on that basis, you rest?

19                   MR. RHODUNDA:  No, actually I want to move the

20    admission of our submission before the Court.

21                   THE COURT:  Move what?

22                   MR. RHODUNDA:  Move the affidavits that are that

23    attached to the memorandum in opposition to the plaintiffs'

24    motion.  As Your Honor is aware, this has been a very

25    expedited matter.  The plaintiffs certainly had at least a

1    week or two headstart on us.  We were able to obtain some

2    affidavits.

3                THE COURT:  From whom?

4                MR. RHODUNDA:  I'm sorry?

5                THE COURT:  Just identify the affidavit.

6                MR. RHODUNDA:  Okay.  The affidavits from

7    Richard Sargent, who is a current City Commissioner, we were

8    able to obtain that yesterday; from a Patrick Gossett that

9    we received yesterday, who is currently Commissioner for the

10   City; and also a former mayoral candidate, Charles Bahan.

11   And we were able to obtain that affidavit yesterday in

12   response to the claims raised in the plaintiffs' memorandum

13   and we would move their admission because they support the

14   consistent and ongoing enforcement of the sign ordinance in

15   the City.  They actually speak to that in just very short

16   one-page affidavits going back over the last 10 years.

17               MR. SCHILTZ:  Obviously, we don't have an

18   opportunity to cross-examine.  They are hearsay and we

19   object.

20               THE COURT:  All right.  Well, I'll take it under

21   advisement.  It's part of the court record already.

22               MR. SCHILTZ:  It is, Your Honor, but I think you

23   understand my position.

24               THE COURT:  Yes, I have your position.  You're

25   objecting to it being part of the record of this hearing and

164

1    I've told you I'll take it under advisement.

2              Is there any other evidence you want to present?

3              MR. SPEAKMAN:  Your Honor, we're having a

4    little trouble deciding whether we have one more witness,

5    depending, because that witness would go towards historical

6    enforcement of the ordinance question.

7              THE COURT:  Well, if you have a witness here and

8    you want to put him on, put him on.

9              MR. SPEAKMAN:  May we have another moment to

10   talk about that?

11             (Counsel confer.)

12             MR. RHODUNDA:  Your Honor, we're resting.

13             THE COURT:  All right.  Is there any rebuttal

14   evidence you want to put on, on the plaintiffs' side,

15   Mr. Schiltz or Mr. Tucker?

16             MR. TUCKER:  One moment, Your Honor.

17             (Pause.)

18             MR. SCHILTZ:  No.

19             THE COURT:  All right.  Both sides then have

20   rested.  The record is complete with the sole exception that

21   I have under advisement whether or not to make certain

22   affidavits or declarations part of the record.

23             Let's talk for a moment about getting your

24   positions before me, your legal positions before me.

25             I have the submissions that both sides have

1   made.  Do you think you want or need some additional

2   opportunity to present to me either argument today, which

3   would have to be very brief, I have a 2:30 matter that I

4   need to address, or do you want to take the opportunity to

5   give me something in writing in light of the evidence that

6   was submitted today?  Mr. Schiltz?

7                MR. SCHILTZ:  Your Honor, from the plaintiffs'

8   position -- and I apologize.  Did I understand that Your

9   Honor has an obligation at 2:30?

10               THE COURT:  Yes.

11               MR. SCHILTZ:  But there would be an opportunity

12  to come back after that to present oral argument?  No, I'm

13  just trying to understand.

14               THE COURT:  No.

15               MR. SCHILTZ:  Your Honor, we're happy to proceed

16  with oral argument right now.  We do not believe we need

17  additional legal submissions summarizing the facts.

18               THE COURT:  There you go.  That's what I'm

19  looking for.  Thank you very much.

20               All right.  Mr. Rhodunda or Mr. Speakman, the

21  same question to you.  Are you prepared to proceed to

22  argument now and do you think you need to give me something

23  else in writing?  I got what you sent in.

24               MR. RHODUNDA:  Correct.  We're ready to proceed

25  to argument, Your Honor.

1          THE COURT:  Okay.  Let's go ahead and have your

2     argument.  And I apologize right now if, for any reason, we

3     don't go through this, I may require you to stay and we come

4     back after I have my 2:30 proceeding, but I'm hoping that we

5     can get through.  We'll see.  Go ahead.

6          MR. SCHILTZ:  Your Honor, our application in our

7     oral argument we think is relatively short.  It follows the

8     legal memorandum we submitted at the outset of the case.

9     There are two arguments that we're going to make.  The first

10    is that the City Ordinance Section 74-16 is unconstitutional

11    on its face and, secondly, that it's been enforced in a

12    selective and discriminatory manner.

13         THE COURT:  As to the first point, let's hit

14    that.  You tell me, which is the one you think you pin most

15    of your hope on, if you had to rank them?

16         MR. SCHILTZ:  Your Honor, I'll be honest.  I

17    think the unconstitutional on its face argument is a very

18    strong argument.  The other argument is very strong as well.

19    The only issue is whether or not there has been some record

20    created that might dispute whether it's been selectively

21    enforced.

22         THE COURT:  Okay.  As to the unconstitutional on

23    its face argument, your opponent cites me to City of Los

24    Angeles vs. Taxpayers for Vincent, where, for aesthetic

25    purposes, the City ordinance banning bills on poles was

167

1  upheld against a challenge that it was an infringement on

2  political speech.  How does that precedent affect your

3  position that this is overbroad to say that you can't have

4  these political signs on public property?

5      MR. SCHILTZ:  The answer, Your Honor, is every

6  constitutional analysis begins with looking at the statute

7  at issue.  And the statute at issue in the Vincent case is

8  just different than the statute at issue in this case.  The

9  statute at issue in the Vincent case prohibited across the

10  board anyone, including the government, from erecting signs

11  on public right-of-way.  Here, the statute excepts the

12  Government from that prohibition.

13      We see it throughout the record, Your Honor.

14  You look at the most glaringly the 30-foot tall City of

15  Rehoboth Beach Convention Center sign.  Is that a

16  directional sign, as our, my friends say?  Even if it is,

17  first of all, I don't see a narrowly tailored exception in

18  74-16 which would prohibit that.  But let's look at the it

19  for what it really is it's a commercial sign.  You see on

20  it, it has an advertisement for "Oklahoma."  Well, you will

21  hear from the deposition testimony that we would submit

22  that that was a private production that is put on by

23  private -- in the private enterprises that charges a fee

24  and earns money for that.

25      So we've got the City promoting commercial

1    speech on a sign.  Now, query:  Could the playhouse down the

2    street erect a 30-foot soon sign that says "Come See Yankee

3    Doodle Dandy?"  I think they would claim that is prohibited

4    by 74-16.  So we have a very different statute.  The one in

5    Vincent prohibited across the board.  City couldn't do it,

6    State couldn't do it, private individuals couldn't do it.

7    Here, that is not the case.  The City, in fact, is exercised

8    its rights to go ahead and erect large signs.

9                THE COURT:  Large signs?

10               MR. SCHILTZ:  There are certainly the City of

11   Rehoboth sign, there is a "Welcome" sign as you come into

12   the town.  You know, we hear this is -- I can show you that

13   although the record is closed.  I can point you to a

14   lighthouse that sits in the circle.  We hear this is about

15   aesthetics and maintaining the lovely Rehoboth Beach, yet

16   the City itself erects a 30-foot blinking sign on the

17   busiest commercial street in the City.

18               THE COURT:  So the City's placing a sign on the

19   commercial thoroughfare you think is --

20               MR. SCHILTZ:  It's an example of what is

21   permitted by the statute, and by permitting that, the

22   statute is unconstitutional because it treats certain

23   speakers, the Government, differently than other speakers,

24   anyone else.

25               And think about that, Your Honor.  Why do we

1    have the First Amendment?  We have the First Amendment to

2    prohibit the Government from silencing the populus and

3    allowing it to speak.  Yet that is what the ordinance does.

4    It allows the Government to speak on any issue, Your Honor.

5    That is not limited.  It can promote any activity that it

6    wants.

7            Look at the Supreme Court precedent.  And, Your

8    Honor, the point there then -- and taking this to the next

9    step.  That renders the statute content-based vs.

10   content-neutral.  The difference between the plaintiffs'

11   submission on the law and mine is that they apply a

12   different test.

13           THE COURT:  They sure do.

14           MR. SCHILTZ:  They do.  It's a time, place and

15   manner test.  And that is what happens when there is a

16   content-neutral statute.  When there is a content-based

17   statute, a much different standard applies.  That is clear

18   from all the case law.  I don't think anybody is going to

19   dispute that.  And, frankly, Your Honor, that is probably

20   the most fundamental decision.  Once your Court decides

21   that, I think the rest flows relatively easily.

22           When you are in a content-based application, you

23   have to show a compelling need, compelling justification.

24   I cited the Court, I believe it's the Whitton case from

25   the Eighth Circuit which said aesthetics and traffic isn't

1   compelling, never has been recognized as such.  And then

2   you have to have it narrowly -- excuse me.  It has to be

3   narrowly tailored.  So it has to say:  Well, we've got a

4   big ban.  We're not going to have any ban but we're going

5   to allow this one little thing.  We're going to allow

6   directional signs.  A lot of statutes, including the

7   Delaware state stature that was at issue in the Rappa case

8   say that:  Big ban, can't have it on this side of the roads,

9   but if you want to put up a directional sign because

10  obviously roads people need to be directed on roads, that

11  that is okay.  It's narrowly tailored, serving the function

12  of the venue.  That's not what we have here, Your Honor.  We

13  have a blank check for the City.

14          THE COURT:  Well, I'm sure that Mr. Rhodunda or

15  Mr. Speakman, of course, will be speaking for themselves but

16  I understand their position to be that what we're talking

17  about here is a permitted time, place and manner restriction

18  to meet an aesthetic end.  And what you are saying is:

19  Don't even get that far because, since this is a restriction

20  only on private signs, doesn't restrict the Government, you

21  never get past that issue.  By that very fact that it's

22  private sign only, I'm in noncontent-neutral space.  Have I

23  understood you right?

24          MR. SCHILTZ:  I believe because it

25  differentiates between speakers that this is a content-based

1    statute.   Then you have to apply the contest-based test and

2    we don't think they meet the test.

3              THE COURT:   And differentiating between speakers

4    is the Government and non-Government?

5              MR. SCHILTZ:   Absolutely.

6              THE COURT:   Okay.   Fine.   I got your argument.

7              MR. SCHILTZ:   I will state, however, Your Honor,

8    even if you apply the plaintiffs' standard, one of the

9    fundamental components of that is narrowly tailoring the

10   relief, the exception; once again, the prohibition.   And

11   again, this statute just doesn't have it.   It's not narrowly

12   tailored on the front end.   It prohibits everything.   The

13   Supreme Court said that's okay.   Now we have this exception.

14             Frankly, Your Honor, I don't think the time,

15   manner and place exception we ever get to, because if you

16   look at the Rappa case, it applied what I will call an

17   intermediate standard.   And let me explain that to Your

18   Honor.   That statute, as I said, had broad prohibition on

19   signs next to roadways and then it had a number of clearly

20   delineated exceptions.   And there, the Supreme Court --

21   excuse me -- the Third Circuit said in situations like that,

22   there must be --

23             THE COURT:   Give me a page cite.

24             MR. SCHILTZ:   Your Honor, it's not it easiest

25   think to articulate but it's at page 1065, Your Honor.

 1          THE COURT:  Okay.  I have it in front of me.

 2  What language do you want to point me to?

 3          MR. SCHILTZ:  Right at footnote six.

 4          THE COURT:  Footnote 36?

 5          MR. SCHILTZ:  Six.  No, I'm sorry.  Headnote

 6  six, at the top of the page.

 7          THE COURT:  All right.

 8          MR. SCHILTZ:  This is dealing with a situation

 9  where there is a general ban and an exception of certain

10  narrowly tailored speech.  The court said:  There must be a

11  significant relationship between the speech that is being

12  permitted and the location that is being regulated.  It must

13  be clear that the State didn't make this distinction in an

14  attempt to sensor viewpoints or control what issues are

15  appropriate for public debate.

16          There is no evidence on that issue here, Your

17  Honor.

18          And it goes on to say:  The exception is

19  substantially related to advancing an important State

20  interest that it at least as important as the interest

21  advanced by the ban.  And then, importantly, the exception

22  is no broader than necessary to advance the special goal;

23  the exception, the goal that is being recognized in the

24  exception; and that the exception is narrowly drawn so as to

25  impinge as little as possible on the overall goal.

1          I just don't see that statute meeting this test.

2    And if you are not going to look at this as contest-based as

3    we think you should, at the very least the Rappa test

4    applies.   And, frankly, we don't think it survives that

5    either.

6              THE COURT:  All right.

7              MR. SCHILTZ:  I'll move on.

8          The second argument we have is the statute has

9    been applied in a discriminatory record.   And I want to

10   break the record down into areas.   The first will be what I

11   term essentially commercial speech and the second is the

12   campaign sign issue.

13         We have heard a lot about where the campaign

14   signs are, whose signs were removed, whose weren't, but the

15   record is clear, Your Honor, that there is a multitude of

16   commercial signs in the public right-of-way which are never

17   touched.   I'll direct the Court's attention to the

18   Village -- I forget.

19             MR. SPEAKMAN:  The Village Improvement

20   Association.

21             MR. SCHILTZ:  Thank you, sir.

22             (Continuing):  -- the Village Improvement

23   Association sign.  The only evidence is that it's located on

24   City property.  It's clearly advocating this association.

25   Let's talk about the 50 Art League signs.  Let's talk about

1    the trailer park sign, a foot off the road.  I just don't

2    see that there has been any consistent enforcement with

3    respect to those signs.  So they let all of those go.  But

4    we're going to remove the political signs.  That is not

5    appropriate.

6             Now, Your Honor has heard a lot of evidence on

7    the last issue, that is, selective enforcement vis-a-vis the

8    campaign signs.  Now, frankly, I think there is clear

9    evidence that the plaintiffs were advised ahead of time that

10   they could erect signs in the public right-of-way.  They

11   relied on that advice and they went out and erected their

12   signs.  Then they see their signs are removed from both

13   private placements as well as public right-of-ways while

14   other signs remain in the identical property, Your Honor.

15            Now, that seems troublesome but it's almost not

16   surprising, given the fact that the City has adopted a

17   completely arbitrary standard for enforcing its ordinance.

18   The ordinance precludes private parties from erecting signs

19   in public right-of-ways.  It has to be enforced, Your Honor,

20   consistently.

21            We heard Mr. Ferrese say we don't enforce it.

22   If it's a 10-foot wide swatch and the pole is five feet

23   right in the middle of it and there is a sign right behind

24   it, we look the other way.  And they look the other way

25   repeatedly here, Your Honor, to the detriment of my client

1    and in favor of the incumbents.

2              Now, instead of looking to the record, to the

3    records in their offices and figuring out where the

4    right-of-way is with respect to all these properties, they

5    employ this rule of thumb that says, well, if it's between

6    the curb and the far side of the sidewalk that it's done,

7    that's no good.  If it's closer to the road than the utility

8    pole, that's no good either.  Then if there is neither of

9    those, frankly, Your Honor, we just let it go.  And that

10   testimony comes from the deposition, Your Honor.

11             THE COURT:  Which deposition?

12             MR. SCHILTZ:  I'll read it to Your Honor.

13             THE COURT:  Well, you can read it to me if it's

14   the deposition of one of these folks.

15             MR. SCHILTZ:  It is.

16             THE COURT:  Okay.

17             MR. SCHILTZ:  It's the deposition of Mr. Onizuk.

18             THE COURT:  Okay.

19             MR. SCHILTZ:  And I apologize, I don't have the

20   final court version of this, but I can submit later a --

21             THE COURT:  That's all right.  Go ahead and put

22   it into the record.  If Mr. Rhodunda or Mr. Speakman have a

23   problem, I'm sure they'll tell me.

24             MR. RHODUNDA:  Not the entire transcript into

25   the record.

1          MR. SCHILTZ:  I've got it, Your Honor.  It's on

2     page 69, line 14 of this transcript that I've got.  And this

3     is Mr. Tucker.

4          "Question:  Let me ask the question.  It is

5     important.  What do you do in that instance?  What do you do

6     in an instance where there is a street, there is no utility

7     poles, and no sidewalk?

8          "Answer:  Then I would say I'm going to leave

9     those signs alone.  They might be on somebody's private

10    property.

11         "Question:  You would not remove those signs?

12         "Answer:  I would not remove them.  If I have

13    any doubt, I won't touch them."

14         THE COURT:  All right.

15         MR. SCHILTZ:  So they're not looking to

16    determine whether or not it's in the public right-of-way.

17    They've adopted a scheme that nobody knew about, that we

18    asked repeatedly about to try to find some information

19    about.  We weren't told.  The incumbents knew it so they

20    knew how to put up their signs so they're not taken down.

21         Your Honor, I just think collectively as a

22    whole, if you look at all those actions, it clearly shows

23    that this statute has been applied in an entirely selective

24    and arbitrary manner, vis-a-vis my client's political signs.

25         THE COURT:  All right.

1    MR. SCHILTZ:  And I'll only touch on it.  I

2    don't think -- I'll say this:  There are other elements that

3    were required to be met in connection with the preliminary

4    injunction application.  I believe there really is no

5    material dispute that if we prevail on the likelihood of

6    success of the merits prong that the others flow therefrom.

7    But if I'm incorrect, Mr. Rhodunda will correct me.

8    THE COURT:  And you will have a chance for

9    rebuttal.

10    MR. SCHILTZ:  Thank you.

11    THE COURT:  All right.  Mr. Rhodunda.

12    MR. RHODUNDA:  Thank you, Your Honor.

13    I think unfortunately this case is a product the

14    heightened emotions associated with a political campaign.

15    It is not a constitutional issue.  The plaintiffs can't

16    escape that this is the City.  They can't escape it.  It's

17    the same type of ordinance that if you read the case

18    carefully, you will see certain governmental signs in the

19    Vincent case particularly cited in the decision are street

20    signs, are traffic signs.  So clearly Vincent, you can't

21    think the City of Los Angeles does not have Governmental

22    directional informational signs within the City of Los

23    Angeles.

24    THE COURT:  Let's get specific here.  The

25    assertion by your opponent that you need to speak to, to

1    meet head on, is that the ordinance at issue in the Vincent

2    case, Section 28-04 of the Los Angeles Municipal Code which

3    is quoted right at the start of the opinion, does not limit

4    itself to private parties but evidently, as the plaintiffs

5    read it, prohibits anybody from posting information.

6    That's the assertion.  And that what makes these cases

7    fundamentally different is the Government is excepted and it

8    gets to post in public rights-of-ways and that private

9    parties don't.  Speak to that issue if you would, please.

10   Does that distinction that they draw hold water?  If not,

11   why not?

12           MR. RHODUNDA:  It doesn't hold water.  There is

13   no doubt this is a content-neutral ordinance.  It should be

14   appropriately considered as content-neutral.  The plaintiffs

15   have not identified any case law that indicates that a

16   Government set aside from private individual or private

17   corporations establishes a different party of interest.  The

18   Government signs that they have identified here are the

19   types of signs any Government is going to have with

20   directional or informational signs for Government.  And I

21   believe the courts have indicated repeatedly that is the

22   case, that they are constitutional and permitted signs.

23           The Rappa case actually strongly supports our

24   position because in the Rappa case, they have a broader

25   ordinance that prohibits signs.  I think they have up to 10

1   exceptions.   The Third Circuit threw out that ordinance

2   based on one of the 10 exceptions.   But what is interesting,

3   and we cited it regularly throughout our filing, is that all

4   the types of signs that Government typically put up are

5   constitutionally-permitted signs.

6          MR. RHODUNDA:   There is also another case that I

7   think is right on point for us.

8          THE COURT:   Well, let me ask you a question

9   about; again, trying to get you to meet the argument made by

10  your opponent; the assertion is made that you, the City of

11  Rehoboth, have gone beyond directional signs.   That you have

12  a big commercial sign advertising commercial activity.   That

13  you have a series of signs, up to 50, that benefit a

14  particular organization by highlighting them and pointing

15  the way to their location.   That's the claim that is made to

16  me, the assertion that is made.   Do those facts make a

17  difference?

18         MR. RHODUNDA:   No, Your Honor, because I relate

19  these signs that you have just mentioned more to like "don't

20  swim in Lake Gerar" signs.   Presumably, it's a government

21  sign, it goes to a government issue of safety by not

22  swimming in the lake.   For whatever reason, they don't want

23  people swimming in the lake.   They actually identified that

24  picture as a photograph that is a government sign in Lake

25  Gerar that they find apparently in violation of the statute.

1          THE COURT:  Okay.  Are you saying that it's

2     unsafe to swim sign is equivalent to an advertisement for a

3     commercial activity?

4          MR. RHODUNDA:  I think in the case of the

5     Convention Center sign, there is an arrow on the sign that

6     points to the convention center.  I think the government

7     certainly has a substantial interest, I believe the Supreme

8     Court has previously indicated that, in helping citizens

9     know where government buildings are and how to get to them.

10          THE COURT:  How about, I take it there is an

11     electronic billboard that is part of that sign?

12          MR. RHODUNDA:  Look, there is one and there are

13     different events.  I'm sure there are government events and

14     non-government events, but it's a government building.  The

15     government benefits from renting that space in the event

16     there is a show or function there but also the government

17     benefits by bringing people into the town by coming and

18     attending these events.

19          THE COURT:  And that's the point I'm trying to

20     get you to answer.  I hear you telling me that it's

21     content-neutral, but the assertion being pressed on me by

22     your opponent is why does the government get to tell people

23     about the play Oklahoma on public property and we don't get

24     to tell citizens, Vote For Mr. Sokolove.  So when you say,

25     oh, it's content-neutral, I need you to address specifically

1    that assertion, if you can.

2              MR. RHODUNDA:  Well, in regard to looking at the

3    Rappa case, they talk about signs being typically related to

4    the property being constitutionally permissible signs.

5    Putting a Convention Center sign right directly across from

6    a Convention Center we believe is a permissible activity

7    because it's just simply identifying a government building.

8              Now, there may be other activities that take

9    place there but the government, citizens of Rehoboth really

10   benefit from any activities that take place at the

11   convention center.

12             THE COURT:  Okay.  Let's take it for the sake of

13   argument that I agree with you.  All right?  And that I'm

14   looking not at the more stringent test that the plaintiffs

15   press on me but at the Rappa test.  Okay?

16             What am I to make of the assertion in the record

17   before me that there was no way to know whether your sign

18   was going to get yanked or not because sometimes they were,

19   sometimes they weren't.  I mean there is a rule of thumb but

20   who knows whose thumb and when it was going to be placed on

21   the scale.  That's the next argument I hear from your

22   opponents.  What is your response to that?

23             MR. RHODUNDA:  I did think there was a

24   communication problem.  I think there were too many lawyers

25   involved in this matter.  The letters that went to the City

1  were on the attack.  They weren't saying, "please tell us

2  where can we put our signs."  It's "we're going to sue you."

3  It went on and on and on.  "The Rappa case applies."  There

4  was no dialogue.

5        Regardless of who is at fault, at the moment,

6  speaking candidly to the Court, they've been able to get

7  along, the politicians, for the last ten years.  We

8  submitted affidavits talking about the knowledge people had.

9  Even the plaintiffs' witness who testified no, we didn't

10  have signs in parks and we may have had them up the day

11  before on a City right-of-way, but he didn't have his signs

12  on public property.

13        THE COURT:  That's not what I heard him say.  I

14  heard him say, Mr. Rhodunda, that he did have his signs on

15  public property and that he had them on public property well

16  before the first day of the election.

17        MR. RHODUNDA:  Well, he had some, but I think he

18  focused on the end of the streets the day before election,

19  but he never had them on a park, he never had them in the

20  library, he never had them on City Hall.  So he is

21  potentially arguing or stating that he had them in the

22  right-of-way between the sidewalk and the curb.

23        THE COURT:  That's kind of like --

24        MR. RHODUNDA:  That is where he had them.

25        THE COURT:  And if that is the case, again,

1    assume for the sake of argument, you don't have to -- I mean

2    you can, and I take it you do, challenge it.  But assume I

3    were to accept that testimony, that historically, either by

4    way of the rule of thumb or some other way, signs have been

5    going up on what is technically public right-of-way.  Does

6    the decision to start enforcing this year --

7                MR. RHODUNDA:  I'm sorry?

8                THE COURT:  Does the decision to start

9    enforcement, if I were to accept that testimony as truthful

10   and accurate, then I would say, well, they decided to start

11   enforcing this year.  Does that make a difference

12   constitutionally, looking back?

13               MR. RHODUNDA:  I think it goes back for many

14   years, the same policy has been in effect.  The affidavits

15   we supplied support that.  Mr. Ferrese's long term tenure

16   with the City support that, that they have been regularly

17   enforced.

18               They had a lawyer research the issue and the

19   lawyer didn't find the prohibition on putting signs on

20   public property.  It really does not make logical sense,

21   Mr. Ferrese says you can put signs anywhere up on the City

22   when they never have been historically placed in parks and

23   median strips, let's say Rehoboth Avenue.

24               I think the biggest issue between the parties

25   is related to the front of residential properties.  As we

1    saw in the zoning map, a good 80-to-90 percent of the

2    property in Rehoboth is probably privately owned commercial

3    or residential property.  The question is can you place a

4    sign in there?  Our argument is you can place a sign in

5    front of or on any of those private properties.  On that

6    map, there really aren't a wide range of areas that would be

7    considered public property.

8         Now, there is a right-of-way in front of the

9    residents.  The City has a reasonable approach to that and

10   it's been a reasonable approach that the past candidates for

11   office have been able to comply with.  And I do think it's a

12   matter of three feet that we stop going through the whole

13   process of showing the photographs because I think the Court

14   appropriately redirected us as to what evidence should be

15   presented today.

16        But the issue before the Court, sadly to say, in

17   these cases is you can't put it between the sidewalk and the

18   curb; but if you have it on the other side of the sidewalk,

19   you're okay.  And our position is in our affidavit or

20   deposition testimony from the people who took the signs down

21   is that is where the signs were.

22        There is a little bit of a question mark when it

23   comes to the telephone poles, but I think the testimony was

24   pretty consistent that if you're behind the telephone poles,

25   which are usually right at the right-of-way edge, we will

1    not take these signs.  And that allows you to put a sign, as

2    you can see from some of the photographs, two or three feet

3    from the roadway.  So this ordinance does not prohibit

4    significant areas of signage for these candidates would like

5    to place out.  There is, 80-90 percent of the Rehoboth could

6    have a sign that says Sokolove For Mayor.

7              THE COURT:  Okay.

8              MR. RHODUNDA:  I think it's a significant

9    factor.

10             THE COURT:  Is there anything else you want to

11   tell me about this, Mr. Rhodunda?

12             MR. RHODUNDA:  Only that in Frumer vs.

13   Cheltenham Township, a Third Circuit case, the Court

14   analyzed a similar statute and they found that that statute

15   was actually narrowly tailored to serve the government's

16   needs regarding signs and there was a complete prohibition

17   of signs there.  So we don't believe that narrowly tailored

18   or the highest standard applies.  We do think it's

19   content-neutral and we have to show reasonable time, place

20   or manner of restrictions.  But in light of all the

21   opportunities for candidates to place signs, just political

22   signs themselves on private property, that that is

23   reasonable.

24             And that there are also many other

25   opportunities.  We deposed the plaintiffs about all the

1    other ways they advertise.   There are 1,300 registered

2    voters in Rehoboth.   They've all mailed out multiple letters

3    to all registered voters.   The question is were we somehow

4    stopping them from putting the word out on their candidacy?

5    The City provided for their own testimony yesterday.

6              THE COURT:   I don't even hear them arguing

7    here today that all speech is shut off by this.   I hear

8    them arguing two things:   facially invalid; and even if

9    not facially invalid in application, indefinite and

10   discriminatory.   Those are the arguments.   So I think we're

11   okay on the points you just raised.

12             Now, your opponent, at the very last moment when

13   he was standing up here, said:   Hey, this case is really

14   about likelihood of success on the merits at this point

15   because the City is not disputing that if the Court were to

16   find plaintiffs had a likelihood of success that the other

17   three factors for preliminary injunction would be met.

18   That is, irreparable injury; and the City would not suffer

19   irreparable injury if an injunctive order were granted;

20   and public interest favored the plaintiff.   That is the

21   plaintiffs' assertion.   What is your take, among those other

22   aspects of preliminary injunctive relief?

23             MR. RHODUNDA:   Certainly.   We believe they

24   cannot proceed on success on the merits, but with regard to

25   irreparable harm to the plaintiffs if the preliminary

1    injunction is ordered, we do believe that there would be

2    harm to the City of Rehoboth.  This has been a long standing

3    policy.  We have provided affidavits that show that this has

4    been an ongoing practice in a limitation on signs, and if

5    this Court were to grant this motion, that certainly would

6    change the long-standing practice.  It may go more directly

7    to the public interest, but the public interest is that

8    legislature in the City of Rehoboth passed an ordinance.

9    That ordinance says no signs on public properly.

10            THE COURT:  No, it says no private signs on

11   public property.  That is their point.

12            MR. RHODUNDA:  I understand that, but I don't

13   think that they found a case that just says because a

14   government allows certain signs that that, all of a sudden,

15   makes that some heightened standard.

16            THE COURT:  Okay.  Thank you very much,

17   Mr. Rhodunda.

18            I've got 120 seconds for you.

19            MR. SCHILTZ:  Mr. Rhodunda made a few points.  I

20   want to speak just briefly about the Vincent case.  He said,

21   well, that permitted directional signs, and it was

22   content-neutral.  And that is not correct, Your Honor.  The

23   statute at issue there was regulating posting of signs on

24   utility poles.  It had nothing to do with whether or not you

25   could put directional signs anywhere.

1    And then the argument seemed to be that, well,

2    directional signs have been constitutionally upheld on

3    numerous occasions.  I agree there are several cases that

4    hold that but it all comes down to the context of the

5    statute.  The statute says everything is banned but this

6    narrow exception is allowed.  We don't have that here,

7    again.  And they want to use their practice over the years

8    as they say to show, well, this is how we're enforcing it or

9    how it's been applied or this is the status of the facts and

10   therefore the statute itself is constitutional.  And that is

11   putting the cart before the horse.  You've got to look at

12   the statute.

13   The other point, that they jab us for putting to

14   a no swimming sign.  Well, Plaintiffs' Exhibit 23 has a no

15   swimming sign on it, Your Honor, but it also has a Tree

16   City, USA -- a sign that one of the deponents, who is going

17   to be submitted through his deposition, said:  Oh, I assume

18   they put that out there to, you know, let people know that

19   that is in there.  That's something that they support and

20   that they'll garner support from the populus by posting Tree

21   City, USA signs.  So once again, we have government trying

22   to sway the minds and thoughts of the public.

23   Mr. Rhodunda said Mr. Cargnino didn't review the

24   Code.  I think she testified just the opposite.

25   The basic point here, Your Honor, is that the

1    defendants aren't applying the statute as written in any

2    manner.  Your Honor pointed that out.  I don't think they

3    had a good response.

4              Mr. Rhodunda then finally ended up by saying if

5    an injunction were to issue and there were a likelihood of

6    success that there would be harm to the City.  The standard

7    how it is irreparable harm.  The fact the City has to change

8    its policy doesn't cause it irreparable harm.  If that were

9    the case, then no injunction could ever issue in a case like

10   this, Your Honor, because obviously that happens when an

11   injunction is enforced.

12             THE COURT:  All right.  I have your positions.

13   Thanks.

14             Now, before I leave the bench, I want to know if

15   anybody has done anything to speak to each other.

16             You don't need to be standing up for this.  Go

17   ahead and sit down, Mr. Schiltz.

18             You have an election coming up pretty darn

19   quick; right?  That is why you guys are saying:  Hey, judge,

20   drop everything else so that the voters of Rehoboth have the

21   benefit of a fair and open election; which I'm taking very

22   seriously, which is why we're all here and have spent the

23   better part of the day.  And I will spend a lot more time on

24   it, too, obviously, because I've got to go back and take a

25   look at your arguments and stuff.

1          But the practical issue of getting signs put up,

2     I'm assuming that you folks can speak to each other.  Am I

3     right?  I mean is there something that prevents the parties,

4     with or without their lawyers, from sitting down and talking

5     about what is and isn't going to be acceptable in the City's

6     view at this time?  Am I missing something here?  I'm just

7     trying to keep an eye on practicality.

8          And the reason I raise it is I get the sense is

9     this never happened.  And I get this sort of who-struck-John

10    stuff about, well, I tried to call.  He didn't call me back.

11    Well, they never got in touch with me.  The only letters I

12    got were threatening.  Moving past all that, do people have

13    signs up now in a way that they're comfortable with?  Has

14    there been discussion about that?  And if not, what is to

15    prevent you folks from sitting down and talking about that?

16         Mr. Schiltz, I'll give you the first crack

17    at it.

18         MR. SCHILTZ:  Yes, Your Honor.  First of all,

19    we do have signs up.  They are certainly not up in the

20    locations that we would prefer them to be and believe

21    we're entitled to erect them.

22         THE COURT:  All right.  And have you talked

23    about that with the other side?

24         MR. SCHILTZ:  We have talked about that issue,

25    Your Honor, before we filed the lawsuit.  We made a couple

1    phone calls.  I mean this is a who-struck-John issue.

2              THE COURT:  Yes, and go ahead and stand up.  If

3    you going to address the Court, you have to be proper.

4              MR. SCHILTZ:  I apologize.

5              THE COURT:  I'm not asking to go back over all

6    of that.  I'm asking whether people have talked since --

7              MR. SCHILTZ:  The effort was made after the

8    lawsuit was filed.  The problem becomes the train has left

9    the station to some degree once the lawsuit is filed, a fact

10   we told the defendants before we filed.

11             THE COURT:  All right.  I fundamentally disagree

12   with that.  This train has not left the station.  You folks

13   can talk to each other, and should.

14             MR. SCHILTZ:  I don't mean to suggest we

15   haven't.  We have.  The problem is what becomes an

16   acceptable resolution becomes much more difficult once we

17   file the lawsuit is filed.

18             THE COURT:  All right.

19             MR. SCHILTZ:  I do think it's worthwhile for the

20   parties to talk and say:  Is this one okay?  Is that one not

21   okay?  I don't think anybody would object to that.  We

22   certainly wouldn't.  But that doesn't address the issue of

23   what we really think, which is we're being prohibited from

24   erecting them in places we think we should be able to.

25             THE COURT:  All right.  Mr. Rhodunda.

1          MR. RHODUNDA:  We have gone over the photographs

2     the last couple days over what has been traditional and

3     acceptable sign locations.  We're certainly happy to have

4     that dialogue with them on that.  The reason why things

5     broke down when we started discussing it was -- and I know

6     this sound like a very minor point, but there is one clear

7     area where signs aren't permitted is between the sidewalk

8     and the curb.  And that's a public right-of-way area.  They

9     even agree with that.

10          But the question is whether or not we get past

11     the stumbling blocks.  I mean we should have a dialogue on

12     where we think the signs can go.  But the unfortunately the

13     City can't say we can put them in the public right-of-way

14     as a part of trying to resolve it, but maybe we can talk

15     about pictures and locations.  I think as I previously

16     stated, we're talking about two or three feet is what we're

17     talking about here, and that is a little bit unfortunate.

18          THE COURT:  All right.  If you haven't been

19     talking, you ought to start talking, because it obviously

20     going to take me -- I'm not going to rule from the bench.

21     And so you are going to wait to get something from me in

22     writing, and I'll try to get that to you forthwith.  But in

23     an election season as short as this one clearly is, every

24     day obviously is important, not just to the candidates but

25     to the people.

1          These are important things, free elections, so

2     you should be speaking to each other.  And you should be

3     working out to the fullest extent possible.  At the end of

4     the day, what ought to happen is we ought to end up with

5     signs pretty much where everybody agrees it makes sense to

6     have signs.  And if we still have a problem, then the

7     problem is one of, if the statute or ordinance isn't

8     appropriate, is one of tightening up and clarifying and

9     fixing an ordinance that hasn't been what it ought to be,

10    perhaps.  But I hate to see an election where people are

11    off on a side line, side tangent from what the issues of

12    the election probably are.

13          Don't misunderstand what I'm saying.  I'm not

14    suggesting the First Amendment is some minor thing off to

15    the side.  It's huge.  It's of tremendous importance.  But

16    as Mr. Sokolove himself said on the stand, he would prefer

17    to be campaigning today.  That would be for the best all the

18    way around is if you folks were focusing on the election and

19    not on your signage.

20          So please speak to each other and work out what

21    you can work out in the meantime, leaving aside what I think

22    is absolutely the case, noticing the tone of the language

23    and body language and things like that in the courtroom,

24    that there has been some heightened emotion associated with

25    litigation.

1      So you know what?  Whether folks have

2  disagreements about the way the ordinance is written or the

3  way it's been applied, I think everybody here, it's safe to

4  say, that has appeared before me has the best interest of

5  the City of Rehoboth at heart, cares about the City of

6  Rehoboth, wants the City to have the opportunity to have a

7  good, clean, fair, open election.  That is a broad,

8  wonderful common ground that you people should be working on

9  before you hear back from me to get things worked out about

10  these signs to a very large degree.  I encourage you to do

11  that.

12      MR. SPEAKMAN:  Your Honor, would you like a

13  report?  A status report?

14      THE COURT:  Well, I'd love a status report.

15  It's not going to hold me up.  I'm going to be working on

16  your case.  But you guys ought to be talking.  All right?

17  We're in recess.

18      (Hearing ends at 2:37 p.m.)

19

20                    INDEX

21  ROBERT D. SOKOLOVE

22  DIRECT EXAMINATION BY MR. SCHILTZ                5
    CROSS-EXAMINATION BY MR. RHODUNDA               48

23

24

25

195

```
 1                    INDEX (CONTINUED)

 2     MELISSA CARGNINO

 3     DIRECT EXAMINATION BY MR. SCHILTZ          80
       CROSS-EXAMINATION BY MR. SPEAKMAN          82
 4     REDIRECT EXAMINATION BY MR. SCHILTZ        87

 5     JOSEPH B. HILL

 6     DIRECT EXAMINATION BY MR. SCHILTZ          88
       CROSS-EXAMINATION BY MR. RHODUNDA         105
 7
       GREGORY JAMES FERRESE
 8
       DIRECT EXAMINATION BY MR. RHODUNDA        114
 9     CROSS-EXAMINATION BY MR. TUCKER           133
       REDIRECT EXAMINATION BY MR. RHODUNDA      160
10

11                       EXHIBITS

12     Plaintiffs' Exhibit Nos. 1 and 2           17
       Plaintiffs' Exhibit No. 3                  22
13     Plaintiffs' Exhibit No. 5                  37
       Plaintiffs' Exhibit No. 6                  42
14     Plaintiffs' Exhibit Nos. 8 and 9           47
       Plaintiffs' Exhibit No. 25                 97
15     Plaintiffs' Exhibit No. 11                 98
       Plaintiffs' Exhibit Nos. 12 through 24    105
16     Defendants' Exhibit No. 3                 126
       Plaintiffs' Exhibit No. 26               135

17

18

19

20

21

22

23

24

25
```