IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ROBERT SOKOLOVE, DAVID                    )
MCCARTHY, WILLIAM SHIELDS,                )
and CITIZENS FOR REHOBOTH                 )
BEACH, a policital action                 )
committee,                                )
                                          )
             Plaintiffs,                  )
                                          )    Civil Action
                                          )    No. 05-514(KAJ)
v.                                        )
                                          )
CITY OF REHOBOTH BEACH,                   )
DELAWARE, and GREGORY                     )
FERRESE, individually and                 )
as Manager of the City of                 )
Rehoboth Beach, Delaware,                 )
                                          )
             Defendants.                  )

          30(b)(6) Deposition of CITY OF REHOBOTH BEACH,
taken through its corporate designee, DAVID F. MURPHY,
taken pursuant to notice at the offices of Century 21,
19606 Coastal Highway, Rehoboth Beach, Delaware,
beginning at 3:23 p.m., on Monday, July 25, 2005, before
Eleanor J. Schwandt, Registered Merit Reporter and Notary
Public.

WILCOX & FETZER

1330 King Street - Wilmington, Delaware 19801

(302) 655-0477



**WILCOX & FETZER LTD.**

Registered Professional Reporters

ORIGINAL

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

David F. Murphy

2

```
1   APPEARANCES:

2          SHAWN P. TUCKER, ESQ.
           WOLF BLOCK SCHORR AND SOLIS-COHEN, LLP
3              1100 North Market Street, Suite 1001
               Wilmington, Delaware  19801
4              for the Plaintiffs

5          WALTER W. SPEAKMAN, JR., ESQUIRE
           BROWN SHIELS BEAUREGARD & CHASANOV
6              108 East Water Street
               Dover, Delaware 19901
7              for the Defendants

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

3

                            DAVID F. MURPHY,

1                       the witness herein, having first been

2                       duly sworn on oath, was examined and

3                       testified as follows:

4                                   EXAMINATION

5   BY MR. TUCKER:

6        Q.    Mr. Murphy, have you ever been deposed before?

7        A.    No.

8        Q.    Has Mr. Speakman or Mr. Rhodunda just had an

9   opportunity to go over the deposition process?

10       A.    A little bit.

11       Q.    I'm going to be asking you some questions.  Just

12  for time sake it will be easier if you let me finish my

13  question before you provide answers.  It tends to be

14  human nature for people to start answering before.

15       A.    Sure.

16       Q.    In our earlier deposition we had a little

17  problem.  For time purposes, if you could let me complete

18  my questions, I'll let you complete your answers.

19            Also, when it comes to probably any unusual

20  words or spellings, we will just pause and give those

21  spellings to the court reporters to make that a little

22  bit easier, as well to make things go more smoothly.

23            Have you ever testified in court before?

4

1     A.    No.

2     Q.    Your testimony today will be under oath.   You

3  have just taken an oath by the court reporter.   I just

4  wanted to remind you of the penalties for being

5  untruthful under oath.   It is a felony under both state

6  law and federal law.

7             MR. SPEAKMAN:   I'm going to object to that.

8  That's harassment.   It is threatening; it is insulting.

9  BY MR. TUCKER:

10    Q.    I'm going to state it on the record anyway.   I'm

11 not trying to harass or insult people.   I always, when I

12 do depositions, read what the penalties are for perjury

13 so folks understand how important and serious a

14 deposition is, and it is pretty standard practice in

15 Delaware.

16             The penalty under both state and federal law

17 is a felony.   Under state law it is punishable up to five

18 years -- I'm sorry, I stand corrected.   It is punishable

19 up to eight years.   And under federal law it is

20 punishable up to five years.   I'm pointing this out to

21 you, sir, only because I want you to understand how

22 important it is that you tell the truth here today.

23             What is your present title, Mr. Murphy, with

24 the City of Rehoboth Beach?



5

1     A.    Building Inspector.

2     Q.    How long have you had that job?

3     A.    Going on about a year and a half now.

4     Q.    And did you have a job with the City prior to

5  that?

6     A.    Yes, I was building inspector for the City of

7  Milford for ten years.

8     Q.    Who hired you with the City of Rehoboth Beach?

9     A.    Greg Ferrese.

10     Q.    Can you give us just a general idea of what your

11  job duties are?

12     A.    My job duties are to supervise the Building and

13  Licensing Department.

14     Q.    Does that include the supervision of Mr. Onizuk?

15     A.    Mr. Onizuk, that is correct.

16     Q.    And besides your supervisory duties, do you have

17  any other duties?

18     A.    Planning and zoning.

19     Q.    Okay.  Do you manage that section as well?

20     A.    Yes.

21     Q.    And do you actually go out into the field

22  yourself on occasion?

23     A.    On occasion.

24     Q.    And regarding Mr. Onizuk, approximately how long



1    has he worked for you?

2        A.    Almost a year.

3        Q.    What is his title?

4        A.    He is the Code Enforcement Officer.

5        Q.    How many code enforcement officers do you have?

6        A.    One.

7        Q.    That's him, right?

8        A.    That is him.

9        Q.    What kind of training, if any, did Mr. Onizuk go

10   through either prior to becoming your code enforcement

11   officer or after he became your code enforcement officer?

12       A.    He trained under me.

13       Q.    What does that training entail?

14       A.    It entailed the rules and regulations of the City

15   of Rehoboth, learning the codes, learning proper

16   procedures.

17       Q.    How did you go about training him, specifically?

18   Were there classes?  Was he given a copy of the code

19   book?  How did you do that?

20       A.    He was given a copy of the code book.

21       Q.    Anything else?

22       A.    He was given instructions on how to go about

23   certain procedures.  He was taking classes with the

24   police department as far as criminal summons writing.

1    Q.    Did he have any classes with the City regarding

2   the zoning code or the sign code contained within it?

3    A.    Well, there really are no classes with the zoning

4   code, with the City.

5    Q.    All right.

6    A.    I mean basically anybody that comes on board will

7   go under their supervision, with the supervisor to learn

8   and be instructed how to do these things.

9    Q.    Was there a period of time where you worked with

10  Mr. Onizuk regarding enforcement of the sign code, that

11  you can recall?

12   A.    Oh, yes.  We would go over, went over the sign

13  code because that was part of his job, is to enforce the

14  sign ordinances.  And that's one of the important aspects

15  of code enforcement is to learn the different codes, and

16  the sign ordinance is a very important part of the code.

17  It is something that the City of Rehoboth is very careful

18  about enforcing.  Make sure that everybody obeys the

19  guidelines in the sign code.

20   Q.    Okay.  Were these sit-down meetings with

21  Mr. Murphy where you sat down and discussed this?

22   A.    In my office, yes.

23   Q.    Do you recall approximately how many occasions

24  you had these discussions?

David F. Murphy

8

1       A.    No, I don't remember that.

2       Q.    More than one?

3       A.    Oh, absolutely more than one.    Probably more than

4   two.

5       Q.    Is more than two about as far as we want to go

6   with that?    Do you think it could be five, 10?

7       A.    It could be more.    I mean there is times when we

8   sit down every once in awhile and go over some things

9   that any of my officers aren't clear on.    It is not that

10  we just sit down and have total classes on the subjects.

11  If an officer has a question, we will discuss the aspects

12  of the code and interpretation.

13      Q.    Mr. Murphy, can you give us, if you can recall,

14  sort of a thumbnail sketch of what the scope of

15  Mr. Onizuk's training or classing was regarding

16  enforcement of the sign code?

17      A.    Basically what I just told you.    I mean, we would

18  sit down and we would go over the codes, make sure he

19  understands it.    If he has any questions with it, he

20  comes back to me and discusses that and make sure he

21  understands the interpretation clearly.    If we do not

22  have a clear definition of the interpretation, then we

23  contact the City attorney and get a clarification of the

24  interpretation.

9

1          And he is told that if he has questions

2    regarding interpretation and I'm not available, then he

3    can contact the City attorney.

4          Q.   I apologize, I'm just trying to drill down into

5    that a little bit deeper regarding specifically what he

6    was taught the sign code meant and how it was to be

7    enforced.  Maybe we will start with some different types

8    of signs and let me ask you some questions about that.

9          A.   Mm-hmm.

10         Q.   Regarding Mr. Onizuk's training in regards to

11   sign removal, was he provided a copy of the ordinance and

12   told to follow it?  Or were there additional specific

13   policies and other information that were provided along

14   with that?

15         A.   Well, every officer is given a copy of the code,

16   the entire City code.  And he is also given sections of

17   the code that have been taken, excerpted out of the code

18   book, and they are to take those and hand those out to

19   anybody they come in contact with that have code

20   violations if they so request or have a question as far

21   as the certain ordinance that they are enforcing.

22         We have gone over several times with

23   different types of signs.  Every day a question pops up

24   about a type of sign that may be in violation.  We go

10

1    over those, make sure that we familiarize ourselves

2    with -- make sure that what we are seeing is exactly what

3    is in the code, make sure we are enforcing it properly.

4        Q.    And beyond the code itself, was Mr. Onizuk ever

5    given any policies about the sign ordinance?

6        A.    He was instructed not to take any signs off

7    private properties, and if he has any doubt as far as a

8    location of a sign, he was to bring it to my attention,

9    not to remove it until he brought it to my attention.

10   That's one thing my officers are instructed, if they have

11   a doubt about something, bring it to my attention and we

12   go around and look at it.

13             Most of the time that is the policy that is

14   followed.  I try to leave my officers the benefit of the

15   doubt as far as to use their own judgment calls.  That's

16   what they are being paid to do.  I can't baby sit

17   everything, because they must be responsible for their

18   actions as far as making these calls.  And I will -- I

19   back them if they say that they had a question about sign

20   location.  And I have told them, I said, "If you have a

21   question about it, then, you know, we don't want to have

22   a problem -- we don't have a problem with it."  Sometimes

23   you have to make a judgment call as far as placement,

24   size, location.

11

1      Q.   Now, besides the fact that they are not supposed

2  to take private signs --

3      A.   That's correct.

4      Q.   -- and besides the fact that if there is some

5  question with that they are supposed to consult you, Mr.

6  Onizuk is supposed to consult with you?

7      A.   That's correct.

8           MR. SPEAKMAN:  Did you say in your question

9  "private signs"?

10          MR. TUCKER:  Yes, that's what your witness

11  said.

12          MR. SPEAKMAN:  I thought he said --

13          THE WITNESS:  Private property.

14          MR. SPEAKMAN:  -- private property.

15          THE WITNESS:  Not private signs, private

16  property.

17  BY MR. TUCKER:

18      Q.   Private property, okay.  Besides those two things

19  you just articulated on the record, any other policies

20  that have been provided to Mr. Onizuk?

21      A.   Regarding?

22      Q.   Signs.

23      A.   Signs.  Basically, if in doubt, come back to me,

24  make sure that he understands that location of the signs,



12

1    if he has a question as far as location of a sign on

2    property, don't touch it.

3        Q.    Saying two things, nothing else.  I want to make

4    sure I'm not missing anything.

5        A.    No, that's it.

6        Q.    Were those two policies verbal, in writing or

7    both?

8        A.    Verbal.

9        Q.    He has been with you about a year, I believe you

10   testified, Mr. Murphy?

11       A.    Mm-hmm.

12       Q.    When was he provided that guidance from you?

13       A.    When he first came on board.

14       Q.    Have there been subsequent discussions regarding

15   those same verbal policies?

16       A.    Yes.

17       Q.    When was the most recent you can recall?

18       A.    At least two weeks ago.

19       Q.    What prompted that discussion?

20       A.    Basically in regards to a sign that was placed on

21   somebody's property, was not a political sign, it was

22   another sign.  It was a real estate sign.

23              (Discussion off the record.)

24   BY MR. TUCKER

13

1    Q.    So the most recent time you had a discussion with

2    Mr. Onizuk -- Mr. Onizuk -- I apologize on that last

3    name -- was about two weeks ago about those policies, and

4    that was in regards to a real estate sign, correct?

5    A.    Mm-hmm.

6    Q.    You mentioned not to take signs off of private

7    property as one of the limitations, correct?

8    A.    That's correct.

9    Q.    How does a code enforcement officer in the City

10   of Rehoboth know what is private property and what is

11   public property?

12   A.    Well, basically, it is pretty clear in the City

13   of Rehoboth as where the front property lines are.  It is

14   usually behind the utility pole line, or at the

15   fenceline.  No property -- no structures of any kind are

16   allowed to go beyond the front property line in the City

17   of Rehoboth.

18            Most of the properties have markers on the

19   corner lots.  Utility poles are not on private property.

20   Most of the properties, it is pretty obvious where the

21   front property lines are and where they run.  Most of the

22   times, we can go to a file and pull a survey out of a

23   property file.  Every property in the City of Rehoboth

24   Beach has a file.  And if there has been a building

14

1    permit issued at any given time in the history of that

2    property, normally there is a survey in the file that we

3    can refer back to.

4              But most of the time you can look at the

5    curb line, the sidewalk.  Most of the properties are

6    behind a sidewalk.

7        Q.    Is there any official document that the City has

8    in its possession that it utilizes to determine the exact

9    location of private property lines?

10       A.    A City document?

11       Q.    Yes.

12       A.    Other than what the surveys say?

13       Q.    Yes.

14       A.    Not that I'm totally aware of.  I mean, unless,

15   except for the one where, the ordinance that the sidewalk

16   and the curb are the property -- are the public, part of

17   the public right-of-way.

18       Q.    Is that in your present zoning code?

19       A.    I believe it is.

20       Q.    Can you point me to that?

21       A.    Do we have a copy of the zoning code?

22       Q.    Let's see here.

23              (Discussion off the record.)

24              MR. TUCKER:  If we can go back on the record now.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

15

1    MR. SPEAKMAN: Sorry, you are the one that

2  asked about it.

3    MR. TUCKER: I was asking whether there was

4  an extra page or not.

5    MR. SPEAKMAN: There isn't any. It looks

6  like that's what he is saying. This is yours, right?

7    MR. TUCKER: Yes. Yes.

8  BY MR. TUCKER:

9    Q.  Back on the record, please. Mr. Murphy, you are

10 referring to something in the zoning code about sidewalks

11 and them being I think in the public right-of-way. I

12 handed you some documents regarding the City's code that

13 were provided to me by the City. Do those documents

14 reflect what you were referring to?

15    A.  Exhibit A.

16    Q.  Explain what Exhibit A --

17    A.  Exhibit A shows the property line, approximately

18 to the backside of the concrete sidewalks, with a grass

19 area between the sidewalk and the backside of the curb

20 line.

21    Q.  And is it your position that the City code

22 defines that area as public right-of-way?

23    A.  That's correct.

24    Q.  Could you show me that specific language?



16

1    A.    Well --

2                MR. SPEAKMAN:  Do you have a code book?

3                THE WITNESS:  I don't have a code book.

4    This is partial.

5                MR. TUCKER:  That's what was provided to me

6    this morning.

7                MR. SPEAKMAN:  That was attached to the

8    police report.  That was an exhibit to the police report.

9                THE WITNESS:  The code book is approximately

10   four inches thick, I mean, and I can't give you something

11   I don't have in front of me.  Then I won't go from memory

12   what the code says.  That's policy I have that I have

13   never...

14   BY MR. TUCKER:

15       Q.    Let's do it this way.  This is Schedule A?

16                MR. SPEAKMAN:  Right.

17       Q.    Mr. Murphy, I'm going to let you read through

18   Schedule A, which is something I had hoped that the City

19   would have been able to go over with you before today but

20   I understand we are on a tight schedule.  Could you

21   please take a look through Exhibit A, read through those

22   questions, please.  And if you could note which ones that

23   you have knowledge about that you can testify to today.

24   When you get to one, maybe you can just stop and we will

17

1    start there.

2        A.    Well, number 3.

3        Q.    Okay.  Let me read number 3 into the record and

4    I'll hand it back to you.  "The title and section number

5    of any federal, state, county or city ordinance, code,

6    statute or regulations including, without limitation,

7    City Ordinance 74-16, which the City contends authorizes

8    it to remove signs, posters or advertisements from public

9    property or rights of ways within the City limits."

10                What are those?

11       A.    What are what?

12       Q.    What are those ordinances, regulations, etcetera?

13       A.    I don't understand your question, what you are

14   asking as far as what the --

15       Q.    Well, I'm looking for the answer to number 3.

16       A.    Oh, you want the answer for number 3?

17       Q.    Yes, sir.

18       A.    It is to remove signs, posters, advertisement

19   from public property or rights-of-way within the City

20   limits.

21       Q.    Let me see that for a second.  We are not

22   communicating.  It is not your fault, it is a long day.

23                The question requests the title and section

24   number of any federal, etcetera.  So I'm asking you for

1  the title and section numbers.  One of the things that we

2  asked the City to produce was information or people with

3  knowledge regarding what these sections are.  So that's

4  what I'm trying to learn from you today.

5      A.  Okay.

6      Q.  I don't have the code here, but that's what we

7  are trying to find out from the City; it is your code.

8  Can you answer that question number 3 for us?

9      A.  Well, number 3 is the City Ordinance 74-16.

10     Q.  Anything else?

11     A.  I'm sure there is other things in this section

12 here, in this sheet that you have handed me, probably

13 does.

14     Q.  Just in terms of number 3 right now.

15     A.  Number 3?

16     Q.  Yes.  Anything else besides 74-16 that you can

17 provide me?

18     A.  That's the City Ordinance for signs, 74-16,

19 regarding the removal of signs, posters or advertisements

20 from public property or rights-of-way within the City

21 limits.

22     Q.  Again, just so the record is clear, any other

23 ordinance section that is related to the sign code

24 defining private rights-of-way, public rights-of-way,

19

1    private property lines, anything else?

2        A.    Not without having the code book in front of me

3    so I can basically say what other codes are.    I can't do

4    that totally from memory.

5                MR. TUCKER:    Maybe we can go off the record

6    for a second.

7                (Discussion off the record.)

8    BY MR. TUCKER:

9        Q.    Let's go back on the record.    Mr. Murphy, what

10   I'm trying to get at, just so we are all on the same

11   page, is what provisions under City law that you rely on

12   to determine where private property ends and where public

13   property begins.    Can you tell us any and all things that

14   you rely upon to make that determination?

15       A.    Yes.    When a property owner brings in a copy of

16   the survey, shows exactly where their front property line

17   is, showing the points of corner markers, I would say 90

18   percent of the surveys that are produced in my office

19   show the sidewalks going across and shows the property

20   line point marks behind the sidewalk.

21       Q.    Okay.

22       A.    And that's pretty much how we designate where the

23   property line ends and the right-of-way begins.

24       Q.    Anything else other than those surveys that are

20

1    brought in by property owners from time to time?

2        A.   Sometimes it could be a copy of the deed.

3        Q.   Anything else?

4        A.   That's pretty much it.

5        Q.   Now, before you remove a sign from a property,

6    whether it maybe be public property or private property,

7    do you consult with the plot plan that may be on file

8    and/or the deed that may be on file?

9        A.   Not all the time.  Maybe if we have a doubt as

10   far as where the sign is located or any structure,

11   whether it be a sign or a fence, we will refer back to a

12   site plan, or survey plan as they are called, to make

13   sure where the location is.  Most survey signs will show

14   locations of utility poles, right-of-ways; again,

15   sidewalks, curbs, driveways, and the points, corner

16   markers, showing the front property line adjacent to the

17   right-of-way.

18       Q.   So unless there is some question in the

19   inspector's mind about whether a sign is on private

20   property or on public right-of-way, you don't consult the

21   deed that you may have on file or the plot plan that you

22   may have on file; is that a fair statement?

23       A.   Not all the time.  Most of the time it is pretty

24   clear where the property line is on majority of the

21

1    properties in the City of Rehoboth Beach.

2                Again, if we have a question as far as where

3    something is, we will try to research and find out where

4    it is at.  If we can't, then we won't touch -- we won't

5    touch the sign or we will contact the property owner to

6    give clarification of the property.

7        Q.    I'm going to show you what is marked as

8    Exhibit 2-A, which is attached to Plaintiffs' Memorandum

9    in Support of Motion For Temporary Restraining Order.

10   I'm going to show you this picture.  Have you ever seen

11   that picture before, Mr. Murphy?

12       A.    No.

13       Q.    Looking at that picture, can you tell us where

14   private property ends and public right-of-way begins?

15       A.    Not by that picture.  If I was out there on the

16   site personally I might be able to.  But not by a

17   picture.

18       Q.    Okay.

19       A.    I mean I'm not sure if there is a pole farther

20   down the street or a pole to the left on this property or

21   behind the subject who took the picture.

22                If there is not, then that sign wouldn't be

23   touched.  None of those signs would be touched because it

24   could be too questionable as to where those signs are

1    located.

2              Sometimes if we do have a question like

3    that, it may not be where we would go back and research

4    where those signs are, because they are so questionable.

5    Again, we may go back to the file for this property and

6    there may not be a survey in there.  If there is not a

7    survey, then sometimes I can't make a determination so

8    they are left alone.

9         Q.   Is there some place in your zoning code or your

10   municipal code generally that says that utility poles

11   indicate or designate lines between private property and

12   public rights-of-way?

13        A.   I don't think so.  Not in this code.  I mean it

14   is almost like an industry standard that utility poles

15   aren't on private property.  Very rare do I ever know

16   that utility poles are placed on private property.  But

17   for majority of my experience is that the property lines

18   are behind the pole line or utility line.

19        Q.   Are you ever aware of a situation where a utility

20   pole was not necessarily on the edge of the public

21   right-of-way but in the middle of it?

22        A.   There has been times when utility poles have been

23   approximately ten feet back from the edge of the road, or

24   more.



23

1    Q.    Right.

2    A.    But I know that most of the time that utility

3    companies have a designated right-of-way where they are

4    supposed to place their poles.  Having worked around

5    utility companies, they pretty much stick to the utility

6    right-of-ways and not put them on private property.  Only

7    in rare cases will probably a pole be placed on private

8    property.

9    Q.    Probably an error?

10    A.    Possible.

11    Q.    So if I --

12    A.    Or location could be a problem.

13    Q.    So if I'm running for office, hypothetically,

14    which I'm not --

15              MR. SPEAKMAN:  Excuse me.  Let me interrupt.

16    What was the number of that exhibit.

17              MR. TUCKER:  That was 2-A.

18    BY MR. TUCKER:

19    Q.    If I was running for office, Mr. Murphy, and I

20    put a sign up behind a utility pole, and that utility

21    pole was in the center of the public right-of-way, not on

22    the edge of the public right-of-way, I can have a sign in

23    the public right-of-way but you wouldn't remove it,

24    correct?

24

1    A.    I wouldn't take it out from behind the utility

2    pole.  And my officer has been instructed not to remove

3    signs behind utility lines.  That is a grace period

4    that -- area that we have given because, again, some of

5    these pole lines are right at the front edge of property

6    lines, and I'm not going to try and a lot of times decide

7    what is right and what is wrong, location.  There is

8    flexibility that you can give on some of these sign

9    locations, but if they are justifiably between the pole

10    line and the edge of the street, then they will be

11    removed.

12    Q.    Now, in the exhibit that I just showed you,

13    again, 2-A from the memorandum, if I was a candidate and

14    I put my signs where those signs are depicted, where

15    there is no sidewalk, and there is no utility pole at

16    least that anybody can see on this picture, those signs

17    wouldn't be removed, correct?

18    A.    We have not removed those signs.

19    Q.    Okay.  And have you personally seen those signs?

20    A.    No, I haven't seen those signs.

21    Q.    Well you said --

22    A.    But if I was going to go around and remove the

23    signs, we wouldn't remove them.  I wouldn't, and I know

24    my officer probably wouldn't remove them because it is



**WILCOX & FETZER LTD.**
Registered Professional Reporters

David F. Murphy

25

1    questionable as far as location.

2        Q.    How many feet would you say those signs are from

3    the road?

4        A.    The "Barbour" sign is probably about three feet

5    from the edge of the one street and probably maybe four

6    feet back from the other edge of the street, maybe.  It

7    is questionable.  It is hard to tell by that.  I would

8    say three or four feet from the edge.

9        Q.    Are you familiar with the City's zoning map?

10       A.    Yes.

11       Q.    I'm going to show you what has been marked as

12   Plaintiffs' Exhibit 7, which is in the top right-hand

13   corner identified as "Zoning Map of the City of Rehoboth

14   Beach," and there is a legend on here as well.

15   Mr. Murphy, do you rely on this map at all for

16   determining right-of-way or private property or public

17   property?

18       A.    Well, I would rely on this map for open space

19   City property, as far as the Lake Gerar area and some of

20   the park areas.  But this is a zoning map, and you

21   couldn't use this map exactly for location of property

22   lines.  This is just a zoning map.  It is not a lot map.

23       Q.    Is this the City's official zoning map?

24       A.    This is the zoning map of -- that was adopted in

1    1991.

2        Q.    According to the document?

3        A.    According to the document.

4        Q.    And is there a legend on this official map that

5    gives an indication as to how one can determine

6    right-of-ways?

7        A.    On this map?

8        Q.    Yes, on the legend.

9        A.    No, I mean just by what the open space -- the

10    O-1, open space area shows as City property.  However,

11    this is not a map that should be used for right-of-ways.

12    It just shows the street locations.

13        Q.    Is there another map that I can buy from the City

14    that shows right-of-ways?

15        A.    I don't think any map really designates

16    right-of-ways.  This map is going to reflect what any

17    other map that we have in our office.

18        Q.    Is there a legend on this map that I've got in

19    front of you, which is Plaintiffs' 7, that gives a

20    reference to street right-of-way line?

21        A.    It does give the street right-of-way line.  I

22    don't know where that line is.

23        Q.    Looking at that official City map that has a

24    designation for right-of-way, can you tell me where on



WILCOX & FETZER LTD.
Registered Professional Reporters

27

1    this map there is any right-of-way located?

2        A.    I don't see it.

3             No, I don't see anything.

4        Q.    Thanks, Mr. Murphy.

5        A.    Again, I wouldn't rely on that map.

6        Q.    You wouldn't rely on an official City map?

7        A.    Not on that map.  It is official City map as far

8    as zoning, but it is not, it is not a map that I would

9    utilize for determining edges of the right-of-ways.  Now

10   it shows the lot boundaries, but -- and shows the

11   streets, but there is no width dimensions on those maps

12   as far as the street widths, and none on the property

13   lines that shows what the sizes of the property lines

14   are.  Only a scale of what it says as far as one inch

15   equals 200 feet.

16       Q.    Now, the legend that we have been referring to

17   designates the zoning categories for the City, correct?

18       A.    That's correct.

19       Q.    And in that same legend it gives a key for other

20   features, including street right-of-ways, correct?

21       A.    That's correct.

22       Q.    So your testimony is that you would rely on the

23   legend for the zoning designations but not for street

24   right-of-way lines?



28

1       A.    Not by what they are showing here as far as the

2  line indication for street right-of-way is.  Apparently

3  it was not shown on this map.

4       Q.    There is no reference anywhere to that on the

5  map, correct?

6       A.    Not showing this line with a dot and another

7  line, which defines street right-of-way line.  It is not

8  on here.  But it does show the different zoning

9  districts.

10      Q.    If I went to the City and got this map, and

11 looked at it to find street right-of-way lines, is it

12 fair to say I couldn't find any?

13      A.    No, you couldn't find any on this map.

14      Q.    Okay.

15      A.    And I wouldn't advise you to use any City map,

16 whether it be Rehoboth's or any other town map, a zoning

17 map for right-of-way.  That is definitely designated by

18 surveys, or if they have a explicit map that shows

19 right-of-ways.

20      Q.    If I was a member of the public and I came in and

21 asked how I would know where my right-of-way is or my

22 private property line in reference to my right-of-way,

23 what would you tell me?

24      A.    Get a surveyor to come out and survey your



29

1    property.

2        Q.    So the burden would be put on the property owner

3    before he or she put a sign in --

4        A.    That's correct.

5        Q.     -- to make that determination?

6        A.    That's correct.

7        Q.    Otherwise --

8        A.    That's what I would require in order for me to

9    give a permit for a sign.

10        Q.    Do election signs have to be permitted?

11        A.    No.

12        Q.    So as I understand this, you feel the burden is

13    on the property owner to determine where their line is

14    before they put a sign in on an election?

15        A.    I would hope that they would know where their

16    property is.  If they built that property and they own

17    that property, I would hope they know where their

18    property line is and place the signs on that property.

19        Q.    Why would the City send out an inspector to

20    remove a sign if they don't know for sure whether it is

21    on private property or public right-of-way?

22        A.    We only remove a sign if we know right exactly

23    where the right-of-way is.  And that's pretty much easy

24    to tell on most times, most parts.  That's what I

30

1    explained to you before.  We do allow a sign between pole

2    line and a front property line.  That is a grace area.

3    Sometimes it is difficult to see a property line, but

4    most of the properties, it is pretty clear where the

5    front property line goes.  If it is beyond the pole line

6    to the edge of the street or between the sidewalk and the

7    back of the curb, in the grass area, we will remove it.

8         Q.    Well, can we agree that a utility pole, which is

9    one of the indicia you use to determine public

10   right-of-way, that that is not necessarily always going

11   to be on the edge of the right-of-way, that that could be

12   on the middle of the right way?

13        A.    It could be in the middle of the right-of-way.

14        Q.    And can we agree that if I wanted to pave a

15   sidewalk on my property, my private property, I could do

16   that if I lived in the City of Rehoboth Beach, correct?

17        A.    You could put it on your property, that's

18   correct.

19        Q.    So if the City is relying on sidewalk location

20   and utility pole location, then that's not a perfect

21   science to determine where private property stops and

22   right-of-way begins, is it?

23        A.    That's why surveys are required.  And even then

24   that's not even a perfect science, but it is 99 percent

31

1  close.  Again, if a survey is submitted, then we know

2  where the location is, because we take the expertise of a

3  surveyor to give the locations of the front property

4  line.

5           If there is a problem and they are wrong,

6  then it has to be corrected.

7    Q.    In this case, though, somebody's sign, election

8  sign is being removed by the City, but the City is not

9  itself obtaining a survey before it is removing it,

10  correct?

11   A.    No.

12   Q.    So if the City was wrong about removing a sign

13  that's on private property, the City would just be wrong,

14  but the property owner would have to show that through a

15  survey?

16   A.    Well, I'm sure there was no intent of taking

17  something off somebody's private property.  If they did,

18  it was maybe an error.  But we try to make sure that

19  these signs are -- again, if a sign is questionable as

20  far as its location, we don't usually mess with them.  We

21  usually try to figure out the location.  If we can't find

22  the proper location, we don't have a survey, I'm not

23  going to make somebody go out and get a survey for a

24  political sign.

32

1        If in doubt, then we will basically say the

2   sign stays.  And that's in all fairness to the property

3   owner and to the City, and to my officers.

4        Q.   Do you recall preparing a report dated July 15th,

5   '05, Plaintiffs' 6?  I'm going to show you that and see

6   if you recognize it.

7        A.   Yes, that's my report.

8        Q.   And was that report generated on activities that

9   occurred on that day, or is that a report summarizing

10  events that have transpired in the --

11       A.   No, this is a report that happened on July 15th.

12       Q.   Okay.  And on that day did you go out looking to

13  remove signs that may be in violation of City law?

14       A.   We went out on the -- to look for signs that were

15  in the right-of-way.

16       Q.   Any particular types of signs that were in the

17  right-of-way?

18       A.   There was political signs that we found at that

19  time, various candidates' signs were removed from

20  right-of-ways beyond the pole line, on the street side of

21  the pole line, I should say, that were removed.

22       Q.   Was your purpose in going out specifically to

23  look for political signs in the right-of-way?

24       A.   No.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

33

1        Q.    Let me see that again.

2              Can you read the second paragraph of your

3    report and tell me if you stand by that statement?

4        A.    Yes, we went out and got some signs, political

5    signs.

6        Q.    Does paragraph 2 indicate that your purpose in

7    going out was to look for political signs in the

8    right-of-way?

9        A.    Well, we also did that.  We also found some other

10   signs.

11       Q.    I understand, but in terms of the report --

12       A.    Yes, I will say yes to paragraph 2, yes, for

13   political signs.

14       Q.    That was your purpose in going out at that point?

15       A.    Political signs, not just a person's signs.  I

16   want to make that clear.

17       Q.    I didn't suggest otherwise.

18             How many signs of Mayor Cooper's have been

19   removed by the City in July?

20             MR. SPEAKMAN:  Here.

21             MR. TUCKER:  Just for the record, the

22   witness is I guess referring to another copy of

23   Plaintiffs' 6 to refresh his recollection; is that fair?

24             MR. SPEAKMAN:  Right.



34

```
 1              THE WITNESS:  Three.
 2       Q.   When were those removed?
 3       A.   One was removed on the 15th, and two were removed
 4  pre the 15th.
 5       Q.   Do you know the dates?
 6       A.   Of July.  No, I do not.
 7       Q.   Why were those removed?
 8       A.   They were in the right-of-way.  They were beyond
 9  the sidewalk, between the curb, sidewalk and also beyond
10  the pole line.
11       Q.   Do you know if they were removed after July 9th
12  or before July 9th, those other two?
13       A.   I'm not sure.  I don't remember.  I really don't
14  remember those dates.
15       Q.   Do you recall any conversations with Mr. Onizuk
16  regarding sign code enforcement in July, early July?
17       A.   Well, we have talked about sign codes.  We talk
18  about the sign code all the time.
19       Q.   Did you have any --
20       A.   I mean, because there is always other signs that
21  are in violation throughout the City.
22       Q.   I'm focusing you on July, though.
23       A.   In July?
24       Q.   In July, particularly on July 7th, did you have
```



35

1   any discussion with Mr. Onizuk regarding sign removal in

2   the City on July 7th, that you recall?

3       A.   I may have.  I may have.  I don't have anything

4   in writing that reflects that I did or didn't.

5       Q.   I'm trying to --

6       A.   I'm just trying to remember from memory.

7       Q.   I understand.  I appreciate that.  I know it has

8   been a little while.

9       A.   It has been awhile.

10      Q.   Let me try to help refresh your memory on that,

11  perhaps.

12      A.   I can say no, I don't remember.  I really don't.

13      Q.   Do you recall any time in July when Mr. Onizuk

14  came to you and told you he had removed a host of

15  political signs around July 7th?

16          MR. SPEAKMAN:  For the record, you are

17  referring to his report?

18          MR. TUCKER:  No, I'm referring to any

19  discussions he had with Mr. Onizuk about signs Mr. Onizuk

20  removed around July 7th.  It may be in his report.  I'm

21  not sure.

22          MR. SPEAKMAN:  It is, on page 2.

23          THE WITNESS:  That was the one where he was

24  advised by subject that there was a political sign placed

36

1   on his private property which he did not want on his

2   property.  And I had -- was advised by the police

3   department that, to tell my officers that we were not to

4   remove any signs off private property.  If somebody found

5   one on their private property and did not want it there,

6   that we were supposed to call the police department and

7   turn it over to them, and they would approach it as found

8   property, like a bicycle been abandoned on their

9   property, of that nature, or any other article that they

10  did not want on the property.

11          Again, because that's private property.

12  BY MR. TUCKER:

13     Q.   Who was it at the police department that informed

14  you of that?

15     A.   Detective Scott O'Bier.

16     Q.   Did he call you and inform you of that?  How did

17  that conversation come about?

18     A.   Apparently he had spoken to Mr. Onizuk about a

19  situation, about sign removals, and I guess he explained

20  that to Mr. Onizuk, that -- and then he relayed that

21  information on to me, I guess to make sure that I

22  understood to tell Mr. Onizuk not to take anything off

23  private property.

24          It has always been a policy that I've told



37

```
 1    my officers, not to remove anything off private property.

 2        Q.   Did you direct Mr. Onizuk to remove all signs in

 3    the City that were in the right-of-way or public property

 4    shortly thereafter?

 5        A.   Yes, I did.

 6        Q.   Do you recall if that was July 7th or maybe

 7    somewhere around that time?

 8        A.   It might have been around that time.

 9             MR. SPEAKMAN:  I got to ask for a recess.

10    I've got to call the City before 4:20.

11             (Recess taken.)

12             MR. TUCKER:  Can you read the last question

13    and answer if you want.

14             (Record read.)

15    BY MR. TUCKER:

16        Q.   Mr. Murphy, why don't we go back on the record,

17    unless you need some more context.

18        A.   No, let's go.

19        Q.   What I'm going to show you, Mr. Murphy, again I'm

20    referring to Plaintiffs' Memorandum in Support of Motion

21    For Temporary Restraining Order.  I'm going to show you

22    some pictures that were attached to an affidavit prepared

23    by Mr. Joseph Hill, and I will state for the record

24    Mr. Hill in his affidavit indicates these pictures were
```



38

1    taken on July 18th and July 20th of this year.

2              Now, you have already seen Exhibit A,

3    Mr. Murphy, but I'm going to --

4              MR. SPEAKMAN:  I would ask you to identify

5    the street address, too.

6              MR. TUCKER:  I don't have the street

7    addresses, Mr. Speakman.

8              MR. SPEAKMAN:  Yes, you do.

9              MR. TUCKER:  They are actually in the

10   affidavit.

11   BY MR. TUCKER:

12       Q.    Have you seen the affidavit of Mr. Hill?

13       A.    Un-un.

14             MR. SPEAKMAN:  Here.  Go to 2.

15   BY MR. TUCKER:

16       Q.    Within the affidavit, Mr. Murphy, on page 3 there

17   is a breakdown of the street addresses that go with the

18   pictures.  If you start with A.  Got it?

19       A.    Yes.  Page 3?

20       Q.    Page 3 on the fax.  Page 2 on the actual --

21       A.    Oh, page 3.  Page 2.

22       Q.    Sorry about that.  A, Samuel Cooper, Ronald

23   Paterson and Dennis Barbour campaign signs located at

24   intersection of State Road and Lee Street, Exhibit A.  I



39

1    guess the black and whites will work for you, I think?

2        A.    Yes, they will work.

3        Q.    You testified earlier, I believe, that these

4    signs weren't removed because they may have been

5    questionable?

6        A.    I haven't been advised that they were removed.

7        Q.    Would these signs be removed today if you saw

8    them?

9        A.    I can't answer that because -- like I said, by

10   the picture, no, if I was out on site, if I knew where

11   the pole line was or any kind of marker, maybe.  But if

12   they were too close to call, probably not.

13       Q.    In such instances would you recommend to your

14   official that they check for a plot plan?

15       A.    It is possible.

16       Q.    How about a deed?

17       A.    Deed is not going to really show me a whole lot.

18   I would rather go by the survey.

19       Q.    By the plot plan?

20       A.    Mm-hmm, yes.

21       Q.    Are you aware that there was a plot plan

22   apparently pulled for Mr. --

23            MR. SPEAKMAN:  Here, if that's what you are

24   going to refer to.

40

1   Q.   Let me get the exhibit.

2        (Discussion off the record.)

3   Q.   Defendants' Exhibit 2, Deposition Exhibit 2 I'm

4   going to put you in front of you.  Are you aware that

5   plot plan was pulled for one of Mr. Manlove's -- I'm

6   sorry, Sokolove's properties?

7   A.   I wasn't aware of this, but I am now.

8   Q.   Okay.

9   A.   Clearly shows his property line.  It clearly

10  shows the sidewalk.  And it shows his landscaping areas

11  behind the property line.

12  Q.   I'll get to the specifics of that.

13  A.   Mm-hmm.

14  Q.   Any idea why a plot plan was pulled for

15  Mr. Sokolove's property where his signs may have been

16  located but not for the property that's identified as

17  Attachment A?

18  A.   I don't know who pulled this.

19  Q.   So you have no knowledge of that?

20  A.   No, I don't know who pulled this.

21  Q.   Let me flip to Exhibit B, and I'll just lay this

22  in front of you.  Exhibit B to the affidavit, that is

23  Exhibit 2, and I'll ask you to take a look at those signs

24  and tell us if they are signs that you would remove today

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

41

1   if you saw them?

2       A.    Again, by this picture, I don't know where the

3   pole line is.  I don't know where the property -- it

4   looks to be that the property line -- I don't know.  It

5   is questionable.  And I probably would not pull these

6   signs, unless, unless I actually saw, like I said, a pole

7   line.  It clearly looks like one of them is closer to the

8   property, to the street edge than the other two.  The

9   Dennis Barbour, I guess that's how you say it, Barbour,

10  sign, it looks closer to the edge.  Again, without being

11  at the site, seeing some kind of landmark, pole line or

12  property marker, fenceline, then I could establish more

13  of a clearer, definitive answer.

14           If, again, if there is nothing there, it

15  would be probably that they would not be removed.  This

16  one probably would have to go back and try to find a

17  survey to give me a general idea exactly where the

18  property line would be on this one.

19      Q.    Do you see in the foreground -- I'll point you to

20  it, I'll show you my color copy here too -- these road

21  signs depicting, looks like state routes?

22      A.    Yeah.  If this is -- normally these signs are put

23  in a right-of-way.  If they -- if there is a right-of-way

24  there, again, the property line may run right up to the



42

1   back of those.  In this case, these signs, if that is the

2   back of the right-of-way and the property line is in that

3   vicinity, I probably wouldn't touch those signs.

4       Q.   So from looking at this picture, you don't think

5   the Barbour sign --

6       A.   It is a possibility the Barbour sign could be in

7   violation, mm-hmm.

8       Q.   If that sign is in line with those road signs,

9   would that normally be pulled?

10      A.   Yes.  That sign would be pulled.  I probably

11  would not have a problem removing the Barbour sign.

12      Q.   I'm going to refer you to Exhibit D, which is the

13  next picture in order there?

14      A.   D?

15      Q.   Yes.  I'm sorry, it is C.  I apologize.

16      A.   C.

17      Q.   I ask you to take a look at those signs and ask

18  you if you would remove those signs under the sign code?

19      A.   No.

20          MR. SPEAKMAN:  I'm going to object to every

21  question you ask him whether he would remove them under

22  the sign code.  Since he clearly has told you that he

23  can't determine, without being -- looking at each site

24  from a photograph what should be done.

43

1          MR. TUCKER:  Well, first of all, I don't

2     think he has said that.  I think he has said that

3     depending on what he sees in the picture, he may or may

4     not be able to determine.  But if he can't determine it

5     from looking at the picture, Mr. Speakman, he can state

6     that on the record.

7          THE WITNESS:  With this sign, these signs

8     here, they are behind the pole line, it looks to be that

9     the curb is right there adjacent to the pole line, I

10    wouldn't bother those signs.

11          Again, I don't know how far back their

12    property line is.  It could be right to the back of the

13    pole there, the way they have got all their plantings and

14    their hedgerows, and then looks like that would be a

15    security sign sitting there in the hostas.

16          Again, I wouldn't pull those.  If they were

17    any other signs of that nature, political, I wouldn't

18    pull those signs.

19    BY MR. TUCKER:

20       Q.   And is there some policy about not removing signs

21    if they are within landscaping?

22       A.   Again, if they are in landscaping and it is

23    not -- in the City some people tend to run their

24    landscaping beyond the pole line.  I will remove that.

44

1    If it is on the street side of the pole line, I will

2    remove it.  But if it is back in somebody's hedge line or

3    planting lines, I normally won't touch them.

4        Q.   If the utility pole that you see sort of towards

5    the center of the picture, the only utility pole you see

6    in the picture, is sitting at the center of the

7    right-of-way and not at the back of the right-of-way, if

8    you will, is it possible that these signs are in the

9    public right-of-way?

10       A.   If this pole was back on the other side of those

11   signs?

12       Q.   No.  If the pole was positioned in the center of

13   the right-of-way as opposed to the very rear of the

14   right-of-way, is it possible that these signs could be

15   located in the right-of-way and you just wouldn't know

16   it?

17       A.   If the pole is there, and these signs are on the

18   other -- are on the street side of the pole, I would

19   remove them.

20              Again --

21       Q.   Let me restate the question.  Maybe I'm not being

22   clear.  You are assuming that pole sits on the very back

23   side of the public right-of-way, correct?

24       A.   I may be assuming that, but I'm not perfectly

45

1    sure that that is where the back of the utility

2    right-of-way is.

3        Q.    Right.

4        A.    Again, utility right-of-ways vary in all areas of

5    any township or city.

6        Q.    I agree.

7        A.    This one could have a right-of-way from the edge

8    of the curb, maybe 3, 4, 5 feet back.

9        Q.    Maybe even 10 feet, perhaps?

10       A.    It could be 10 feet.

11       Q.    If that were the case, hypothetically, I'm not

12   saying it is, but if actually the right-of-way there went

13   back 10 feet from the curb, those signs would be in

14   public right-of-way, probably, wouldn't they?

15       A.    Yeah, they would be -- they would be in the

16   right-of-way, if that's, that's where it was.   Again,

17   anything on the street side of the poles we are not

18   touching.

19            MR. SPEAKMAN:   I'm going to object to the

20   form of the question because it presents a hypothetical

21   with no facts offered to back it up.

22            MR. TUCKER:   Well, I think we have an

23   answer, but the facts to back it up were assuming the

24   right-of-way went back 10 feet.

David F. Murphy

46

1    THE WITNESS:  Don't know.  Don't know if it

2  is there.

3    MR. TUCKER:  That's the hypothetical.  That

4  was the fact to be assumed.

5    MR. SPEAKMAN:  Okay.

6  BY MR. TUCKER:

7    Q.    All right.  Let's go to Exhibit E.  I would ask

8  you to look at that sign and tell us, in the picture if

9  you can determine whether or not that's in the public

10  right-of-way or not.

11    I apologize, I did it again.  Exhibit D, as

12  in dog.  I'm getting a little ahead of myself.

13    A.    D?

14    Q.    Yes.

15    A.    It looks to be -- I'm not sure if that's a

16  telephone pole in the upper right-hand corner of the

17  picture.  If that is a pole, again, that sign wouldn't be

18  in violation.  It is possible it wouldn't.  It would be

19  behind the pole line.  And again, I'm not sure how close

20  the property line runs to the backside of that pole.

21  That sign would be questionable.

22    Q.    Okay.  When you say it wouldn't be in violation

23  if it is on the backside of that pole, you are assuming,

24  again, aren't you, that that pole sits on the very back

David F. Murphy

47

1    of the right-of-way?

2        A.    Well, I'm not assuming that it is in the back of

3    the utility -- the right-of-way.  Sometimes they don't

4    use the full right-of-way.

5        Q.    Right.

6        A.    They use whatever is the best way to place a

7    pole.

8        Q.    Right.

9        A.    There are certain criterias for placing the

10   poles, as far as distance apart, height, if they have a

11   cross-over pole, going across the street, sometimes they

12   try to get the poles to the very front of the

13   right-of-way.  If there is ample room without tearing up

14   somebody's bushes that they have planted in the

15   right-of-way, they try not to destroy that vegetation,

16   and also try to put the poles in the easiest place for

17   them to put the pole and maintain the pole.

18       Q.    That makes sense to me, Mr. Murphy.

19       A.    Yes.

20       Q.    What I'm trying to focus on a little bit more,

21   though, I believe you testified that that sign would not

22   be in violation of the sign code because it is behind the

23   telephone --

24       A.    Well, it wouldn't be -- I'm not saying it is



WILCOX & FETZER LTD.
Registered Professional Reporters

48

1    in -- it wouldn't be in violation of the sign code.  I'm

2    just saying that I am utilizing the pole as a line of

3    delineation as far as, it may be in the right-of-way.

4         Q.    Right.

5         A.    But it is not a hindrance.  It is not a problem.

6    It is an area, a grace area that we are allowing to be,

7    in all fairness, to allow somebody to put a sign out

8    close to the roadway.

9              Again, sometimes it is very hard to decide

10   exactly where the property line and the back of the

11   right-of-way meet.  And then most times it is very easy

12   to see where it is.

13             Again, this one is questionable if I would

14   remove -- to remove it.  Is it in the right-of-way?  It

15   is possible.  Is it on their private property?  It is

16   possible.  But to me it is questionable and I probably

17   would not remove that sign.

18        Q.    Would you take any effort to pull a plot plan to

19   see if there had been any recent survey filed with the

20   City like is --

21        A.    For this one here?

22        Q.    -- like depicted on Defendants' 2?

23        A.    Probably not.  Probably not.

24        Q.    All right.  Let's jump ahead to, now we are on E.

David F. Murphy

49

1    A.    E.

2    Q.    See if I can get it right this time.  Same

3  question, if you can tell from this picture --

4    A.    Well, I'm assuming that to the right of the "Ron

5  Paterson" sign is a corner marker, and from that corner

6  marker to the edge of the street, both those signs would

7  be in violation.

8            And again, I don't know if there is a pole

9  line on that side of the street.

10            MR. SPEAKMAN:  Can you show him the color

11  photograph?

12            MR. TUCKER:  Oh, sure.

13            THE WITNESS:  Well, let me see something

14  here.

15            I don't believe there is any pole line on

16  this side of the street.  This is --

17            MR. SPEAKMAN:  What is the address?

18            THE WITNESS:  This is the corner of Bay Road

19  and State Road.  Bay Road coming into State Road right

20  here.  And I know this property, it is Mr. Finelli's

21  property, I believe it is Mr. Finelli's property.  That

22  may be a corner marker there.  So those signs are in the

23  right-of-way.  They would probably be removed.  Yes.

24  They would probably be removed.  If they haven't been

50

```
 1   removed already.  I'm not sure if they are still there.

 2   BY MR. TUCKER:

 3       Q.    If you ran into a conflict between a pole, a

 4   utility pole and a marker such as that, which one would

 5   you yourself rely on?

 6       A.    If there was a pole in the vicinity of that

 7   marker?

 8       Q.    Yes, sir.

 9       A.    If one was out beyond the pole I would remove it.

10   If one was behind the pole I wouldn't remove it.

11       Q.    So you would rely on the utility pole overtop of

12   the marker?

13       A.    Yes, I would.  In fairness.

14       Q.    That's a fair answer.

15       A.    In fairness.

16       Q.    That's a fair answer.  I'm just trying to

17   understand the process that you use.

18       A.    Yes.

19       Q.    Now, going on to E, as in -- I'm sorry, F, as in

20   Frank, same question, if you can tell from looking at

21   that --

22       A.    I wouldn't touch those.

23       Q.    Why not?

24       A.    Well, you can see where there is a landscape
```



51

1    timber running across there.  And that's probably the

2    property line, where that landscape timber is.  I'm

3    assuming that's where it is.  But I will give -- again, I

4    would allow -- I would not remove those signs.  They are

5    just too close to decide.

6         Q.   In your experience with the City and with the

7    City of Milford, I think you said prior, have you seen

8    instances when folks do extend their landscaping into

9    public right-of-way?

10        A.   Oh, absolutely.  Absolutely.

11        Q.   So can we agree that there is no guarantee that

12   simply because there is a landscaping --

13        A.   That landscaping timber may be four or five feet

14   out beyond their property line.  It is something that

15   happens in every town.  Everybody tries to push the

16   envelope with their property.  Especially when there is a

17   situation like this with the street edge and grass, they

18   always try to take more than what they deserve.

19             Again, I would say that I wouldn't touch

20   these signs, unless, unless there was a pole line that so

21   showed that they were well beyond the utility pole line,

22   then I would probably remove them.  But without seeing

23   exactly where these were located in regards, relationship

24   to a pole line, without a pole I would leave them.

David E. Murphy

52

1    Q.    Okay.  Going on to G, have you ever seen that

2    before?

3    A.    Oh, every morning.

4    Q.    I'll show you a color one of that.

5    A.    I know what that one looks like.

6    Q.    Can you tell us what Exhibit G is reflecting?

7    A.    It looks like the welcome to the Rehoboth, City

8    of Rehoboth Convention Center sign out in the middle of

9    the streetscape island.

10   Q.    It appears that "Oklahoma" was playing July 19th

11   at 8:00 p.m., correct?

12   A.    Yes.

13   Q.    Is that a City event or a private person event?

14   A.    I don't know.  I don't get involved in what they

15   play at the Convention Center.  It could be anybody's.

16   Q.    Can we agree that that is in the right-of-way?

17   A.    Yes, it is probably -- yes, it is definitely in

18   the right-of-way.  Am I going to take that sign down, no.

19   Q.    Is that because sign code exempts public signs?

20   A.    I don't think it says or exempts a City sign.  I

21   think -- I don't know.  I would have to refer to my

22   esteemed lawyer.  I don't know.  I don't know.  I don't

23   know of any town that basically has it written where

24   their own signs, you know, are exempt or not exempt.  In