53

1    the years that I've spent in this line of work, I've

2    never been told to go after a City sign.

3        Q.    Moving on to the next one, see how your copy is.

4    That's not too bad.  That would be Exhibit H.  "Skip

5    Faust For Sale Coldwell Banker" it looks like?

6        A.    That sign would be removed, if not already.

7        Q.    That's because of the utility pole you would be

8    relying upon there?

9        A.    Yes.

10       Q.    I'm going to now move you on to I, ask you the

11   same question about --

12               MR. SPEAKMAN:  Can you show him the color

13   picture of that?

14       Q.    The North Star?

15       A.    North Star Heating and Air.  It looks like a pole

16   right there, and that sign would be removed.

17               MR. SPEAKMAN:  Wait a minute.  Is that the

18   one you just showed him?

19               THE WITNESS:  Faust?  Skip Faust, yes.  That

20   sign would be removed.  If I didn't remove it the power

21   company probably would remove it.

22               If that's an intersection that's even more

23   of a problem, because that could be removed for safety

24   reasons for vehicle visibility.



1    BY MR. TUCKER:

2        Q.    Now, is there another ordinance in your code that

3    deals with visibility that you rely on?

4        A.    Under the code, safety.

5        Q.    Is there a specific ordinance that addresses

6    that, separate and apart from the sign code?

7        A.    I believe there is.

8        Q.    Can you --

9        A.    As far as safety, I don't remember from memory,

10   but I believe there is something in the code that says

11   for safety.  My job is to enforce the codes, I think it

12   is under the code enforcement -- or the building

13   inspector's realm of responsibilities.

14       Q.    We looked at I.

15       A.    That sign would be removed.  And I'm surprised it

16   is even there because all of the -- most of the

17   contractors know that they are not allowed to put their

18   signs out beyond the property line.  That is something

19   that we constantly explain to the contractors, that if

20   they put a sign out beyond the property line, out that

21   far out that we will remove their sign.

22       Q.    All right.  I'm moving on to J.  Can you tell us

23   from looking at that picture if those signs are in

24   violation?

1    A.    They are on Lake Gerar.  They are on City

2  property.  That's Lake Gerar public park.  Again, that is

3  Lake Gerar public park.  That's something that the City

4  probably installed when they built the playground.

5    Q.    So it is not a violation, in your opinion?

6    A.    No.

7    Q.    Okay.  K.  Looks like Grenoble, and I don't know

8  if it would be First Street.  It looks pretty close to

9  the boardwalk to me.

10   A.    Grenoble is on that side.

11   Q.    Can you look at that sign, "Village Improvement,"

12  and tell us --

13   A.    It looks like it is behind the pole line.  There

14  is a pole line that runs back that side of the street.

15  Again, that would be a sign that would be behind the pole

16  line.  I don't know the history of that sign, but the

17  sign looks pretty old.  It is a possibility it has been

18  there for a long, long time.

19   Q.    Is there some exception in the sign ordinance for

20  older signs that you are aware of?

21   A.    In my experience, sometimes it is hard to go

22  after old signs.

23   Q.    Why is that?

24   A.    Normally it is like a grandfathering type of



David E. Murphy

56

1    situation.  It has been there all these years, before

2    ordinance, sign ordinance was written, or changes were

3    made.  And it is like anything, if a code or ordinance is

4    written after something has been installed, that

5    structure or sign is grandfathered as far as its location

6    or placement.

7              I don't know if any kind of -- I don't know

8    if the City made a variance on this or an allowance.  I

9    don't know.  Again, this sign pre-dates me, so I don't

10   know the status on this sign, how it came about.  But it

11   does look like it has got some age to it.

12       Q.    Can you, though, point me to a specific provision

13   in your ordinance or in your sign code that exempts signs

14   that are over a certain age?

15       A.    No, there isn't.

16       Q.    Going on to L, I'll point your attention in

17   particular to the Art League sign.  Can you tell from

18   looking at that picture at that sign on the stop sign

19   pole if that is in the public right-of-way?

20       A.    It probably is, it is a sign, corner post, it is

21   a directional sign, the Art League.  Again, I think that

22   sign pre-dates -- I know that sign pre-dates me because I

23   know the Art League has been where it is at for the last

24   40, 50 years.  And it probably was put up there when the

1   Art League was established.

2       Q.   Mr. Murphy --

3       A.   I don't know.  Like I said, I wouldn't be going

4   after that sign.  Maybe it is not the right answer, but I

5   didn't even notice the sign until the other day when it

6   was pointed out to me.

7       Q.   Well, let's explore that.

8       A.   I've driven right by it.

9       Q.   Let's explore that a little bit.  You said you

10  wouldn't go after that sign.  It is a private sign,

11  correct?

12      A.   I don't know if it is private or not.

13      Q.   Is the Art League a public organization?

14      A.   I don't know.

15      Q.   Is it a City organization?

16      A.   I don't know.

17            MR. SPEAKMAN:  I can't answer.

18      A.   I don't know.  I don't know if it is affiliated

19  with the City or not.  I'm not into art, so I don't know.

20  I still don't even know where the place is.

21      Q.   All right.

22      A.   I don't know.  I don't even know where it is.

23  I've probably ridden by it a half dozen times and I don't

24  even know where it is at.  I keep hearing all about the



58

1  Art League.

2       Q.   Mr. Murphy, I have to confess, I've been coming

3  to Rehoboth since I was a child and I don't know where

4  the Art League is either.

5       A.   I've probably ridden by it a hundred times.   I

6  don't know where it is at.   I don't even know where some

7  of these places are.

8       Q.   Assuming that is a directional sign for a private

9  organization, in your opinion should that be removed

10  under the sign code, the way the sign code is written?

11       A.   The way the sign code is written, if it was a

12  private sign?

13       Q.   Yes, sir.

14       A.   Probably.

15       Q.   All right.

16       A.   Again...

17       Q.   Do you know approximately how many of those there

18  are in the City?

19       A.   No, no.

20       Q.   You mentioned just the other day your attention

21  was drawn to these.   Who drew your attention to these?

22       A.   Oh, I was riding around the other day, I think it

23  was Thursday, I had to go do an inspection, and I believe

24  there is one on the corner of 2nd and Lake Avenue.   It is



1    the only reason I saw it is because a gentleman stopped

2    me on the corner to ask me a question, because I was in a

3    City truck, who I know, and I happened to look up where

4    he was standing and I happened to see it up there.  So

5    when I saw this, I realized that this is at 2nd and Oak,

6    so there must be more than one of these.

7        Q.    I want to point you to the next exhibit in order,

8    M, as in Mary.  Same sign?

9        A.    Same sign.

10       Q.    Again, does that appear to you, based on the

11   picture, to be in the public right-of-way?

12       A.    It appears to be.

13       Q.    N, as in Nancy, "Tree City U.S.A." sign, does

14   that appear to be in public right-of-way or public park?

15       A.    That looks to be in the public park, as we were

16   designated as a tree city.

17       Q.    Based on what you have testified to earlier, what

18   is your position on that sign being in compliance or not?

19       A.    Well, again, I don't know if it is right or

20   wrong.  It looks to be something that the City might have

21   installed.  And if the City is justified in saying that

22   it is a City sign, then -- unless I'm instructed to take

23   it down by my superiors...

24       Q.    That wouldn't come down unless you were



David F. Murphy

60

1    instructed by your superiors?

2        A.    That's correct.

3        Q.    O, "Oak Grove Trailer Park" sign?

4        A.    That's an oldie.

5        Q.    Okay.

6        A.    Apparently Oak Grove Trailer Park has been here

7    for, I guess forever.  I don't know if -- according to

8    this, it is not that far from the edge of the street --

9        Q.    Right.

10        A.    -- the curb line.  But, again, I don't know its

11    location as far as where the property line is.  I've seen

12    the sign, but, again, it is a informational sign showing

13    where the small trailer park, Oak Grove Trailer Park is.

14    I've never questioned it.  It is just one of those things

15    you ride by and you just sort of know it is there, but it

16    is not on your main purpose to go after.

17                    I've probably gone by it a half dozen times

18    going on inspections or going on other things, and just

19    ride right by it sometimes.

20        Q.    Are you aware of any exception in the code for

21    private directional signs or identification signs that

22    are private?

23        A.    I believe under the sign ordinance there is a

24    section for directional signs, in the sign code, sign

1    ordinance itself.

2        Q.   What about if they are in the public -- I'm

3    sorry, go ahead.

4        A.   It doesn't stipulate the right-of-way or private

5    property.  But most of the time, if I was to give a

6    permit for this sign, it would have to go on the private

7    property.

8        Q.   So if that is in the public right-of-way, that

9    sign, the Oak Grove sign --

10        A.   If it is in the right-of-way it would be in

11    violation, that's correct.

12        Q.   P, Henlopen Acres.

13        A.   Oh, I don't know about this one.  I believe

14    that's on Henlopen Acres' property.

15        Q.   You do not believe that's the public

16    right-of-way?

17        A.   If it is, it is Henlopen Acres.

18        Q.   But Henlopen Acres is within the corporate limits

19    of the City?

20        A.   No.

21        Q.   Do you have any enforcement authority in there?

22        A.   No.

23                MR. SPEAKMAN:   It is a separate

24    municipality.



62

1          THE WITNESS:  Henlopen Acres is a separate

2    municipality.  They are a town of their own.

3          MR. SPEAKMAN:  You didn't know that?

4          THE WITNESS:  You didn't know that?

5          MR. TUCKER:  Let your witness answer,

6    Mr. Speakman.

7          THE WITNESS:  But I knew that.  I mean, no.

8    When I first came here I did not know it.  But I did find

9    out very quickly that Henlopen Acres has their own

10   building inspection agency, their own form of government.

11   So I don't have any jurisdiction on anything that has

12   anything to do with Henlopen Acres, nor would I want to.

13          (Discussion off the record.)

14   BY MR. TUCKER:

15     Q.   Mr. Murphy, let me roll back the clock a little

16   bit here and go back to where we started this afternoon.

17   On July 9th, when some of Mr. Sokolove's signs were

18   removed by Mr. Onizuk, did you have any communications

19   with Mr. Onizuk on that date?

20     A.   July 9th was a --

21     Q.   I believe it was a Saturday?

22          MR. SPEAKMAN:  Saturday.

23     A.   No.

24     Q.   Did you have any communications with Mr. Ferrese



**WILCOX & FETZER LTD.**

Registered Professional Reporters

David E. Murphy

63

1    on that day?

2        A.    Yes.

3        Q.    Can you tell us what they were?

4        A.    He called me up at home and asked me if we had

5    removed any political signs on -- I believe that was

6    regarding the 7th, July 7th, and I said yes, we had, and

7    he said he had gotten a complaint through the police

8    department, and wanted to make sure that what we were

9    doing.  And I told him that we had been removing

10   political signs on public right-of-way.  And apparently

11   the mayor, Sam Cooper, had contacted him and he asked me

12   to contact Mr. Cooper, which I, once I hung up from

13   Mr. Ferrese I called Mr. Cooper and explained to him what

14   we were doing.  And I advised him if he had any signs

15   that were in public right-of-way, that they would be

16   removed also, any of Mr. Cooper's or any of the other

17   candidates'.

18       Q.    Okay.

19       A.    And that was the end, basically that was the end

20   of the conversation.

21       Q.    Going back to the conversation with Mr. Ferrese,

22   about what time did he call you on Saturday, the 9th, if

23   you recall?

24       A.    I think it was around noon.



64

1    Q.    Okay.   Did you discuss with him the sign code and

2    the sign policy or --

3    A.    Just told him we were removing signs from the

4    right-of-way.   On the grass between the sidewalk and the

5    curb or anywheres on the corner where they were around

6    stop signs, and in any of the park areas or the islands,

7    where some of them were found to be.

8    Q.    Okay.   Did he then ask you to contact Mayor

9    Cooper directly to advise him about these enforcement

10   activities?

11   A.    Yes.

12   Q.    About how much later after 12:00 o'clock did you

13   contact Mayor Cooper?

14   A.    As soon as I hung up from Mr. Ferrese.

15   Q.    What did you tell Mayor Cooper?

16                 MR. SPEAKMAN:   I think he just answered

17   that.

18   A.    Yes, what I just said.   I mean, I told him that

19   Mr. Ferrese called me and that Mr. Ferrese said that

20   Mr. Cooper wanted to call me -- wanted me to call him to

21   advise him what I was doing and that I told him that we

22   were removing political signs in the park areas, and in

23   the medians, and in the right-of-ways, and between the

24   grass areas, between the sidewalk and curb.   And I told

65

1   him that if he also had any, that they would be removed,

2   the same as the rest of the constituents, or the

3   candidates, I should say.  I play no favoritism.

4       Q.    What did Mayor Cooper say?

5       A.    Well, he said he wanted to make sure that I was

6   playing -- doing it fair.  And I said, well, I told him,

7   I said that, again, I will remove his or anybody else's

8   signs that were in those same areas, regardless who they

9   were.

10      Q.    Now, we have spent some time today talking about

11  how you use utility poles as a benchmark, if will you.

12      A.    Mm-hmm.

13      Q.    And how you use sidewalks as a benchmark.

14      A.    Yes.

15      Q.    Did you have specific discussions with Mr. Cooper

16  about those two markers, if you will, that you rely upon?

17      A.    No, no.

18      Q.    Okay.  As I understand from reading your

19  memorandum, Plaintiffs' 6, subsequent to your

20  conversation with Mayor Cooper --

21      A.    Mm-hmm.

22      Q.    -- you had to remove three of his signs?

23      A.    Yes.  Well I removed one that day on the 15th,

24  and two previous.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

David F. Murphy

66

1      Q.   And your conversation with him, though, was on

2  the 9th?

3      A.   On the 9th.

4      Q.   Do you recall whether or not Mayor Cooper had any

5  signs up for the City on the 9th, which would be the day

6  you were speaking to him, obviously?

7      A.   He had a few.  He had a few.

8      Q.   Now, after speaking to the mayor and Mr. Ferrese

9  on the 9th, did there come a time when either you

10  contacted someone or someone contacted you regarding

11  Mr. Sokolove's sign removal that took place on the 9th?

12      A.   Well, basically, it was Mr. Ferrese, when he

13  called me, asked me if I had removed any of

14  Mr. Sokolove's signs, and I said yes, we had.

15      Q.   Same day, 7/9?

16      A.   7/9.

17      Q.   This is a later call, later in the day?

18      A.   Same call.  It was about a 15-minute call.  I do

19  remember I was getting ready to go out the door, take my

20  grandson to dinner.

21      Q.   So at that point, did you know whether or not

22  Mr. Onizuk had removed the signs on the 9th, or whether

23  or not this was some sign removal that happened I think

24  you suggested on the 7th?

David F. Murphy

67

1    A.    No, that was in regards to the signs that were

2    removed on the 7th, which was a Thursday.

3    Q.    Okay.

4    A.    And I knew those signs had been removed.  And Mr.

5    Onizuk had told me that; he came and he told me he had

6    removed some signs.  And I said, well, as long as they

7    were on City, you know, in the park, and in the island at

8    2nd Street and Olive, were removed, and they were placed

9    in the back of the City truck for my department, and

10   that's where they were stored.  Then Saturday morning,

11   Saturday at noon I got the phone call, advising

12   apparently that somebody had seen the signs,

13   Mr. Sokolove's signs, along with various other signs in

14   the back of the City truck, in front of my office.  And I

15   guess that was Mr. Joe Hill.  And that's when this whole

16   I guess issue started.

17   Q.    Okay.  How did you get informed about Mr. Hill?

18   How did that come about?

19   A.    Well, I didn't know it was Mr. Hill until that

20   Monday, when I received the notice from the police

21   department, the report from the officer that day who

22   handled that.  I suppose a theft of political signs.

23   Q.    Okay.  So on the 9th you have this one

24   conversation with Mr. Ferrese --



68

1     A.    Mm-hmm.

2     Q.    -- one conversation with the mayor?

3     A.    Yes.

4     Q.    Then when is the next time somebody has a

5  discussion with you about any of Mr. Sokolove's signs?

6     A.    Monday morning.

7     Q.    Monday morning, and that's what you were

8  referring to with the police report?

9     A.    That's correct.  Apparently that Saturday night,

10 which was the 9th, Mr. Sokolove came over to retrieve his

11 signs, from what I was explained on Monday by Detective

12 Scott O'Bier.  And that was approximately, I believe,

13 around 10:30, 11:00 o'clock at night, on Saturday night,

14 and Mr. Sokolove was given back his signs.

15           Apparently they were placed right back in

16 the same area of the Gerar Park, and I guess Mr. Onizuk

17 removed them again from the park and the island at 2nd

18 and Olive.  And then Monday morning I guess this whole

19 thing sort of went nuts with these political signs, if

20 you will.

21    Q.    Did you get interviewed by a City of Rehoboth

22 police officer in regard to --

23    A.    Yes, I did, by Detective Scott O'Bier.

24    Q.    Was that on that Monday?



David F. Murphy

69

1    A.    No, because Detective O'Bier interviewed me on

2  Wednesday.  He works -- he doesn't work on Mondays and

3  Tuesdays.  It was Wednesday.  Wednesday, I don't know

4  what the date is on that Wednesday.

5    Q.    But you did receive a call on Monday from the

6  police department?

7    A.    Actually it wasn't a phone call.  I got a copy of

8  the incident report.

9    Q.    How did you get that?

10    A.    Through the mail.  Inner-City mail.  It was left

11  in my mailbox over at City Hall.

12    Q.    When did you first see it, on Monday?

13    A.    Monday morning.

14    Q.    Did you call anybody about that or speak to

15  anybody about that?

16    A.    I just spoke to Mr. Onizuk, made sure that that

17  is what happened.

18    Q.    Mr. Hunt?

19    A.    Onizuk.

20    Q.    Onizuk, I'm sorry.  You did have a conversation

21  with him on Monday?

22    A.    Mm-hmm.

23    Q.    As best as you can remember, can you give us an

24  idea of what that conversation was?



70

1      A.    I just questioned to make sure where he removed

2    the signs from.  I wanted to make sure that they were

3    justified in being removed and not on private property.

4    And the problem is that they were on -- in Lake Gerar,

5    and some of the areas were between the sidewalk and curb

6    on Lake Avenue, a couple in other areas of town.

7      Q.    So you had a brief conversation with him on

8    Monday, Mr. Onizuk.  On Wednesday you get interviewed by

9    Rehoboth Beach P.D., correct?

10     A.    Yes, yes.

11     Q.    And between that Monday and that Wednesday did

12   you speak to any other City official about the sign

13   issue?

14     A.    Mr. Ferrese.

15     Q.    When did that take place?

16     A.    Monday.

17     Q.    Tell me what that conversation was about.

18     A.    Apparently, you know, advising what we had done

19   when I went over to City Hall to get my mail, and to make

20   sure that he knew what was going on, because he is my

21   superior.  And he basically told me, he says if they are

22   in the right-of-way or on City property that they are to

23   be removed, regardless of who they are, whose signs they

24   are.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    Q.    That was on that Monday?

2    A.    That was on a Monday.

3    Q.    Any other discussions with him that day,

4  Mr. Ferrese?

5    A.    Not about these.  Not about the political signs.

6    Q.    Now, leading up to the discussion with the police

7  officer on Wednesday, anybody else in the City or City

8  official or City employee you had a discussion with about

9  the sign removal leading up to Wednesday?

10    A.    No.

11    Q.    And when you were interviewed by Rehoboth P.D.,

12  was that private or were other folks present?

13    A.    Private.

14    Q.    And that was in City offices?

15    A.    It was my office.

16    Q.    Following a discussion with Rehoboth Beach P.D.,

17  did you have discussions with anybody else regarding

18  removal of the signs on 7/9?

19    A.    No.

20    Q.    How did you find out about this deposition today?

21    A.    From my attorney.

22    Q.    From Mr. Speakman?

23    A.    Yes.

24    Q.    Have you had an opportunity to review any of the



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    materials that were filed with the District Court of

2    Delaware in regard to this lawsuit?

3        A.    Just what is right in front of me is the only

4    thing I've got, I've seen.

5        Q.    When you say that --

6        A.    And this notice of deposition from Mr. Joe Hill,

7    and this Plaintiffs' Memorandum For the Temporary

8    Restraining Order.  Today is the first day I've seen

9    these.

10       Q.    First day is today?

11       A.    Mm-hmm.

12       Q.    And you've had no other discussions since the

13   last time you spoke to Rehoboth P.D. about this with any

14   City official or employee?

15       A.    Well, I've spoken to Mr. Speakman about this.

16       Q.    Other than Mr. Speakman?

17       A.    Other than Mr. Speakman, no.  Unless you want to

18   consider my wife.

19       Q.    No, we won't consider her.  That's privileged.

20            MR. SPEAKMAN:  That's privileged.

21            MR. TUCKER:  Husband and wife, that's why I

22   said that, out of respect for the privilege.

23       A.    Oh, I do want to say I did speak to Mr. Sokolove

24   about this.

73

Q.    When did you speak to him?

A.    I'm not sure if it was Monday or Tuesday.

Q.    Can you give us --

A.    I'm not sure what day it was on, but he did come over and speak to me, very cordial, and we spoke about it and I told him I said, "Look," I said, "If they are in City park, in the island there at Olive and 2nd Street, or between the curb and sidewalk, or on the street side or the pole line," I said, "look," I said, "that is the right-of-way, we will remove them."

And I told him, I said, "If they are up on your property, I won't touch them."  I won't touch them on anybody's private property.

I said I try to be as fair and honest about this and hopefully I try to give the benefit of the doubt as far as location of these signs.  But I won't go up on private property and I will not instruct any of my staff to remove anything from private property.  If they do, it is not intentional.

Sometimes they may.  If they have removed a sign, again, it was not intentional.  We try to make sure we know where the locations of property lines are.  And that's something that we are very critical about.

Q.    And did you have any discussion with him about

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

74

1  utility pole as a benchmark or the sidewalks as a

2  benchmark?

3      A.    I've talked to him about that as far as saying,

4  you know, I won't touch anything on utility -- I mean,

5  there are some signs across the street from his

6  restaurant establishment at 59 Lake that were clearly

7  against the pole line or behind it, and I didn't touch

8  them, because I felt that on Lake Avenue the property

9  lines and the pole lines are really, really, really close

10 to each other.  So, again, if it was up against a pole or

11 behind a pole, we weren't going to touch them.

12          And there were several that were blatantly

13 beyond the pole line and beyond the curb line because

14 some people have extended their landscaping beyond the

15 edge of the street, and that is clearly in the

16 right-of-way, and a couple of them were removed because

17 of safety.

18          MR. TUCKER:  Housekeeping matter for you off

19 the record.

20          (Discussion off the record.)

21          (Recess taken.)

22 BY MR. TUCKER:

23      Q.    Back on the record.  Mr. Murphy, have you had an

24 opportunity to review the Schedule A of the deposition



75

1   notice with counsel?

2        A.    Yes.

3        Q.    And can you provide us answers to certain

4   questions identified in Schedule A this evening?

5        A.    Yes.

6        Q.    Could you please go through that list and give

7   answers to those questions that you can represent on

8   behalf of the City.

9        A.    We have gone through questions 1, 2 and 3.

10       Q.    Okay.

11       A.    Number 4 is basically, we don't have anything

12   from the State of Delaware --

13             MR. TUCKER:  Can I see yours, your

14   deposition notice?

15             MR. SPEAKMAN:  That's not my deposition

16   notice.

17             MR. TUCKER:  I'm looking for your copy of

18   what Mr. Murphy has.

19             MR. SPEAKMAN:  Oh, here.

20             MR. TUCKER:  So I can look at it while he is

21   looking at it.  Thank you.

22   BY MR. TUCKER:

23       Q.    I'm sorry, Mr. Murphy.

24       A.    Number 4, I have no knowledge of, if the State of



WILCOX & FETZER LTD.
Registered Professional Reporters

76

1    Delaware has given the City any right or authority.

2            Number 5, question (a), who decides whether

3    or not to enforce the federal, state, county or city

4    ordinance, code, the City manager authorizes me to

5    enforce the City Ordinance 74-16.

6        Q.    Okay.

7        A.    And (b) would be on who decides when to enforce

8    the federal, state, county or city ordinance, code,

9    statute or regulations, without limitation, to 74-16.

10   That would be myself.

11           And question (c) --

12       Q.    If I could just pause you there.  Is it your

13   testimony that Mr. Ferrese has no authority in that

14   regard?

15       A.    He does.  I'm sorry.  Mr. Ferrese does too, yes,

16   absolutely, as the City manager.

17       Q.    All right.

18       A.    (C), who decides whether or not a particular

19   sign, post or advertisement violates the federal, state,

20   county or city, ordinance, code, statute or regulations

21   including, without limitation, the City Ordinance 74-16.

22   Do you want me to read the whole --

23           MR. SPEAKMAN:  I don't think you need to.

24       Q.    You don't need to.

1    A.    Okay.    In question (c) would be myself, with, I'm

2  sure the City manager has input on that also.

3              (D), how often does the City enforce the

4  City Ordinance 74-16, it would be 365 days a year, would

5  be the answer to that.

6    Q.    Okay.

7    A.    How often are signs removed as a result of

8  alleged violations, regarding City Ordinance 74-16,

9  again, when signs are found to be possibly in violation,

10  they will be -- they are removed.

11              As far as question (f), I don't know the

12  answer to question (f).

13    Q.    Let me ask you this:  Are you aware of any

14  policies, procedures, regulations beyond those that you

15  have testified to today?

16    A.    No, just what I've testified today.

17              In question (g), as far as what has been --

18  what signs, posters or advertisements that have been

19  removed in the last five years from public right-of-ways,

20  I don't know what happened previously, before I started a

21  year and a half ago.  I have no information on that.

22    Q.    Can you tell us who would, if you know?

23    A.    I don't know.  I don't know if there is any.

24              Question (h), same question -- same answer,

78

1    I don't have any knowledge of what has been erected on

2    public property or right-of-ways, I don't know.  There is

3    no record that I found that acknowledges what has been

4    allowed to be installed in the last five years.

5              The removal of campaign signs from public

6    right-of-ways within the City.  Since July 1, the

7    question who decided campaign signs should be removed and

8    why, and that is myself, and that is if they are on

9    public property, public right-of-way areas.

10              Question (b) who directed City employees to

11    remove campaign signs, that was myself.

12    Q.    What date was that, Mr. Murphy?

13    A.    It was --

14    Q.    Would you like to refer to --

15    A.    Well, that was for the 15th.

16    Q.    All right.

17    A.    That report is for the 15th.  But it was pre July

18    7th.  Probably within two weeks of that.

19    Q.    Okay.

20    A.    What directions or instructions were given to

21    employees, basically that they were to remove them from

22    public right-of-ways, public property, the parks, areas

23    between the sidewalk and the curb, and areas from the

24    pole line out to the street.



```
 1            And (d), as far as who decides what certain

 2   campaign signs should be removed and others left

 3   standing, it is myself and my code enforcement officer,

 4   Walter Onizuk.

 5            And question (e) is why did the City remove

 6   certain campaign signs and leave others standing, because

 7   there was doubt as far as their location in question, we

 8   felt if that's the case then we wouldn't move them.  If

 9   they were behind the pole line or on private property,

10   they would be left standing.  If they were from the pole

11   line to the street edge, then they were removed.

12       Q.   Mr. Murphy, did Mr. Ferrese have any input

13   regarding what signs would be left standing and which

14   ones would not?

15       A.   Basically, after I advised him what we were

16   doing, he stated that anything in the public

17   right-of-way, between the sidewalk and the curb, would be

18   removed and anything in public property, as far as parks

19   and other areas that were designated as public areas,

20   were still to be removed.

21       Q.   Did you have a discussion with him, and you may

22   have already answered this and I apologize if you have,

23   did you have a specific discussion with him about using

24   telephone utility poles as benchmarks and sidewalks as
```

80

1  benchmarks?

2      A.   Not beforehand.

3      Q.   So he was not aware that those were benchmarks

4  that were being used by you or your enforcement officer?

5      A.   It was a policy that I started.

6      Q.   Was he aware of it, though, was my question?

7      A.   Not beforehand, but after this, all these

8  incidents happened on the 9th, he was made aware.

9      Q.   Okay.  Just very briefly, moving back to your

10 July 15th memo, which is Plaintiffs' 6 --

11     A.   Mm-hmm.

12     Q.   -- who asked you to create that memo?

13     A.   I do a report if I go out and do a -- if I go out

14 and do a violations removal of this nature.  It is

15 something that I have been trained to do from my previous

16 employment with the City of Milford.  And I do a report

17 like this if there is a possible question.  I'm very

18 thorough.  I try to be very thorough in my reports, and

19 it is something that I found is a good policy.

20     Q.   So your testimony is nobody asked you to do this

21 report, you did it on your own?

22     A.   I did it on my own.

23     Q.   Does Mr. Onizuk do similar reports when he goes

24 out?



81

1    A.    I wouldn't say he is as precise.    If he does do a

2  report, he may just do a statement and put it in the

3  computer.    He may give me a copy of something that he

4  did, if he went out on, did a rounds on -- checked some

5  restaurants for violations, when he works evening shifts,

6  he may give me a list of restaurants that he has checked

7  so I know that if a complaint has -- does come in, I can

8  go back and look at his brief report that he, indeed, had

9  been at those sites and had found no violations or had

10  found violations to compare with any complaints.

11    Q.    Do you know if Mr. Onizuk prepared any such even

12  minor type of written reports for the signs that were

13  removed on 7/9?

14    A.    I think he might have just did one or two.    I'm

15  not -- I don't have anything that -- he didn't date

16  anything, so there is probably one or two that he wrote,

17  but they were basically not official, what I would call

18  an official report.    They were basically stating that I

19  went around this area and found such and such, and that

20  was it.    Or I went around and observed and found nothing.

21  But nothing of this magnitude as far as a report.

22    Q.    Mr. Murphy, have you ever done a report like this

23  in the past year for the City of Rehoboth Beach?

24    A.    I have done reports like this.



David F. Murphy

82

1   Q.   For signs?

2   A.   Not for signs.

3   Q.   Is this the only time you went on a sign search

4   with Mr. Onizuk?

5   A.   This is -- I have been on other sign searches,

6   not for political signs but for other signs.

7   Q.   And were reports done, written reports like this

8   that I have here as Plaintiffs' 6?

9   A.   Not, not this in-depth.  Basically it was just

10  going to a particular site with him, basically because he

11  needed my help in deciding whether a sign was in

12  violation or not, in a commercial store.

13  Q.   At the time you did this report, which is dated

14  July 15th, were you aware that a lawsuit was being

15  contemplated against the City regarding its sign code and

16  enforcement thereof?

17  A.   I think there may have been mentioned that there

18  was a -- that somebody was talking about possibly doing a

19  lawsuit.  But nothing that was official that I knew of.

20  Everybody talks about lawsuits in Rehoboth, but nothing

21  that would make me go out of my way to do a report of any

22  magnitude.  It is just something that a lot of times if I

23  feel that it is a subject that is intense, then I will do

24  a report.  Very seldom do I get to go out on the road.

83

1    Q.    Who all got this report?  Who all did you send it

2    to?

3    A.    This report went to Detective Scott O'Bier, Greg

4    Ferrese; City attorney, Mr. Speakman.

5    Q.    Okay.  Had prior reports been sent to those same

6    people?

7    A.    For other --

8    Q.    Prior sign reports?  I think you had testified

9    you had done one but maybe not in this depth?

10    A.    I have sent reports to Mr. Ferrese, but not -- I

11    mean not regarding signs.

12    Q.    Okay.  Not to Mr. Speakman?

13    A.    I've sent -- not regarding signs.  I've sent

14    reports to Mr. Speakman and Mr. Ferrese regarding

15    restaurant violations or of that nature.

16            MR. TUCKER:  Thank you, Mr. Murphy.  I don't

17    have anything else for you, unless Mr. Speakman has some

18    stuff, in which case I might have some follow-up

19    questions.

20                         EXAMINATION

21    BY MR. SPEAKMAN:

22    Q.    Mr. Murphy, I'm sorry, but this is important to

23    get your testimony in.  I have a few questions for you.

24    First off, how many people are in your department, your

84

1    Building and Licensing Department?

2        A.    I have two secretaries, an assistant building

3    inspector, and a code enforcement officer.

4        Q.    That's Walter Onizuk; is that correct?

5        A.    Walter Onizuk is the --

6        Q.    Onizuk?

7        A.     -- Onizuk is the code enforcement officer.

8        Q.    Is he full-time?

9        A.    He is part-time.

10       Q.    His main job, he is assigned the task of removing

11   signs, whether it be political signs or not, that are in

12   the City's public lands or public right-of-way; is that

13   correct?

14       A.    That is correct.

15       Q.    City-owned land?

16       A.    That is correct.

17       Q.    And he is part-time?

18       A.    He is part-time; he works 24 hours a week.

19       Q.    So the fact that a sign may be up, including

20   political signs may be up in violation is not highly

21   significant, is it?

22       A.    No.

23       Q.    Since he might not be around, he might not have

24   worked that day to review it or no one had reported it to



85

1   you?

2      A.   That's correct.  I mean he only works three days,

3   and sometimes we get complaints and he will go out and

4   handle a complaint, whether it be a sign complaint or any

5   other complaint.

6      Q.   Can you tell us how far away 59 Lake Avenue is

7   from your office, or your department?

8      A.   A block.

9      Q.   Rather close, then?

10      A.   Rather close.  I would say a couple hundred feet.

11      Q.   So you would probably more likely see sign

12   violations there, a place that's ten blocks away --

13           MR. TUCKER:  Mr. Speakman, I'm just going to

14   note that you are leading the witness.  I would ask that

15   you not do that.

16           MR. SPEAKMAN:  I don't think that's leading.

17   This is a deposition, I would remind you.

18           MR. TUCKER:  I'm just asking you not to ask

19   leading questions.  Go ahead.

20   BY MR. SPEAKMAN:

21      Q.   You can answer the question.  Do you remember the

22   question?

23      A.   Yes.

24      Q.   Okay.



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

86

1    A.    The way to get out of the parking lot to my

2    office is either onto Rehoboth Avenue or out the back

3    entrance onto Lake Avenue.

4    Q.    Can we have Defense Exhibit 10?  Is it buried

5    here?

6           MR. TUCKER:   What is that, Walt?

7    BY MR. SPEAKMAN:

8    Q.    Defense 10 -- Defense 2, and that's from the

9    Walter Onizuk depo, and I guess all these that have

10   exhibits will be, for the record, they will be from that

11   deposition.  We decided to leave them jointly.

12           You mentioned when Mr. Tucker asked you

13   questions that it showed that that survey shows there was

14   a sidewalk.  Is that sidewalk in front of the restaurant,

15   59 Lake?

16   A.    There is a sidewalk in front of 59 Lake

17   restaurant.

18   Q.    Is that sidewalk on City property or on

19   Mr. Sokolove's property?

20   A.    There is a section that is on City property, and

21   there is a section that is on Mr. Sokolove's property.

22   Q.    Obviously, the street is owned, Lake Avenue, is

23   City property, is it not?

24   A.    That is correct.

87

1      Q.    Let's go back to, did Mr. Ferrese instruct you to

2   pick up any political signs this year?

3      A.    No.

4      Q.    Then why did you pick them up?

5      A.    Because that was the policy that was -- the

6   instructions that were given to me at last year's

7   political campaign.

8      Q.    So prior to, would it be fair to say prior to

9   July 9th, to the best of your knowledge, Mr. Ferrese had

10  no idea that you were picking up any political signs?

11     A.    That's correct.

12     Q.    Now, last year did you have -- that was your

13  first election campaign for the City, when you worked as

14  Building Inspector; is that correct?

15     A.    Correct.

16     Q.    Did you pick up political signs last year in the

17  right-of-way?

18     A.    Yes.

19     Q.    Do you remember picking up any candidates', any

20  of the candidates you picked up?

21     A.    Yes.

22     Q.    Can you tell us who the candidates are that you

23  picked -- you remember having their signs picked up?

24     A.    Patrick Gossett, a commissioner Rick Sargent.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

88

1    Q.    For the record, Patrick Gossett, he was elected a

2  commissioner?

3    A.    He was elected commissioner.

4    Q.    Were there a lot of political signs last year?

5    A.    Yes.

6    Q.    Now, the plaintiffs have alleged that in their

7  complaint, that the City adopted a policy to remove

8  plaintiffs' campaign signs from property located within

9  the City.  You understand the plaintiffs are Mr. Shields,

10  Mr. Sokolove and Mr. McCarthy?

11    A.    Yes.

12    Q.    Is that true?  Did you develop a policy just to

13  remove their signs?

14    A.    No.

15    Q.    Had Mr. Ferrese or Mayor Cooper ever even

16  instructed just to pick up their signs?

17    A.    No.

18    Q.    To the best of your knowledge, have you

19  instructed Mr. Onizuk or has Mr. Onizuk on his own

20  initiative just singled out Mr. Sokolove's signs or the

21  rest of the plaintiffs' signs?

22    A.    No.

23    Q.    As far as you are concerned, has this 74-16, the

24  prohibition against signs in the public right-of-way, or



89

1    private signs in the public right-of-way or in public

2    lands, has that been fairly administered and enforced by

3    your department?

4        A.    Yes.

5        Q.    And against everyone that has a violation?

6        A.    That's correct.

7        Q.    Do you have any specific policy about whose signs

8    get picked up?

9        A.    Only if they are in violation of the, between the

10   sidewalk and the curb or on City property.  If they are

11   on the -- from the pole to the edge of the street or edge

12   of the curb we will remove those signs.

13       Q.    If there is any question about them, what is the

14   policy, question about the location of the sign?

15       A.    Don't touch them.  Try to find out the location

16   of the property line.  If there is a pole line, try to

17   figure out where the pole line is.  If you can't do that,

18   then we don't touch them.

19       Q.    Did Mayor Cooper, when you talked to him on July

20   9th, ask you not, or instruct you not to pick up his

21   signs from any location?

22       A.    No, he did not.

23       Q.    In fact, you told him, you have already

24   testified, that if his signs were in the public



90

1    right-of-way you would remove his signs as well?

2        A.    That is correct.

3        Q.    Has Mr. Ferrese, to the best of your knowledge,

4    instructed you or Mr. Onizuk to remove just plaintiffs'

5    campaign signs?

6        A.    No, he has not.

7        Q.    Were there signs that were left up last year, to

8    the best of your knowledge?

9        A.    Yes.

10       Q.    Why was that?

11       A.    Well, we felt that they were legal placement,

12   where they were on private property, where there was

13   questionable doubt as far as where they were located.

14       Q.    Now, would you turn to your report?  Do you have

15   a copy of that?

16       A.    Yes.

17       Q.    I think I'm going to need to share it with you.

18   You don't have it.  Would you turn to the back portion

19   and read whose signs have been taken and the number?

20       A.    "Political signs removed to date:  Mayor Cooper,

21   3; Mr. Sokolove's, 19; Mr. Barbour, 3; Mr. Paterson, 1;

22   Mr. Shields, 2."

23       Q.    That's all the candidates for elective office in

24   the City currently; is that correct?



91

1      A.    That is correct.

2      Q.    Can you explain why more of Mr. Sokolove's signs

3  have been removed than Mayor Cooper's signs?

4      A.    Because they were placed in the right-of-way, and

5  the public parks, and in areas designated as

6  right-of-ways.

7      Q.    So according to this report, only returned to

8  Mr. Sokolove were 14 signs.  Did he come get the five?

9      A.    Yes.  Since this report was written he has

10  collected the other five.

11      Q.    So all 19 signs that have been removed by your

12  office have been returned to him; is that correct?

13      A.    That is correct.

14      Q.    I'm going to show you some pictures.  This would

15  be, for the record, Defendants' Exhibit 19.  Can you

16  identify that photograph?

17      A.    This is a Mr. Bob Sokolove for Mayor sign on the

18  corner of Lake Avenue and 3rd Street.  This sign is

19  beyond the curb line, was placed in some plantings that

20  are beyond the curb line.

21      Q.    I'm going to show you what is Defendants'

22  Exhibit 16.  Can you identify that picture?

23      A.    This is the same corner of Lake Avenue and 3rd

24  Street.  The business is called Bad Hair Day, and there

92

1    is --

2        Q.    Well, let me just say, has the sign that was just

3    shown in the last exhibit, 19, been removed?

4        A.    Yes.

5        Q.    Or moved back?

6        A.    Yes.   That was removed.

7        Q.    In Exhibit 19, for the record.   That's been

8    moved.   Are all those signs okay now?

9        A.    Yes.

10       Q.    All right.   Thank you.

11              I want to show you what has been marked as

12   Defense Exhibit 4.   Can you identify that location?

13       A.    That's Lake Avenue, appears to be adjacent to 59

14   Lake.

15       Q.    Is there a political sign there?

16       A.    It is Bob Sokolove for Mayor, Dave McCarthy and

17   Bill Shields for Commissioner.   It is on private

18   property.

19       Q.    That sign is okay now?

20       A.    That sign is okay.

21       Q.    One moment, please.

22              I'm going to show you what has been marked

23   Defendants' 17.   Can you identify that photograph?

24       A.    This sign is in front of 1 Norfolk Street.   It is

93

```
 1   between the curb and the sidewalk, Mr. Bob Sokolove for

 2   Mayor, and David McCarthy and Bill Shields.

 3        Q.   Was that a sign -- a photograph that you took?

 4        A.   Yes.

 5        Q.   What day did you take it?

 6        A.   I believe this was on the 15th of July.

 7        Q.   Was that sign removed?

 8        A.   That sign was removed because it was up against a

 9   fire hydrant.

10        Q.   Mr. Murphy, wasn't it also between the sidewalk

11   and the street?

12        A.   Yes.

13        Q.   And so whether it was up against the fire hydrant

14   or not it would have been removed?

15        A.   It would have been removed.

16        Q.   Can you identify what has been marked as

17   Defendants' Exhibit 17 -- excuse me -- 18?

18        A.   This is Lake Avenue.  There appears to be two Bob

19   Sokolove for Mayor political signs in, looks like to be

20   wine barrels, behind the pole line.

21        Q.   They are not just wine barrels, are they?

22        A.   They are planters of some sort.  Wine barrel

23   planters.  And they are behind the pole line so we left

24   them.
```



94

1      Q.    How about Defendants' Exhibit 5, can you identify

2   that photograph?

3      A.    This is looking east on Lake Avenue at the front

4   of 59 Lake Avenue, and it shows two Bob Sokolove

5   political signs in the planter areas on his property,

6   which we left.

7      Q.    So those signs are okay?

8      A.    Correct.

9      Q.    Mr. Murphy, Mr. Tucker showed you several

10  photographs from Mr. Hill's deposition too.  Would it be

11  fair to say that without going to the actual location,

12  sometimes it is difficult just from a photograph to tell

13  whether it meets your policy, whether it is in violation

14  of your policy how you would determine a political sign

15  was in violation or not?

16     A.    It is very difficult from a photo.

17     Q.    Unless, of course, you see a sidewalk or a --

18     A.    If I see a sidewalk or a pole line of such, then

19  I could make a determination.  But normally from photos I

20  don't try to make a determination.

21     Q.    Mr. Murphy, in the photographs in Defendants' 2,

22  the government, many of those signs were directional and

23  what we call locality signs, marking where a location

24  was, what was there; is that correct?

95

1      A.    Mm-hmm, that's correct.

2      Q.    Did you see yourself any of the signs that

3   Mr. Onizuk removed before he removed them?

4      A.    Yes.

5      Q.    Can you tell us from memory what signs?

6      A.    The ones in Gerar Park and the ones in the island

7   at Lake and Olive and 2nd.

8      Q.    Is that across from the Breakwater Hotel?

9      A.    It is across from The Breakers.

10     Q.    Breakers, excuse me.

11            Were there several political signs on Lake

12   Avenue, Park Avenue, Pennsylvania Avenue, Henlopen Avenue

13   and Columbia Avenue, and Oak Avenue that were considered

14   to be partially infringing on the City's property;

15   however, you made a decision not to remove them?

16     A.    That's correct.

17     Q.    Why was that?

18     A.    Well, they were either against the pole line or

19   behind the pole line, or in a grassy area next to the

20   fenceline, and we left them.

21     Q.    If it is questionable, what is your policy as to

22   the location of the sign?

23     A.    If it is questionable, don't take it.

24     Q.    And these were signs of all the candidates that

96

1  were left?

2      A.    That's correct.

3      Q.    Including the plaintiffs?

4      A.    That's correct.

5      Q.    Again, to clarify, Mr. Ferrese didn't direct you

6  to take political signs this campaign season?

7      A.    No, he did not.

8      Q.    You are the one who instructed Mr. Onizuk to do

9  so?

10     A.    That's correct.

11     Q.    It is correct that you did so based on last

12  year's policy?

13     A.    That's correct.

14     Q.    One moment, please.

15            (Discussion off the record.)

16            MR. SPEAKMAN:  I have no further questions.

17                        EXAMINATION

18  BY MR. TUCKER:

19     Q.    Mr. Murphy, I'll try to be short.

20     A.    Please, I got to be at 7:00 o'clock.

21     Q.    I know.

22     A.    I'm first to give my report.

23     Q.    I don't usually anticipate --

24     A.    They get very mad at me if I'm late, they really



97

1   do.

2       Q.   When I gave you my time, I didn't think you were

3   going to get direct from your own counsel.  I apologize.

4               Mr. Speakman asked you about the fact that

5   some of these private signs were directional signs that I

6   showed you, at least that's the way he characterized

7   them.  Is there an exception in the City code you are

8   aware of for private directional signs?

9       A.   Not that I know of.

10      Q.   Now, you did this list that's attached to --

11      A.   As far as location?  I mean for directional signs

12  in commercial district, they are allowed, private

13  property.

14      Q.   On a right-of-way?

15      A.   Not in a right-of-way.

16      Q.   For example, the Art League signs?

17      A.   No.

18      Q.   For example, the trailer park sign?

19      A.   No.

20      Q.   Regarding the Plaintiffs' 6, which is your memo

21  dated 7/16/05, Mr. Speakman was asking you about the last

22  page and the breakdown on the candidates and how many

23  signs were recovered by the City for each candidate.

24  With the exception of Mr. Sokolove, can you tell us which

David F. Murphy

98

1  candidates on that list had signs removed on or before

2  7/9?

3      A.   7/9.

4      Q.   On or before that date?

5      A.   Mr. Cooper and Mr. Shields.

6      Q.   How many signs did Mr. Cooper have removed before

7  7/9?

8      A.   Two.

9      Q.   Do you remember what those dates were?  I think I

10 asked you earlier, but you weren't sure?

11     A.   I'm not sure what dates those were.  I really am

12 not.

13     Q.   How about, what was the second one?

14     A.   Mr. Shields.

15     Q.   Mr. Shields, were both of his removed before that

16 date or after that date, or on that date?

17     A.   One was on the 15th and one was before that date.

18     Q.   Before the 9th?

19     A.   Yes.  However, I believe Mr. Shields' signs were

20 not placed there by himself.  I believe those were signs

21 that were basically pitched off the side of the road.

22     Q.   Okay.  So they did not appear to be installed,

23 they just seemed to be left?

24     A.   Yes.

99

1    Q.    How about Mr. Cooper's, Mayor Cooper's?

2    A.    Installed.

3    Q.    Now, Mr. Speakman also asked you about fair

4    enforcement.  And he asked you about things that could

5    account for why Mr. Sokolove has so many signs taken down

6    and others did not, correct?  Is it fair, would it be

7    fair for me to say that folks who are running for office

8    who know about your sidewalk policy and your utility pole

9    policy have a much better idea of where signs will or

10   will not be picked up by City officials than those who

11   don't know those policies?

12   A.    I hope so.

13   Q.    Okay.

14   A.    I mean, I have been very vocal and I've talked

15   to, explain to Mr. Sokolove where I will and will not

16   pick up signs.  And Mr. Cooper, and Mr. Paterson.  I have

17   not spoken to Mr. Barbour or Mr. Shields.  But they know

18   my policy.

19   Q.    Your discussion with Mr. Sokolove, however, did

20   not occur until was it 7/9 or thereafter?

21   A.    Thereafter, right.

22   Q.    Were you aware of any discussions that

23   representatives of Mr. Sokolove or other candidates had

24   through an attorney directly with Mr. Ferrese about what



WILCOX & FETZER LTD.
Registered Professional Reporters

100

1    the City's sign policy was?

2        A.    No.

3        Q.    Now, again in terms of fairness, in terms of

4    let's say free speech, would you agree that there are

5    certain folks who have private signs up in the

6    right-of-way, directional or otherwise, that are still

7    there today; for example, Art League?

8        A.    Yes, yes, I would say that.

9        Q.    Does that strike you as fair?

10                MR. SPEAKMAN:  I'm going to -- I instruct

11    you not to answer that question.

12                MR. TUCKER:  I want an answer.

13                MR. SPEAKMAN:  That's not a relevant issue

14    here today.

15                MR. TUCKER:  Mr. Speakman, you asked this

16    witness about fairness.

17                MR. SPEAKMAN:  I asked him about enforcement

18    of it.

19                MR. TUCKER:  Okay.  So am I.

20                MR. SPEAKMAN:  I don't think he has --

21    that's not -- I don't think he should answer that.  I

22    think I'm instructing him not to.

23                MR. TUCKER:  Well, it is not privileged.

24    You asked him about fairness.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

David F. Murphy

101

1          MR. SPEAKMAN:  It is not relevant.

2          MR. TUCKER:  Are we really going to try to

3   get a judge on the phone at 6:30?

4          MR. SPEAKMAN:  If you want to try to get a

5   judge, go ahead.

6          MR. TUCKER:  Is that what you thought, I

7   wouldn't be able to get a judge at 6:30?  Well, I don't

8   have his home number, Mr. Speakman.  But you certainly

9   opened the door to that question.  This witness, in all

10  fairness, should answer that.  It is clear to me there is

11  a lack of fairness when it comes to some of these issues.

12         Mr. Murphy, I'm not going to put you through

13  any more.  I'm trying to follow up with you on questions

14  Mr. Speakman asked you almost exactly.  But I'm done.

15         THE WITNESS:  Thanks.

16         (Proceedings conclude at 6:31 p.m.)

17                 I N D E X

18  Deponent:  David F. Murphy                    Page

19  By Mr. Tucker................................    3

20  By Mr. Speakman..............................   83

21  By Mr. Tucker................................   96

22                 - - - - -

23

24

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

DEPOSITION OF: *David F. Murphy*

DATE TAKEN: *July 25, 2005*

IN THE MATTER OF: *Sokolove v City of Rehoboth Beach, De*

Pursuant to Rule 30(E), this transcript was made available to the witness for examination.

The witness has failed to sign this deposition transcript within the designated 30-day period set forth in rule 30(E).

Therefore, this original transcript is being forwarded as transcribed.

DATED: *9/09/05*

*Barbara Reichert*
Barbara Reichert
Production Manager

```
1   State of Delaware )
                      )
2   New Castle County )

3

4             CERTIFICATE OF REPORTER

5

6           I, Eleanor J. Schwandt, Registered
    Professional Reporter and Notary Public, do hereby
    certify that there came before me on the 25th day of
7   July, 2005, the deponent herein, DAVID F. MURPHY, who was
    duly sworn by me and thereafter examined by counsel for
8   the respective parties; that the questions asked of said
    deponent and the answers given were taken down by me in
9   Stenotype notes and thereafter transcribed by use of
    computer-aided transcription and computer printer under
10  my direction.

11          I further certify that the foregoing is a
    true and correct transcript of the testimony given at
12  said examination of said witness.

13          I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
14  interested in the event of this suit.

15

16

17             Eleanor J. Schwandt
18             Certification No. 125-RPR
19             (Expires January 31, 2008)

20

    DATED:

21

22

23

24
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters