IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ROBERT SOKOLOVE, DAVID          )
MCCARTHY, WILLIAM SHIELDS,      )
and CITIZENS FOR REHOBOTH       )
BEACH, a policital action       )
committee,                      )
                                )
          Plaintiffs,           )
                                )   Civil Action
v.                              )   No. 05-514(KAJ)
                                )
CITY OF REHOBOTH BEACH,         )
DELAWARE, and GREGORY           )
FERRESE, individually and       )
as Manager of the City of       )
Rehoboth Beach, Delaware,       )
                                )
          Defendants.           )

          30(b)(6) Deposition of CITY OF REHOBOTH BEACH,
taken through its corporate designee, ALEXANDER W.
ONIZUK, taken pursuant to notice at the offices of
Century 21, 19606 Coastal Highway, Rehoboth Beach,
Delaware, beginning at 11:41 a.m., on Monday, July 25,
2005, before Eleanor J. Schwandt, Registered Merit
Reporter and Notary Public.

WILCOX & FETZER

1330 King Street - Wilmington, Delaware 19801

(302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

ORIGINAL

```
 1  APPEARANCES:
 2         SHAWN P. TUCKER, ESQ.
        WOLF BLOCK SCHORR AND SOLIS-COHEN, LLP
 3             1100 North Market Street, Suite 1001
               Wilmington, Delaware  19801
 4                    -and-
        EUGENE M. LAWSON, JR., ESQUIRE
 5      FLETCHER HEALD & HILDRETH, P.L.C.
               1300 North 17th Street, 11th Floor
 6             Arlington, Virginia  22209
               for the Plaintiffs
 7

        WILLIAM RHODUNDA, JR., ESQ.
 8      OBERLY JENNINGS & RHODUNDA
               800 Delaware Avenue
 9             Wilmington, Delaware  19801
                    -and-
10      WALTER W. SPEAKMAN, JR., ESQUIRE
        BROWN SHIELS BEAUREGARD & CHASANOV
11             108 East Water Street
               Dover, Delaware 19901
12             for the Defendants
13  ALSO PRESENT:
           ROBERT SOKOLOVE
14
15
16
17
18
19
20
21
22
23
24
```



Alexander W. Onizuk

3

1          (Plaintiffs' Deposition Exhibits 1, 2, 3, 4,

2     5, 6, 7, 8, 9 and 10 were marked for identification.)

3              ALEXANDER W. ONIZUK,

4          the witness herein, having first been

5          duly sworn on oath, was examined and

6          testified as follows:

7              EXAMINATION

8     BY MR. TUCKER:

9     Q.    Good morning, sir, how are you?

10    A.    Fine.  I was.

11    Q.    Your last name is pronounced "Onizuk"?

12    A.    Onizuk.

13    Q.    I want to make sure I get that right.  I know I'm

14    going to have trouble with that today.  Onizuk.  I'll do

15    by best.  Bear with me on that.

16          Has your attorney advised you about how a

17    deposition is handled and what the procedures are?

18    A.    Not entirely.

19    Q.    Okay.  Let me just give you a quick thumbnail

20    sketch of what I'm going to be asking you today and why.

21    I'm going to be asking you questions about items related

22    to the removal of elections signs.

23    A.    Oh, yes, he explained all that.

24    Q.    Okay.  And I'm going to ask questions probably

1    for the next hour or so about this incident.

2        A.    Hour or so?

3        Q.    Yes.

4        A.    Not 20 minutes?

5        Q.    Unfortunately, not.

6              Please let me finish my questions before you

7    answer because it will just go better throughout the

8    deposition.

9              Answer them as best as you can, answer them

10   truthfully.

11             Has your attorney advised you as to the

12   penalty if you are to not answer these questions

13   truthfully this morning?  What did your attorney advise

14   you?

15       A.    Actually he didn't.

16             MR. RHODUNDA:  Not on the penalties.

17       A.    Not the penalty part.

18   BY MR. TUCKER:

19       Q.    Let me go through that with you, then I'm going

20   to show you what has been marked as Plaintiffs' Exhibit

21   1.  I'm going to hand this over to you and ask you to

22   take a look at the highlighted versions on page 1 of

23   plaintiffs' 1 and page 2 of plaintiffs' 1.

24             MR. RHODUNDA:  We object to that.  You are



1  trying to intimidate the witness by throwing a perjury

2  statute.  He knows he has to tell the truth, but throwing

3  a perjury statute in front of him is harassment.  If you

4  want to ask him if he is aware that's perjury, he knows

5  he is here to tell the truth, but he does not need to see

6  the perjury statute.

7              MR. TUCKER:  For the record, I'm going to

8  advise the witness of the penalties for perjury.  I'm

9  certainly not trying to harass him.  I certainly do want

10  to make sure he understands that it is important he tell

11  the truth today.

12  BY MR. TUCKER:

13      Q.    Under Delaware Code, a person is guilty of

14  perjury in the first degree when the person swears

15  falsely and when the false statement consists of

16  testimony and is material to the action, proceeding or

17  matter in which it is made.  Perjury in the first degree

18  is a Class D felony.  Penalty under Delaware law from the

19  statute I'm reading from is it can be punished up to

20  eight years in prison.

21              Referring to Plaintiffs' Exhibit 2, which is

22  the sister statute, under federal law, perjury is also a

23  felony under federal law and it is punishable up to five

24  years in prison.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1              Sir, do you understand that it is very

2    important you tell the truth here today?

3        A.    Mm-hmm, exactly.

4        Q.    Is that "yes"?

5        A.    Yes.

6        Q.    Now, Mr. Onizuk, can you tell us what your job

7    title is with the City of Rehoboth Beach?

8        A.    Code Enforcement Officer.

9        Q.    And who is your direct report?

10       A.    Dave Murphy.

11       Q.    Do you have any other direct report?

12       A.    No.

13       Q.    So if there is an issue regarding your job

14   duties, Mr. Murphy is the person that you communicate

15   that to?

16       A.    Mm-hmm.

17             THE COURT REPORTER:  Is that "yes"?

18             THE WITNESS:  Yes.

19       Q.    For the reporter.

20       A.    Yes.

21       Q.    I know you have never done this before.

22       A.    You are right.

23       Q.    But yes and no answers are the best.

24       A.    Okay.



1      Q.    If you can answer yes or no.

2      A.    Okay.

3      Q.    Can you give us an idea of what your job

4   responsibilities are?

5      A.    My job responsibility is mainly I go around and

6   check contractors, make sure they are licensed for the

7   City of Rehoboth, they got a permit to do the job.  I go

8   around and check sidewalks.  I check grass, people,

9   uncontrolled, you know, grass.  Signs.

10      Q.    Okay.  What are your duties in regards to signs?

11      A.    If they are on City property, pick them up.

12      Q.    And how long have you had this job?

13      A.    One year.

14      Q.    And is there anybody else who has the same job?

15      A.    I think this is the first time that they created

16   this job.  They have never been this job before, just

17   created it.

18      Q.    About a year ago?

19      A.    Yes, a year ago.  It is a new job for them.

20      Q.    So you are the only person for the City of

21   Rehoboth Beach that performs this job?

22      A.    Yes.

23      Q.    Again, let me finish my question.  It will go

24   smoother, and then you can answer.



1          Was there a similar job title before you

2   were employed to do this job?

3       A.   Not that I know of.

4       Q.   Was there a code enforcement officer before you

5   were hired --

6       A.   No.

7       Q.   -- to act in that capacity?  So if there was a

8   problem with a house being built or a sign issue, who

9   would handle that for the City, if you know?

10      A.   The assistant building inspector.

11      Q.   Assistant building inspector?

12      A.   Mm-hmm.

13      Q.   Now, before you held this current job, did you

14  have another job at the City?

15      A.   Yes.

16      Q.   What was that, sir?

17      A.   Custodial.

18      Q.   Okay.

19      A.   I worked, I worked in the -- oh, God, I can't

20  think of it.  In the Convention Center.

21      Q.   At the Convention Center?

22      A.   Yes, we set up tables, what have you.

23      Q.   How long did you have that job, sir?

24      A.   About a year.



1    Q.   And besides setting up tables, what other things

2    would you do in that job?

3    A.   We would sweep floor, mop floors, whatever needed

4    to be done.

5    Q.   All right.  And prior to having that job, did you

6    have another job with the City?

7    A.   No.

8    Q.   And where were you employed prior to being

9    employed by the City?

10   A.   I wasn't.  I was retired.

11   Q.   Okay.  And what type of work are you retired

12   from, sir?

13   A.   Federal government, Department of Defense.

14   Q.   I don't know if I can ask you any questions about

15   that, so I won't.

16   A.   No, you better hadn't.

17   Q.   Now, who hired you at the City in your first

18   position as a custodian?

19   A.   Greg Ferrese.

20   Q.   And who hired you in your current position, code

21   enforcement?

22   A.   Dave Murphy.

23   Q.   Now, can you give us an idea of the normal hours

24   that you work in your present position?



Alexander W. Opilla

10

1      A.     I work three days a week.

2      Q.     Okay.

3      A.      In the wintertime it is Monday, Wednesday and

4   Fridays; and in the summertime it is Tuesday, Thursdays

5   and Saturdays.

6      Q.     And do you have typical hours you work during

7   those days?

8      A.      Well, 8:30 to 4:30 normally and some Saturdays

9   they make me work nights because of some of the problems

10  they have had with some of the clubs.

11     Q.     Okay.

12     A.     Not his.

13     Q.     Okay.

14          MR. TUCKER:  For the record, the witness

15  pointed to plaintiff.

16     Q.     It is good to know.

17          Now, you mentioned that one of your duties

18  is sign removal.

19     A.     Right.

20     Q.     Can you tell us how many times over the past

21  year, since you have been employed, that you have been

22  asked to remove signs by any City official or employee?

23     A.     None that I recall.

24     Q.     On July 9th, do you recall whether or not you

11

1   were asked to remove signs by any City employee?

2       A.    July 9th, what day is that?

3       Q.    That would be a Saturday.

4       A.    Oh, that Saturday, no, nobody asked me.

5       Q.    Nobody asked you to --

6       A.    No, nobody asked me to remove signs.

7       Q.    Okay.  Now, you say you have never been asked to

8   remove signs, correct?

9       A.    No.

10      Q.    How is it that that became one of your duties?

11      A.    It is in the code.

12      Q.    When you say, "It is in the code," what do you

13  mean by that?  Explain that to me, because I don't

14  understand.

15      A.    Any sign that's on City property is supposed to

16  be picked up and, you know, we would pick them up.  If it

17  is a real estate sign, a lot of times I call them ahead

18  of time, let them know that, you know, their sign is

19  going to be picked up.

20            But other signs I just go ahead and pick

21  them up, like construction signs that are on City

22  property, I pick them up.

23      Q.    Okay.  And did you receive any training regarding

24  what signs you could or could not pick up under City

Alexander W. Orizuk

12

1  statute or ordinance?

2      A.    No.   Pretty clear.   The ordinance says, you know,

3  signs on City property.

4      Q.    Okay.   And how did you know it was your job to

5  enforce what is in the City code?   Who told you to do

6  that?

7      A.    They pretty much give me my -- told me I was code

8  enforcement officer and read the book.

9      Q.    Who told you to do that, sir?

10     A.    Dave Murphy, yes.

11     Q.    And so you have learned how to enforce the code

12  by reading the code; is that right?

13     A.    Yes.   And what I don't know, you know, if I have

14  any doubts, if I ever have any doubts I go to them,

15  because those guys got all the experience in the world.

16  They are very knowledgeable.

17     Q.    When you say "them" who is them?

18     A.    Dave Murphy and Steve Kordak.

19     Q.    And what is Steve Kordak's job?

20     A.    He is assistant to Dave Murphy.

21     Q.    And what is Dave Murphy's title?

22     A.    He is a building inspector, and Steve is

23  assistant building inspector.

24     Q.    Okay.   After reading the code as you were

Alexander W. Omizuk

13

1    instructed to do when you were hired, have you ever

2    inquired with anybody at the City about specific

3    questions or concerns you may have had?

4         A.    Oh, my God, especially concerning signs.

5         Q.    Can you tell us when you first did that?

6         A.    Oh, Lord.  Always.

7         Q.    Every day you come to work?

8         A.    Well, sign ordinance is so vague that, you know,

9    you know, I have to go and ask them all the time, you

10   know, should I do this, should I do that.

11        Q.    Okay.

12        A.    You know, they got banner signs, they got so many

13   different signs.

14        Q.    Give us an example of a typical situation and how

15   you would handle that.

16        A.    A banner sign?

17        Q.    Any example you would like to give where you

18   sought help.  Tell us how that came about.

19        A.    Well, all -- we had a Hooter's had a banner sign

20   up and they were having their grand opening or what have

21   you, you know, going to have a contest for their opening

22   and they put a big banner sign up.  And, oh, we had a big

23   discussion about that.  And we even got Walt Speakman

24   involved in that one.  And we come about saying that the

W&F

WILCOX & FETZER LTD.

Registered Professional Reporters

14

1    banner signs are banned in the City of Rehoboth.

2        Q.    Okay.  Did you seek assistance on that?

3        A.    Oh, yes, I had to, you know.

4        Q.    How did that come about?  Was there a complaint

5    or did you just see the sign on your own?

6        A.    Somebody complained.  Most of my problems are

7    from complaints.

8                THE knows that.

9        Q.    When you say "he" are you referring to --

10       A.    Mr. Sokolove.  I got a complaint about his place.

11       Q.    You got a complaint about his place from whom?

12       A.    From whom?  I can't tell you.  But his gas tank.

13               THE WITNESS:  Remember that?  Came to your

14   house.

15       Q.    Sir, I'm asking the questions.  I don't mean to

16   be disrespectful, but I'm asking the questions here

17   today.  We have a timetable to keep.

18       A.    Yes.  We are leaving at 12:00, I hope.

19       Q.    So getting back to Saturday, July 9th, what hours

20   were you working that day?

21       A.    4:00 to 12:00.

22       Q.    Okay.  Did there come a time on that day, did

23   there come a time on July 9th that you began looking at

24   campaign signs in your travels through the City?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1    A.    No.   I just happened to go down that street, see

2  campaign signs on City property.

3    Q.    What street?

4    A.    Lake Avenue.

5    Q.    About what time was that?

6    A.    Oh, Lord.   I was thinking it was starting getting

7  dark.   Maybe around 8:00 I would say.   Eight-ish.

8    Q.    Eight in the evening?

9    A.    Yes, in the evening.   That's what I'm thinking.

10    Q.    When you saw those signs, what did you do?

11    A.    Oh, well, they are on City property so I picked

12  them up.

13    Q.    And when you make that determination as to

14  whether signs are on City property or not, are you

15  relying on the ordinance that you referenced earlier?

16    A.    Well, you pretty much know anything beyond the

17  sidewalk, between the sidewalk and the curb, that little

18  grass area is City property.

19    Q.    And how do you know that?

20    A.    How do I know that?

21    Q.    Yes.

22    A.    Well, property line ends at the sidewalk.

23    Q.    How do you know that?

24    A.    I guess from experience.



Alexander W. Orizuk

16

1    Q.   Okay.

2    A.   Besides that, we got drawings in there that said,

about the sidewalk and how they are laid out, property

line stops at the sidewalk, little grass area is...

5    Q.   Okay.  Are you suggesting there is a provision in

your code that instructs you as to where private property

ends and public property begins?

8    A.   No.  No.  You can almost tell where property ends

by the -- most of them got markers.

10    Q.   What kind of markers?

11    A.   Boundary markers.

12    Q.   What do they look like?

13    A.   Some of them pipes in the ground.  Could be any,

just about anything.

15    Q.   And using boundary markers, how do you know to do

that?  Who told you to do that?

17    A.   Look for boundary markers?

18    Q.   Yes.

19    A.   Harry Homeowner knows everything about boundary

markers.

21    Q.   So, are you saying that the determination of

where private property is and public property is is

something that you have internally decided that --

24    A.   Well, no.  We know that the private property

Alexander W. Ortiuk

17

1    stops at the sidewalk.

2        Q.    How do you know that?  That's my question.

3        A.    How do I know that?

4        Q.    Yes.

5        A.    I guess it is in -- I don't know whether it is in

6    the code book or not.  But talking, you know the guys,

7    Dave and Steve.

8        Q.    So your belief -- I'm sorry I didn't mean to

9    interrupt you --

10       A.    Sometimes I go out on inspections with them, you

11   know.  And they make me aware of everything.

12       Q.    When you say --

13       A.    Between the building code and what have you.

14       Q.    When you say "them," who are you referring to?

15       A.    Dave and Steve.

16       Q.    Dave, last name Murphy?

17       A.    Murphy and Steve Kordak.

18       Q.    So is it your testimony that your knowledge about

19   where private property ends and public property begins

20   comes from those two gentlemen?

21       A.    Pretty much, yes.  Them and the code books.

22       Q.    Okay.  Can you tell me where in the code book you

23   look for guidance on where private property begins and

24   where public property begins?



Alexander W. Onizuk

18

1      A.    Oh, Lord, I can't tell you where the sign

2   ordinance is under.  I would have to go and look them up,

3   you know.  I spend a day looking at things.

4      Q.    On July 9th when you went out and removed signs,

5   did you look at the code book that day?

6      A.    July 9th, no.  We did look at it that night, but

7   during the day, no.  No.

8      Q.    I'll get to that.  Prior to removing the signs

9   did you look at the code book?

10      A.    No.

11      Q.    Now, you mentioned boundary markers and other

12   things that you rely on.  Can you describe for us each

13   sign that you removed on Lake Street --

14            MR. SOKOLOVE:  Avenue.

15      Q.    I'm sorry, Lake Avenue, strike that -- and why

16   you removed it?

17      A.    Each one was in front of a house and each one was

18   in that little grass area, after the sidewalk.

19      Q.    Okay.  If you could bear with us, sir, I'm going

20   to give you a piece of paper, and I'm going to ask that

21   this be marked Exhibit 11.

22            (Plaintiffs' Deposition Exhibit 11 was

23   marked for identification.)

24      Q.    I would ask you to please, to the best of your

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

19

1    ability, draw the street for me and show us where you

2    removed signs.

3              MR. RHODUNDA:  Don't you have a diagram or

4    anything of this area?

5              MR. TUCKER:  No, I don't.

6    A.    Okay.  This is the sidewalk.  And this little

7    area is curb.  This is a curb here.  This is a curb.  All

8    the signs were in this area right here.  The houses were

9    back here.

10   Q.    Okay.  Are you familiar with where Mr. Sokolove's

11   business is?

12   A.    Yes, mm-hmm.

13   Q.    And were signs removed from the front of his

14   business?

15   A.    Not that I know of.

16              Now, there was one sign, say his business is

17   right here, there was one sign over in this guy's

18   property right here, in front of his place, and I

19   happened to -- when I was picking the signs up I happened

20   to talk to that guy.  He says, "I want that sign

21   removed."  He said, "I don't like that guy."  He said, "I

22   had an issue with him before over a tree."

23   Q.    What was that gentleman's name?

24   A.    Lord, I don't know.  But I know he lives in

Alexander W. Onizuk

20

1    Claymont.

2        Q.    Was this sign in front of Mr. Sokolove's

3    property?

4        A.    Not directly in front.  It was on this guy's --

5    more or less on 63.  He has 59.

6        Q.    So getting back to my question, were there any

7    signs directly in front of Mr. Sokolove's property that

8    you removed?

9        A.    No, uh-uh, not at all.  None.

10              MR. RHODUNDA:  Clarify that as far as

11   property, Shawn, as far as parking lot versus the

12   building itself.

13       A.    In front of his building?

14       Q.    In front of his building or parking lot, his

15   property.

16       A.    None in front of his property.

17       Q.    Okay.  Can you tell us how many signs were

18   removed on Lake Avenue that day?

19       A.    About six, maybe seven.

20       Q.    And about what time --

21       A.    Now wait.  On Lake itself, well, probably about

22   four maybe, three or four.  Because the other, the other

23   two or three I got in Lake Gerar Park area and the other

24   two were in a medial strip.

W&F

**WILCOX & FETZER LTD.**

Registered Professional Reporters

21

1     Q.   I'll get to those.   Right now I'm focused on Lake

2  how many signs do you think you removed from Lake that

3  day?

4     A.    Maybe three, maybe four.

5     Q.   And none of those were in front of Mr. Sokolove's

6  property?

7     A.    No.

8            Where would he put them in front of his

9  property?

10     Q.   Maybe one day you can take my deposition, but

11  today I'm asking the questions, all right?   Just, it

12  works easier this way, trust me.

13     A.    I don't know where he would put them in front of

14  his property, but hey.   Does he have it attached to his

15  building, do you know?   I don't know where he could put

16  them, believe me.

17     Q.   Show us the location on Plaintiffs' 11 where the

18  three signs were, to the best of your ability, along Lake

19  that you removed.

20     A.    Oh, God.   There was -- I know there is three

21  houses here.   "Sea Witch" I think one of them is called.

22  I don't know what the other two.   And then there was one

23  right here.   Maybe four.   Okay.   There was three -- this

24  woman, I think she owns three houses there.

1          There was one right here.  And his, I'll say

2   his restaurant was right here.

3       Q.   Okay.  Do you know the addresses of those

4   properties?

5       A.   I know this one.  63.  This guy is 63.  Other

6   than that, I don't know what they are.

7       Q.   Okay.

8       A.   They may be 65, 67, 69, I don't know.

9       Q.   So you are thinking it was four signs now?

10      A.   It may have been, yes.

11      Q.   And can you tell us how you determined for each

12   of those signs that they were on public property?

13      A.   They were all right here in this little grass

14   medial strip, right there.

15      Q.   When you say grass area, do you mean the area

16   between the sidewalk and the curb?

17      A.   Between the sidewalk and the curb.

18      Q.   Do you recall a conversation with Mr. Sokolove

19   that day or that evening?

20      A.   Mm-hmm.

21      Q.   And do you recall reviewing portions of the

22   City's code with him?

23      A.   We got the book out, yes, see if I could find

24   anything about political signs.



Alexander W. Opizuk

23

1    Q.    Okay.  And tell us what happened.

2    A.    Couldn't find anything about political signs.

3    Q.    And did you --

4    A.    He told me, he said, I won't find anything in

5    there on political signs because it is a federal thing.

6    Q.    Did you make any statement to Mr. Sokolove about

7    the fact that you didn't know why you were removing the

8    signs because there was nothing in the code regulating

9    political signs?

10    A.    State that again.

11    Q.    Do you recall making a statement to Mr.

12    Sokolove --

13    A.    That I did not know --

14    Q.    -- why you were removing the signs because you

15    couldn't find anything in the code regulating political

16    signs?

17    A.    Well --

18    Q.    Or words to that effect.

19    A.    He told me it was a federal offense, okay.  And I

20    knew we didn't have anything dealing with federal

21    offenses but I knew what we had to do with signs, but

22    federal offenses, I didn't know.  Because he -- you know,

23    federal offense, I don't commit a federal offense.

24    Q.    Let me ask my question again.  I'll try to ask it

Alexander W. Opizuk

24

1  a little differently.

2      A.    Make it easy.

3      Q.    Okay.  I'm trying, if you could make it easy,

4  too.

5              Did Mr. Sokolove and you discuss whether or

6  not political signs were regulated by the City's zoning

7  code?

8      A.    Yes, we did.

9      Q.    And at the end of that conversation, did you

10  agree that signs were not regulated as political signs by

11  that zoning code?

12     A.    Probably did, because I didn't know anything

13  about federal offenses, you know.  Political signs, he

14  scared the heck out of me.  I thought, hell, I'm going to

15  jail, you know.

16     Q.    Okay.  So --

17             THE WITNESS:  You did.

18     A.    He tapped on my window; scared me at first.

19     Q.    So is it your testimony that you only agreed

20  because you were afraid?

21     A.    Well, I don't know whether I agreed that it

22  was -- that it was wrong to take -- I may have, you know.

23     Q.    Did you do that out of fear, or did you do that

24  because you believed that political signs --

25

1    A.    Probably more out of fear than anything.    If I

2  thought I was committing a federal offense -- but I found

3  out the next day it wasn't.   I called my son.

4    Q.    Okay.   We will get to that.   That's a little bit

5  beyond the scope of my question right now, sir.   Okay.

6          So you have a discussion with Mr. Sokolove,

7  correct?

8    A.    Yes.

9    Q.    You agree with him that political signs are not

10  regulated by the --

11          MR. RHODUNDA:   Objection, leading.

12          MR. TUCKER:   Just restating what he said.

13          MR. RHODUNDA:   Well, I'm not so sure what he

14  has really said about it.   He talked about the federal

15  offense.   I think you need to ask him a more broad

16  question than that.

17          MR. TUCKER:   I thought I was restating what

18  he testified.   Rather than backing up and having it read

19  back, I'll ask the question again.

20  BY MR. TUCKER:

21    Q.    Did you or did you not agree with Mr. Sokolove at

22  that time, when he spoke with you, that political signs

23  were not regulated by the city code?

24    A.    I may have, because I couldn't find anything in

1    the code book about political signs.

2        Q.    Okay.  Now, after --

3        A.    But --

4        Q.    Go ahead.  Go ahead.

5        A.    -- signs in general are regulated.

6        Q.    Okay.

7        A.    So, you know.

8        Q.    After you had that discussion with Mr. Sokolove,

9    what did you do next?

10       A.    Gave him his signs back.

11       Q.    And did you discuss your conversation that you

12   had with Mr. Sokolove with anyone?

13       A.    I called my son the next day.

14       Q.    Did you discuss the conversation with anybody who

15   works for the City?

16       A.    Next day, no.  I was off the next day, Sunday.

17       Q.    Did there come a time when you discussed that

18   conversation with anybody from the City?

19       A.    Probably Tuesday -- now, wait.  Let me ask you

20   something.  Are we talking about that Saturday?

21       Q.    You spoke with Mr. Sokolove on July 9th,

22   Saturday, correct?

23       A.    Yes, yes.  Because I was off the next couple days

24   so I didn't speak to anybody about that.



27

1      Q.    When was the first time after you spoke with

2    Mr. Sokolove that you spoke to anybody at the City about

3    your conversation with Mr. Sokolove?

4      A.    That was a couple days later.

5      Q.    A couple days?

6      A.    Yes.  Well, actually, the policeman stopped in

7    that night.  As soon as he left, the policeman stopped

8    in, Detective O'Bier, O'Bayer.  He stopped in and said I

9    committed a federal offense.  He said there is all kind

10   of commotion going on.

11     Q.    Did he interview you at that time about what

12   happened?

13     A.    Yes, he did.  He said that I committed a federal

14   offense and he didn't know what the federal offense was,

15   he wasn't familiar with it, but...

16     Q.    What did you tell him?

17     A.    I said, well, I didn't mean to commit a federal

18   offense, you know.  I apologized.  Just doing my job.

19     Q.    Is it your testimony that the City of Rehoboth

20   police officer accused you of committing a federal

21   offense?

22     A.    He come in and told me I had committed a federal

23   offense, yes.

24     Q.    What was that officer's name again?

Alexander W. Onizuk

28

1    A.    Scott O'Bier.

2          MR. SOKOLOVE:   O-B-I-E-R.

3    Q.    What happened after that?

4    A.    I don't know.  He asked me what happened.  I told

5    him what happened and everything.  I think he took -- I

6    don't know whether I wrote that statement that night.

7    But I did leave, I did leave a message to Dave of what

8    happened.

9    Q.    Dave Murphy?

10   A.    Mm-hmm.

11   Q.    Okay.  Was that on his machine or was that in

12   person?

13   A.    That was on -- I put it on my computer and typed

14   it out and gave it to him.  Put it on his desk.

15         MR. SOKOLOVE:   They don't have voicemail.

16   Q.    You made a report that evening?

17   A.    Yes, for Dave Murphy, that if I caused such a

18   commotion.

19   Q.    Did you leave any message for Mr. Murphy the next

20   day or just the document on his desk?

21   A.    Just the document on his desk.

22   Q.    And when you were contacted or spoke to City

23   officials a couple days later, who was that and who

24   contacted who?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

29

```
 1        A.    God, who knows?

 2              Probably, probably went in and talked to

 3  Dave Murphy, one thing.  And I think Scott O'Bier came

 4  in.  I think Scott was in there, Detective Scott O'Bier.

 5  I think he came in.

 6        Q.    And were you summoned to come in --

 7        A.    No.

 8        Q.    How did that --

 9        A.    My regular day coming.  I was off Sunday and

10  Monday, and my regular day of work is Tuesday.

11        Q.    So when you came in, how did that meeting end up

12  taking place?

13        A.    I have no idea.  I think Scott just was in there,

14  came in later on and that's how it took place.

15        Q.    And did he approach you, Scott, about discussing

16  this?

17        A.    I think that's when he came in and asked me to

18  make a statement, you know, about what happened.

19        Q.    When you say "Scott," you mean the police

20  officer?

21        A.    Scott O'Bier, Detective O'Bier.

22        Q.    Who was present when you made that statement to

23  the police officer?

24        A.    Just me.  Me and the detective.
```



30

1    Q.    Okay.  And after you made that statement to the

2    police officer, did you speak to anybody else about this

3    matter?

4    A.    Probably Dave Murphy.

5    Q.    When was that?

6    A.    The same day.  Right after Scott left.

7    Q.    Okay.  What did you tell Mr. Murphy?

8    A.    Oh, Lord.  Lord only knows what I told him.  I

9    told him about what happened.  I picked up the signs and

10    I committed a federal offense.  But I knew it wasn't a

11    federal offense when I talked to him, when I talked to

12    Dave Murphy that day.  I told him it wasn't a federal

13    offense; I knew that.

14    Q.    And when was the next time you spoke to somebody

15    else from the City about this incident?

16    A.    Probably spoke to somebody every day about this

17    incident.

18    Q.    Tell us the folks -- I'm sorry, go ahead.

19    A.    Since then, you know.  It has always been brought

20    up about signs, you know.

21    Q.    Tell me all the people, to the best of your

22    memory, that you have spoken to about this incident

23    since --

24    A.    Just Dave Murphy.



31

```
 1        Q.      -- July 9th.  Dave Murphy is the only person?

 2        A.    Yes, yes, I haven't spoken to -- don't ask me

 3   about the mayor because I don't even know the mayor.   I

 4   have never spoken to the mayor.

 5        Q.    I didn't ask you about the mayor.

 6        A.    But I haven't spoken to him.  I didn't speak to

 7   Greg Ferrese or anybody about it.

 8        Q.    So the police officer you spoke to?

 9        A.    Yes.

10        Q.    Murphy?  And that's it?

11        A.    Dave Murphy, yes.

12        Q.    Give me one moment, please.

13              In your discussions with Mr. Murphy, did you

14   go over any aspects of the sign code?

15        A.    I don't know.  Probably.

16        Q.    Did you discuss any policies related to the sign

17   code at that time?

18        A.    I think what the -- yes, I think the policy was

19   to -- anything on City property, take.  But anything you

20   have a question about, which if I had any doubt I

21   wouldn't take any signs anyhow.

22        Q.    So you did have a discussion about policies with

23   Mr. Murphy --

24        A.    Yes.
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1      Q.   -- after this incident?

2      A.   I think it was taboo there for a few days about

3   campaign signs, until we really figured out, you know,

4   what was what with it.

5      Q.   Okay.  So was there some confusion as to what

6   the --

7      A.   Yes, campaign signs, yes, mm-hmm.  Well, somebody

8   said there was a case, you know, in court now or

9   something, they went and looked it up and what have you.

10     Q.   Who said that?

11     A.   I think it was Walt Speakman, actually.

12     Q.   Without telling me what you said, did you speak

13  to Walt Speakman about this matter?

14     A.   Did I?

15     Q.   Yes.

16     A.   No, uh-uh.

17     Q.   How do you know that Walt Speakman --

18     A.   I think Dave Murphy told me.

19     Q.   Let me finish my question.  You are getting a

20  little ahead of me.  Okay?

21     A.   Okay.

22     Q.   Is that the first time you heard of any policy

23  from Mr. Murphy regarding signs?

24     A.   Policy, as to keep our hands off for awhile, yes,

Alexander W. Onizuk

33

1    yes.

2        Q.    Okay.    What was the policy he articulated to you?

3        A.    Oh, he said that for now we are not going to do

4    anything with campaign signs.    We are going to let them

5    be where they are.

6        Q.    Can you give me an approximate date on when he

7    told you that?

8        A.    No, I can't.    It is -- let's see, the 9th was on

9    a Saturday.

10       Q.    Right.

11       A.    10th, 11th -- probably about the 12th, something

12   like that.    That would be the day I worked.

13       Q.    Approximately the 12th, is that fair?

14       A.    Yes, we will say, that's fair.

15       Q.    And did he indicate where that policy came from?

16       A.    I think it came from higher-ups.

17       Q.    Did he say who?

18       A.    Probably Greg, I think Greg.    Greg probably

19   called Walt, you know, Speakman.    I think that's --

20              MR. RHODUNDA:    Testify to what you know.

21              THE WITNESS:    Yes.

22              MR. RHODUNDA:    Don't speculate as to what

23   you think happened.

24              THE WITNESS:    Yes.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

34

1    A.   Well, I know that that's where it came from.

2 Greg Ferrese said to keep your hands off the signs,

3 campaign signs for awhile.

4 BY MR. TUCKER:

5    Q.   Did Greg Ferrese tell you that or tell Mr. Murphy

6 that?

7    A.   He told Mr. Murphy.

8    Q.   Who told you?

9    A.   Who told me.

10    Q.   Did Mr. Murphy identify Mr. Ferrese as the one

11 who told him that?

12    A.   Pretty much, yes, I think so.

13    Q.   Any other sign policies of any kind that you have

14 been made aware of since this incident?

15    A.   No.

16    Q.   Now, you may have already answered this, but I

17 just want to back up for a moment.

18          You said initially you determined how to

19 enforce the sign code by reading the sign code, correct?

20    A.   Pretty much, yeah.

21    Q.   And also by going out into the field with two

22 other City employees --

23    A.   Yeah, mm-hmm.

24    Q.   -- determining public versus private property; is

35

1    that fair?

2        A.    That's fair.

3        Q.    Anything else you relied on in terms of how you

4    enforced the sign code, besides the code and discussions

5    you had with two other City employees regarding how you

6    determined where private and public property are

7    determined?

8        A.    No.

9        Q.    When you spoke with Mr. Sokolove back on the 9th

10   of July, was there a Charles Silverstein present?

11       A.    He had a friend with him, yes.

12       Q.    And did you have any conversation with

13   Mr. Silverstein?

14       A.    I think we -- I know we shook hands, yeah.

15       Q.    Was he present the whole time you spoke --

16       A.    Pretty much, yeah, mm-hmm.    I knew he was from

17   down South somewhere.

18       Q.    Sir, have you had an opportunity to look at the

19   plaintiffs' memorandum in support of motion for temporary

20   restraining order?    It was filed with the court on July

21   21st, 2005.

22       A.    No.    No.

23       Q.    Have you seen this affidavit prepared by Charles

24   Silverstein which is attached to that memorandum at



Alexander W. Opnizuk

36

1    Exhibit 3?   I'm showing the witness that document now.

2         A.    Yes, I did.   Mm-hmm.

3         Q.    Can you tell us who showed you that document?

4               THE WITNESS:   It might have been you.

5         Q.    Mr. Rhodunda?

6         A.    Yeah, mm-hmm.

7         Q.    Without telling us anything the Mr. Rhodunda said

8    to you or you said to Mr. Rhodunda, when was that?

9         A.    Yesterday.

10        Q.    Okay.  And did you read through that affidavit

11   when you were with Mr. Rhodunda?

12        A.    No, uh-uh.

13        Q.    I'll tell you what, I'm going to ask you --

14        A.    Oh, don't ask me that.

15        Q.    -- if you could read it right now while we sit

16   here?

17        A.    This whole thing?

18        Q.    Yes.  It is less than a page.

19        A.    I've been directed by my boss.

20               No, this is not true.

21        Q.    I'm just asking you to read it right now, and

22   then I'm going to ask you a couple questions about it.

23        A.    Okay.

24        Q.    Are you done reading it?



1    A.    Yeah.

2    Q.    It is your testimony that you did not read this

3    yesterday?

4    A.    I didn't read it all the way through.

5    Q.    Do you agree or disagree with that affidavit that

6    I just showed you?

7    A.    I disagree with it.

8    Q.    Can you tell me what aspects you disagree with?

9    A.    Mr. Onizuk stated that Mr. Murphy was directed to

10   remove Bob Sokolove's signs by Mr. Greg Ferrese, I didn't

11   make that statement.

12   Q.    You disagree; you don't believe you --

13   A.    I disagree.

14   Q.    Anything else?

15   A.    They said Mr. Onizuk stated that he personally

16   removed the campaign sign at the directions of his boss,

17   who asked for them to be removed from City right-of-way,

18   which is a true statement in a way, because I told him,

19   on that Thursday I picked up campaign signs of Bob

20   Sokolove's in the City property.  And he said, "Good,

21   pick up all the signs that are in City property."

22   Q.    Who said that?

23   A.    Dave Murphy.

24   Q.    All signs that are in City property?



Alexander W. Onizuk

38

1     A.    Yes.  He didn't say Bob Sokolove's or Mayor

2  Cooper.  He just said, "Pick up all the signs that are

3  in" --

4     Q.    In City property?

5     A.    -- "City property."

6     Q.    What date was that?

7     A.    Well, I picked them up on a Thursday, which

8  probably would have been the 7th.  And that morning when

9  I went in -- well, no, I didn't.  Now, when was that?

10              Yes, it was on the 7th, yes.

11    Q.    When you were told to pick up all signs --

12    A.    On the City property.  He said, "Good, pick up

13  all signs on City property."

14    Q.    Was there any attempt made to distinguish between

15  political signs and other signs?

16    A.    No, uh-uh.

17    Q.    Just all signs?

18    A.    All signs.

19    Q.    On City property?

20    A.    Yes.

21    Q.    And does City property include City right-of-way,

22  as far as you know?

23    A.    Right.

24    Q.    I think you mentioned one thing in particular you



39

1    disagree with that is in the affidavit that's in front of

2    you.  Anything else?

3                    I may have misspoken.  Anything else you

4    disagree with?

5                    MR. RHODUNDA:  Well, he has two things he

6    disagrees with he has discussed, Shawn.

7                    MR. TUCKER:  I'm not sure what the second

8    thing was, but the record is the record.

9        A.    Well, he said, Also Mr. Onizuk reviewed the sign

10   ordinance and the code book with us and agreed that he

11   saw no recollection regarding political signs and stated

12   he was unsure as to why the City would direct the removal

13   of the signs.

14                   Well, nobody directed me to remove the

15   signs, other than, you know, pick up signs that are on

16   City property.

17       Q.    I believe you testified that on 7/7/05 you were

18   directed to pick up signs from City property?

19       A.    On City property, I guess that would be true

20   then, yeah.

21                   I guess there were six signs, about that.

22   Six signs.

23       Q.    Now, you had mentioned that Mr. Murphy told you

24   that there would be a policy in place for some period of

40

1    time where you wouldn't touch any political signs, right?

2       A.    Correct.

3       Q.    How long did that policy last, as far as you

4    know?

5       A.    Oh, probably about four or five days.

6       Q.    And so when, approximately when did you believe

7    it was okay again to remove political signs?

8       A.    I think it was around the 15th or something like

9    that.

10       Q.    Around, give or take a day, the 15th; is that

11    fair?

12       A.    Right, that's fair.

13       Q.    July 15th?

14       A.    Mm-hmm.

15       Q.    After that date you were back to your normal

16    duties regulating signs?

17       A.    Right, after that date we were.

18       Q.    And do you recall the dates that you worked after

19    7/15/05?  I'll tell you what day 7/15 was here in a

20    moment.

21             MR. LAWSON:  15th is on a Friday.

22       A.    Yes, I worked the 16th.

23       Q.    Okay.  Which was a Saturday, correct?

24       A.    Yes, mm-hmm.

41

```
1        Q.    How about the 17th?

2        A.    No.

3        Q.    How about the 18th?

4        A.    No.

5        Q.    How about the 19th?

6        A.    I worked the 19th.

7        Q.    Now, I'm going to back up for a moment and I'm

8    going to show you Exhibit 4 to the memorandum that I

9    noted earlier that's been filed in District Court of

10   Delaware.  I'm going to show you this Exhibit 4.  It is

11   an affidavit of Robert Sokolove, and ask you to take a

12   look at it and tell me if you recognize it.

13       A.    No I don't recognize it.

14       Q.    You have never seen that document?

15       A.    No.

16       Q.    Can you take a few moments, again it is just a

17   page, and read that to yourself.

18             (Discussion off the record.)

19       A.    Greg Ferrese's name was never brought up.

20       Q.    First just read through it, and then I'll ask you

21   questions about it.

22       A.    Okay.

23       Q.    Okay.  Can you tell us if you agree or disagree

24   with what is set forth in that affidavit?
```



Alexander W. Orlik

42

1     A.    Some of it is true.

2     Q.    Can you tell us the portions that you disagree

3 with?

4     A.    I didn't see any signs in flowerbeds.

5     Q.    Again, I want you to take your time --

6     A.    He said placed them on front... I don't know what

7 he is trying to say here.  He said, "Additionally, I

8 placed them in the front lawns of three

9 bed-and-breakfasts," yes.  They were in that grass area.

10 "In and around the street areas, but on the grass, of

11 other landowners with permission."

12            And then he made a statement here, asked --

13 "When asked why such a direction would be given, he

14 stated that Mr. Murphy was directed to do so by City

15 Manager, Greg Ferrese."  I did not make that statement.

16     Q.    Okay.

17     A.    "And it was unclear to him, as he stated, as to

18 why he was directed to remove our political signs."

19            Nobody told me to remove any political

20 signs.  They just told me to pick up signs.

21            And then there wasn't ten signs in the bed

22 of the truck.  Unless he was counting the signs we picked

23 up that morning.

24     Q.    You just said signs that somebody picked up that

43

1    morning.  Who picked up signs in the morning?

2      A.    Mr. Sokolove.

3              I had picked up signs Thursday, and I had

4    them in the back of a truck.  And he told me he had a

5    discussion with the mayor that morning, which was

6    Saturday morning, and he went and got the signs out of

7    the back of the truck.

8      Q.    Your truck?

9      A.    Yeah, mm-hmm.

10     Q.    Okay.  I'm going to show you some pictures,

11   original pictures that, for the record, we have a copy of

12   under Plaintiffs' Exhibit 9, for the record, and ask you

13   if you can take a look at those pictures and tell us if

14   you recognize them.

15     A.    Yes.

16     Q.    What are they pictures of?

17     A.    Back of my pickup truck.

18     Q.    Do you know when they were taken, approximately?

19     A.    When these particular ones were taken?

20     Q.    Yes.

21     A.    No.

22     Q.    Were you present when they were taken?

23     A.    Was I present when these pictures were taken?

24     Q.    Yes.



Alexander W. Onizuk

44

1    A.   No.

2    Q.   What do they reflect?

3    A.   Reflect that I picked up a lot of signs.

4    Q.   And are they just signs that you picked up in

5 July or are there also signs in there that are older, you

6 had picked up --

7    A.   There is a couple signs that are older in there.

8    Q.   And when you say "older," how old?

9    A.   Well, maybe -- I know one has been in there for

10 about a month.

11    Q.   Okay.  Approximately, looking at those pictures,

12 and given your personal knowledge, how many of those

13 signs do you think predated July 11th -- I'm sorry, July

14 9th, in terms of you picking them up and putting them in

15 your truck?

16    A.   Oh, about three, four of them.

17    Q.   Okay.  And how many total do you think you had in

18 your truck when those pictures were taken?

19    A.   Oh, Lord.  I have no clue.

20    Q.   Do you recall whether or not any of those signs

21 that you've picked up were Mayor Cooper signs?

22    A.   There is none in this particular picture, no.

23 But we did pick up Mayor Cooper signs.

24    Q.   Are there Mayor Cooper signs in your truck there

Alexander W. Onizuk

45

1    that can't be seen in those pictures?  Is that your

2    testimony?

3         A.    Well, no.  What I'm saying is that this

4    particular night I didn't pick up any Mayor Cooper signs

5    because his signs weren't out then.

6         Q.    Okay.  All right.  Thank you.

7                  Now, can you give us an idea, when you go

8    out on sign patrol --

9         A.    I don't have sign patrol.

10        Q.    Well, you testified that on July 7th you were

11   told to go out and pick up signs, correct?

12        A.    July 7th, no.

13        Q.    You didn't testify under oath just a little while

14   ago --

15        A.    I went out and picked up signs.  I picked up

16   signs, and I told him, I said, "I picked up a lot of Bob

17   Sokolove's signs."  I went and told Mr. Murphy after I

18   did this, after I did this.

19        Q.    I want to back you up for a moment.  Earlier

20   today, actually you were reading the affidavit --

21                  MR. RHODUNDA:  He said the same exact thing

22   he just said previously.  There was some confusion,

23   things you are trying to say that he was directed to.

24   You may need to clarify that.  Two times in his

1    deposition he said things that could be construed

2    differently about that.

3    BY MR. TUCKER:

4        Q.    On or about July 7th, Mr. Onizuk -- I apologize,

5    I'm having trouble with your last name -- didn't you

6    testify that there was a discussion with you and City

7    officials about picking up signs in the City?

8        A.    After I picked up the signs.  Only after I picked

9    up signs, I made them aware that I picked up signs.

10       Q.    And that was July 7th?

11       A.    If that's on that Thursday, yes.

12       Q.    All right.  Give us an idea when you go out to

13   pick up signs, what do you do?

14       A.    I don't go out to pick up signs.  I go out to

15   look for contractors and whatever, you know, whatever

16   with my job.  And I just happened to see these signs.

17             What really caught my eye was the one on

18   Norfolk Street.

19       Q.    What contractor were you looking for on Norfolk

20   Street that day?

21       A.    I go up and down all the streets.

22       Q.    You go up and down all the streets of the City?

23       A.    Just about every day I go up and down every

24   street.



1  Q.  Okay.  Okay.  So your normal practice is to go up

2  every street when you go out and you work?

3  A.  Except for Saturday nights.  But during the day,

4  yes, I go up and see the contractors working, or anybody

5  working without a permit or what have you.

6  Q.  And why would Saturday nights be different?

7  A.  Contractors -- no contractor's allowed in the

8  City of Rehoboth on Saturdays.

9  Q.  Okay.

10  A.  Now Saturday day, if I was working day, then I

11  would walk around, ride around and see if I can find

12  contractors sneaking in.

13  Q.  But they don't sneak in at night?

14  A.  No, not normally.

15  Q.  So what do you normally do on a Saturday night

16  when you are working 4 to --

17  A.  Well, I got to patrol normally the commercial

18  districts where we have a lot of patio with loud music

19  and what have you going on.

20  Q.  And when you came back to work on the 16th, July

21  16th, that was during the day, correct?

22  A.  What day is the 16th?

23  MR. LAWSON:  Saturday.

24  Q.  Saturday, that's correct.  July 16th.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1    A.   It was on a Saturday.   I don't know whether I

2  worked days or night.   Because in between, when I picked

3  up his signs, the next week I worked days.   Didn't work

4  nights.

5    Q.   Okay.   So does that mean on the 16th you think

6  you were working during the day?

7    A.   I think so.

8    Q.   Now, I'm going to show you --

9    A.   Aren't we done?

10    Q.   No, we are not, sir.   I have some questions I

11  have to ask you.   I appreciate you bearing with us.

12    A.   I'm going to call my wife.   She is going to get

13  you.

14              (Discussion off the record.)

15  BY MR. TUCKER:

16    Q.   I guess we are ready to go back on the record.

17              Sir, have you seen the affidavit, which is

18  attached as Exhibit 2 to the memorandum filed in the

19  Federal District Court on July 21st by plaintiffs, of

20  Joseph B. Hill, with photographs attached A through Q?

21    A.   I have seen some of it.   I didn't read it.

22    Q.   Okay.   So you did not read the affidavit --

23    A.   No.

24    Q.   -- but you have seen the pictures?



Alexander W. Onizuk

49

1     A.    I've seen the pictures.

2     Q.    All right.

3     A.    I didn't even know who Joseph Hill is.  Didn't

4   somebody say he is a realtor?

5     Q.    All right.  According to Mr. Hill's affidavit,

6   these pictures were taken on July 18th and July 20th.

7     A.    Right.

8     Q.    Now, I'm going to show you --

9     A.    What has he got to do with this?

10    Q.    Sir, again, I ask the questions here today and

11  I'd appreciate if you would answer them as best as you

12  can.

13            Referring to attachment A to Mr. Hill's

14  affidavit, and the picture that's there, I'm going to

15  have you take a look at that and ask you if you can tell

16  us whether or not the signs depicted in that picture are

17  in the public right-of-way or not?

18    A.    I would say they are not.  If I have any doubt,

19  if I have any doubt whatsoever, I don't touch signs.  I

20  don't even think about touching the signs.

21    Q.    Okay.

22    A.    And this is, the picture is doubtful.  I don't

23  know.  I don't think they are.

24    Q.    Okay.  And why not?



Alexander W. Gmizuk

50

1    A.    I can't see any telephone poles.  I can't see

2    sidewalk or anything like that.  If I have any doubts, I

3    wouldn't touch -- I wouldn't pick those campaign signs

4    up.  And I have doubts on those.  I would say they are on

5    private property.  If it is on private property, I won't

6    touch it.

7    Q.    Okay.  I'm going to show you now a picture that's

8    attached as B to Exhibit 2.  I ask you to take a look at

9    that exhibit and tell us whether or not in your opinion

10   those signs are located in the public right-of-way?

11   A.    Well, I can also tell you he has got some signs

12   right up the street near them and --

13   Q.    I know --

14   A.    I'm saying if I have a doubt on them, I think

15   they are on private property, I don't know.  But if there

16   is any doubt, I will just go ahead and leave them sit

17   there.  If there is any doubt to me, I don't touch them.

18   I won't touch anybody's sign.

19   Q.    Okay.

20   A.    It has got to be obvious.

21   Q.    All right.  I'm going to show you Tab C of that

22   same affidavit and ask you if those signs are in the

23   public right-of-way?

24   A.    No, they are not in the public right-of-way.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters