1    Q.    Why not?

2    A.    They are behind the pole, for one thing.

3    Q.    I'm going to show you Exhibit D to that same

4    affidavit and ask you if that sign is in the public

5    right-of-way?

6    A.    No.  It is behind the pole.  It looks like it is

7    somebody's property.

8    Q.    I'm going to show you Exhibit E from that same

9    affidavit and ask you if either one of those signs are in

10   the public right-of-way?

11   A.    No.  I would say they are on private property

12   somewhere.

13   Q.    Why?

14   A.    Well, looks like they are behind the sidewalk

15   there, for one.

16   Q.    It is your testimony that both those signs are

17   behind the public sidewalk?

18   A.    I would think so.  But then again, when you think

19   about it, that could be somebody's property line right

20   there.  You would have to go and look.  But to me, if it

21   is a judgment call, I won't touch them.

22   Q.    Well, I'm going to show you Exhibit F, just so we

23   are clear.  It is a picture of signs again.  In your

24   opinion, are they in the public right-of-way or on

52

```
 1   private property?
 2        A.    They are on private property.
 3        Q.    Why do you conclude that?
 4        A.    They are behind those landscaping logs, for one
 5   thing.
 6        Q.    And does that prove to you that they are on
 7   private property because they are behind landscaping
 8   logs?
 9        A.    I would think so.
10        Q.    Is that a City policy or rule that you follow in
11   that regard?
12        A.    If I have any doubt in my mind, I will not touch
13   anybody's sign.
14        Q.    Is there --
15        A.    That's my rule, yes.
16        Q.    Are you aware of any City policy or rule, though,
17   that discusses signs that are behind landscaping markers
18   or things of that nature?
19        A.    Well, to me, that's on private property.  I'm not
20   going to touch somebody's campaign sign on private
21   property.
22        Q.    So you are not aware of any policies on this
23   issue?
24        A.    No.
```



Alexander W. Onizuk

53

1     Q.   I'm going to show you what is marked on the

2  affidavit at Tab G, which is a picture, tell us if you

3  recognize that.

4     A.   Yes, I do.

5     Q.   What is that?

6     A.   That's a directional sign for the City.

7     Q.   Okay.  Is that located on public right-of-way?

8     A.   Sure is.  That's municipal sign.

9     Q.   And you called it a directional sign; is that

10  correct?

11     A.   I guess.  It gives you all kinds of information,

12  informational sign.

13     Q.   Informational sign, not just directional?

14     A.   Yeah, sometimes it has directions.  It all

15  depends on what is printed on there.

16     Q.   On this particular day --

17     A.   It is an informational sign telling you about

18  "Oklahoma" and Convention Center's there.

19     Q.   What is, if you know, "Oklahoma," July 19th, 8:00

20  p.m., do you know what that is?

21     A.   Do I know what that was?

22     Q.   Yes.

23     A.   Yes.

24     Q.   What is that?

Alexander W. Opizak

54

1    A.    They had a show there of, I guess it is

2  singing-and-dancing-type show.

3    Q.    Okay.  Is there a fee charged to get into that

4  show, do you know?

5    A.    I would assume, yeah.  At the Convention Center,

6  yes, probably.

7    Q.    Was that something the City had put on, if you

8  know, or was that private?

9    A.    Private.  As far as I know.  The City didn't put

10  it on.

11    Q.    I'm going to show you what has been marked as

12  Exhibit H to the affidavit and ask you if you recognize

13  that sign.

14    A.    I recognize the sign but I have never seen it.

15    Q.    Is that sign located in the public right-of-way?

16    A.    I would say -- I would say, yeah, that is.

17    Q.    Okay.

18    A.    It is behind --

19    Q.    I'm sorry.

20    A.    It is -- there is the pole right there.

21    Q.    Okay.

22           (Mr. Speakman is present at this time.)

23    A.    Yeah.  I have never really seen that sign.  I

24  probably would have taken that sign if I saw it.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

55

1      Q.   I show you what has been marked as Exhibit I to

2  the affidavit and ask you if that sign is in the public

3  right-of-way?

4      A.   Well, that's questionable.  I'm not even going

5  to -- I didn't take it.  I would say it is -- well, it is

6  definitely behind the pole.

7      Q.   I'm talking about the blue sign.

8      A.   Which one?

9      Q.   The blue sign, sir.

10     A.   Yes, it is -- I would say it is on the public.

11     Q.   Okay.

12     A.   It looks like a telephone pole right there.  Pole

13  to pole.  But I didn't take it.

14     Q.   I show you Exhibit J and ask you if those signs

15  are in the public right-of-way?

16     A.   Public right-of-way?  They are on public

17  property.  They are on City park.

18     Q.   Okay.  So they are on public property?

19     A.   Mm-hmm.  The City.  It is City stuff.

20     Q.   Okay.  And I'm going to show you Exhibit K, ask

21  you if that sign is on public property?

22     A.   Lord, I don't know.  It looks like it is behind

23  the sidewalk.  There is the sidewalk right there.

24     Q.   Okay.



Alexander W. Opiłka

56

1    A.    So it is on the other side of it.

2    Q.    So in your opinion, is that in the public

3    right-of-way or not?

4    A.    No.

5    Q.    I'm going to show you Exhibit L and point you to

6    the sign that says "Art League" on that exhibit and ask

7    you if that's in the public right-of-way?

8    A.    That's, yes, that's a directional sign for the

9    Art League.

10    Q.    Is the Art League a City entity or private

11    entity?

12    A.    I have no clue.  Probably a private.  But those

13    signs have been there forever.

14    Q.    Okay.  And do you know if that pole is owned by

15    the City?

16    A.    Yes, the pole is owned by the City.

17    Q.    I'm going to show you Exhibit M, ask you the same

18    question about the Art League sign:  in the public

19    right-of-way or not?

20    A.    On City property, isn't it?  Yes.

21    Q.    Public right-of-way?

22    A.    Yeah, it is a directional sign for the Art

23    League.  If they didn't have it up there, they would

24    never find it, would they?

Alexander W. Cniuk

57

1     Q.    Approximately how many of those Art League signs

2  do you think are in the public right-of-way in the City?

3     A.    Two that I know of.

4     Q.    In your travels have you encountered any others?

5     A.    I don't pay any attention to the Art League

6  signs.  Those are the only two I know of.

7     Q.    Would it surprise you if there is more than 50?

8     A.    No, not at all.

9     Q.    I'm going to show you Exhibit N, as in Nancy, and

10  ask you if those signs are in the public right-of-way?

11     A.    They are on a public park, looks like.

12     Q.    And is that top sign on that pole, is that --

13     A.    "Tree City U.S.A."?

14     Q.    Yes.  What is that?

15     A.    I would say that's a City sign, wouldn't you?

16     Q.    Well, I'm asking your opinion.

17     A.    I would think it is a City sign.  Tree City

18  U.S.A., something they must be proud of.

19     Q.    I'm going to show you Exhibit O, ask you if that

20  sign is in the public right-of-way?

21     A.    This has been here longer than, almost as long as

22  the City itself.  Private property probably.

23     Q.    You don't think that's in the public

24  right-of-way?

58

1     A.    I would have to go and see where the -- I can't

2  tell by that.

3     Q.    You said earlier you did have a chance to review

4  these pictures?

5     A.    Yes.

6     Q.    When was that?

7     A.    This morning we went over a couple of them.

8     Q.    First time this morning?

9     A.    Yes.

10     Q.    I show you Exhibit P, as in Paul.  Let me see if

11  you recognize this sign, if that's in the public

12  right-of-way?

13     A.    That sign doesn't -- that's not even on City

14  property.  That's on Henlopen Acres.

15     Q.    Is it on public right-of-way?

16     A.    Don't ask me.

17     Q.    I'm asking you, do you know?

18     A.    I don't know.  I would say that's -- you will

19  have to ask Henlopen Acres about that.  I don't know.

20             MR. SPEAKMAN:  I think you need to clarify

21  whose right-of-way you are asking about.

22     A.    That's not part of the City of Rehoboth.

23     Q.    For the record, I asked if this was in the public

24  right-of-way?

59

1       A.    That's not in the City of Rehoboth's right-of-way

2   anyway.

3       Q.    That property is not within the incorporated

4   municipality of the City of Rehoboth Beach?

5       A.    This, no.

6       Q.    I'm going to refer you to Exhibit Q, which is the

7   last exhibit in that affidavit, and ask you if you know

8   if that sign is in the public right-of-way?

9       A.    That's the back of the other sign.  And that's in

10  Henlopen Acres.  That's not even City of Rehoboth's

11  property.

12      Q.    When you say it is not public right-of-way, how

13  do you know it is not public right-of-way?

14      A.    I didn't say it was not public right-of-way.  It

15  may be that's not City of Rehoboth sign.

16            MR. RHODUNDA:  He didn't believe it is in

17  the City of Rehoboth property, is what he is saying.

18            THE WITNESS:  That's not City of Rehoboth

19  sign.

20      Q.    I didn't ask you if it was the sign.  I asked you

21  if it was in the public right-of-way?

22      A.    I have no clue.

23      Q.    You testified earlier when you are not sure about

24  things, you go and you ask your supervisor, correct?



Alexander W. Crisek

60

1    A.   As far as signs go?

2    Q.   Yes.

3    A.   If I'm not sure about the particular sign, a lot

4  of -- sometimes, yes.

5    Q.   Okay.

6    A.   But normally if I'm not sure about a sign, I

7  won't even mess with it.  Especially a campaign sign.

8    Q.   Those pictures that I just showed you, A through

9  Q, did you discuss any of those signs with your

10  supervisors?

11    A.   No.  Well, I can't say no.

12    Q.   Well, what can you say?  Take your time and think

13  about it.  It is an important question.  You can't confer

14  with your attorney.

15          THE WITNESS:  Can I bring up what Greg

16  Ferrese said?

17          MR. RHODUNDA:  No, well --

18    Q.   Yes, you can bring up what Mr. Ferrese said.

19          MR. RHODUNDA:  You can just answer what, if

20  any, of the discussions you've had about the signs.

21          MR. SPEAKMAN:  Not where attorneys are

22  present.

23          MR. RHODUNDA:  Yes.

24          MR. TUCKER:  You know, he is not supposed to

61

1  be conferring in a deposition.  I'm not asking for

2  attorney/client.

3              MR. SPEAKMAN:  If it occurred in the

4  presence of an attorney that would be asking for that.

5              MR. TUCKER:  If it is privileged.

6              MR. SPEAKMAN:  It is privileged.

7              MR. TUCKER:  We don't even know what he is

8  going to say.

9              MR. RHODUNDA:  Well, it is a privileged

10  comment.

11              Restate your question.  Maybe there is a

12  question he could answer about it.  You are asking, I

13  guess, whether or not he explored whether or not these

14  signs were within the right-of-way.  Is that your --

15              MR. TUCKER:  My question was had he ever

16  discussed any of these signs I just showed him today,

17  Exhibits A through Q?

18              THE WITNESS:  I didn't discuss anything with

19  him, no.  I was just shown -- I was shown those signs

20  this morning.

21  BY MR. TUCKER:

22      Q.    Okay.  I'm just exploring this.  Were you in a

23  room where Mr. Ferrese made comments about these pictures

24  that you heard?



Alexander W. Onizuk

62

1    A.    Yes.

2    Q.    Okay.  Were Mr. Rhodunda or Mr. Speakman present

3    during that conversation?

4    A.    Yes.

5            MR. TUCKER:  Is it your position,

6    Mr. Rhodunda and Mr. Speakman, that was a privileged

7    conversation?

8            MR. RHODUNDA:  Yes.

9            MR. SPEAKMAN:  Yes.

10   BY MR. TUCKER:

11   Q.    Now, earlier you had made mention that you went

12   down Norfolk and something caught your eye, words to that

13   effect.  What was that?

14   A.    A sign on City property.

15   Q.    Whose sign?

16   A.    Mr. Sokolove's.

17   Q.    Where was it located?

18   A.    Across the street from his house.

19   Q.    And was that sign removed by you?

20   A.    Mm-hmm.

21   Q.    Do you recall what date that was?

22   A.    7th, more likely.

23   Q.    July 7th?

24   A.    I think that went on on the 7th.

W&F

**WILCOX & FETZER LTD.**

Registered Professional Reporters

63

```
 1        Q.    Okay.  And why did you conclude that was on
 2   public property?  What was it about that sign?
 3        A.    It was between the sidewalk and the curb, that
 4   little grass area.  As a matter of fact, I think it was
 5   right next to the fireplug.  It was within that area.
 6        Q.    Now, today we were provided with a memorandum, it
 7   is marked as Plaintiffs' Exhibit 6, that was prepared by
 8   Mr. Murphy, who is your boss, correct?
 9        A.    Mm-hmm.
10        Q.    I ask you to take a look at that and tell me if
11   you recognize that.
12        A.    I read some of it.  I didn't read it all.
13        Q.    Were you involved in the preparation of that
14   report?
15        A.    No.
16        Q.    Not at all?
17        A.    He made the report up.
18        Q.    Did he have conversations with you regarding that
19   report?
20        A.    He probably come in and asked me about it, but I
21   didn't even know he was making a report up, to tell you
22   the truth.
23        Q.    I want you to tell me the truth.  It is
24   important.
```



64

1    A.    Yeah.

2    Q.    I'm going to direct you to the last page in

3    particular regarding, looks like regarding the numbers of

4    signs that were collected.    I want to ask you to review

5    that and tell us if you agree with those numbers.

6    A.    I guess 19 of Sokolove's, probably, they are

7    counting the ones I got on Thursday and Saturday, and

8    whatever the other time.    Probably true.

9              I know I returned -- he picked up about ten

10    out of my truck.    Five that one night, five or six one

11    night, and that same morning picked up some.

12    Q.    Do you agree with those numbers that are on page

13    3 of that exhibit?

14    A.    Oh, I couldn't verify, you know.    Sounds about

15    right.

16    Q.    Were you the only one that would have been

17    picking up signs in the City during that period?

18    A.    Dave and I went out and picked up signs one day.

19    Q.    Mr. Murphy went with you?

20    A.    Dave and I both did, yes.

21    Q.    When you pick up a sign and remove it, do you

22    document where and when?

23    A.    We did the last time.    We took pictures of it.

24    Q.    You took pictures of the signs?    On what day?

1     A.    15th, something like that.

2     Q.    15th of July?

3     A.    Yeah.

4     Q.    Now, wasn't that during the period, though, when

5  there was a policy that you weren't going to enforce --

6     A.    I think that was the morning -- the day the

7  policy went off.

8     Q.    It was the 15th?

9     A.    It was opened, yes.

10    Q.    And you took pictures of signs that day you

11 removed?

12    A.    Yes, we did.

13    Q.    Prior to that you did not take pictures?

14    A.    Right.

15    Q.    Do you know what steps, if any, the City took to

16 notify people that they were not removing election signs

17 for some period of time?  Is that no?

18    A.    What was the question again?

19    Q.    Do you know if the City made any attempt to

20 notify people that there was going to be a period of time

21 during which they were not going to remove election

22 signs?

23    A.    Not that I know of.  I'm not aware of it.

24    Q.    Now, let me refer you to Plaintiffs' Exhibit 5,



1    which is the notice of deposition, Mr. Rhodunda.    And

2    just for the record, before we started Mr. Rhodunda

3    indicated you may have some answers to some of the

4    questions that are asked under our Rule 30(b)(6) notice

5    of deposition.    And I want to go through some of those

6    questions with you, but first I want to ask you if you've

7    had an opportunity to look at Schedule A attached to

8    Plaintiffs' Exhibit 5?

9        A.    Oh, me?

10       Q.    Yes, sir.    Have you seen that document?

11       A.    I never saw this document.    Did you want me to

12   read it.

13               MR. TUCKER:    Can we go off the record for a

14   second?

15               (Discussion off the record.)

16   BY MR. TUCKER:

17       Q.    Why don't we go back on the record, and let's

18   start, sir, if I could ask you to read 5 -- I'm sorry?

19               MR. RHODUNDA:    Maybe it is confusing.    If

20   you just take out, we basically are enforcing only the

21   City ordinance, and you may just want -- I'm trying to

22   make this as easy as possible so he understands, because

23   you list the federal, state in there as well.    Maybe it

24   will cut to the chase to just ask him the question



67

```
 1    directly without removing some of these other things to

 2    try and help him understand the question better.

 3                    MR. TUCKER:  I'll tell you what,

 4    Mr. Rhodunda, can he look at your copy while I look at

 5    mine?

 6                    MR. RHODUNDA:  Yes.  What are we looking at,

 7    5(b)?

 8                    MR. TUCKER:  5(b), and this is Plaintiffs' 5

 9    which is the notice of deposition to Mr. Rhodunda under

10    Rule 30(b)(6), which I believe Mr. Rhodunda has an

11    identical copy in front of him that the witness is now

12    looking at.

13    BY MR. TUCKER:

14        Q.    Question 5(b) reads, "who decides when to enforce

15    federal, state, county or City ordinance, code, statute

16    or regulation, including, without limitation, City

17    Ordinance Section 74-16, which the City contends

18    authorizes it to removes signs, posters or advertisements

19    from public property or rights-of-way within the City

20    limits."

21        A.    Who decides when to enforce it?

22        Q.    Yes, sir.

23        A.    Me, I guess.  I'm the Code Enforcement Officer.

24        Q.    Okay.  So over the past year it has been at your
```

68

```
 1    complete and total discretion?

 2        A.    When to pick up signs?

 3        Q.    Yes, sir.

 4        A.    Pretty much, yes.

 5        Q.    Have you responded to complaints in removing

 6    signs?

 7        A.    Yes.

 8        Q.    So in part it is driven by complaints?

 9        A.    A lot of complaints, a lot of, a lot of signs I

10    pick up, like contractor signs.  They do have an

11    ordinance about too many signs in one area, you know,

12    like if you have got two -- one contractor and three

13    subcontractors, the subcontractor can't have their signs

14    there.  So you give them fair warning, you know, to

15    remove their signs.  And a lot of times the subcontractor

16    is already gone, so you go in and pick their signs up.

17        Q.    Is this driven primarily by complaints or by your

18    own observations?

19        A.    Both.  Mostly on signs it is more or less me.

20        Q.    Okay.  And on July 9th did you have any

21    complaints about signs?

22        A.    Was that on Saturday?

23        Q.    Yes.

24        A.    No.
```



1    Q.    No complaints?

2    A.    Un-un.

3    Q.    Reading from subparagraph (c), "who decides

4    whether or not a particular sign, poster or advertisement

5    violates the federal, state, county or City ordinance,

6    code, statute or regulation, including, without

7    limitation, City Ordinance 74-16, which the City contends

8    authorizes it to remove signs, posters or advertisements

9    from public rights-of-ways within the City limits," who

10   decides?

11   A.    Me.

12   Q.    That's your sole discretion?

13   A.    Sure.

14   Q.    You testified earlier that you also discuss, I

15   believe your testimony was, questionable issues with

16   Mr. Murphy and his assistant?

17   A.    Yeah, mm-hmm, yeah.

18   Q.    So it is not just you, correct?

19   A.    Yes, well, you are right.  If I have any

20   question, I definitely go to them.  I don't take it upon

21   myself, you know, to know everything.  They know.  They

22   are the ones that help me most.

23   Q.    And on occasions when you are unsure and they

24   give you guidance, do you follow their guidance?  When I



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Alexander W. Onizuk

70

1    say "they," I mean Mr. Murphy and his assistant.

2       A.   Yes.

3       Q.   On July 9th, Saturday, did you receive any

4    guidance from Mr. Murphy or his assistant?

5       A.   No.  Not at all.  They weren't even there.

6       Q.   You had no complaints?

7       A.   No, no complaints, no guidance, no nothing.  It

8    was all me.  I called that.

9       Q.   Earlier when you testified about July 7th, which

10   I think is the first day you were talking about going out

11   and picking up signs --

12      A.   Right.

13      Q.   -- who were those discussions with?

14      A.   Mr. Murphy.  After I picked up the signs, I went

15   and told him what I did.

16      Q.   Okay.

17      A.   And he was -- they are so busy in that office,

18   believe me, they are so busy that I don't even know

19   whether he fully understood what I was telling him.  But

20   he just said, "Pick up all the signs."

21      Q.   On July 7th Mr. Murphy instructed you to pick up

22   all signs?

23      A.   Anything on public property, pick up signs.

24      Q.   Did he limit you in any way in the City or did

Alexander W. Ohnzak

71

1    you take that to mean any place in the City?

2        A.    No, he didn't limit anything.    Anything on public

3    property, he said pick up.

4        Q.    Okay.  So --

5        A.    He just didn't say Lake Street or Lake Avenue.

6        Q.    So on July 9th you were still following that

7    directive, correct?

8        A.    Right, mm-hmm.

9        Q.    Question (d) is how often does the City enforce

10   federal, state, county or City ordinances, codes,

11   statutes or regulations including, without limitation,

12   City Ordinance 74-16," how often?

13       A.    Every day.

14       Q.    (E) reads, "how often are signs removed as a

15   result of alleged violations of federal, state, county,

16   City, statutes, regulations, including, without

17   limitation, City Ordinance 74-16," how often?

18                MR. RHODUNDA:   How often are signs removed?

19       A.    All the time.

20       Q.    So I'm clear, it is enforced all the time?

21       A.    Yes.

22       Q.    Signs are removed all the time?

23       A.    Right, right.

24       Q.    Is that correct?



WILCOX & FETZER LTD.
Registered Professional Reporters

Alexander W. Onizuk

72

```
1         A.    Right.  Now, sometimes, like I said, on realtor

2    sign, I will give them fair warning, I call them up.  If

3    they are not directly in front of the house, they are in

4    that grass area, I say, "Look, I'm going to remove your

5    sign.  You better come and get it."

6              Or sometimes I pick them up and take them to

7    them.  Especially -- a lot of Lingo's.  They are forever

8    picking them up.

9         Q.    Let's go on to question 6, which your attorney

10   indicated you might be able to answer for us today.  "The

11   removal of any campaign signs by the City from private

12   property or public property or rights-of-way within the

13   City limits since July 1 '05."  Since July 1, '05 who has

14   decided certain campaign signs would be removed and

15   others would be left standing?

16        A.    July 1, '05?

17        Q.    Since that time.

18        A.    No one.

19        Q.    Would you agree from the pictures that I showed

20   you that were attached to Exhibit 2 to the Memorandum A

21   through Q, some of those pictures established that there

22   still are signs in the right-of-way within Rehoboth

23   Beach?

24        A.    Possibly.  I'm not going to -- just by looking at
```

73

1    the pictures, I can't really tell for sure. But it could

2    be. They look like they could be on private property,

3    you know.

4        Q.    Okay.

5        A.    If I have any doubt, I don't pick a sign up.

6        Q.    So is it your testimony that campaign signs that

7    you believe were on private property you would not have

8    picked up?

9        A.    I would not have picked up any campaign sign on

10    private property.

11        Q.    If you believed a campaign sign was on public

12    property, would you have picked it up?

13        A.    Yes, I would pick it up.

14        Q.    Did you have any discussions with Mr. Murphy or

15    his assistant, or anybody else with the City, about

16    campaign signs that you had questions about?

17        A.    I didn't have any questions about these

18    particular campaign, campaign signs I picked up. They

19    were right there on public property.

20        Q.    I'm not talking about just the ones you picked

21    up. I'm talking about ones that maybe you didn't pick

22    up.

23        A.    No, uh-uh. No. To me, there wasn't any

24    question, they were on private property. I didn't, I

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

Alexander W. Oriznk

74

1    didn't pick them up.

2        Q.    Okay.

3        A.    I didn't question any signs.

4        Q.    And the Art League sign that we showed you

5    earlier in your deposition, it is also attached to

6    Exhibit 2 to the memorandum, those signs such as that

7    weren't removed.    Why?

8        A.    Tell you the truth, I hardly ever see them.

9        Q.    Why would you not remove a sign like that?

10       A.    I think they are grandfathered in.

11       Q.    What does that mean?

12       A.    It means they have been there longer than the

13   code has been made up.

14       Q.    Okay.  How did you make that determination?

15       A.    How did I make that determination?

16       Q.    Yes, sir.

17       A.    I didn't.

18       Q.    Well, then where is that coming from?

19       A.    Mr. Murphy and Mr. Kordak.  We talk about things

20   being grandfathered in, you know, longer than the code.

21       Q.    Did you have any specific discussion with

22   Mr. Murphy or his assistant about grandfathering of

23   signs?

24       A.    No, uh-uh, but I did have about other things, you



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    know, being grandfathered.

2        Q.    Can you tell me where in the code any of the

3    signs that I showed you that are attached to Exhibit 2 to

4    our memorandum, can you show me in the code where they

5    are grandfathered?

6        A.    No.   I couldn't show you.   If I -- I would have

7    to go and ask somebody else.

8        Q.    Okay.   So is it your testimony then that you

9    didn't remove those signs, that is, the Art League signs,

10   because, why?

11       A.    I don't pay any attention to Art League signs.

12       Q.    Why not?

13       A.    I miss them.   I see the stop sign.   But I never

14   see the Art League sign until you showed them to me.

15       Q.    You had no idea --

16       A.    Well, I'm oblivious to it.   I probably seen it a

17   dozen times, you know, a million times, but never paid

18   any attention to it.

19       Q.    Would you agree that they are private signs?

20       A.    I would think they are private signs.   But they

21   have been there forever.

22       Q.    Would you agree that they are in the public

23   right-of-way?

24       A.    Right.



1    Q.    But they have not been removed; is that correct?

2    A.    They have not been removed.

3          We are done?

4    Q.    We are done when we get done with the questions,

5    sir.  I'm doing my best.

6          MR. TUCKER:  Bill, I just need a couple

7    minutes.  I got a lot of information at the last moment

8    here.  Let's go off the record.

9          (Discussion off the record.)

10          (Recess taken.)

11          MR. TUCKER:  Let's go back on the record.

12    BY MR. TUCKER:

13    Q.    Sir, you had mentioned earlier during your

14    testimony that there was a banner sign that Hooter's had

15    out that you had taken off because banner signs --

16    A.    I didn't take it off, no.

17    Q.    I stand corrected.  You had mentioned earlier, I

18    believe, that Hooter's had a banner sign up that's not

19    permitted under the code; is that correct?

20    A.    Yes.

21    Q.    Are you aware of a banner sign that the City had

22    put up in the past couple of weeks?

23    A.    Uh-uh.

24    Q.    Never saw any banner sign by the Convention



77

1   Center put out by the City of Rehoboth?

2      A.   Uh-uh.

3      Q.   If they had put out a banner sign, would that

4  have been unlawful?

5      A.   No.

6      Q.   Why not?

7      A.   The City put it out.

8      Q.   So the City is exempt?

9      A.   But City don't put out banner sign.

10     Q.   For purposes of my question, just assume that

11  they did.  If they did, would that have been unlawful?

12     A.   Would it have been unlawful?

13     Q.   Yes.

14     A.   Anything the City does, it is all right.

15          MR. RHODUNDA:  Do you mean in regard to the

16  statute?  What do you mean in reference to?

17     Q.   Unlawful in general.  Would you take that down?

18     A.   Would I take it down?

19     Q.   Yes, sir?

20     A.   Not if the City put it up I wouldn't take it

21  down.

22     Q.   If the sign was for a private event at the

23  Convention Center but was but up by the City, would it

24  violate the code or not violate the code?



**WILCOX & FETZER LTD.**

Registered Professional Reporters

1      A.    Yes.

2      Q.    It would violate the code?

3      A.    If it was for a private event?

4      Q.    Yes, put up by the City.  Would that violate the

5   code?

6      A.    I would think so.

7      Q.    Now, do you treat the boardwalk like a sidewalk?

8      A.    Do I?

9      Q.    Yes, sir, in terms of enforcement?

10     A.    Yes.

11     Q.    Do you consider the whole boardwalk public

12  right-of-way from the north end to the southern end?

13     A.    Oh, yes.

14     Q.    Do you have any knowledge as to in terms of

15  whether or not any of that is private property or not?

16     A.    Oh, I have no idea.

17     Q.    What do you believe it to be?

18     A.    The boardwalk?

19     Q.    Yes, sir.

20     A.    Itself?

21     Q.    Yes, sir.

22     A.    I think that's City property.

23     Q.    And the property that the boards are on top of,

24  do you also believe that's City property?



79

1      A.    Well, I did have one guy tell me he owned all the

2   way down to the end of the beach, so evidently the

3   City -- boardwalk is on private property.

4      Q.    Do you believe that?

5      A.    I would think, yes.

6      Q.    Did you have those discussions with Mr. Murphy or

7   his assistant?

8      A.    No, uh-uh.  I had that with Mr. Capano.

9      Q.    Mr. Capano.  And you accepted his word on that?

10     A.    Hey, he told me he owned halfway down to the

11  beach and I took him for his -- at his word.

12     Q.    You believe to this --

13     A.    I want to tell you one thing, this is Gerry

14  Capano.  I don't believe half the stuff he tells me.

15     Q.    I think I might leave that one alone.

16              Let me ask you something about the practice

17  you have about determining where there are public

18  right-of-ways versus private property and how you

19  distinguish between the two.  What if you have a road,

20  like Lake, where there are no sidewalks, and there are no

21  utility poles?

22     A.    And no utility poles?  That would be a good one.

23     Q.    What would you do in that case, sir?  How many

24  feet can you be within, close to the road with a sign?



1  How many feet do you get?

2      A.    Well, right across the street, on Lake Avenue

3  there is a, big flower pots sitting in the parking lot,

4  with his signs in it.

5      Q.    You say "he" --

6      A.    Mr. Sokolove's signs.  I did not touch those

7  signs because I have doubts.  If I have any doubt, I

8  don't touch anybody's signs.

9      Q.    That wasn't my question.  And I know you are

10 trying to help.

11     A.    No, no.

12     Q.    Let me ask the question.  It is important.  What

13 do you do in that instance?  What do you do in an

14 instance where there is a street, there is no utility

15 poles, and no sidewalk?

16     A.    Then I would say I'm going to leave those signs

17 alone.  They might be on somebody's private property.

18     Q.    You would not remove those signs?

19     A.    I would not remove them.  If I have any doubt, I

20 won't touch them.

21     Q.    Have you ever spoken to Mr. Murphy or his

22 assistant about what to do in those situations?

23     A.    No.

24     Q.    Are you aware where the private property lines



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    run along Lake?

2        A.    Some, yeah.

3        Q.    Do they run in a straight line; that is, do the

4    property lines run perpendicular to -- I'm sorry,

5    parallel to the road?

6        A.    Parallel, I would say they would.

7        Q.    Based on the ones you are aware of?

8        A.    Yes.

9        Q.    Can you tell us which ones they are, what

10   properties they are, if you know?

11       A.    Well, Mr. Sokolove's, for one.

12       Q.    Runs parallel?

13       A.    Mm-hmm.

14       Q.    And do you know whether or not the lots on Lake,

15   their private property lines run parallel to one another?

16       A.    I would say they do.

17       Q.    And what do you base that belief on?

18       A.    Well, looking down there you can see where the

19   sidewalks are and you can just about see, you know, tell

20   everybody's property.  You can see, that's obvious.

21       Q.    So you rely on the sidewalk to try to determine

22   where the public right-of-way is?

23       A.    To determine, yes, mm-hmm.

24       Q.    In front of Mr. Sokolove's business, is there a

82

1    sidewalk?

2        A.    That's a good question.   He has got a brick

3    sidewalk, I think, in front of his place.

4        Q.    Do you know whether that's private or public?

5        A.    Actually I do know.

6        Q.    What is it?

7        A.    That's public.

8        Q.    How do you know that?

9        A.    I got his plot out and looked at it.

10       Q.    His plot.   Is that his deed or is that something

11   else?

12       A.    It is a recording of his land.

13       Q.    Deed?

14       A.    I guess it is the deed.

15       Q.    When did you pull that out and look at it?

16       A.    The other day.

17       Q.    Why did you do that?

18       A.    To see exactly where -- because I was accused of

19   taking signs from in front of his place.

20       Q.    Okay.

21       A.    And flower pots too.

22       Q.    That's why you pulled it?

23       A.    Well, I wanted to see what it looked like, yeah.

24       Q.    You testified you didn't remove any signs from



83

```
 1    the front of his place?

 2        A.    No, I did not.  I don't see how he could put a

 3    sign in front of his place.

 4        Q.    So why would it matter where the public

 5    right-of-way was in front of his place if you didn't

 6    remove any signs from in front of his place?

 7        A.    Just curious.

 8        Q.    Was that your idea to pull that document?

 9        A.    Yes.

10        Q.    Where did you pull it from?

11        A.    We got files over there and I can look it up.

12        Q.    So you have a copy of Mr. Sokolove's deed --

13        A.    Mm-hmm.

14        Q.    -- in a public file --

15        A.    Mm-hmm.

16        Q.    -- at the City of Rehoboth?

17        A.    Right.

18              MR. RHODUNDA:  It is not a deed.

19        A.    It is not a deed.  It is not a deed.

20              MR. RHODUNDA:  I'll share that.  I'll review

21    that with him in a moment.

22              MR. TUCKER:  Why don't we go off the record

23    for a moment.

24              (Discussion off the record.)
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

84

1          MR. TUCKER:  I think we are done.

2          (Discussion off the record.)

3                    EXAMINATION

4   BY MR. RHODUNDA:

5      Q.    Mr. Onizuk, just to follow up quickly.  You have

6   been the code inspector for the City of Rehoboth for how

7   long?

8      A.    One year.

9      Q.    What has been your rule of thumb during that one

10  year-period related to determining where the public

11  property ends or the right-of-way ends and the private

12  property starts?

13     A.    We normally went by the sidewalk.  Anything after

14  the sidewalk is public property.

15     Q.    And if there is no sidewalk and there is a

16  utility pole, how do you use the utility pole to

17  determine that?

18     A.    Well, the utility pole is on the easement.  It is

19  not on private property.  And you can tell anything past

20  the utility pole is private property.

21     Q.    Do you never do any enforcement action on the

22  backside of a telephone pole?

23     A.    No, I would not.

24     Q.    Have you ever taken any campaign signs off of



85

1  private property?

2      A.   No, not to my knowledge, not at all.

3           (Defendants' Deposition Exhibit No. 1 was

4  marked for identification.)

5      Q.   I'm showing you Defendants' Exhibit 1.  We've had

6  a lot of discussion about Mr. Sokolove's restaurant; is

7  that correct?

8      A.   Mm-hmm.

9      Q.   Is this his restaurant?

10     A.   Yes, it is.

11     Q.   These were taken yesterday; is that right?

12     A.   Yes.

13     Q.   There are two "Sokolove" signs in the back

14 planting area behind the sidewalk?

15     A.   Yes, look like in the flowerbed there.

16     Q.   Are they lawfully placed there?

17     A.   Yes.

18     Q.   Is that consistent with the City code?

19     A.   Yes.

20     Q.   Have you ever removed any signs from that

21 location?

22     A.   No, never.

23     Q.   Did you ever move any signs from this area --

24     A.   Yes.



86

1    Q.    -- far end of the parking lot?

2    A.    I removed signs right here.

3    Q.    Can you mark with my pen where you removed the

4    sign from.

5    A.    Right back in here.

6    Q.    Mark it real heavy, if you would.

7    A.    This grass area back in here.

8    Q.    Okay.  Now, that's one sign that you removed from

9    the area of his restaurant?

10    A.    Right.

11    Q.    What is the street address of this home right

12    there?

13    A.    That home right there.

14    Q.    Where is 63 Lake Avenue?

15    A.    63 is on the left side of that.

16    Q.    Okay.  Now, were there any signs removed from

17    where the "X" is marked on Defense Exhibit 1 and the far

18    end of his restaurant building?

19    A.    Yes, there was a sign on the other side of his.

20          MR. RHODUNDA:  Now, if I could have this

21    marked as Defense Exhibit 2, please.

22          (Defendant's Deposition Exhibit 2 was marked

23    for identification.)

24          MR. TUCKER:  Bill, can we interrupt just for

1    a second just to see this.

2               MR. RHODUNDA:  And Exhibit 3, please.

3               (Defendant's Deposition Exhibit 3 was marked

4    for identification.)

5        Q.   I'm going to show you what is Defense

6    Exhibit Number 2, and this is basically a plot plan that

7    shows the property where the restaurant 59 is located; is

8    that correct?

9        A.   Right, mm-hmm.

10       Q.   And Exhibit 3 is a defense photograph, No. 3,

11   that shows the front of the 59 building; is that correct?

12       A.   Yes, mm-hmm.

13       Q.   Now, when you look at the plot plan, it depicts

14   three steps coming out of the front of the building; is

15   that correct?

16       A.   Mm-hmm.

17       Q.   Do you see the three steps coming down in front

18   of the building?

19       A.   Yes.

20       Q.   And do you see the sidewalk brick area in front

21   of this restaurant?

22       A.   Right.

23       Q.   Now, when you looked at this plot plan that's in

24   the City files, is the sidewalk for Mr. Sokolove's



88

1    restaurant on private property or public property?

2        A.    It looks like it is on public, public property to

3    me.

4        Q.    Now, if you look down between Exhibits 1 and 3,

5    you see the "Sokolove" signs that are located in the

6    landscaped area?

7        A.    Right.

8        Q.    And you have testified already these are lawfully

9    in place; is that correct?

10       A.    Yes, they are, yeah.

11       Q.    Now, were the X marks the spot and you have

12   removed that sign, could you please mark on Defense

13   Exhibit 2 where that is?

14       A.    That was over in this area right here.    Right in

15   there.

16       Q.    And you would state that that was actually

17   located on the same area as the sidewalk in front of the

18   business if you went straight down?

19       A.    I'd say it is, sure, exactly.

20       Q.    Did you remove any signs from the front of this

21   59 restaurant?

22       A.    No, I didn't.

23            MR. RHODUNDA:    Can I have this marked as

24   Exhibit 4, please.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

89

1          (Defendant's Deposition Exhibit 4 was marked

2     for identification.)

3          Q.    Now, I believe that this actually may be on the

4     other end of the restaurant property; is that correct?

5          A.    Right.

6          Q.    And you indicated previously you removed the sign

7     from that area; is that correct?

8          A.    That was over here.

9          Q.    Could you please mark on this photograph an "X"

10    where you removed the sign.

11         A.    Here.    That area.

12         Q.    Now, I see a "Sokolove for Mayor" sign that's in

13    a different location from where you marked the X; is that

14    correct?

15         A.    Right, mm-hmm.

16         Q.    Is that in a position now that's consistent with

17    the City code?

18         A.    I would think so, yes.

19         Q.    And why would you say that?    What is it that you

20    are looking at --

21         A.    I was looking at where I picked it up before.    It

22    was out in the medial strip between the sidewalk and the

23    curb.    And the owner over there is the one kind of helped

24    me out on it anyhow.    He did not want it there.



WILCOX & FETZER LTD.
Registered Professional Reporters

90

1     Q.   But now this is a lawful location?

2     A.   To me it is a lawful location.  Now, I don't know

3 whether that is on that guys's fence or not.

4          MR. TUCKER:  Just a housekeeping matter,

5 Bill.  You obviously don't have copies for us, so if we

6 can just kind of look at them so we can get a reference.

7          MR. RHODUNDA:  Oh, yes.

8          Can I have this marked as Exhibit 5, please.

9          (Defense Deposition Exhibit 5 was marked for

10 identification.)

11 BY MR. RHODUNDA:

12     Q.   Now, I have a corner across the street from 59

13 restaurant.  Do you recognize that corner?

14     A.   Mm-hmm, right.

15     Q.   That picture was taken yesterday.  Did you remove

16 a sign from that location?

17     A.   Yes, I did.

18     Q.   Where did you remove that from?

19     A.   It was on this side of -- right in this area

20 here.

21     Q.   Was it located in the front of the telephone

22 pole?

23     A.   Yes.  In the green, grass area.

24          MR. RHODUNDA:  If I could have these marked



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    as Exhibits 6 and 7, please.

2              (Defense Deposition Exhibits 6 and 7 were

3    was marked for identification.)

4        Q.   Thank you.  Mr. Onizuk, I'm showing you Exhibits

5    6 and 7.  You previously testified at length about these

6    bed-and-breakfasts --

7        A.   Right.

8        Q.   -- that are close to the restaurant.  You have

9    removed some signs from in front of those, didn't you?

10       A.   Right.

11       Q.   Could you mark with my pen where you removed them

12   from.

13       A.   Both pictures?

14       Q.   Yes.  If they depict locations where you removed

15   them from.

16       A.   All of them were in front of the building, in the

17   grass area.  See, this is a big building here.

18            The other one would be way down here.

19            (Defense Deposition Exhibit 8 was marked for

20   identification.)

21       Q.   Now, with reference to Defense Exhibit 6 and 7, I

22   do see some "Sokolove for Mayor" signs that are on the

23   other side of the sidewalk now?

24       A.   Mm-hmm.



92

1      Q.   Are those consistent with the City code?

2      A.   Yes, they are private property, mm-hmm.

3      Q.   Would you ever remove them if they were in that

4   position?

5      A.   No, never.

6      Q.   Now, Defense Exhibit 8 shows two "Sokolove for

7   Mayor" signs across the street from the

8   bed-and-breakfast.  Do you recognize those signs?

9      A.   Yes, I recognize those signs.

10      Q.   Did you leave those signs there?

11      A.   Yes.

12      Q.   Did you see those signs and make an analysis as

13   to whether those should be removed or not?

14      A.   I saw those signs and I said well, they are on

15   private property, as far as I'm concerned, they are

16   behind the easement, the pole line and everything.

17      Q.   So you left those signs there?

18      A.   I left those signs.  Private property, you know.

19   If I have any doubt I leave them.

20           MR. RHODUNDA:  Okay.  Exhibit 9.

21           (Defendants' Deposition Exhibit 9 was marked

22   for identification.)

23      Q.   Now, these are "Sokolove for Mayor" signs that

24   are located behind the sidewalk.  Are those legal

1  positions?

2      A.   To me they are legal, yes.

3            (Defendant's Exhibit 10 was marked for

4  identification.)

5      Q.   Number 10 is a fire hydrant on Norfolk Street; is

6  that correct?

7      A.   Mm-hmm.

8      Q.   You testified there was a sign removed from

9  there?

10     A.   Yes.

11     Q.   Did you remove that sign?

12     A.   Yes, I did.

13     Q.   Could you mark where you removed that from?

14     A.   Somewhere in that area right there.

15     Q.   Why did you remove that?

16     A.   It was within City right-of-way.

17     Q.   Now, all the photographs we have gone through so

18  far were all taken yesterday, right?

19     A.   Right.

20     Q.   And you were present when they were taken?

21     A.   Right.

22     Q.   And they accurately depict the subject matter of

23  what they were taken of?

24     A.   Right.



94

1        Q.   We will continue to go through yesterday's

2    photographs.

3                (Defendants' Deposition Exhibit 11 was

4    marked for identification.)

5        Q.   Defense Exhibit 11 is a "Sokolove for Mayor" sign

6    located right on the corner of an intersection very close

7    to the roadway.  Is that a legal sign?

8        A.   I would say it is a legal sign, yes.

9        Q.   And is that because it is behind the sidewalk?

10       A.   Yes.

11               (Defendants' Deposition Exhibit 12 was

12   marked for identification.)

13       Q.   Defense Exhibit 12 looks like a commercial

14   business with the "Sokolove for Mayor" sign in front of

15   that.  Is that a legal sign?

16       A.   I would say it is legal, a legal sign, next to

17   their house and everything.  Or it might be a store.

18       Q.   Looks like a store, doesn't it?

19       A.   Yes, mm-hmm.

20               (Defendants' Deposition Exhibit 13 was

21   marked for identification.)

22       Q.   Defense Exhibit 13 shows a park.  Do you remember

23   the name of this park?

24       A.   Lake Gerar or Gerard.



1    Q.    Lake Gerar?

2    A.    Yes.

3    Q.    Did you remove some signs from Lake Gerar that

4  were Sokolove signs?

5    A.    Yes.

6    Q.    Can you mark on here where you removed them from?

7    A.    About in this area right here.  Around that area

8  somewhere.

9    Q.    This is Lake Gerar, which is a park; is that

10  correct?

11    A.    Park, right, City park.

12    Q.    How many political signs have you seen within the

13  Lake Gerar boundaries?

14    A.    Only the one.

15          (Defendants' Deposition Exhibit 14 was

16  marked for identification.)

17    Q.    When you say only one sign, I'm talking about all

18  the candidates running for office.

19    A.    Right.  That's the only one.

20    Q.    Exhibit 14 shows a median across the street from

21  Lake Gerar?

22    A.    Right.

23    Q.    Did you remove some signs from this median?

24    A.    Yes, I did.



1    Q.    Can you mark where you --

2    A.    Yeah.   There was one on this end.   Well, I would

3  say around in here.   There was -- the one up in the other

4  end of it, which is, you can't see but it was way back in

5  there.

6    Q.    Okay.   So basically Exhibit 14, Defense

7  Exhibit 14 is across from Lake Gerar.   It is a very wide

8  grassy median with a lot of landscaping and it helps

9  define the roadways and area?

10    A.    Exactly.

11          MR. TUCKER:   Let's let the exhibit speak for

12  itself.

13    Q.    So you have two signs removed from there?

14    A.    Right.

15    Q.    How many other candidates had signs within this

16  grassy area?

17    A.    None.

18          (Defendants' Deposition Exhibit 15 was

19  marked for identification.)

20    Q.    Defense Exhibit 15 shows an intersection.   That

21  was across from Bad Hair Day, isn't it?

22    A.    Yes.

23    Q.    That reminds me of myself every day.

24          MR. TUCKER:   If you were lucky.



97

1          (Discussion off the record.)

2              MR. RHODUNDA:  We are on 15 I think.

3          (Record read.)

4  BY MR. RHODUNDA:

5      Q.    Defense Exhibit 15 shows two "Sokolove for Mayor"

6  signs, and they are fairly close to the roadway.  Are

7  these legal signs?

8      A.    I would say they are legal.  There is a telephone

9  pole right there.  I would say it is on the other side of

10  it.  And this one looks like it is on the other side of

11  the sidewalk.  There is a little sidewalk in there.

12      Q.    You would not take these down?

13      A.    No, I would not take these down.

14              (Defendants' Deposition Exhibit 16 was

15  marked for identification.)

16      Q.    Defense Exhibit 16 is a picture of a Bad Hair

17  Day, and are there some signs in front of this business?

18      A.    They are on private property.

19      Q.    Okay.  How do you --

20      A.    I wouldn't -- if there is any question, doubt in

21  my mind, I wouldn't even touch them.

22      Q.    Why are these on private property?

23      A.    Well, there is the sidewalk there.  And I would

24  say they are over there, but there is no sidewalk here,

98

1    but still, it looks like private property to me.

2        Q.    So the first 15 exhibits then or 16 exhibits are

3    all pictures that were taken yesterday; is that right?

4        A.    Right, exactly.

5                (Defendants' Deposition Exhibit 17 was

6    marked for identification.)

7        Q.    Now, Exhibit 17 was taken I believe by Dave

8    Murphy but you were present?

9        A.    Dave Murphy, mm-hmm, I picked this sign up.  It

10   was right on the City property.

11       Q.    Do you know what date it was when that was taken?

12       A.    It might have been the 15th.

13       Q.    15th?

14       A.    Yes.

15       Q.    We have another one of our exhibits, actually

16   just shows a fire hydrant where you marked the box where

17   this was located; is that correct?

18       A.    Right, yes.

19       Q.    And then this is the actual sign that you

20   removed?

21       A.    Yes.

22       Q.    That's Exhibit 17.

23                (Defendants' Deposition Exhibit 18 was

24   marked for identification.)



99

1      Q.    Defense 18 is actually another picture of those

2   two flower pots across from the bed-and-breakfast area;

3   is that correct?

4      A.    Yes.

5      Q.    And so on July 15th when you went around and

6   looked to take down signs, you saw these two signs,

7   didn't take them down?

8      A.    We didn't take them down because they were on the

9   other side of the telephone pole.

10     Q.    And there is still --

11     A.    They are still there.

12     Q.    They are still there right now; they were there

13  yesterday when you took a picture of them?

14     A.    Yes, mm-hmm.

15          (Defendants' Deposition Exhibit 19 was

16  marked for identification.)

17     Q.    Now, Exhibit 19 is also Bad Hair Day, and this

18  was a picture that was taken on July 15, and it shows

19  some "Sokolove for Mayor" signs.  Is this one that you

20  removed when you were there on July 15?

21     A.    Yes, we removed that one because it is on the

22  other side of the telephone pole.  We looked down the

23  lines and saw that it was definitely on City property.

24     Q.    So one of your practices would be to look down



**WILCOX & FETZER LTD.**

Registered Professional Reporters

100

1   the street to see where the telephone pole is lining up?

2       A.   Yes, mm-hmm.

3       Q.   Mr. Tucker referred to Mr. Hill's affidavit with

4   attached pictures earlier?

5       A.   Mm-hmm.

6       Q.   Do you recall looking at these pictures?

7       A.   Yes.

8       Q.   There are two pictures located at items 11 -- I'm

9   sorry, L and M, and they are Art League signs?

10      A.   Yes.

11      Q.   Is there any sort of directional symbol on the

12  Art League sign?

13      A.   Yes, there is an arrow on each sign.

14      Q.   Now, Exhibit G to Mr. Hill's affidavit is the

15  City of Rehoboth Beach Convention Center sign.  Do you

16  see -- it may be hard to see in this photograph.  Do you

17  see a directional item on the sign?

18      A.   No.

19      Q.   Well, do you see where it says "Convention

20  Center" --

21      A.   Convention Center, oh, yes it does have an arrow,

22  yes, I didn't see that.

23      Q.   What does that arrow point to?

24      A.   The Convention Center.

