Alexander W. Onile

101

1    Q.   It points to the Convention Center?

2    A.   Yes, mm-hmm.

3    Q.   That's the Convention Center sign?

4    A.   Right.

5    Q.   That's a City Convention Center?

6    A.   Yes, it is.  Never took notice to that arrow.

7    Q.   What involvement, if any, did Mr. Ferrese have

8  regarding taking down the Sokolove signs --

9    A.   Mr. Ferrese?

10   Q.   Mr. Ferrese on July 7th --

11        MR. SPEAKMAN:  Ferrese, excuse me.

12   A.   Nothing.  He had nothing to do with it.

13   Q.   Did he direct you to take down the signs?

14   A.   No.

15   Q.   Was it conveyed to you through some other third

16  party that he had directed the signs be taken down?

17   A.   No.

18   Q.   Did you ever say that to Mr. Silverstein or

19  Mr. Sokolove, that Mr. Ferrese was involved with taking

20  these signs down?

21   A.   No.  I forgot who Mr. Silverstein was.

22        MR. RHODUNDA:  Mr. Tucker, do you have the

23  exhibit marked with the two photographs in the back of

24  the truck?  Thank you.

102

1     Q.    Plaintiffs' Exhibit Number 9 is the photograph of

2   the back of your truck you have already testified about?

3     A.    Yes.

4     Q.    And actually, there are two Polaroids of the back

5   of your truck?

6     A.    Right.

7     Q.    Please identify for me the types of signs that

8   are in the back of the truck at the time these pictures

9   were taken.

10     A.    Well, I got about six campaign signs, political

11   signs, one auction sign, two auction signs, a Pep Up

12   Heating and Air Conditioning sign.  I know I have a -- I

13   know I got a real estate sign in there.  But this is what

14   I can read right now.

15     Q.    Does it appear there are a large number of signs

16   piled on top of each other?

17     A.    Yes.

18     Q.    Is it fair to say there may be other signs

19   underneath the signs that you can see?

20     A.    Oh, there is a lot of signs underneath those.

21     Q.    Now, the sign ordinance that you are relying on

22   to remove the signs, does it make exceptions for any

23   types of signs?

24     A.    No, it doesn't.



WILCOX & FETZER LTD.
Registered Professional Reporters

1    Q.    So political signs were not an exception?

2    A.    No.

3              MR. RHODUNDA:  Let me just have a moment.

4  Be right back.

5              (Recess taken.)

6  BY MR. RHODUNDA:

7    Q.    I just have a couple follow-up questions for you.

8              Has anyone associated with the City singled

9  out Mr. Sokolove's signs for removal?

10    A.    No.

11    Q.    And the removal of signs, is that done year-round

12  or just during summertime?

13    A.    Year-round, yes.

14    Q.    During those efforts to remove signs on a

15  year-round basis, just give me the types of categories of

16  signs that you would be removing.

17    A.    Real estate signs, no campaign signs -- let's

18  see, real estate signs, contractor signs, subcontractor

19  signs, and a rental sign.  Rental signs like private

20  person put up a rental sign on the City property.

21    Q.    You have identified some businesses here as well,

22  auction houses?

23    A.    Yes, auction signs.  What he will do, he will put

24  them on City property and leave them there for two or

104

1  three days.

2              MR. RHODUNDA:  I have no further questions

3                       EXAMINATION

4  BY MR. TUCKER:

5      Q.   Sir, I'm sorry, but your lawyer has raised some

6  issues and I have some more questions for you.  I

7  apologize, but I'm going to have to ask you some more

8  questions.

9              I'm going to show you what has been marked

10  as Defense Exhibit 19 Mr. Rhodunda was just reviewing

11  with you.  I'll ask you to look at that.  Would you agree

12  that that sign depicted in that exhibit is located within

13  landscaping?

14     A.   Mm-hmm.

15     Q.   Now, I'm going to show you Exhibit 2, Tab E from

16  Plaintiffs' Memorandum in Support of Motion For Temporary

17  Restraining Order that I had shown you previously during

18  this deposition.  Do you remember seeing that exhibit

19  maybe a half hour, an hour ago?

20     A.   Yes.

21     Q.   Do you recall the explanation you gave for why

22  you did not remove those signs?

23     A.   They were behind the logs.

24     Q.   The landscaping logs you referred to?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

105

1    A.    The landscaping logs.

2    Q.    Can you explain for us then why on Defendants'

3  Exhibit 19 you removed a sign that was behind or within

4  landscaping, and when it came to Tab E to Exhibit 2 your

5  explanation was that you wouldn't remove that because it

6  was questionable I believe because it was landscaping?

7    A.    Yeah, well, this particular sign was pointed out

8  to me by Mr. Murphy.  We were riding around.  That's why

9  he got a picture of my truck.  But this is -- this sign

10  and particular sign up there is on the other side of the

11  poles, so we picked them up.

12    Q.    Where are the poles that you can see in that

13  picture?

14    A.    Where can I see them in the picture?  I can't.

15  But this is definitely on the -- that would be on City

16  property, because it is on the other side of the

17  sidewalk, for one thing.

18    Q.    Sir, again, Defendants' 19 I don't see the

19  sidewalk.  Can you point me to the sidewalk that's in

20  that picture?

21    A.    Right there.

22    Q.    Is it your testimony that that little strip there

23  is a sidewalk?

24    A.    Yes.



1    Q.   So the rule that you don't take down signs that

2    are within landscaping doesn't apply then if there is a

3    sidewalk as well?

4    A.   Well, see, this is on the other end of this

5    sidewalk.  And we discussed it and he said this is

6    definitely --

7    Q.   When you said "we discussed it," who is "we"?

8    A.   Mr. Murphy.  This is on City property.

9    Q.   So you and Murphy -- I'm sorry, go ahead.

10   A.   We discussed it and we picked it up, said it was

11   on City property.

12   Q.   You had a very specific discussion about that

13   with Mr. Murphy?

14   A.   Right.

15   Q.   And you jointly decided that was on City

16   property?

17   A.   Right, mm-hmm.

18   Q.   That was based on exactly what, for the record?

19   A.   I guess on the sidewalk and the -- we picked up a

20   lot of them.  I don't remember, but I think it was based

21   on -- I don't see any poles there.  It has to be on the

22   sidewalk.  To be honest with you, I don't, I don't see

23   any poles.  But that's the end of the sidewalk there, so

24   it was probably based on that.

1    Q.    You said you picked up a lot of signs.

2    A.    That morning?

3    Q.    Generally, I think you said?

4    A.    Oh, generally.

5    Q.    Is that what you meant when you said you picked

6    up a lot of signs?

7    A.    We picked up about five or six that morning, yes.

8    Q.    Mr. Rhodunda has shown you all these pictures

9    that he has marked Defendants' I think probably 1 through

10   19.  Have you seen this pictures before today?

11   A.    Yes.

12   Q.    When did you first see them?

13   A.    Probably yesterday.

14   Q.    And who did you review them with?  Your

15   attorneys?

16   A.    Yes.

17   Q.    And these marks that you have put on these

18   pictures, 1 through 19, Defendants' 1 through 19, are you

19   absolutely certain beyond any doubt that those are the

20   exact locations that you removed signs?

21   A.    The ones I marked, yes.

22   Q.    Beyond any doubt?

23   A.    Right.

24   Q.    Over ten days later you are certain of that?



Alexander W. Onizuk

108

1    A.    I know exactly where they were.

2    Q.    Did you go back out to the sites and look to

3    confirm?

4    A.    No.

5    Q.    You are relying exclusively on the pictures?

6    A.    On the pictures?

7    Q.    Yes.

8    A.    Yes.

9    Q.    When were Mr. Cooper's three signs picked up?

10   A.    Mr. Cooper's?

11   Q.    Mayor Cooper's?

12   A.    Yeah.  When were they?

13   Q.    Yes, sir.

14   A.    The same day that one was, the 15th.

15   Q.    The same day the one in Defendants' 19 was picked

16   up?

17   A.    Yes, mm-hmm.

18   Q.    So that was after the signs of Mr. Sokolove were

19   first picked up, correct?

20   A.    That's -- yes, after -- that was on the 15th or

21   something like that.

22   Q.    Do you recall if this sign was removed more than

23   once by you?

24   A.    No.  I don't recall.  I think it was only that



**WILCOX & FETZER LTD.**
Registered Professional Reporters

109

1    one time.

2        Q.    Do you recall when you spoke to Mr. Sokolove

3    about the signs that were located in the back of your

4    truck on the 11th?

5        A.    Mm-hmm.

6        Q.    Do you recall what you said to him about losing

7    your job?

8        A.    About losing my job.

9        Q.    Yes.

10       A.    No.

11       Q.    You don't recall ever making a statement to him

12   about fearing for losing your job?

13       A.    No.

14       Q.    You never made that statement?

15       A.    Uh-uh.

16       Q.    You are absolutely certain?

17       A.    Yes.  I asked him if he gets to be mayor, the

18   first thing I want him to do is fire me, but other than

19   that, I didn't -- wasn't worried about my job.  That's

20   the last thing I'm worried about.

21       Q.    Say that again.  I didn't follow that.  What did

22   you say to Mr. Sokolove?

23       A.    I said, "When you get to be mayor, I want the

24   first official thing for you to do, I want you to fire



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Alexander W. Onizuk

110

1   me."

2       Q.   Why did you say that?

3       A.   Joke.

4       Q.   Had you thought you had done something wrong?

5       A.   No.  Well, had I thought I done something wrong?

6   Well, yes, he told me I committed a federal offense.

7       Q.   Okay.  And you thought you should be fired for

8   that if he became mayor?

9       A.   Well, it was a joke.  I wasn't afraid of losing

10   my job.  God, that's the last thing I was worried about.

11       Q.   Do you recall speaking to Detective O'Bier about

12   that statement?

13       A.   No.  Why would I be afraid to lose my job?  I'm

14   retired.

15       Q.   Sir, I'm just asking you why you said it.  You

16   are the one who made the statement.

17       A.   I didn't say -- I did not say that.

18       Q.   Now, is it your testimony that the reason you did

19   not remove the Convention Center sign is because it was a

20   directional sign?

21       A.   Pardon me again?

22       Q.   Mr. Rhodunda asked you about the Convention

23   Center sign, the very large one on Rehoboth Avenue?

24       A.   Yes.



Alexander W. Orliak

111

1    Q.    And I believe he pointed out to you that there

2    was an arrow on it --

3    A.    Yes, there is.

4    Q.    -- and pointed.  Is it because of the arrow that

5    you did not cite that sign or remove that sign?

6    A.    No, because it is City sign, City sign.

7    Q.    Are you aware of another sign that's located in

8    front of the Convention Center which also points to it

9    that's much smaller?

10    A.    Convention Center.

11    Q.    Yes, sir.

12    A.    I'm sure there is.

13    Q.    Mr. Rhodunda was also asking you about signs that

14    were in the back of your pickup truck that were shown on

15    Plaintiffs' Exhibit 9.

16    A.    Mm-hmm.

17    Q.    I believe you testified earlier that some of

18    those signs had been in your truck from a previous date

19    that you had picked up signs?

20    A.    Mm-hmm.

21    Q.    Is that correct?

22    A.    Mm-hmm.

23    Q.    I want to turn to this plot plan that

24    Mr. Rhodunda has provided us, and I think --

Alexander W. Okot

112

1    MR. RHODUNDA:  I think we have one marked

2    already.

3    MR. TUCKER:  No, I was looking for one that

4    was marked.

5    THE WITNESS:  He has got one marked.  Right

6    there.

7    MR. RHODUNDA:  There you go.

8    BY MR. TUCKER:

9    Q.   All right.  I'm going to refer you to Defendants'

10   Number 2.  I'm also going to refer you to Defendants' 4

11   as well.  I'm going to point you to lot 61 on Defendants'

12   2, okay, and I'm going to refer you to the picture which

13   is Defendants' 4 where you put an X where you said you

14   removed a sign.

15   A.   Mm-hmm.

16   Q.   I'm going to ask you, if Mr. Rhodunda doesn't

17   have an objection, to use my pen, which is not green, it

18   is black, and mark on Defendants' 2 where you believe the

19   green X would be that you have marked on Defendants' 4.

20   A.   Well, it is obviously not on the driveway.  This

21   is all driveway here.  So it has got to be in a grassy

22   area.  Around that area somewhere.

23   Q.   Why do you believe it is on public property?

24   A.   Well, it is pretty obvious.  It is on grass area.

113

1    Q.    Sir, if where you put the X on Defendants' 4 was

2    actually private property and not public property, would

3    you have removed that sign in error?

4              MR. RHODUNDA:    If it was private property.

5    Q.    Yes.

6    A.    If it was on private property and I removed it,

7    it would be an error.

8    Q.    Okay.    Now, looking at the plot plan in

9    Defendants' 2, you referred to a private sidewalk in

10   front of our client's restaurant, which is on lot 59,

11   correct?

12   A.    Yes.

13             MR. RHODUNDA:    On a public sidewalk is what

14   he talked about.

15   Q.    Public sidewalk, I stand corrected.

16             Tell me on this plot plan where it indicates

17   that that is a public right-of-way.

18   A.    Well, this is the end of his -- I would say his

19   line, wouldn't you think?

20   Q.    I'm asking you.

21   A.    Right there.    That's the end of his line right

22   there.    His line stops right there.

23   Q.    Is there any notation on that plot plan that you

24   relied upon, that it is a public right-of-way?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

114

1      A.    Any indication?

2      Q.    Yes.

3      A.    You can see where his line ends and this says

4   "Rehoboth Avenue," well this is along Lake Avenue.

5      Q.    Well, I see a dash where it says "Rehoboth

6   Avenue" that I'm pointing to.

7      A.    I mean Rehoboth Avenue is down the street there.

8           MR. RHODUNDA:    That's an arrow.

9      A.    That's an arrow, actually.

10     Q.    Okay.  How do you know for certain that where you

11  put the X on Defendants' 4 is on Rehoboth Avenue and not

12  within the boundary --

13     A.    It is not on Rehoboth Avenue.  It is on Lake

14  Avenue.

15     Q.    Let me finish -- - and is not on Lake Avenue or

16  was on Lake Avenue and not on lot 61?  How do you know

17  that from looking at this plot plan for sure?

18     A.    That was on Lake Avenue and not on Rehoboth

19  Avenue?

20     Q.    No.  How can you know for sure that the location

21  that you put the X on in green on Defendants' Exhibit 4

22  is located on Lake Avenue or on the right-of-way and is

23  not located within the private property known as lot 61?

24     A.    Lot 61, just by looking at this, I would say it



**WILCOX & FETZER LTD.**

Registered Professional Reporters

1   has no grassy area.

2      Q.   Wouldn't you need a survey to know that for sure,

3   sir?

4      A.   Probably.  But I would think this would be

5   adequate.

6      Q.   How can you tell where that property line for lot

7   61 ends without a survey?

8      A.   Well, you know what?  This guy that lives in 63,

9   he said, "Get that sign out of the front of my house."

10      Q.   So you relied on a neighbor to tell you where the

11   boundary was?

12      A.   Well it is on, on the green area too, after the

13   sidewalk.

14      Q.   Okay.  But it is your testimony that you could

15   rely on a plot plan like Defendants' No. 2 and make that

16   determination?

17      A.   Well, I can -- well, no.

18      Q.   Okay.

19      A.   I've determined that just by looking at it right

20   there, that green area.

21      Q.   In fact, you didn't even have Defendants' No. 2

22   when you were out in the field, did you?

23      A.   I didn't have this with me?

24      Q.   Right.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    A.    Of course not.

2    Q.    Okay.

3    A.    You don't carry these around.   I don't -- not

4    very often I get to see these.

5    Q.    Okay.  So is it your testimony that this exhibit

6    helps establish that --

7    A.    Yes.

8    Q.    -- the sign in Defendants' 4 was taken from the

9    right-of-way?

10   A.    I thought it might help us out, yes.

11   Q.    Do you still feel that way?

12   A.    Mm-hmm.

13   Q.    Can you tell me what on this exhibit you are

14   relying on that makes you feel more confident that that

15   sign was removed from public property and not private?

16   A.    Well, I know for a fact just by looking at this,

17   his property line stops right here.   All commercial

18   vehicles -- commercial property stops.   They can build

19   right up to the property line.   And his steps are right

20   there.   It goes all the way down.

21   Q.    Well, sir, there is a sidewalk --

22   A.    There is also an iron pipe right there.

23   Q.    Right.

24   A.    An iron pipe right there that says his...



117

1    Q.    And I see there is a sidewalk shown in front of

2    lot 59, correct?

3    A.    Right.

4    Q.    But there is not in front of 61, correct?

5    A.    No.

6    Q.    So does that mean the sidewalk is within lot 61?

7    A.    The sidewalk is in lot 61?  I would say the

8    sidewalk is in, according to this, is in 59.

9    Q.    So you can't tell from looking at Defendants' 2

10   whether where you put the X is inside lot 61 or not, can

11   you?

12   A.    Well, I would say this says "pavement," hell, I

13   can't put a sign in -- there is no sign in the pavement,

14   is there?  Concrete pavement at that.

15   Q.    I also see a rectangle here.  What is that?

16   A.    What rectangle?

17   Q.    Right here.  What is that?

18   A.    I don't know.  I have no clue.  What is it?

19   Q.    Could that be the strip coming out that you have

20   the X marked on in green?

21   A.    Could be.  But I would doubt it.  Wouldn't you

22   say that would be -- that is on somebody's property

23   there?

24   Q.    I'm asking you.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    A.    Wouldn't you say that's on somebody's property.

2    Q.    I'm asking your opinion, sir.

3    A.    That's on somebody else's property.

4         MR. RHODUNDA:  He has given his answer

5    numerous times.  This property matches up with this

6    because this sidewalk and this sidewalk match up.  You

7    cannot answer that question anymore.

8         MR. TUCKER:  I just asked --

9         THE WITNESS:  You can't beat a dead dog.

10        MR. SPEAKMAN:  You are getting

11   argumentative.

12        MR. TUCKER:  Mr. Speakman, I am not getting

13   argumentative.  I haven't gotten argumentative at all.  I

14   have been asking questions very politely.  Your witness

15   is asking me questions, which is inappropriate.  I've

16   cautioned him probably six times today not to do that.

17   If you didn't want to prep your witness and your witness

18   doesn't want to listen to me, that's not my fault, sir.

19   I'm trying my best to get through this.  But I am not

20   getting argumentative with your witness.

21   Q.    Sir, I'm going to show you Defendants' No. 13

22   that your lawyer marked, Mr. Rhodunda.  You put a big X

23   in green on that one, correct?

24   A.    Yes.



Alexander W. Orndel

119

1      Q.   Is it possible that the sign you removed was not

2  from where you marked the X?

3      A.   It could have been.

4      Q.   But closer?

5      A.   Could have been down there, yes.

6      Q.   Could it have been closer to the sign, the

7  directional sign up here with the arrow, where you buy

8  your parking stickers?

9      A.   Oh, I don't know.

10      Q.   It could have been, though?

11      A.   Yeah.  But I think if it wasn't here it was

12  down -- it's somewhere in that area.  I just wanted to

13  make a point that it was in that part.

14      Q.   Okay.  For the record, I just want to be clear,

15  make sure I understand that you are not 100 percent

16  certain where you have put these X's is exactly where you

17  removed these signs; is that fair?

18      A.   In the front of those houses I was.  But in this,

19  it could have been anywheres in that, around that trash

20  can and that park.

21      Q.   Okay.

22      A.   I put the X because it was around the trash can.

23  That's where the sign was, near that trash can, around

24  that area.

120

1    Q.   Okay.  So when we look at this picture and look

2    at where you put the green X --

3    A.   Yes.

4    Q.   -- it could be exactly there, it could be around

5    there; is that fair?

6    A.   Yes, it could be right in front of that thing,

7    for all I know, you know.

8    Q.   Is it fair you can say that about the other

9    pictures where you put the X's too, it is not exact?

10   A.   Yes, they are exact.

11   Q.   You are certain of that?

12   A.   Yes.

13   Q.   You didn't go out to the site and walk these off,

14   correct?

15   A.   I walked them -- when I picked those signs up, I

16   walked and picked them up.  I didn't go ride along in my

17   truck and picked them up.  I walked that and picked them

18   all up.  I know exactly where they were.  They were right

19   in front of each one of those houses where I put the X.

20           Now, that park is a big park.  In front of

21   somebody's house, you kind of narrowed the area there.

22   Q.   I'm going to show you Defendants' 14 where you

23   have marked X's.

24   A.   Yes.



1       Q.    Absolutely certain that's exactly where those

2    signs were located?

3       A.    One of them was right in there, and the other

4    ones were -- now I said we don't see the other end of

5    this park.  They were at the other end of the park.

6       Q.    Again, those X's are not exact, it is the general

7    vicinity?

8       A.    General vicinity.  Like I said, if we showed a

9    picture of the other end of the park, I can show you.

10   But that doesn't show the other end of the park.

11      Q.    I'm just referring to where you put the X's that

12   your attorney said --

13      A.    I said they are in that area.

14            MR. TUCKER:  Well, I think we are done.

15            (Discussion held off the record.)

16   BY MR. RHODUNDA:

17      Q.    I have three quick follow-ups for you.

18            In regard to where you marked the X on the

19   Gerar Park --

20      A.    Yes.

21            MR. SPEAKMAN:  Identify the photograph

22   number.

23      Q.    Photograph 13, was the sign located on the far

24   side of the sidewalk?



Alexander W. Onizuk

122

1    A.    Far side of the sidewalk.

2    Q.    Are you sure about that?

3    A.    Yes.

4    Q.    And then as far as these signs on Exhibit 14, the

5  large median strip that's landscaped and whatnot, were

6  those signs within that median area?

7    A.    Yes, they were.

8    Q.    And in regard to Defendants' Exhibit 19, there is

9  a telephone pole right here.

10   A.    I couldn't make out for sure, but I thought it

11  was.

12   Q.    If you looked at that telephone pole and looked

13  back --

14   A.    Yes.

15   Q.    -- was that sign in front of the telephone pole?

16   A.    Sure it is.  Way in front of it.

17   Q.    And does this --

18        MR. TUCKER:  Wait, I'm sorry.  Is there a

19  telephone pole in that picture?

20        MR. RHODUNDA:  Yes, right here.  You can see

21  the wires going across the street.

22  BY MR. RHODUNDA:

23   Q.    In addition to the landscaping shown on the

24  exhibit where the signs are behind the landscape screen,

 1    that landscape marker, the signs are behind that?

 2        A.   Along the --

 3             MR. TUCKER:  I'm going to object, only that

 4    Mr. Rhodunda is leading this witness.  If he wants to ask

 5    him a question about what the picture shows, I'm fine

 6    with that.

 7    BY MR. RHODUNDA:

 8        Q.   We have a landscape marker; is that right?

 9        A.   Landscape log.

10        Q.   What is behind the landscape log?

11        A.   The signs, all three signs were behind the

12    landscape log.

13        Q.   What is behind the landscape log?

14        A.   Trees.

15        Q.   What is behind that?

16        A.   It is somebody's house.

17        Q.   Now, in regard to this landscaped area where

18    "Sokolove" sign was removed, is it the same situation as

19    in this picture?

20        A.   No.

21        Q.   Or is it a little island that --

22        A.   They got a little island that is probably on City

23    property.

24        Q.   It extends out into the road; is that right?



124

1      A.    Yes, it does.  We have a lot of those little

2  islands in town that, which we are trying to clear up a

3  little bit at a time.

4              MR. RHODUNDA:  Nothing further.  Thank you.

5              MR. TUCKER:  I have nothing further.

6              (Proceedings conclude at 2:25 p.m.)

7                    I N D E X

8  Deponent:  Alexander W. Onizuk              Page

9  By Mr. Tucker...........................      3

10 By Mr. Rhodunda.........................     84

11 By Mr. Tucker...........................    104

12 By Mr. Rhodunda.........................    121

13                    - - - - -

14                 E X H I B I T S

15 Plaintiffs':                               Page

16  1    Subchapter VI Offenses                 3

    2    Title 18; Section 1621                 3

17  3    Letter dated 7/11/05                   3

    4    Letter dated 7/13/05                   3

18  5    Complaint                              3

    6    City of Rehoboth Report 7/15/05        3

19  7    Zoning Map of City of Rehoboth Beach   3

    8    Initial Crime Report 7/9/05            3

20  9    Photographs                            3

   10    Letter dated 7/12/05                   3

21 11    Diagram                               18

22                    - - - - -

23

24

**W&F**

Defendants':                                           Page

1    1    Photograph                                     85
     2    Plot Plan                                      87
2    3    Photograph                                     87
     4    Photograph                                     89
3    5    Photograph                                     90
     6    Photograph                                     91
4    7    Photograph                                     91
     8    Photograph                                     91
5    9    Photograph                                     93
     10   Photograph                                     93
6    11   Photograph                                     94
     12   Photograph                                     94
7    13   Photograph                                     95
     14   Photograph                                     95
8    15   Photograph                                     96
     16   Photograph                                     97
9    17   Photograph                                     98
     18   Photograph                                     99
     19   Photograph                                     99

- - - - -

DEPOSITION OF: _Alexander W. Onizuk_

DATE TAKEN: _July 25, 2005_

IN THE MATTER OF: _Sokolove v City of Rehoboth Beach, De._

Pursuant to Rule 30(E), this transcript was made available to the witness for examination.

The witness has failed to sign this deposition transcript within the designated 30-day period set forth in rule 30(E).

Therefore, this original transcript is being forwarded as transcribed.

DATED: _9/9/05_

_Barbara Reichert_
Barbara Reichert
Production Manager

1  State of Delaware )
                    )
2  New Castle County )

3

4              CERTIFICATE OF REPORTER

5

6          I, Eleanor J. Schwandt, Registered
   Professional Reporter and Notary Public, do hereby
   certify that there came before me on the 25th day of
7  July, 2005, the deponent herein, ALEXANDER W. ONIZUK, who
   was duly sworn by me and thereafter examined by counsel
8  for the respective parties; that the questions asked of
   said deponent and the answers given were taken down by me
9  in Stenotype notes and thereafter transcribed by use of
   computer-aided transcription and computer printer under
10 my direction.
11         I further certify that the foregoing is a
   true and correct transcript of the testimony given at
12 said examination of said witness.
13         I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
14 interested in the event of this suit.

15

16         _Eleanor J. Schwandt_/sct

17         Eleanor J. Schwandt

18         Certification No. 125-RPR

19         (Expires January 31, 2008)

20

   DATED: 07-25-05

21

22

23

24

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters