Case 1:05-cv-00514-GMS    Document 47-2    Filed 11/08/2005    Page 1 of 18

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2005 JUL 28 PM 5:33

ROBERT SOKOLOVE, ET AL.,         )
                                 )
            Plaintiffs,          )
                                 )
    v.                           )    Civil Action No. 05-514-KAJ
                                 )
CITY OF REHOBOTH BEACH,          )
DELAWARE, ET AL.,                )
                                 )
            Defendants.          )

## MEMORANDUM ORDER

### Introduction

This case challenging a local ordinance on First Amendment grounds is before me on the plaintiffs' request for a preliminary injunction (*See* Docket Item ["D.I."] 1 at 9 and D.I. 2; the "Motion"). The plaintiffs are a candidate for Mayor of the City of Rehoboth Beach, Delaware (the "City" or "Rehoboth"), two candidates for the City Commission, and a political action committee supporting those candidates. The defendants are the City and its appointed Manager. The parties' dispute relates to an election for Mayor and for seats on the City Commission which will take place on August 13, 2005, two weeks from this Saturday; hence, the need for celerity in these proceedings. City employees had removed the plaintiffs' campaign signs[1] from along City streets, prompting the plaintiffs to challenge the constitutionality of City Ordinance

---

[1] For ease of expression, reference to the "plaintiffs" will at times be, as it is in this instance, to the individual plaintiffs, when the discussion is focusing primarily on candidates for public office. The meaning should therefore be clear in context.

**Background**[3]

Robert Sokolove is a candidate for Mayor of Rehoboth City in the upcoming election on August 13, 2005. Two candidates for seats on the City Commission, David McCarthy and William Shields, are running for office in association with Mr. Sokolove's campaign. In preparation for the election, Mr. Sokolove sought information about the lawful placement of campaign signs in the City. The City Manager, Mr. Gregory Ferrese, responding to an inquiry from an attorney working on an unrelated matter, stated that political signs should not be placed on a particular newly renovated street scape but that otherwise such signs could be placed on public rights-of-way in the City. That advice was passed on to Mr. Sokolove, who then, after the July 4th holiday, began placing signs along roadways in the residential areas of Rehoboth.

Sometime in the early morning of July 9, 2005, representatives of the City's Building and Licensing Department removed many of the signs that Mr. Sokolove had placed. One of the plaintiffs' political supporters, Mr. Joseph Hill, became aware of that and of the removed signs being in the custody of the City. "Custody" is perhaps too formal a word, since the signs were merely lying in the back of a City pick-up truck. Mr. Hill made a complaint to the City police department, which was followed by a brief investigation by an Officer Cleveland of that department. According to that officer's

---

[3] The following background information is based upon the plaintiffs' complaint and the record created at the preliminary hearing. This information includes preliminary conclusions but does not constitute final findings of fact. Because an official transcript of the preliminary injunction hearing has not yet been prepared, except for the portion of the hearing in which the parties gave their closing arguments, citations to a transcript are generally not possible, again with the exception of the closing arguments.

Section 74-16 (the "Ordinance"), which prohibits the placement of signs on public property. (D.I. 1 at ¶¶ 15-20, 24-32.)

The Complaint was filed on Thursday, July 21, 2005 (D.I.1), along with a motion for a temporary restraining order (D.I. 2), and a memorandum in support thereof (D.I. 3.). I held an *ex parte* teleconference with plaintiffs' counsel that same day and scheduled the case for a preliminary injunction hearing on Tuesday, July 26, 2005.[2] I also ordered that the parties proceed with limited discovery on an expedited basis. The preliminary injunction hearing took place as scheduled, with both parties calling witnesses and submitting other evidence. Having considered the evidence and the parties' arguments in support of and in opposition to the Motion, I have concluded that the Motion must be denied. The plaintiffs have failed to demonstrate a likelihood of success on the merits of their claim that the Ordinance is unconstitutional on its face, and, while they have sufficiently demonstrated a likelihood of success on their claim that the Ordinance has been arbitrarily and unconstitutionally applied, they have not demonstrated entitlement to the relief they seek, namely an injunction that prevents the City from removing their signs from public property, including public rights-of-way.

---

[2]Efforts to reach the City's solicitor and his co-counsel were initially unsuccessful, but, by the following morning, July 22, 2005, they were informed of the scheduled hearing and my order permitting expedited discovery. To their credit and the credit of all the parties, the expedition necessary to timely address this matter has been facilitated by the willingness of all to conform to the schedule I set.

2

report (PX 5),[4] Mr. Hill stated that the signs should not have been removed and that he had tried unsuccessfully to contact Mr. Ferrese to discuss the matter with him. (*Id.*) Officer Cleveland later spoke with Mr. Ferrese and related the conversation as follows: "he [Mr. Ferrese] advised that the signs should not have been picked up, and he did not know why they had been. ... He advised me to give Hill permission to remove the signs from the back of the vehicle." (*Id.*)

Later that same day, Mr. Sokolove, having recovered the signs, placed them once more at various locations in the City. Late that evening, however, a City employee named Walter Onizuk again removed some of the signs, including a few signs that Mr. Sokolove had allegedly placed on private property. (*See* D.I. 1 at ¶ 14; PX 1; PX 2.) Mr. Sokolove went to Mr. Onizuk and, understandably frustrated, demanded an explanation. According to a report later filed by Officer Keith Banks of the Rehoboth police (DX 1), Mr. Sokolove, who is an attorney as well as a restaurateur, accused Mr. Onizuk of having "committed a Felony federal law by removing the signs." (*Id.* at 3.) Officer Banks noted that Mr. Sokolove had said the same thing to him. (*Id.*) At some point, the plaintiffs also suggested that, by removing the signs, Mr. Onizuk was guilty of theft under state law. (*See id.* at 4; PX 8; PX 9.)

Shortly thereafter, on July 12th, Mr. Sokolove and Officer Banks had a further conversation stemming from the allegations of theft. According to Officer Banks, Mr. Sokolove became argumentative, insisting that he was permitted under the First

---

[4]Citations to "PX __" are to exhibits submitted by the plaintiffs during the preliminary injunction hearing. Similarly, citations to "DX __" are to the defendants' exhibits.

4

Amendment to put his signs anywhere and that the city's property rights ended at the edge of the street, as opposed to including rights of way over the curb, the sidewalks, and grassy areas between the curbs and sidewalks. (*Id.*) Officer Banks advised Mr. Sokolove later that day that no further investigation of the theft charges would be made, that he had learned that the state attorney general's office would not prosecute that charge, and that, from the police department's perspective, the case was effectively closed. (*Id.*)

The plaintiffs also pursued relief through civil litigation. They retained counsel who promptly sent letters demanding an explanation for the City's removal of the signs and threatening "civil and criminal liability against the perpetrators." (PX 8 at 1; *see also* PX 9.) Someone from the City communicated to the plaintiffs that the City was relying on City Ordinance Section 74-16, as the basis for removing the signs. That Ordinance reads in its entirety: "No person shall keep, maintain or post any private advertisement, poster or sign upon or on any beach or strand or public boardwalk, park, sidewalk, street or other public property or way within the limits of the city." The plaintiffs rejected the City's position, asserting that the Ordinance is unconstitutional on its face. (*See* PX 9 at 1.)

Perhaps because of the fast-approaching election day, or the failure of the principals to actually speak to each other,[5] or the remarkably rapid rise in the temperature of the rhetoric thrown about by those involved in the dispute, no resolution

---

[5] Mr. Ferrese claimed that he was available and willing to speak to Mr. Sokolove but that no one contacted him. Mr. Sokolove contended that Mr. Ferrese had not been available when he and his representatives tried to reach him.

5

of the sign placement issue was seriously discussed before this suit was filed. Instead, as promised in their second letter to the City (PX 9 at 3), the plaintiffs proceeded to court.

At the preliminary injunction hearing, Mr. Sokolove and his counsel emphasized that the plaintiffs are facing a long-time incumbent and that it is critical for plaintiffs to be able to increase their name recognition through appropriately placed political signs. The plaintiffs complain that the Ordinance is unconstitutional because it discriminates based on content and it is not narrowly tailored to meet appropriate ends. In addition, they argue that the Ordinance has been selectively enforced against them and that its enforcement in general has been arbitrary and capricious. The defendants, naturally, argue the contrary on all points.

**Standard of Review**

It is within my discretion to grant preliminary injunctive relief, but "an injunction is an extraordinary remedy, which should be granted only in limited circumstances." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002) (internal quotation marks and citation omitted). The standard for judging a request for a preliminary injunction is straightforward and acknowledged by both parties (D.I. 3 at 3; D.I. 12 at 1):

> In exercising its discretion, the District Court must be convinced that the following factors favor granting preliminary relief: (1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest.

*Id.*

**Discussion**

A. <u>Facial Invalidity</u>

The plaintiffs rightly observe, and the defendants do not deny, that this case implicates one of the most cherished rights under our Constitution, the right to free speech, safeguarded by the First Amendment.[6] It is a commonplace of constitutional law, however, that First Amendment rights are not absolute. "[E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The plaintiffs' attacks on the Ordinance and on the City's action under it begin with the assertion that the Ordinance is not content-neutral and that it must therefore be judged by a much stricter standard than the "reasonable restrictions on time, place, or manner" standard that is otherwise applicable. They further assert that the Ordinance is not narrowly tailored to serve a compelling government interest.[7]

---

[6]The First Amendment to the United States Constitution provides that "Congress shall make no law ... abridging the freedom of speech ... ." Signs are "a form of expression protected by the Free Speech Clause ... ." *City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994). Through the Fourteenth Amendment, the First Amendment's strictures on government authority are made applicable to local authorities. *See Lovell v. City of Griffin*, 303 U.S. 444, 450 (1938) ("Freedom of speech and freedom of the press, which are protected by the First Amendment from infringement by Congress, are among the fundamental personal rights and liberties which are protected by the Fourteenth Amendment from invasion by state action.").

[7]For obvious reasons, the plaintiffs assert that the City's interests must be "compelling" to justify the challenged regulation. (D.I. 3 at 7.) The defendants, on the

7

As to the first argument on facial invalidity, the plaintiffs assert that "[t]he Ordinance is content based, as it differentiates between speakers and permits one party's views to be expressed at the expense of another's. Specifically, the Ordinance precludes 'private' advertisements, posters or signs on public property or rights of way within the City while implicitly permitting public – i.e., governmental – advertisements, posters and signs." (D.I. 3 at 4.) The example they give of favored speech is a City welcome sign with a motto. (*Id.* at 4-5.) The defendants counter that the Ordinance is actually content-neutral, that it bans all signs on public property except for those erected by the government, and that the plaintiffs have cited no case supporting the proposition that permitting government signs and prohibiting all others is content based discrimination. (D.I. 12 at 4.)

Interestingly, both sides say that the opinion of the United States Court of Appeals for the Third Circuit in *Rappa v. New Castle County*, 18 F.3d 1043 (1994), supports their position. In *Rappa*, a challenger for the Democratic Party's nomination for Delaware's seat in the United States House of Representatives placed signs along several roadways only to have them removed by government officials as violating state, county, and city laws and ordinances. *Id.* at 1047. The district court granted partial summary judgment for the plaintiff, holding that those laws and ordinances were facially unconstitutional because they permitted a variety of commercial signs and non-political signs while not permitting political signs. *Id.* The Third Circuit upheld the district court's

---

other hand, argue that the lower threshold of "significant interest" is the appropriate test for justifying the regulation. Which quality of interest is the appropriate test depends upon the answer to the basic question of whether the Ordinance is a content-based or content-neutral regulation.

8

ruling, although on a different analytical basis. *Id.* The Third Circuit held that the laws and ordinances at issue were content-based because they discriminated among the types of speech permitted, that such content-based discrimination is permissible in certain narrow circumstances, and that the regulatory schemes at issue failed to fit within those narrow circumstances. *Id.* From the perspective of the plaintiffs in the case at bar, *Rappa* supports their position because, although it applies something less than the strict scrutiny typically applied in cases involving content-based regulation of speech, it nevertheless shows that, if some signs are permitted while others are not, then that must be viewed as content-based regulation. (Tr. at 10 (plaintiffs' counsel arguing, "if you are going to look at this as content-based as we think you should, at the very least the *Rappa* test applies").)[8] The defendants' counter-argument is that *Rappa* allows the type of distinction made in the Ordinance between government and private signs. (*See* D.I. 12 at 5-6.)

It seems that both sides have made this issue more difficult than it needs to be. "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791. That principal inquiry requires me to focus on the City's purpose in

---

[8] Citations to "Tr. at __" are to the transcript of the closing arguments at the July 26th preliminary injunction hearing.

9

establishing the Ordinance. *See id.* ("The government's purpose is the controlling consideration.").[9]

The plaintiffs have offered no evidence to contradict the defendants' assertion that the purpose of the Ordinance is the City's legitimate and substantial interests in traffic safety and community aesthetics. (*See* D.I. 12 at 6.) Nor do they contend that the Ordinance fails to serve those interests. Instead, apparently conceding the accuracy of the defendants' assertion about the City's intent, the plaintiffs argue that such interests are not pertinent since the very fact that the City is not under the same ban as private parties is, in and of itself, enough to make the Ordinance content-based. (*See* Tr. at 4-5 (plaintiffs' counsel distinguishing the facts in *Members of the City*

---

[9]Recently, the Eleventh Circuit stated that the Supreme Court has "receded" from the analysis set forth in *Ward*. *Solantic, LLC v. City of Neptune*, 410 F.3d 1250, 1259 n.8 (11th Cir. 2005). However, I do not believe that assertion is supported. The circuit court's basis for indicating that *Ward* is no longer good law regarding where to begin the analysis of content-neutrality is apparently language from the Supreme Court's analysis in *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993), in which the high court emphasized its rejection of the argument that "discriminatory ... treatment is suspect under the First Amendment only when the legislature intends to suppress certain ideas." *Id.* at 429 (internal quotation marks omitted; quoted in *City of Neptune Beach*, 410 F.3d at 1259 n.8). But to say that intent is not the "only" issue is not inconsistent with saying that intent is the "principal" and perhaps controlling issue. Indeed, in the later Supreme Court decision in *Hill v. Colorado*, 530 U.S. 703 (2000), an admittedly controversial opinion but one in which six justices joined, the Court stated, "we have repeatedly explained [that] government regulation of expressive activity is 'content neutral' if it is justified without reference to the content of regulated speech." *Id.* at 720. That implies that the government's justification, in other words its expressed intent, is still the starting point for analyzing content-neutrality. Thus, while "illicit governmental motivation is not an element of a prima facie case under the First Amendment[,]" *Rappa*, 18 F.3d at 1062, government motivation is the appropriate starting point for a content-neutrality inquiry. *See* Rodney A. Smolla, Smolla and Nimmer on Freedom of Speech § 3.2 at 3-5 (2003) ("At bottom, the distinction between content-based and content-neutral regulation of speech may be distilled into an inquiry into the justifications advanced for the law.").

10

*Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 787 (1984), arguing, "the statute at issue in the *Vincent* case prohibited across the board anyone, including the government, from erecting signs on the public right-of-way.").) But that alone does not show any intent or purpose to discriminate against any type of speech. It seems much more logical to view that as an exception allowing the government to erect signs which are part of the ordinary exercise of the government's police powers, such as traffic safety and directional signs.

The Third Circuit's decision in *Frumer v. Cheltenham Township*, 709 F.2d 874 (1983), is instructive in this regard. In that case, a candidate in a primary election challenged the constitutionality of a township ordinance forbidding the affixing of any temporary signs on utility or street poles within public rights-of-way. *Id.* at 875. The Court held that "[t]he ordinance is certainly facially content-neutral since it does not discriminate among the types of speech or the content of the messages which might be found on temporary signs." *Id.* at 877. Significantly, the ordinance only forbade temporary signs, the implication being that permanent signs of the type which local governments regularly affix to street poles, e.g., signs designating street names, stop signs, walk/don't walk messages, were perfectly acceptable. In that context, the Third Circuit considered the ordinance to be "certainly facially neutral." *Id.; cf. Taxpayers for Vincent*, 466 U.S. at 816 ("Any constitutionally mandated exception to the City's total prohibition against *temporary* signs on public property would necessarily rest on a judicial determination that the City's traffic control and safety interests had little or no applicability within the excepted category, and that the City's interests in esthetics are

11

not sufficiently important to justify the prohibition in that category." (emphasis added)).

Viewing the Ordinance in the present controversy as simply providing a sensible allowance for the government to erect signs consistent with its police powers, it appears to be, like the ordinances in *Frumer* and *Taxpayers for Vincent*, content-neutral. Accordingly, neither the standard of review set forth in *Rappa* for content-based speech regulation in particular circumstances, nor the strict scrutiny more generally required in cases of content-based regulations, are applicable.[10] The case is a straightforward one of content-neutral restrictions on the time, place, and manner of expression. *Cf. City of*

---

[10] I recognize that *Rappa* may be read more broadly to require a finding of content discrimination if any signs, including government posted directional signs, are exempted from a ban on signage. See *Rappa*, 18 F.3d at 1054 (statute that "distinguishes between, and allows the posting of certain signs based on subject matter the sign conveys (for example 'for sale' signs and directional signs) ... [is] content-based."). But *Rappa* also directs a more nuanced inquiry than that flat statement indicates. See *id.* at 1062 ("[W]e indicated that the laws at issue here looked as if they plainly involved content discrimination. After all, they each exempted some signs from regulation based on the content of those signs. Yet ... whether the laws are content-based is more difficult than it initially appeared to us.") In light of other precedent from the Third Circuit, such as *Frumer*, and from the Supreme Court, such as *Taxpayers for Vincent*, which upheld ordinances that banned only temporary signs, and thus impliedly exempted permanent signs of the types typically erected by local governments for traffic safety or direction, I believe the better reading of *Rappa* allows for the Ordinance here to be viewed as content-neutral. Even if that were not the case, however, I would still hold that, under the higher degree of scrutiny called for by *Rappa*, the Ordinance would survive the plaintiff's effort to show, on the present record, a likelihood that it is facially invalid. The *Rappa* test states that, "when there is a significant relationship between the content of particular speech and a specific location, the state can exempt speech having that content from a general ban so long as the exemption is substantially related to serving an interest that is at least as important as that served by the ban." *Id.* at 1066. The burden is on the plaintiffs at this stage to demonstrate a likelihood of showing that the Ordinance does not meet that test. The ordinance as written, by directing itself to private signage and not specifying government signage, appears to imply nothing more than an exception for government signage associated with traditional police powers, e.g., simple directional and warning signs.

*Ladue*, 512 U.S. at 48 ("While signs are a form of expression ..., they pose distinctive problems that are subject to municipalities' police powers.")

I next turn to the question of whether the Ordinance is "narrowly tailored to serve a significant governmental interest ... ." *Ward*, 491 U.S. at 791. Though the issues embedded in that question received scant attention from the parties (see D.I. 3 at 7 (one paragraph asserting the Ordinance is not narrowly tailored)), the totality of the ban set forth in the Ordinance is the feature that has given me more pause than any other aspect of the regulation. The quality of the traffic safety and aesthetic concerns of the City is not at issue. While perhaps insufficient to qualify as "compelling" interests, such concerns are generally accepted as significant government interests. *See, e.g., Taxpayers for Vincent*, 466 U.S. at 817 ("findings of the District Court provide no basis for questioning the substantiality of the esthetic interest at stake"); *Whitton v. City of Gladstone*, 54 F.3d 1400, 1408 (8th Cir. 1995) ("a municipality's asserted interests in traffic safety and aesthetics, while significant, have never been held to be compelling"); *Frumer*, 709 F.2d at 877 ("Plaintiffs challenge ... [the] conclusion that the ordinance serves significant governmental interests in traffic safety and community aesthetics. ... [However], the legislative judgment that such goals are advanced by an ordinance is deferred to unless it is facially unreasonable."). The question then is whether a total ban on signs, including political signs, on all public property in the City can be said to be "narrowly tailored," and it is a truly troubling question. *Cf. City of Ladue*, 512 U.S. at 55 ("Our prior decisions have voiced particular concern with laws that foreclose an entire

13

medium of expression."); *Rappa*, 18 F.3d at 1080 (statute that "sweeps broadly and indiscriminately" cannot be viewed as narrowly tailored) (Alito, J., concurring).

At this preliminary stage, however, I must be mindful that it is the plaintiffs' burden to demonstrate that the regulation is not appropriately tailored for the stated end. It may well be that Rehoboth, a relatively small community of 1,300 registered voters, cannot vindicate its legitimate interests in traffic safety and community aesthetics without a total ban on private signs on public property. On the present record, I cannot making a holding to the contrary.[11] In short, the plaintiffs have failed to show a likelihood of success in challenging the Ordinance as facially unconstitutional, although factual findings on a more complete record may lead to a different result.

## B. Invalidity in Application

The plaintiffs' efforts have been a great deal more successful in showing that the City has applied the Ordinance in an arbitrary and therefore unconstitutional manner. Indeed, the evidence at this stage is overwhelming that the City has not applied the Ordinance according to its terms.[12] It is unrebutted that the City sometimes allows

---

[11] Similarly, the parties' barely mentioned the issue of alternative channels of communication. As with other decisions by the parties on what is fairly at issue and how to use the time available in court on short notice, I do not fault the parties for not addressing the question. However, the record now is what it is, and, in light of the accessibility of private property for the posting of signs, and given the availability of other forms of campaigning, such as direct mail, newspapers, and door-to-door canvassing, I cannot say on the present record that there are inadequate alternative channels for communication.

[12] Among the items of evidence offered by the defendants at the hearing were affidavits of current City Commissioners and a City resident about past practices regarding the placement of campaign signs. (*See* D.I. 12.) The plaintiffs objected to those affidavits on hearsay grounds and I reserved decision on their objection. While it is somewhat troubling that the plaintiffs, who themselves offered testimony and other

14

political signs on public rights-of-way. Mr. Ferrese testified that the City "tries to be lenient" and uses a "rule of thumb" in deciding whether to enforce the ban on signs. That loose approach is consistent with the conflicting statements apparently made by Mr. Ferrese in the course of the events leading to this lawsuit. He gave some indication before the plaintiffs' signs went up that only a newly landscaped portion of a particular road would be off limits to campaign signs, and he told the first Rehoboth police officer who questioned him about the plaintiffs' signs that those signs should not have been taken down. Nevertheless, the City took them down a second time, after they had been replaced by the plaintiffs.

How far back from the road a sign must be before the City will accept it as appropriately placed, which side of the sidewalk a sign can be placed on, whether signs must be behind an imaginary boundary marked by the line of utility poles when there is no sidewalk, whether landscaping ties are a permissible boundary for determining the placement of signs, whether signs for other non-profit organizations, like the community arts league, are permissible – all these questions are, it seems, answered by unwritten "rules of thumb" that only the City's cognoscenti know. That may be a satisfactory way of doing business as long as no one objects. But it is not a constitutionally valid way of

---

evidence that was clearly objectionable on hearsay grounds (see PX 3 (newspaper article)), thought it necessary to try to keep the affidavit testimony out of the record, despite their having had a head start in preparing for the hearing, I am compelled to agree that the affidavits are inadmissible hearsay under Federal Rule of Evidence 801 and that no exception for their admission has been advanced by the defendants. I therefore have not considered them in reaching my decision on the present Motion. In any event, the evidence regarding current practice, let alone historical practice, is sufficient to support the plaintiffs' showing a likelihood of success in establishing that there has been arbitrary enforcement.

15

doing business, *cf. Secretary of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 964 n.12 (1984) ("By placing discretion in the hands of an official to grant or deny a license, ... a statute creates a threat of censorship that by its very existence chills free speech."), and the day that someone would object should have been foreseen.

C. Requested Relief

The plaintiffs have succeeded in showing that they are likely to succeed on the merits of their claim that the Ordinance has been unconstitutionally applied. (*See* D.I. 1 at ¶ 27(d).) That does not mean, however, that they are entitled to the relief they seek. The plaintiffs' motion for a temporary restraining order (D.I. 2), which became the basis for the preliminary injunction hearing, asks for an order "enjoining defendants ... from removing plaintiffs' campaign signs from private property or public property or rights-of-way located within the City." It is undisputed that the defendants are not entitled under the Ordinance to remove the plaintiffs' campaign signs from private property, and the defendants have disclaimed any desire to do so. That point is simply not in issue.[13] What is fairly at issue is whether the plaintiffs are entitled to an order preventing the defendants from removing plaintiffs' signs from public property. They are not.

By asking that the defendants be enjoined from removing their signs from public property, the plaintiffs are in effect asking that I enjoin enforcement of the Ordinance itself, as if it were invalid. That is not an appropriate remedy because the plaintiffs have failed to demonstrate a likelihood of success on the claim that the Ordinance itself, as

---

[13]The evidence is inconclusive on whether the defendants had ever removed plaintiffs' signs from private property, but, even if they had, the evidence persuades me that it was a *de minimis* and good faith mistake.

16

opposed to its manner of enforcement, is invalid. In other words, because the plaintiffs have not shown a likelihood that they will succeed on the merits of their claim that all enforcement of the Ordinance should be enjoined, they have failed to establish a necessary element of their specific claim for preliminary injunctive relief. I must therefore deny the Motion.[14]

*signature*
UNITED STATES DISTRICT JUDGE

July 28, 2005
Wilmington, Delaware

---

[14] As I mentioned to the parties at the close of the preliminary injunction hearing, the parties ought to be speaking to each other in an effort to appropriately maximize the opportunity for the voters of Rehoboth to be advised of the candidacies of those running in the August 13th election, including the plaintiffs. While preliminary injunctive relief has not been granted, I hope that hearing one another in court and reading this Order will be of some assistance to the parties in setting aside any rancor associated with litigation, so that their shared interest in benefitting the City and its residents will predominate and they can cooperate in facilitating a fair election.

17