*Exhibit "A"*

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1176541 (D.N.J.)
(Cite as: 2000 WL 1176541 (D.N.J.))

**H**
Only the Westlaw citation is currently available.

United States District Court, D. New Jersey.
THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, Plaintiff,
v.
John J. MASSARO, Defendant.
**No. CIV. A. 97-2022.**

Aug. 11, 2000.

Reid L. Ashinoff, Esq., Michael H. Barr, Esq., Michael A. Schlanger, Esq., John L. Grossbart, Esq., Gary Meyeroff, Esq., Sonnenschein, Nath & Rosenthal, New York, NY, Alan E. Kraus, Esq., Riker, Danzig, Scherer, Hyland & Perretti, Morristown, for Plaintiff.

Fred J. Gross, Esq., Mt. Ephraim, for Defendant.

OPINION

WOLIN, District J.

*1 This matter is opened before the Court upon the motions of plaintiff, Prudential Insurance Company of America for summary judgment on counts one and two of its complaint, and for the entry of a permanent injunction against defendant John J. Massaro, and the motion of Massaro for summary judgment striking Prudential's equitable claims against him. Massaro has also moved for disqualification of Prudential's attorneys and to deem admitted certain requests for admissions he propounded to Prudential. The motions have been decided upon the written submissions of the parties pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, Prudential's motion for summary judgment will be granted and Massaro will be permanently enjoined. Massaro's motions to strike Prudential's equitable claims and to disqualify Prudential's attorneys will be denied. Massaro's motion to deem admitted certain requests for admissions will also be denied, without prejudice.

BACKGROUND

The Court's task is lightened by the fact that the factual substance of the allegations and counter-allegations surrounding defendant Massaro have been addressed in several opinions by various judges and other officials of this Court. Familiarity with the background facts and prior findings will be presumed. The Court cannot flatter itself that this is the end. It may be hoped, however, that we have outlived Churchill's admonition, *cf. In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 169 F.R.D. 598, 612 (D.N.J.1997), and arrived at the beginning of the end of this long-suffering controversy, at least with respect to Massaro.

As is well known, Massaro was an in-house attorney employed by the legal department of plaintiff Prudential. Prudential alleges that Massaro violated the attorney-client privilege and breached his duty to protect confidential information he received in the course of his employment with Prudential. Prudential's complaint seeks an injunction of further breaches of confidence and damages.

The Court is further aided by the fact that the principle facts are not disputed between the parties. Except as noted, the factual points in the following discussion are set forth in plaintiff's Rule 56.1 statement of undisputed facts and not contradicted by defendant, or are otherwise of record in this matter.

Massaro is an experienced attorney, having been admitted first to the Virginia bar in 1972. He worked at Prudential from 1986 to 1988, and from 1992 until he was terminated in connection with the instant dispute in 1997. In the mid-1990's Massaro was involved with the defense of a large number of lawsuits in Florida arising out of allegations against Prudential of fraudulent sales practices. He was also involved with the matter of *Martin v. Prudential,* a wrongful discharge case. Plaintiff's attorney in the *Martin* matter was J. Bruce Miller and Miller was lead and liaison counsel to a group of Prudential sales agents suing the company for wrongful discharge and retaliation. Massaro disputes Prudential's characterization of him as "principally responsible" for defending these lawsuits. However, there is no dispute that Massaro was aware of them and of Miller.

*2 Massaro was also aware of a memo or memos written in 1992 by another Prudential in-house attorney, James Helfrich (the "Helfrich Memo"). The Helfrich Memo identified increasing complaints over fraudulent sales practices in connection with financed insurance products as a source of potential legal exposure for Prudential. Elsewhere, this Court has found that the Helfrich Memo was an important piece of evidence against Prudential, because it established a date by which senior Prudential management must have been aware of the fraudulent practices of its sales personnel. Slip op. of Jan 29, 1997. Prior to the events at issue, Helfrich left Prudential and brought suit against Prudential for wrongful discharge.

Massaro expressed his concern within Prudential that the company had improperly failed to turn over the Helfrich Memo to the Multi-State Task Force investigating Prudential's sales practices, and to the Florida Department of Insurance and Attorney General. The Florida officials had promulgated investigatory subpoenas to which Massaro believed the Helfrich memo was responsive. Further, Massaro was "disappointed and bothered" by Prudential's settlement of Helfrich's lawsuit. Massaro claims now that he perceived the settlement as out of proportion to the allegations made in the case and an attempt to buy Helfrich's silence.

Lastly, Massaro witnessed the now-famous, supposed destruction of documents by Michael Barr, Esq., outside counsel to Prudential. Massaro brought the apparent document destruction to the attention of his superior, Deborah Belle-Monaco, at Prudential. Belle-Monaco investigated and reported back to Massaro that Barr had only been shredding redundant copies of documents, and that nothing improper had occurred.

Whatever his motivation, it is apparent that Massaro was not satisfied to leave matters as they stood. He began to consult with a series of attorneys. After the first of these attorneys declined the representation, Massaro's search for counsel, regrettably, focused upon attorneys actively representing parties adverse to Prudential in the sales practices litigation. Two such attorneys refused to represent him, perhaps due to the flagrant conflict of interest. Attorney Miller, when approached, accepted the retention.

In December 1996, having taken a leave of absence from the company, Massaro sent an e-mail to Belle-Monaco stating that if Prudential did not report the document shredding incident to the Florida authorities, he would consider it his ethical responsibility to do so. Richard E. Meade, Associate General Counsel for Prudential, responded with a strongly worded letter that such an act would be wrongful and that Prudential and its outside counsel would defend their reputations vigorously should Massaro take such a step.

On December 23, 1996, Massaro gave a sworn statement to a Florida Assistant Attorney General. Attorney Miller was present as Massaro's counsel. This statement, in the nature of a deposition, was both transcribed and tape recorded. There is no genuine dispute that in his testimony Massaro disclosed to the Assistant Attorney General:
  *3 a. the existence and amount of the Helfrich settlement;
  b. communications from Massaro to other attorneys at Prudential regarding the production of the Helfrich memo to the Multi-State Task Force and Massaro's concerns over whether the Helfrich memo was responsive to the Florida regulators' investigatory subpoena;
  c. concerns expressed by Prudential executives about the fairness of the remediation plan negotiated with the Multi-State Task Force;
  d. internal Prudential communications regarding the Barr document shredding incident;
  e. document collection efforts by Prudential and its outside counsel to respond to the Florida subpoenas; and
  f. Prudential litigation strategy with respect to whistle blower suits.
In addition, Prudential claims that Massaro discussed its trial strategy in an arbitration known as *Ward & Cognett v. Prudential*. More precisely, however, the transcript shows that Massaro revealed his own communications to other Prudential attorneys regarding the negative evidentiary impact of a video tape prepared for training Prudential employees, known as "Compliance 101." Massaro contends and Prudential has not contested for the purposes of this motion, that the "Compliance 101" videotape actually instructs salesmen on how to avoid legal compliance obligations without detection.

Immediately after the sworn statement was completed, Miller and Massaro met with a reporter from the Los Angeles Times, Scot Paltrow. Prudential claims that Paltrow interviewed Massaro about his testimony before the Assistant Attorney General. Massaro says that they had a "discussion," but that no privileged or confidential information was disclosed. The Court notes, however, that this does not directly contradict Prudential's version of the meeting, because Massaro also claims that no privileged or confidential information was disclosed by Massaro in his testimony to the regulators either.

Miller gave Paltrow the tape recording of the sworn statement. Massaro maintains that Miller did so without Massaro's approval or authorization. Paltrow wrote an article about Massaro's disclosures. Paltrow confirmed the accuracy of the

article with Massaro by reading it aloud to him over the telephone before the article was published.

Later in December 1996, Massaro filed an affidavit in this Court setting forth many of the issues that were the subject of the sworn statement in Florida. These issues included the Barr shredding incident and the production of the Helfrich memo. By Order dated January 14, 1997, this Court appointed a Special Master, Justin P. Walder, Esquire, to investigate the matter. [FN1] In the course of a deposition of Massaro by the Special Master, Massaro produced notes that Prudential contends contained privileged information. The Special Master gave the notes back to Massaro and to Miller so that they could redact privileged communications between each other. Prudential contends that the production of the notes constituted a violation of its confidential and privileged information with respect to both the Special Master and Miller.

> FN1. The Court declined the parties' invitation to investigate the Helfrich settlement, however. The Special Master was empowered to depose Barr, certain other Prudential legal personnel and Massaro.

*4 On January 24, 1997, the Special Master made his report, which was adopted by this Court. The Special Master's investigation disclosed that the version of the Barr shredding incident originally relayed to Massaro by Belle-Monaco had been essentially accurate. There was no wrongful destruction of documents; the shredded documents were meaningless duplicates. The Special Master found that the Helfrich memorandum had been timely produced pursuant to the Florida subpoenas.

As to the Multi-State Task Force, the Special Master found that the only request to which the memorandum would have been responsive came from the New Jersey Department of Insurance, in the spring of 1996. Prudential's production of the memorandum in July 1996 was untimely, the Special Master found, and it affected the conclusions of the Multi-State Task Force's report. However, while the Court found Prudential's actions in this regard and with regard to the Barr shredding incident "insensitive," the Court did not find that any law or legal rule was violated nor did it levy a sanction.

Still prior to the filing of the instant complaint, Prudential moved in January 1997 to disqualify attorney Miller as lead and liaison counsel to the former Prudential sales agents. Then-Magistrate Judge Joel Pisano recommended that Miller be disqualified. Judge William Walls of this Court adopted Magistrate Pisano's report and recommendation, in part based upon the fact that Miller had access to Prudential's confidential and privileged information by virtue of his representation of its former attorney, Massaro. Judge Walls expressly rejected Miller's claim that any disclosures he might gain from Massaro were excepted from the attorney-client privilege by the crime-fraud exception.

In March 1997, an individual litigant who had opted-out of the class action attempted to gain access to Prudential documents collected by the Florida Attorney General's Office under Florida's public records law. Prudential argued that the documents contained privileged information and that they were either stolen or contained information divulged to regulators without Prudential's consent. The Florida court rejected this contention and ordered that the documents be turned over, based in part on its finding that the state officials had not participated in any wrongdoing in obtaining the documents. *Hill v. Prudential Ins. Co. of Am.*, 701 So.2d 1218, 1220 (Fla.App.1997), *review denied*, 717 So.2d 536 (Fla.1998).

In April 1997, Prudential filed its complaint and order to show cause in this matter. This Court referred the application to Judge Pisano, and Massaro consented to being temporarily restrained from disclosing any confidences of Prudential. The temporary restraints were converted by consent to a preliminary injunction in May 1997. Yet another attorney retained by Massaro also represented claimants adverse to Prudential, and the Court disqualified this attorney and enjoined Massaro from retaining any other attorney with a similar conflict of interest.

DISCUSSION

*5 Prudential seeks summary judgment on counts one and two of its complaint. Count one alleges breach of duty by Massaro in disclosing Prudential's confidential informations and information subject to Prudential's attorney-client privileged. In addition, Prudential moves for a permanent injunction against any further improper disclosures by Massaro.

Indeed, summary judgment on count one is a logical necessity before the Court may consider granting the motion for a permanent injunction. The Court may not grant a permanent injunction without a plenary finding, whether as a matter of law or after trial, that the applicant has succeeded on the merits of its claim. *Harlem Wizards Entertainment Basketball, Inc. v. NBA Props., Inc.*, 952 F.Supp. 1084, 1091 (D.N.J.1997). As disclosed in Prudential's papers, the only issue apparently reserved is what damages, if any, may be available to the company arising out of the alleged breach by Massaro. Moreover, the arguments of both sides make clear that the ultimate issue in this case has been joined and this Court must determine whether Prudential's claim against Massaro may be determined as a matter of

·

law.

The primary thrust of Massaro's cross-motion is to assert that Prudential's prayer for equitable relief should be struck on the doctrine of unclean hands. This portion of the cross-motion also goes to the heart of the case, and it should have been briefed with Massaro's opposition to Prudential's motion. Counsel has made this issue the principal subject of Massaro's separate moving brief. This constitutes an unauthorized departure from the Rules of Court in that Massaro's submissions on this subject far exceed the prescribed page limitations. In any event, the Court will treat Prudential's motion and this portion of Massaro's cross-motion as a single set of cross-motions for summary judgment.

Neither side has expended effort on the pros and cons of count two of Prudential's complaint, which seeks a declaration that Prudential's termination of Massaro was proper. Although the natural inference is that the termination was proper if Massaro breached his duty to his employer, that is not the only possible outcome. Notwithstanding this fact, Prudential's notice of motion made clear that it sought judgment on count two as well. Massaro has raised no argument in opposition that is not also addressed to the merits of the breach of duty issue. The Court will assume, therefore, that the natural inference is also the correct one and that a grant of summary judgment on count one will permit a grant of summary judgment on the propriety of Prudential's discharge of Massaro as well.

The Court will dispose of Massaro's cross-motion to deem admitted his requests to admit, and his motion to disqualify Prudential's attorneys, following the discussion of the primary motion and cross-motion. These issues are not properly raised as a cross-motion, because they are not related to Prudential's initial motion. To the extent the motion to deem admissions is relevant to the main motions, it would also have been subject to the page limitation mentioned above. In the interest of efficiency, however, the Court will overlook these violations of the Rules of Court and address all of the motions in a single opinion.

1. The Summary Judgment Standard

*6 The standard for deciding a motion for summary judgment has been stated many times by this Court and will be addressed only briefly here. Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see Hersh v. Allen Prods. Co., 789 F.2d 230, 232 (3d Cir.1986).

The non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). When the non-moving party's evidence in opposition to a properly-supported motion for summary judgment is merely "colorable" or "not significantly probative," the Court may grant summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1983). The Court "must view the evidence presented through the prism of the substantive evidentiary burden," here the preponderance of the evidence standard, and determine whether a rational finder of fact applying that standard could find for the non-movant. Id. at 254.

Whether a fact is "material" is determined by the substantive law defining the claims. Id. at 248; United States v. 225 Cartons, 871 F.2d 409, 419 (3d Cir.1989). Of course, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. Moreover, in making this determination, a court must draw all reasonable inferences in favor of the non-movant. Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n. 2 (3d Cir.1983), cert. dismissed, 465 U.S. 1091 (1984). On the other hand, the non-movant may not "rest upon mere allegations, general denials, or ... vague statements." Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir.), cert. denied, 520 U.S. 940 (1991); Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir.1990) ("unsupported allegations in [a nonmovant's] memorandum and pleadings are insufficient to repel summary judgment"); see Fed.R.Civ.P. 56(e).

2. The Duty of Confidentiality and the Attorney-client Privilege.

The attorney client privilege is fundamental to the day-to-day practice of law. No lawyer is without a thorough understanding of its importance, its purpose and the basic parameters of the privilege. These bear review here, however, as the arguments of counsel imply that this time-honored privilege has suffered an erosion at its edges.

The Restatement of the Law Governing Lawyers identifies two types of duties with respect to information learned in the course of a legal representation. The first is a direct duty of professional responsibility to protect the client's confidential information. *Restatement of the Law (Third) Governing Lawyers,* § 111 *et seq* . (Proposed Final Draft No. 1, 1996) (hereinafter "*Rest. (3d) of Lawyers* "). This duty extends to
   *7 information relating to that client, acquired by a lawyer or agent of the lawyer in the course of or as the result of

representing the client, other than information that is generally known.
*Id.* § 111.

The operative principle under the Restatement is that the lawyer may not disclose confidential information "if there is a reasonable prospect that doing so will adversely affect a material interest of the client or if the client has instructed the lawyer not to use or disclose such information." *Id.* § 112. As the general language of the rule suggests, the duty includes "all information relating to the client," regardless of the source from which it is acquired. Accidentally or casually acquired information is covered. *See generally id.* § 111 cmt. b. Even information that becomes known by others remains confidential for the purposes of the lawyers duty, as long as the information is not generally known. *Id.* § 111 cmt. d.

The second duty identified by the *Restatement* is the attorney-client privilege. At bottom this is an evidence rule. An affirmative duty is imposed upon the lawyer, however; the lawyer *must* assert the privilege whenever the discovery or admission into evidence of a privileged communication is sought. *Rest. (3d) of Lawyers* § 135(1)(b). The obvious corollary is that lawyers must not themselves voluntarily divulge information covered by their clients' attorney-client privilege.

The attorney-client privilege casts a more closely defined net than the client confidences rule. It covers (1) communications, (2) between a defined class of "privileged" persons, (3) made in confidence, (4) for the purpose of obtaining or providing legal assistance. *Id.* § 118. Privileged persons are the client (including, for a corporate entity, any person who needs to know of the communication to act for the client), its lawyers, and their agents used in facilitating the representation. *Id.* §§ 120, 123. A communication is in confidence if the communicating person reasonably believes that no one will learn of the communication except for privileged persons. *Id.* § 121. Illustrating the fact that the attorney-client privilege is narrower than the duty to protect client confidences is that the privilege is waived upon an authorized communication to a non-privileged person, *id.* § 129, while the duty to protect confidences would survive. *Id.* § 111 cmt. d (*supra* ).

The Court is satisfied that the hornbook law set forth by the *Restatement*, the law of Florida and the law of New Jersey are substantially consistent with each other. In Florida, "[t]he confidentiality rule applies not merely to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source." *R. Regulating Fla. Bar* 4-1.6 cmt. The Florida comment to the rule appears verbatim in the comment to New Jersey's *Rule of Professional Conduct* 1.6. The New Jersey Supreme Court has cited section 112 of the *Restatement*, albeit in different circumstances, see *A. v. B.*, 158 N.J. 51, 61-63 (1999), and the courts of New Jersey have regularly treated other provisions of the Restatement as highly persuasive authority. *E.g., National Utility Serv., Inc. v. Sunshine Biscuits, Inc.,* 301 N.J. Super 610, 615 (App.Div.1997) (applying *Restatement* to claim that the crime-fraud exception to the privilege applied). Finally, Prudential asserts without contradiction that no material conflict exists between the laws of the two states.

a. Massaro's Disclosures

\*8 As noted, the summary of these disclosures as set forth above was drawn primarily from Prudential's Local Rule 56.1 statement of undisputed facts. The Court was careful, however, not to include any statement found in that document which was specifically contradicted in Massaro's counter-statement of undisputed facts. Massaro's counter-statement contains additional information not appearing in Prudential's original statement which, where material, will be discussed below. However, the basic content and circumstances of Massaro's disclosures are not uncontested. *See Township of Belleville v. Federal Transit Admin.,* 30 F.Supp.2d 782, 786 n. 3 (D.N.J.1998) (Court relied upon parties' Rule 56.1 statements).

Even the foregoing rudimentary statement of the law compels the conclusion that Massaro breached his duty of confidentiality to his client, Prudential, and violated its attorney-client privilege. The substance of internal discussions regarding whether to produce the Helfrich memorandum was obviously confidential and obviously subject to the attorney client privilege. It is no answer to claim, as Massaro does, that the Helfrich memorandum was not confidential by virtue of its ultimate production to the authorities. The issue is the internal strategizing by Prudential lawyers concerning whether and when to produce it. These were plainly confidential communications between privileged persons.

In other circumstances, the simple fact that a client shredded redundant copies of documents might be considered so innocuous and non-material as to not be covered by the privilege. As with the Helfrich memo, however, the internal discussions of Prudential's legal staff regarding the shredding are different. These communications were, beyond any legitimate debate, both confidential and privileged.

Moreover, the disclosure of the shredding led to an investigation by this Court and the deposition of a number of Prudential legal personnel. The Court cleared Prudential of wrongdoing in this particular incident, but its Opinion hardly enhanced the company's reputation. *See* Slip Op. of January 29, 1997 at 7 (Prudential "lacked sensitivity gene" in shredding documents).

Clearly, the disclosure of the document shredding had an adverse effect upon Prudential. If any doubt could have remained regarding whether the information was material and confidential, it was removed when Massaro's superior expressly ordered him not to disclose the fact of the shredding. On its face, disclosing the document shredding incident violated Massaro's duty to preserve client confidences.

Other disclosures present more or less clear-cut violations of Massaro's ethical responsibility. The confidential terms of Prudential's settlement of Helfrich's lawsuit, the adequacy of Prudential's settlement with the regulators, the mechanics of Prudential's document collection efforts, Prudential's legal strategy for whistle blower suits, the impact of the "Compliance 101" video tape, all were both client confidences and core attorney-client privilege material. There can be no doubt that Massaro learned this information because of his attorney-client relationship with Prudential. It does not matter that the information Massaro disclosed may have consisted in part of his own mental impressions and statements he himself made to other Prudential lawyers. The privilege does not permit the attorney giving advice to disclose that advice to outsiders, any more than the attorney is permitted to disclose the client's communication to the attorney.

*9 To the extent Massaro is arguing that only communications relevant to matters he was handling for Prudential are privileged, the Court rejects that suggestion. In-house counsel devote all of their professional legal skills to their sole corporate client. A corporate client is entitled to consider that an in-house lawyer will protect its interests and preserve its confidences in any and all legal matters. It is for this reason that an in-house lawyer is permitted access to privileged communications and confidential information on a wide range of matters, well beyond those for which the particular lawyer may be personally responsible. Moreover, regardless of whether information or communications beyond the scope of Massaro's direct responsibilities were technically privileged, they obviously were confidential. Equally obvious was Massaro's ethical and legal duty not to disclose.

The rule Massaro cites from *Payton v. New Jersey Turnpike Auth.*, 148 N.J. 524, 550 (1997), concerns lawyers acting in a business or other capacity. "An attorney who is not performing legal services or providing legal advice in some form does not qualify as a 'lawyer' for purposes of the privilege." *Id.* at 550-51. *Payton* is inapplicable.

Here, an in-house attorney, acting at all times as a lawyer, learned from other in-house attorneys details of hotly contested matters on which he did not happen to be working. First, the Court must presume that Massaro only learned the privileged information he disclosed because of his privileged status as a member of Prudential's legal staff. Second, Massaro, regardless of what matter upon which he may have been working, had not stepped outside of his role as Prudential's attorney. Any communication of a legal nature to him was privileged (and even more certainly confidential), regardless of the matter to which it is relevant.

Thus, on the admitted facts, Massaro violated both his duty to preserve client confidences and the attorney-client privilege. Indeed, Prudential argues and the Court agrees, that Massaro acknowledged as much when he warned Prudential that his ethical duty required him to divulge privileged information and again in his affidavit of December 30, 1996 filed in this Court. The Court will turn now to the various exceptions and defenses that Massaro contends justified his conduct.

b. The Crime Fraud Exception.

Massaro claims that his disclosures were excused, indeed made necessary, by the crime-fraud exception to the duty of confidentiality and the attorney-client privilege. The crime-fraud exception has a precise application. *United States v. Jacobs*, 117 F.3d 82, 88 (2d Cir.1997); *United States v. White*, 887 F.2d 267, 271 (D.C.Cir.1989). This is a necessary function of the context of the attorney-client relationship, which will often be concerned with allegations of wrongdoing by the client. Communications regarding past client wrongdoing are included within the scope of the privilege. *United States v. Zolin*, 491 U.S. 554, 562 (1989). A client who in the past has committed wrongdoing is entitled to confidential communications and advice from an attorney. *First Union Bank of Fla. v. Whitner*, 715 So.2d 979, 983 (Fla.App.1998), *review denied*, 727 So.2d 915 (Fla.1999).

*10 "[C]ommunications made for the purpose of getting advice for the commission of a fraud or crime" are outside the rationale of the privilege and are not privileged or confidential. *Zolin*, 491 U.S. at 563. However, an accurate understanding of each element of the foregoing statement shows how specialized the crime-fraud exception is. To subject the attorney-client communications to disclosure, "they must actually have been made with an intent to further

an unlawful act." *White,* 887 F.2d at 271. Moreover, a logical link must exist between the privileged communication and the proposed crime or fraud; it must be "the advice that leads to the deed." *Haines v. Liggett Gp., Inc.,* 975 F.2d 81, 91 (3d Cir.1992); Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 1.6:104 at 147 ("the communications must actually contribute to the criminal activity, not merely provide evidence of it"). A wrongdoer's failure to heed the advice of his or her lawyer does not remove the privilege. *Jacobs,* 117 F.3d at 88.

The crime-fraud exception does not extend to tortious conduct generally, but is limited to communications to and from an attorney in furtherance of a crime or fraud. *Motley v. Marathon Oil Co.,* 71 F.3d 1547, 1552 (10th Cir.1995), *cert. denied,* 517 U.S. 1190 (1996). It is true that New Jersey cases have construed the "fraud" element broadly, finding an exception to the privilege in a wide range of dishonest activity. *Fellerman v. Bradley,* 99 N.J. 493, 503 (1985). However, the cases consistently require a specific nexus between the supposed fraud and the attorney consultation for the exception to exist. *See, e.g., In re Grand Jury Proceedings,* 604 F.2d 798, 802 (3d Cir.1979) (purpose of privilege frustrated "if the client used the lawyer's services to further a continuing or future crime or tort").

The Florida rule is even more circumscribed than the common-law principle set forth above. Under the *Rule Regulating the Florida Bar* 4-1.6, an attorney has an affirmative duty to divulge privileged or confidential client information only when necessary to prevent the commission of a crime or bodily harm to another person. [FN2] See *The Florida Bar v. Lange,* 711 So.2d 518, 519-20 (Fla.1998). New Jersey has a somewhat broader and more complicated crime-fraud rule. *See N.J. Rules of Prof. Conduct* ("RPC") 1.6. Most nearly applicable to Massaro's conduct is RPC 1.6(b)(2), that requires disclosure by the attorney to "the proper authorities" as necessary "to prevent the client ... from committing a criminal, illegal or fraudulent act that the lawyer reasonably believes is likely to perpetrate a fraud upon a tribunal."

> FN2. Florida Statute 90.502 makes admissible a broader class of privileged information, when "The services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew was a crime or fraud." As the Florida courts have found, however, this is an evidence rule only, and not relevant to determine the propriety of an attorney's disclosures. *Lang,* 711 So.2d at 520 n. 2.

The Third Circuit in *Haines v. Liggett Gp., Inc.,* 975 F.2d 81 (3d Cir.1992), applying *Zolin,* has laid down the procedure to be followed where a party claims that privileged or confidential information is subject to the crime-fraud exception. The party seeking disclosure of privileged material under the crime-fraud exception must first apply to the court with a factual basis sufficient to form a good faith belief that the exception would apply. *Id.* at 96.

*11 Upon such a showing, the court will conduct an *in camera* review, on the theory that this would constitute the least intrusive method of evaluating the crime-fraud contention. *Id.* Only upon satisfying a yet more stringent burden of proof, *in camera,* will the party be permitted publicly to disclose the allegedly non-privileged crime-fraud material. *In re General Motors Corp.,* 153 F.3d 714, 716 (8th Cir.1998) ("*Zolin* dictates a higher standard of proof for public disclosure than for *in camera* review"); *Haines,* 975 F.2d at 96-97 (more formal proceeding than *in camera* review necessary prior to breaching privilege); *Ferguson v. Lurie,* 139 F.R.D. 362, 367 (N.D.Ill.1991). Indeed, even following this second finding, confidentiality must be preserved until all avenues of appeal are exhausted. *Haines,* 975 F.2d at 97; *see R. Regulating Fla. Bar* 4-1.6(d) (when disclosure required by tribunal, attorney must exhaust appellate remedies on behalf of client).

In no procedural context may the bare, unilateral assertion that the crime-fraud exception applies justify disclosure. *See Zolin,* 491 U.S. at 571 (prosecutor's assertion that exception applied did not permit disclosure of privileged materials to grand jury); *Rabushka ex rel. United States v. Crane Co.,* 122 F.3d 559, 566 (8th Cir.1997) (where party "merely offered his general theory that a fraud occurred and asserted that any communications made aided that fraud," *in camera* review not justified), *cert. denied,* 523 U.S. 1040 (1998).

As the Third Circuit has held, following *in camera* review and prior to full abrogation of the privilege, "the party invoking the privilege has the *absolute right* to be heard by testimony and argument." *Haines,* 975 F.2d at 97 (emphasis added). This Court, in an analogous situation dealing with a former Prudential attorney, has taken pains to preserve Prudential's right to a judicial determination before disclosure of privileged or confidential material. *See Prudential Ins. Co. of Am. v. Nelson,* 11 F.Supp.2d 572, 581-82 (D.N.J.1998). In the absence of some emergency, disclosure completely outside the judicial process is wrong. *See Lange,* 711 So.2d at 519 (affirming referee finding that attorney should have advised court of generalities of privileged information and sought guidance on how to proceed).

Massaro obviously complied with none of these procedural niceties designed to protect his client, Prudential, from an improvident assertion of the crime-fraud privilege. Massaro had no right unilaterally to invoke the crime-fraud exception; his statement to Prudential that his ethical duty compelled disclosure was completely contrary to law. More

serious, Massaro's subsequent conduct deprived Prudential of its "absolute right" to be heard before a court of law in defense of its privilege.

Absent a judicial finding, confiding in attorneys adverse to Prudential, giving sworn statements to authorities investigating the company, filing an affidavit in open court all were in flagrant violation of Massaro's duty as an attorney. Permitting a member of the national press to receive a tape of his Florida testimony and abetting the publication of an article regarding that testimony are only the most outrageous examples. This cannot possibly be reconciled with either the legal protections set forth in *Haines* nor with the underlying rationale for the crime-fraud exception itself. In short, even without regard to whether the crime-fraud exception ultimately would have justified setting aside the privilege, Massaro's actions and the manner in which he disclosed Prudential's confidences and privileged information were a gross violation of his duty to his client.

*12 Turning to the substantive issue of whether the crime-fraud exception would have applied had it been appropriately raised in the first instance, the Court finds Massaro's position again without merit. One of the primary examples of supposed crime or fraud, the delay in producing the Helfrich memorandum, was at bottom a discovery dispute. The Helfrich memo was timely produced pursuant to the Florida subpoena. While the Court disapproved of the lateness of producing the memo to the Multi-State Task Force, the Court declined to find any specific legal duty had been violated. While a direct violation of law is not necessary to trigger the crime fraud exception, *Fellerman, 99 N.J. at 503,* the absence of any clear breach is, at the least, relevant.

In addition, the Court has noted that not all wrong acts trigger the crime-fraud exception. It can be argued that any wrongful refusal to comply with a discovery obligation is a species of fraud. However, here the document was produced months before Massaro took his accusations public. As a general matter, the Court would be most reluctant to find that a difference of opinion between counsel and client regarding the production of a document strips the privilege from the parties' discussions. Here, without approving of the delay in producing the Helfrich memorandum, the Court finds insufficient evidence that the delay was driven by "the requisite duplicitous intent," *id.* at 506, to justify abrogating the privilege.

Indeed, the proposition is antithetical to the functioning of the attorney-client relationship. Therefore, even assuming the delay in producing the Helfrich memo was wrongful, it did not rise to the level of a crime or fraud necessary to trigger the exception. The Court finds that Massaro's disclosures regarding the Helfrich memo was not within the crime-fraud exception.

Regarding the Barr document shredding incident, other Prudential attorneys explained to Massaro that the shredding was innocuous. The explanation was objectively reasonable and, in the ultimate event, turned out to be true. Prudential's prior misconduct regarding document destruction did not, without more, supply grounds to assume that this destruction was a crime or fraud within the exception.

The Florida rule cannot possibly justify Massaro's conduct. There was no necessity to foil a crime. Evaluating the shredding incident under the New Jersey rule, the Court finds Massaro has conspicuously failed to adduce sufficient evidence to resist summary judgment on his crime-fraud argument. See *National Utility Serv., Inc. v. Sunshine Biscuits, Inc.,* 301 N.J.Super. 610, 618 (App.Div.1997) (" 'The burden of establishing the elements of the ['crime fraud'] exception is upon the person seeking to overcome the privilege." ') (quoting *Restatement 3d of Lawyers* § 132 cmt. a). New Jersey requires a showing sufficient to permit a "reasonable lawyer" to form a belief based "upon information that has some foundation in fact and constitutes prima facie evidence" of a fraud on a tribunal. RPC 1.6 (d). The record before the Court would not permit such a finding. Indeed, except for an alleged, unrelated inconsistency in Belle-Monaco's explanation of the shredding incident, Massaro makes no showing at all why he disbelieved her explanation that Barr was shredding redundant copies. In any event, the only tribunal that might conceivable have been the victim of a fraud was this Court. Giving statements to the Florida Attorney General, attorneys adverse to Prudential, and the Los Angeles Times did not constitute informing "the proper authorities." RPC 1.6(b).

*13 Prudential's refusal to disclose the incident upon Massaro's demand was, at worst, an example of a refusal to take an attorney's advice regarding past (supposed) wrongdoing. It did not concern an attorney-client communication regarding a ongoing or future wrong, as required to trigger the crime-fraud exception. Massaro accused outside counsel of destroying documents and Prudential told him to mind his own business. Even assuming that Prudential's ongoing refusal publicly to disclose the Barr incident were considered the crime or fraud at issue (instead of the shredding itself), Massaro's threat to disclose was not "the advice that leads to the deed." *Haines, supra,* 975 F.2d at 90. The crime-fraud exception cannot, therefore, apply.

To the contention that a reasonable belief that a crime or fraud is afoot is all that is required, the Court agrees. This

presumes, however, that the proper procedures are observed, judicial review is obtained, and confidences are protected from improvident disclosure. Here, however, Massaro took his information directly to Prudential's legal adversaries and to the press. As discussed, the Court believes that this course of action breaches an attorney's duty regardless of the underlying merits of the accusation of crime or fraud. To proceed as Massaro did, however, is to proceed at one's peril. The Barr incident having turned out not to have been willful misconduct, Massaro cannot avoid responsibility by claiming that he was reasonable in mistakenly believing otherwise.

Massaro claims that the settlement payment to Helfrich amounted to witness tampering, because it was a pay-off and because it bought Helfrich's silence with respect to Prudential's sales practices. The logical problems with this preposterous accusation are two-fold. First, the core substance of any knowledge possessed by Helfrich was contained in his memo and the evidence of who had seen that memo. This knowledge has long-since passed into the record of the case, without, so far as the Court is aware, any hindrance or omission by Helfrich.

Second, beyond the bare representation of counsel, there is no suggestion that the settlement payment was so far out of proportion to the value of Helfrich's claims as to raise an inference of wrongdoing. As Massaro is aware, Helfrich was not the only Prudential employee to sue the company following his departure from the company. The number of former-employee suits, the need to obtain some measure of peace in the midst of the massive class action, and any number of other, inscrutable factors no doubt influenced Prudential's decision to settle. The Court will not intrude into Prudential's resolution of these issues. Certainly the alleged statement of Belle-Monaco that "We paid him off-he held us hostage," Massaro Opp. Brf. at 20, does nothing to impugn the legitimacy of the Helfrich settlement; the Court expects that the same sentiments are probably entertained by most defendants settling lawsuits before it.

\*14 The last ground for rejecting Massaro's crime-fraud contention is the least conspicuous because of its ubiquity in this case. As will be seen above, the only issues that even require detailed discussion under the crime-fraud exception are those surrounding the document shredding incident and, to a lesser extent, the disclosure of the Helfrich memorandum. But Massaro's disclosures were much broader. For example, there was no threat of a fraud on a tribunal with respect to Prudential's strategy in handling whistle-blower lawsuits or the fairness of the settlement with the Multi-State Task Force.

The scope and manner of the disclosures were hopelessly overbroad as well. Massaro might attempt to take refuge in RPC 1.6(c)(1), permitting disclosure of confidential information to rectify the consequences of a fraudulent act in which his services had been used, "to the extent the lawyer reasonably believes necessary." But Massaro's services were not used in any of the supposed crimes or frauds he now alleges. More importantly, his disclosures were grotesquely broader than any lawyer would reasonably have believed necessary. Massaro's crime-fraud argument must be rejected.

c. *Massaro's other arguments in justification.*

Massaro raises a series of other claims and arguments to justify his breach of duty. These are quickly dispensed with, seriatim.

1. *The demand letter from Massaro's superiors warning Massaro not to disclose confidential information was "a criminal attempt at witness tampering."* (Massaro Opp. Brf. at 3).

The Court has reviewed the letter in question, and finds that it is a typical and thoroughly unexceptional example of an attorney's cease and desist letter. The letter affords no basis for a claim of witness tampering.

2. *Prudential is collaterally estopped from claiming that Massaro's Florida testimony is privileged by the holding in Hill v. Prudential Ins. Co. of Am., 701 So.2d 1218 (Fla.App.1997).*

The Court has discussed the holding of the *Hill* case, *supra*. It is obvious that the Florida court did not rule on whether Massaro's disclosures in his testimony were proper. On the contrary, the Florida court said that there was no evidence of wrongdoing *on the part of the regulators* that would weigh against disclosure. This hardly rules out the possibility that Massaro acted wrongfully in disclosing the information to the regulators. Even more clearly, *Hill* says nothing regarding Massaro's disclosures to other entities, including the press. Massaro's collateral estoppel argument fails at its inception, because the case he relies upon does not support his position.

3. *Information Massaro disclosed was not privileged because it was gained in casual office or "water cooler" gossip.*

The Court states its emphatic disapproval of the rule Massaro urges the Court to apply. There is no such thing as a "water cooler" exception to the attorney client privilege for in-house or for any other attorneys. The Court believes

that corporations with permanent legal staff and law firms both have a reasonable and proper expectation that any communication between legal personnel containing a client's non-public information will be treated as confidential and privileged. The formality of the setting in which such a communication occurs is completely irrelevant in most, if not all cases.

*15 A contrary rule would threaten the health of the attorney-client relationship. The benefits to the client of a collegial professional atmosphere among legal staff are beyond dispute. If an attorney must fear a disloyal ear in their own firm or legal department when that attorney seeks only to bounce an idea off a colleague or to air the latest crisis in a client's affairs, the ability to serve the client and the attorney-client relationship itself would be impaired.

The client has a right to expect that all of its attorneys will be guarding its interests at all times, whether behind their desks, in casual or social gatherings, or at the water cooler. Obviously, regardless of the informality of the setting, the Court is pre-supposing that only privileged persons are privy to the communication. The Court would not be heard to encourage discussing a client's business where it might be overheard by non-legal personnel or outsiders. Nonetheless, the Court believes it is implicit in the day-to-day reality of a healthy attorney-client relationship that attorneys and staff can discuss any legal issue among themselves at any time without imperiling the client's privacy or the privilege. This principle has special urgency for a large corporate client with many attorneys. Particularly in this context, Massaro's "water cooler" exception is rejected.

4. *Massaro had a right to disclose confidential Prudential information to his own attorneys.*

The problem with this argument, of course, is that Massaro sought out attorneys whom he knew were actively representing parties adverse to Prudential. This Court has already disqualified two of those attorneys, precisely because they would unfairly gain privileged or confidential knowledge from Massaro. Requiring Massaro to secure the services of an attorney without a known and obvious conflict of interest is neither unfair nor unreasonable. Massaro's reliance in this context upon his right to consult the attorney of his choice is misplaced.

With respect to the time-line notes produced by Massaro in the deposition before Special Master Walder, the Court cannot accept Massaro's argument that it was the Special Master that caused the violation of Prudential's privilege. Massaro produced these notes and then asked for the opportunity to redact them to preserve *his own* attorney-client privileged information. The Special Master returned copies to both Massaro and Miller to permit that redaction.

First, it was the fact that Massaro chose to be represented at the deposition by Miller that ultimately led to the notes being disclosed to his attorney. Having set the stage for Miller to gain access to the notes, Massaro can hardly claim now that it was the solely the fault of the Special Master when he provided Miller with a copy. Second, even if the Special Master had acted unilaterally to turn over the notes to Miller, it was Massaro's duty at that point to object and to seek to preserve his client's (Prudential's) privileged information. In the event the notes were important to the Special Master's investigation, an *in camera* review as discussed in *Haines, supra,* could have been undertaken. Massaro made no such objection and he cannot shift responsibility for this failure to the Special Master.

5. *Miller gave reporter Paltrow the tape of Massaro's Florida sworn statement without Massaro's consent.*

*16 Massaro claims that during the meeting immediately after the Florida deposition, Miller, without warning, handed the tape recording of the sworn statement to Paltrow. Massaro claims that this act was done without his consent or authorization and that Miller "was on a frolic of his own." He argues that he should not be held accountable for the breach of the privilege and confidentiality that resulted.

Here again, Massaro's argument based upon the admitted facts falls well short of providing an excuse or defense to Prudential's claims of breach. Miller, in the presence of his client, handed to a member of the press a tape recording of Massaro divulging privileged and confidential information to the Florida regulators. Massaro did not object. Massaro did not demand the return of the tape, presumably his own property. Massaro never alerted the Court to this supposed betrayal by Miller. In the words of his own brief, Massaro simply "felt very ill at ease."

Massaro contends that there is no evidence to contradict his assertion that Miller acted on his own. The Court finds that Massaro's failure to act when Miller handed the tapes to Paltrow constitutes compelling evidence that he failed to protect Prudential's privileged information. Elsewhere, Massaro has emphasized that Miller was acting as his attorney. The Court must presume, as no doubt the reporter Paltrow presumed, that Miller was acting as his client's agent when he handed over the tape in Massaro's presence and without objection from him.

Finally, as with the time-line notes the Special Master handed to Miller, Massaro set the stage for this further dissemination of Prudential's privileged information. Massaro knew his testimony was being taped. Responsibility for

Miller's possession of the tape can be traced to no-one but Massaro. If Miller was cultivating the press at the expense of Massaro's responsibility to Prudential, Massaro must bear the blame.

d. Summary judgment on the issue of breach of the duty of confidentiality and the attorney client privilege.

The foregoing discussion establishes that there is no genuine issue of material fact that Massaro breached his duty of confidentiality to his client and violated his client's attorney-client privilege by disclosing information on the subjects discussed above. Indeed, the parties do not dispute the material facts, only the legal implications of them. For the reasons stated, Massaro's claims of excuse and justification are without merit.

The occasions upon which Massaro committed these breaches and violations were 1) when he testified to the Florida regulators, 2) when he spoke with the reporter Paltrow, and caused the tape recording of the Florida statement to be given to Paltrow, 3) when he filed his December 30, 1996, affidavit in this Court, and 4) when he provided notes containing privileged and confidential information to the Special Master appointed by this Court. To the extent these breaches occurred in Miller's presence or that also Miller received the privileged and/or confidential matter disclosed, these too constitute instances of breach of Massaro's duty.

*17 The Court will, therefore, grant summary judgment to Prudential with respect to the fact of the breach and Massaro's liability for it. The equitable remedy Prudential seeks as a result of this breach is discussed immediately *infra*. Whether Prudential is entitled to any legal damages as a result of the Court's ruling has not been addressed by the parties.

3. Prudential's request for a permanent injunction.

a. The equitable factors

It has been held in this District that the standard for an award of a permanent injunction is identical to that for the award of a preliminary injunction, except that actual success on the merits must be shown, rather than a mere likelihood. *Harlem Wizards*, 952 F.Supp. at 1091 (Walls, J.). It is clear that the different showing on the merits is an important point of distinction. " 'In deciding whether a permanent injunction should be issued, the court must determine if the plaintiff has actually succeeded on the merits (i.e. met its burden of proof)." ' *ACLU v. Black Horse Pike Reg. Bd. of Educ.*, 84 F.3d 1471, 1477 n. 3 (3d Cir.1996).

For the reasons discussed in the preceding section, the Court has no hesitation in finding that Prudential has established actual success on the merits in this matter. This Court's decision to grant summary judgment stands as its plenary decision on the merits.

It is not so clear that another critical element of the preliminary injunction showing, irreparable injury, also applies to permanent injunctions. The Court of Appeals noted a conflict in the case law on this issue in *Temple Univ. v. White*, 941 F.2d 201, 213 (3d Cir.1991), *cert. denied sub nom.*, *Snider v. Temple Univ.*, 502 U.S. 1032, (1992), but declined to resolve it. Since then the Third Circuit has not spoken on whether irreparable injury is necessary for a permanent injunction.

Of course, were a legal remedy available, the Court would not issue an injunction in equity. Moreover, the Supreme Court has long held that "[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theaters, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959). Other panels of the Third Circuit, prior to *Temple University*, treated irreparable injury as a necessary part of the analysis of a request for permanent injunctive relief. *See, e.g.*, *Natural Resources Defense Council, Inc. v. Texaco Refining & Marketing, Inc.*, 906 F.2d 934, 936 (3d Cir.1990).

In the abstract, the Court would not hesitate to find that a flagrant breach of the attorney-client privilege would inflict an irreparable injury upon the client. In any situation in which confidential information is at stake, once it is made public the *status quo ante* cannot be restored. *See Hadix v. Johnson*, 1989 WL 27984, *2 (6th Cir.1989) (attorney-client relationship "fragile" and "no adequate legal remedy for a violation of the privilege") (unpublished). On the other hand, the controversies that form the back-drop of Prudential's suit against Massaro, the class action, multi-district litigation and Multi-State Task Force investigation, are either resolved or nearly so. As the underlying source of conflict between the parties passes into history, it is not clear what prospective threat persists of wrongdoing by Massaro against his former client. Finally, there is no fresh complaint of disclosures by Prudential; Massaro has apparently been complying with the preliminary injunction now in place against him.

*18 On balance, however, the Court is satisfied that a sufficient showing of a **threat** of irreparable **injury** persists to

sustain a **permanent injunction** in this matter. The Court has no idea of what additional, as yet undisclosed Prudential confidences Massaro might still possess. Nor can it be ruled out that some motive, altruistic or otherwise, might remain for Massaro to commit further breaches.

It is crystal clear, however, even assuming the truth of Massaro's claims that he intended to act in the public interest, that Massaro lacks even the most basic understanding of his obligations as attorney to his former client. Nor do the arguments of Massaro's counsel serve his cause in this respect. The baseless accusations of criminality and the sadly truncated version of the attorney's duty with which Massaro's briefs are laced bespeak an intention to fight on without scruple against Prudential. These submissions could give no one confidence that Massaro will avoid future breaches of his duty to his former client.

The two factors of the equitable injunction analysis not yet discussed are the balance of the hardships and the public interest. The Court cannot perceive any hardship to Massaro from the entry of the injunction. As noted, Massaro has already been subject to an injunction for a substantial period during the pendency of this action. In the event Massaro believes that future events make it necessary and proper for him to disclose privileged or confidential information, an application to an appropriate court with the protections set forth in the *Haines* case, discussed *supra*, is the correct course for him to follow.

The public interest in enforcing the attorney-client privilege and attorney's duty of confidentiality is self-evident. Particularly in a such a prominent case and where the violation is so flagrant, to condone Massaro's behavior would work real damage. This damage would be both to the bar's perception of its own responsibilities and the to public's perception of the sanctity of the trust it places in its attorneys.

Massaro has argued generally against an injunction based upon his various contentions that the public interest required his disclosures. These arguments are essentially the same as those disposed of elsewhere in this opinion where the crime-fraud exception and the unclean hands doctrine are discussed. As is shown, these public-interest contentions are without merit. To the extent they have any resonance outside of the more specific legal contexts in which the Court has otherwise addressed them, these residual public interest considerations cannot remotely outweigh the fundamental importance to the public interest of the attorney-client privilege and duty of confidentiality. In the face of Massaro's egregious conduct, the public interest weighs strongly in favor of an injunction.

b. The doctrine of unclean hands.

As noted, Massaro cross-moves for summary judgment to strike Prudential's claim for equitable relief on the doctrine of unclean hands. The Court will treat this as a cross-motion for summary judgment on liability in this matter, because it is not clear what legal claim would survive if the Court were to find that Prudential was barred from enforcing in equity its rights to confidentiality and attorney-client privilege against Massaro.

*19 The unclean hands doctrine is familiar to beginning law students as a rule of equity "that whenever a party who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him *in limine*." *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 244-45 (1933) (internal quotation omitted). The doctrine protects the courts from litigants who would invoke judicial power to further their own bad conduct. *Gaudiosi v. Mellon*, 269 F.2d 873, 881 (3d Cir.), cert. denied, 361 U.S. 902 (1959).

Massaro quotes at length from this Court's own opinion on unclean hands, *In re New Valley Corp.*, 222 B.R. 722, 732 (D.N.J.1998). Unfortunately, since Massaro's brief was written, the Court was reversed by the Third Circuit on precisely the grounds cited. *In re New Valley Corp.*, 181 F.3d 517 (3d Cir.1999), cert. denied, 120 S.Ct. 983 (2000). Indeed, in the *New Valley* matter, the Court of Appeals found that this Court had read its older, *Gaudiosi* case too broadly, inadequately appreciating the importance of the connection between the applicant's alleged bad acts and the equities of the dispute at bar before the unclean hands doctrine may be applied. Thus, whatever else may be said about this inherently discretionary and fact driven doctrine, its boundaries are indisputably narrower than the authority invoked by Massaro. [FN3]

> FN3. The Third Circuit's *New Valley* opinion was handed down in July 1999. The Court has received numerous submissions since the briefing was closed on these motions, including supplementary submissions discussing new case law. The parties did not, however, address the Third Circuit's *New Valley* opinion.

In *New Valley,* the Court of Appeals found as "the critical element" and "the primary principle" of the unclean hands rule that "the alleged inequitable conduct must be connected, *i.e.*, have a relationship, to the matters before the court for resolution." 181 F.3d at 525. The Third Circuit, in turn, relied upon the Supreme Court's opinion in *Keystone.*

There the Supreme Court held that the alleged misconduct by the party seeking relief must have "immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." 290 U.S. at 245. Drawing on *Keystone* and its own precedents, the Court of Appeals found that the link "must be close" and "directly related to the subject of plaintiff's suit." 181 F.3d at 525.

It is clear from *New Valley* that the connection between the allegedly unclean hands and the equitable relief sought is a *sine qua non* of application of the doctrine. *Id.* ("there must be a relationship between the inequitable conduct and the claims brought before the court in order for the doctrine to apply"). Even where such a connection exists, however, application of the doctrine is not mandatory. "[W]hen assessing whether to invoke the doctrine of unclean hands, courts of equity must not be 'bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.' " *Id.* (quoting *Keystone*, 290 U.S. at 245-46).

*20 In his submissions, Massaro focuses much attention on the allegations against Prudential of wrongdoing, including improper sales practices, that formed the substance of the class action and various multi-district litigation matters pending before this Court. It should be plain from the foregoing discussion that these alleged misdeeds can form no part of the Court's assessment of Massaro's unclean hands argument. The relief sought here is an injunction against further disclosures of Prudential's privileged and confidential information. Prudential's sales practice and related alleged wrongdoing have nothing to do with the equities of Massaro's conduct.

That Massaro may have learned this privileged and confidential information in the course of representing Prudential hardly qualifies as the type of close connection required by the Third Circuit for the unclean hands doctrine to apply. Indeed, it could hardly be otherwise. As previously noted, a substantial part of the practice of law involves representing persons whose legal problems are the result of prior misdeeds. Little would be left of the privilege and duty of confidentiality if the unclean hands defense were available whenever an attorney violated his trust with his client. Therefore, the Court will accord no weight to Massaro's general allegations of wrongdoing by Prudential that parallel the general allegations of the class action and multi-district litigation.

Massaro makes other "unclean hands" accusations that are at least arguably closer to home. These too fail. First, while closer, this additional conduct that Massaro seeks to impugn is not nearly close enough in its connection to the relief Prudential seeks against Massaro. Second, the conduct Massaro attacks was not nearly wrongful enough to bar relief from Massaro's own, egregious misconduct.

Massaro raises the cease and desist letter from Prudential Associate General Counsel Richard Meade, threatening that Prudential and its attorneys would vigorously defend their reputations if Massaro were to disclose the Barr shredding incident. As already discussed, there was nothing wrongful at all in this letter. Likewise, Prudential did not commit witness tampering when it settled with Helfrich.

Massaro contends that Prudential was uncandid with this Court in obtaining an *ex parte* temporary restraining order ("TRO") against him at the commencement of this lawsuit. However, of the information Massaro claims was wrongfully omitted from Prudential's application, none was material. In particular, the fact that Massaro claimed he had no forewarning that his attorney, Miller, would hand the tape of the Florida statement to the reporter Paltrow did nothing to mitigate the gravity of this breach. Moreover, as has already been found by Judge Pisano and this Court, the TRO application was not *ex parte*. The papers were provided to Massaro and he voluntarily consented to the entry of the TRO. *See* Slip op. of Oct. 8, 1998, at 3-4 (denying appeal from Judge Pisano's denial of Massaro's motions to vacate the TRO, for injunctive relief and to disqualify Judge Pisano).

*21 The Court rejects the factual premise of Massaro's contention that Prudential has unclean hands because it has interfered with his ability to be represented by counsel. There is no legitimate dispute that Massaro retained and attempted to retain various attorneys knowing that they represented parties adverse to Prudential and thus had an irreconcilable conflict of interest. The Court granted Prudential's motions to disqualify two of these attorneys. Prudential's efforts to seek these disqualifications cannot be considered wrongful. For Miller to excuse himself on the ground of a conflict of interest in the midst of Prudential's deposition of Massaro is no fault of Prudential's. If Massaro, through his unorthodox choice of counsel, found himself without representation in the deposition, he brought this situation upon himself. The Court need not consider whether Prudential's attorneys should have adjourned the deposition to permit Massaro to retain different counsel, because no such request was made.

Moreover, in addition to being innocuous, the above-referenced conduct of Prudential in litigating its suit against Massaro also is not sufficiently connected to the equities of its claim to permit the application of the unclean hands doctrine. Likewise, Massaro's complaints about the violation of his own privilege by Prudential attorneys in connection with certain documents he produced lacks the requisite link to Massaro's own misconduct. Obviously, each of these examples of Prudential's conduct occurred well after Massaro made his disclosures to Paltrow, the Florida

regulators, and to this Court in his affidavit. Logically, there is no connection at all between Massaro's breach of confidence and the conduct of the litigation by Prudential.

Even if the requisite connection between Prudential's alleged misconduct and Massaro's breach of confidence were present, the Court would not exercise its discretion to apply the unclean hands doctrine against Prudential in this matter. An attorney has breached his duty to his client, a duty that is central to their relationship and to our adversarial legal system. There was no need for this breach for the attorney to defend himself; as Judge Pisano has found, at no time was Massaro's performance as an attorney put in issue. Slip op. of Feb. 20, 1997 at 17 (disqualifying Miller). Prudential never waived its privilege or right to confidentiality. Even if, well after the breach was complete, Prudential overstepped the bounds of proper advocacy in seeking redress, the Court would be most reluctant to penalize a wronged client by refusing to enjoin further disclosures by the attorney.

With respect to other misdeeds of Prudential, "courts of equity do not make the quality of suitors the test.... They apply the [unclean hands] maxim, not by way of punishment for extraneous transgressions, but upon considerations that make for the advancement of right and justice." Keystone, 290 U.S. at 245. Whatever taint Prudential may carry, it does not disqualify the company from the right to a confidential relationship with its attorneys. Refusing to enforce this right on the undisputed facts of record would not advance "right and justice." Therefore, Massaro's cross-motion based upon the unclean hands doctrine will be denied.

\*22 The Court makes this last, concluding point, which may be applied as well to the discussion, *supra,* of the crime-fraud exception to the attorney-client privilege. No-one familiar with the Prudential Sales Practices Litigation matter, pending before this Court since 1995, can retain the illusion that this Court has approved of Prudential's conduct, either in the defense of the claims against it, or in the conduct substantively at issue. Indeed, the contrary is public knowledge and the Court has meted out heavy sanctions. As Judge Pisano once noted, it is not without irony that Prudential comes before the Court seeking redress from ethical lapses. Slip op. of Feb. 20, 1997 at 30.

It might well be argued that Massaro's transgressions are exponentially smaller in scope than Prudential's. That difference is quantitative only. Qualitatively, Massaro's breach of duty is on a different plane. Respect for the attorney-client privilege goes not only to the rights of the parties, but to the efficient administration of justice. In an adversarial system, the privilege is rightly regarded as implicit in " 'ordered liberty.' " Royal Surplus Lines Ins. Co. v. Sofamor Danek Gp., Inc., 190 F.R.D. 505, 509 (W.D.Tenn.1999) (quoting Edna S. Epstein, *A.B.A. Section of Litig., The Attorney-Client Privilege & the Work Product Doctrine* 2 (3d ed.1997)). It is for this reason that courts weigh carefully claims that client confidentiality or the attorney-client privilege should be set aside. *Id.*

Plainly, the privilege is not absolute. It must yield where the purpose of the privilege is not served, such as where alleged misconduct is directly linked and integral to the privileged communication. Likewise, as an equitable matter, social disapproval of misconduct closely related to the wrongdoer's assertion of privilege may bar enforcement under the rubric of "unclean hands."

Neither of these scenarios pertain here. Regardless of its faults, indeed because of them, Prudential was entitled to loyal representation by counsel. Prudential never attacked Massaro's handling of its affairs, and Massaro had no personal need to air Prudential's confidences. The bizarre, unnecessary, and wholly improper manner in which Massaro breached his duty completely undermines his protestations regarding his own ethical duty and the public interest in his disclosures. Massaro's conduct constitutes its own, comparatively small, yet concentrated niche of malfeasance in this sprawling class action and multi-district litigation. It is distinct in kind and quality from the larger context of the accusations against Prudential. The Court has no hesitation in finding that claims of "crime-fraud" and "unclean hands" do nothing to excuse Massaro's conduct or bar an injunction against further harm to Prudential.

4. Massaro's motion to disqualify Prudential's attorneys

Massaro devotes two pages of his brief to a discussion of why his motion to disqualify Prudential's attorneys should be granted. This discussion suffers from a lack of precision in stating the legal grounds upon which Massaro relies for this relief. Massaro cites "massive misconduct" and claims "[t]he waters of justice have been polluted."

\*23 More concretely, however, and reading the papers as generously as possible, Massaro apparently bases this motion primarily on his claim that Prudential has "stolen" confidential information from him and is now using this information against Massaro in the litigation. This claim appears to stem from Prudential taking control of certain documents previously in Massaro's possession in the course of a document production in the chambers of Judge Pisano.

These documents were the subject of the original TRO against Massaro, which directed Massaro to turn over to

Prudential all documents "which involve, affect, arise from, or relate to any aspect of the business of Prudential." The gist of Massaro's complaint is that some documents within the scope of the TRO were also privileged communications between Massaro and his attorney, Miller.

Massaro contends that he first provided these documents to a law firm that was considering representing him. When that firm declined, Massaro sought and was granted permission to produce them in Judge Pisano's chambers for inspection by Prudential's attorneys. Prudential's attorneys went through the approximately two boxes of documents, and retained a substantial percentage of them. Massaro was not present. Massaro's attorney attended the document production. However, this attorney (not Miller, who had already been disqualified), was prevented by yet another conflict of interest from reviewing the documents for privilege or any other purpose during the inspection. *See* Decl. of Lucas, dated Dec. 5, 1997.

The Court has already discussed this claim in its October 8, 1998, slip opinion,
> Massaro asserts that Prudential holds Massaro's privileged communications with his own attorney. Massaro does not substantiate his contention that the documents he produced were his "own documents." Indeed, the TRO required only that Massaro return to Prudential the property of Prudential.

Slip op. at 13. The Court noted, further, that Massaro had received copies of the documents back from Prudential through discovery, and that Massaro's claim of prejudice was, consequently, without merit.

Any remaining claim of unfairness is answered by the observation that Massaro himself produced these documents to Prudential. During the May 23, 1997, telephone conference before Judge Pisano, Massaro claimed that some of the documents contained privileged communications. He did not, however, ask Judge Pisano for *in camera* review to determine whether his privilege would trump the mandate of the TRO. Indeed, Judge Pisano asked whether Massaro sought such review, but Massaro apparently did not. Gross Decl. Ex. K (Trspt. of May 23, 1997 at 20:24-25).

Instead, Massaro was content to accept the assurance of Prudential's attorneys that they would not retain any personal documents not belonging to Prudential that were not covered by the TRO. This assurance, by Prudential attorney Schlanger, was as follows: "Anything that is personal to Mr. Massaro, anything that concerns his relationships with other attorneys, his relationships with any third-party *that are not within that paragraph of your Honor's order*, I'm not going to look at." *Id.* (Trspt. at 22:17-23:22) (emphasis added). However, communications between Massaro and Miller, might easily be within the terms of the TRO, *i.e.*, that they "involve, affect, arise from, or relate to any aspect of the business of Prudential."

\*24 Indeed, the fact that Massaro had breached his duty to Prudential by confiding in Miller was a part of the grounds for the TRO, this lawsuit generally, and the instant request for a permanent injunction. Review of the transcript reveals that Schlanger never promised Massaro to ignore documents within the terms of the TRO simply because they also contained communications with Miller. Any claim that Massaro understood to the contrary is not credible.

In light of this history, Massaro may not now term Prudential's actions a "litigation coup" and seek the attorneys' disqualification. In any event, the Court has found no need to rely upon any of the documents at issue in granting summary judgment to Prudential on the issue of Massaro's breach of the duty of confidentiality and attorney-client privilege. With respect to any prejudice that may remain against Massaro stemming from Prudential's access to privileged communications with Miller, the Court remains ready to fashion a suitable protective order. [FN4] The more extreme remedy, disqualification of Prudential's attorneys, is not warranted and Massaro's motion will be denied.

> FN4. Prudential maintains that communications between Miller and Massaro were never privileged, due to the fatal conflict of interest that existed from the inception of this ill-advised attorney-client relationship. The Court need not reach this argument.

To the extent Massaro relies upon his accusations of other supposed wrongdoing by Prudential's counsel in the course of the litigation, those accusations have been dealt with elsewhere in this opinion.

5. Massaro's motion to deem admitted his requests for admissions

Massaro contends that Prudential has improperly refused to provide discovery based upon Prudential's responses to Massaro's 451 requests for admissions. To all of these requests, Prudential stated a general objection. The objection states that Massaro's breach of duty is established beyond legitimate dispute by Massaro's own admissions in these proceedings and by prior decisions of the Court and that the information sought in the requests for admissions is thus not relevant.

The Court does not agree that Prudential's objection correctly states the law regarding relevance for discovery

purposes. Whether information is relevant in the sense of constituting a material fact with respect to liability and whether it is relevant as contemplated by the rules governing discovery are, of course, quite different. As counsel well know, to be relevant for discovery purpose a fact need merely lead to the discovery of admissible evidence, Fed.R.Civ.P. 26(b)(1), an exceedingly low threshold.

This truth notwithstanding, Massaro has not cited any specific request for admission nor any other, unanswered discovery request to claim that it might lead to evidence enabling him to resist this motion for summary judgment. Massaro has also cited Federal Rule of Civil Procedure 56(f) to claim that summary judgment is not proper at this time, but again fails to explain how discovery would permit him to undermine the admitted facts against him.

It is true that Massaro's contends Prudential has refused to provide discovery regarding its legal expenses in the *Hill* litigation in the Florida courts. Counsel represents that Prudential seeks to include these litigation expenses as part of its damages from Massaro's conduct. However, the issue of money damages is not before the Court upon this motion.

**\*25** Apart from this, Massaro frames his argument based on Prudential's alleged failure to provide discovery only in the most general of terms. In the absence of some explanation of how such discovery might affect the disposition of the substantive motions pending before the Court, the Court must, to a limited extent, agree with Prudential's argument regarding relevance. Massaro's discovery complaints cannot stave off the adjudication of the pending motions.

The configuration of this remaining issue in this case will be drastically altered by this Opinion and its accompanying Order. Doubtless, much of the discovery Massaro seeks will become moot. On the other hand, it may be that other discovery requests will remain relevant and worth pursuing after this Opinion and Order are issued. If so, they may be renewed. It would waste judicial resources for this Court to consider them further now. Therefore, Massaro's motion to deem admitted his requests for admissions will be denied, without prejudice.

## CONCLUSION

For the reasons set forth above, the Court will make the following disposition of the motions before it. Certain arguments raised by Massaro (*e.g.*, that Prudential has engaged in misconduct because the certification to its interrogatory resonses was mis-paginated) have not been addressed because they do not warrant burdening this already lengthy opinion. The parties are assured that the Court has weighed every contention raised and given it the consideration it deserves.

Prudential's motion for partial summary judgment on counts one and two of its complaint and Prudential's motion for the entry of a permanent injunction will be granted. Massaro's motion for summary judgment striking Prudential's claim for equitable relief is denied. Massaro's motion to disqualify Prudential's attorneys is also denied. Massaro's motion to deem admitted certain requests for admissions is denied without prejudice.

An appropriate Order is attached.

## ORDER AND PERMANENT INJUNCTION

In accordance with the Court's Opinion filed herewith,

It is on this 14th day of August, 2000

ORDERED that plaintiff Prudential Insurance Company of America's motion for partial summary judgment on counts one and two of its complaint is granted, and it is further

ORDERED that defendant Massaro's motions to strike Prudential's claim for equitable relief and to disqualify Prudential's attorneys are denied, and it is further

ORDERED that defendant Massaro's motion to deem admitted certain requests for admissions is denied without prejudice, and it is further

ORDERED that Prudential's motion for a permanent injunction is granted and Massaro is hereby enjoined from disclosing to any person information that he acquired during or as a result of Massaro's employment as an attorney-at-law of Prudential, subject to the following provisos:
 1. this injunction shall apply only to information over which Prudential asserts the attorney-client privilege; information that Prudential asserts is confidential to it; and/or to any information for which Massaro has knowledge of facts sufficient to cause a reasonably attorney to believe the Prudential would assert the privilege or confidentiality;

*26 2. the term "disclosing" in this injunction shall include, without limitation, the producing of or otherwise permitting access to any document;

3. this injunction shall not affect Massaro's communication with an attorney representing him in this action or with respect to legal process, a subpoena or a court order referenced in sub-paragraph 5 of this Order and Injunction, provided that Massaro's attorney agrees in writing to be bound by the terms of this injunction, such writing to be provided to Prudential and to the Court within three days of this injunction or the retention by Massaro of the attorney, whichever is later;

4. this injunction shall not prevent Massaro from disclosing information pursuant to the order of a court of law or subpoena from a court to which he is subject to compulsory process;

5. In the event Massaro receives any legal process, subpoena, court order or other paper commanding him to disclose information covered by this injunction, Massaro shall immediately provide Prudential with a copy and, before making any disclosure, permit Prudential a reasonable time to object to or seek relief from the court out of which such process, order or other paper has issued.

Not Reported in F.Supp.2d, 2000 WL 1176541 (D.N.J.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.