**EXHIBIT "B"**

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

ROBERT SOKOLOVE, et al.,          )
                                       )
        Plaintiffs,          )
                                         )
        v.          )          Case No. 05-514-KAJ
                                         )
CITY OF REHOBOTH BEACH, et al.,          )
                                         )
        Defendants.          )

## AFFIDAVIT OF GLENN C. MANDALAS

COMES NOW Glenn C. Mandalas, ("Affiant"), who, being duly sworn according to law, doth DEPOSE and SAY:

1.    I speak from personal knowledge and am competent to make this Affidavit.

2.    I am an attorney admitted in good standing to the practice of law in the State of Delaware and am an associate in the employ of the law firm of Prickett, Jones & Elliott, P.A.

3.    I am also the City Solicitor for the City of Rehoboth Beach, Delaware.

4.    I have personal knowledge of the facts averred by Plaintiffs in the *Motion for Contempt*.

5.    When the *Stipulated Consent Judgment and Order* was signed by the Court and entered as an *Order* on or about May 26, 2006, (D.I. # 72), I conferred with Eugene Lawson, Esquire, then Plaintiffs' Counsel, concerning the drafting of an enforcement ordinance as provided for within ¶¶2-5 of the *Order* which would operate to cure the constitutional infirmities of the existing Ordinance and its enforcement.

6.    Mr. Lawson advised that his clients were seeking a comprehensive re-write of the City's sign ordinance rather than a refinement of the enforcement provisions.

7.    I expressed to Mr. Lawson my concerns that between the May 26, 2006, entry of the *Order* and the July 15, 2006, deadline stated within ¶3 of the *Order* that the City would be able to draft, conduct public hearings and adopt a wholly new comprehensive sign ordinance.

8.    Mr. Lawson agreed that the City could adopt a "Political Sign Directive" (not an ordinance) to comply with the July 15, 2006, deadline and in advance of the Annual Municipal election, and that should the City follow that course of action, Plaintiffs would waive any claim or remedies for contempt against the City for failing to adopt a wholly new ordinance by that date. Mr. Lawson and I also agreed to thereafter work together in good faith to adopt a more comprehensive ordinance which would include an enforcement provision.

9.    At the June 19, 2006, regular meeting of the City Commissioners attended by Mr. Lawson, I outlined our agreement and asked him whether I correctly stated the terms, and he replied that I had. (Exhibit A hereto is the Minutes of the June 19, 2006, Meeting)

10.    On June 24, 2006, I prepared a first draft of the Directive and sent it to Mr. Lawson for his comments and edits which he provided.

11.    On June 28, 2006, I circulated to the Mayor and Commissioners the agreed-upon version of the "Political Sign Enforcement Directive" for their review and comment. At around the same time, Mr. Lawson's draft comprehensive re-write of the sign ordinance was distributed to the Mayor and Commissioners for their review and consideration.

12.    At a Special Meeting of the Mayor and Commissioners on July 3, 2006, the "Political Sign Enforcement Directive" instituting a policy of consistent enforcement of City Code § 74-16 was adopted and implemented by the City. (Exhibit B hereto is the "Political Sign Enforcement Directive; Exhibit C hereto is the Minutes of the July 3, 2006, Special Meeting)

13.    It was my understanding as City Solicitor that by adopting and implementing the "Political Sign Enforcement Directive", the City would be in good faith compliance with the intent, if not the letter, of the Court's May 26, 2006, *Order* given our efforts to work with Plaintiffs and their stated ambition for a comprehensive rewrite of the sign ordinance.

14.    It was also my understanding, in good faith, that Plaintiff's had agreed to extend the July 15, 2006 deadline for the adoption of a sign enforcement ordinance, and had waived any argument that the City had violated the Court's *Order* of May 26, 2006, by failing to enact a wholly new ordinance by the July 15, 2006, deadline.

15.    After the Enforcement Directive was adopted, Mr. Lawson participated in a meeting at which was present each of the candidates running for Commissioner. The sole purpose of the meeting was to advise the candidates as to the provisions contained within the Directive.

16.    Thereafter I continued my efforts with Mr. Lawson to draft a comprehensive re-write of the City's sign ordinances including meeting with him on at least one occasion at Mr. Lawson's offices to discuss the sign ordinance and related issues.

17.    Mr. Lawson's draft of the comprehensive re-write of the City's sign ordinance included a "grandfather" provision for certain existing signs, defining a legally "non-conforming sign" as one existing prior to the enactment of the ordinance and which would be allowed to remain where placed so long as it was not enlarged or altered, and prohibiting reconstruction in the event of destruction "except in compliance with the provisions" of his proposed re-write. (See Exhibit D hereto, being Mr. Lawson's draft ordinance, at "Definitions" and "Non-conforming sign" thereunder).

18.     At the September 18, 2006, regular meeting of the Mayor & Commissioners, the Enforcement Ordinance, Code § 74-17, was adopted. (Exhibit E hereto is the Ordinance to Amend Chapter 74 of the Municipal Code enacting Code § 74-17; Exhibit F hereto is the Minutes of the September 18, 2006, Meeting)

19.     In substance, the Ordinance codified into Code § 74-17 the definitions and requirements of the July 3, 2006, "Political Sign Enforcement Directive" drafted with Mr. Lawson's full participation. (*Compare* Exhibit B *with* Exhibit E)

20.     Further Affiant sayeth NOT.



GLENN C. MANDALAS

State of Delaware          )
                           )     SS.
County of Kent             )


BE IT KNOWN that on this 9th day of November, 2006, did appear before me, a Notary Public in the State and County aforesaid, GLENN C. MANDALAS who, being made known personally to me, did swear and make the foregoing statement his very own by act and deed.

Lori Rebuck, Notary Public

My Commission expires:

LORI WILSON REBUCK
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires June 6, 2010

**EXHIBIT "1"**

**MAYOR AND COMMISSIONERS MEETING**
**CITY OF REHOBOTH BEACH**

**June 19, 2006**

The Regular Meeting of the Mayor and Commissioners of the City of Rehoboth Beach, was called to order at 7:05 p.m. by Mayor Samuel R. Cooper on Monday, June 19, 2006 in the Commissioners Room in City Hall, 229 Rehoboth Avenue, Rehoboth Beach, DE.

Commissioner Ron Paterson gave the invocation that was followed by the Pledge of Allegiance.

**ROLL CALL**

Commissioner Kathy McGuiness called the roll.

Present:      Commissioner  Patrick Gossett
              Commissioner  Kathy McGuiness
              Commissioner  Ron Paterson
              Mayor         Samuel R. Cooper
              Commissioner  Dennis Barbour
              Commissioner Patti Shreeve

Also in attendance was:          City Manager Gregory Ferrese
                         City Solicitor Glenn Mandalas

**CORRESPONDENCE**

There was none.

**APPROVAL OF MINUTES**

Minutes of the April 17, 2006 Regular Meeting, May 15, 2006 Regular Meeting and June 5, 2006 Workshop Meeting were distributed prior to the meeting.

Commissioner Patrick Gossett made a motion, seconded by Commissioner McGuiness, to approve the April 17, 2006 Mayor and Commissioners Regular Meeting minutes as written. Motion carried unanimously.

Commissioner Patti Shreeve made a motion, seconded by Commissioner McGuiness, to approve the May 15, 2006 Mayor and Commissioners Regular Meeting minutes as written. Motion carried unanimously.

Commissioner Shreeve made a motion, seconded by Commissioner McGuiness, to approve the June 5, 2006 Mayor and Commissioners Workshop Meeting minutes as written. Motion carried unanimously.

**REPORT OF THE POLICE DEPARTMENT**

(See attached report.)

Police Chief Keith Banks presented the report of the Police Department for the month  of May 2006.  There were 69 criminal and 209 traffic charges made during the month.   Seventeen vehicle accidents were investigated.  The Dispatch Center handled 259 traffic stops, and 9-1-1 calls totaling 545 were received.  There were 27 false alarm incidents.  Chief Banks and City Solicitor Glenn Mandalas have devised a form for better documentation to be use for noise complaints.

Mayor and Commissioners Regular Meeting
June 19, 2006
Page 2

City Solicitor Mandalas added that the noise complaint form would create a record that the court would look to for establishing that a reasonable person would find the noise to be unnecessary or disturbing.

## REPORT OF THE BUILDING AND LICENSING DEPARTMENT

(See attached report.)

Building Inspector David Murphy presented the report of the Building and Licensing Department for May 2006. During the month, 103 building permits were issued for a value of work totaling $1,710,962.43. Fees collected totaled $36,122.58 for the month. No cases were heard by the Board of Adjustment in May. No restaurant application was received in May. Three stop work orders were issued. Two notices of violation were issued due to contractors working without licenses. Five notices of violation were issued due to contractors working without building permits. One notice of violation was issued due to an owner working without a building permit. One notice of violation was issued for a contractor working after 5:00 p.m. Ten notices of violation were issued for contractors working on Saturday. Seven sidewalk and five tall grass notices of violation were issued. One notice of violation was issued for an A-frame sign located on the Boardwalk.

Mr. Hoyte Decker, 214 Laurel Street, asked how many permits have issued for new residential homes since September 12, 2005. Mr. Murphy responded with three permits.

Ms. Bitsy Cochran, 102 N. First Street, asked how many speaker violations there are. Mr. Murphy responded that he found two restaurants with speaker violations during the month of May 2006, and notices were given.

## REPORT OF THE PLANNING COMMISSION

There was no report due to there not being a meeting held in the month of May 2006.

## OLD BUSINESS

Mayor Cooper called for an update on Streetscape and reported that there had been a dedication ceremony on Friday, June 16, 2006. Commissioner Patrick Gossett and Dennis Barbour were acknowledged for organizing the event, along with the help from the State of Delaware. The work on the Bandstand Pavilion is continuing, and there will be a final inspection of the Streetscape elements on June 22, 2006 which will develop the final punchlist. The electrical work at the Bandstand was being worked on today. Completion for the project is expected by June 30, 2006. The pavers were expected to arrive today, and Mainstreet will check each paver for accuracy. After that, the pavers will be installed.

Commissioner Barbour thanked the businesses and volunteers that contributed to the event.

City Manager Gregory Ferrese stated that the first performance at the Bandstand is scheduled for July 2, 2006.

Mayor Cooper called for further discussion of modifications to Floor Area Ratio definition, calculations, and other related Zoning Code issues.

Commissioner Barbour clarified that there have been discussions about exemptions since last year when the Floor Area Ratio was reduced from .7 to .6. The current package is an attempt to address some of the concerns that have been raised

Mayor and Commissioners Regular Meeting
June 19, 2006
Page 3

by many people over the course of the past year. Commissioner Barbour distributed an outline of suggested revisions to the proposed FAR. (Copy attached.) The provisions relate principally to R-1 properties and cover mostly new construction. Current structures are grandfathered where there is, for example, a change in the setback requirements. The amendments provide more options for homeowners.

Proposed Exclusions to FAR:

1.  Attics. Used for storage space and have no permanent staircase.
2.  Basements. Up to 6'-6" in new construction would be allowed and would not be calculated in the total square footage. For existing homes with a basement, any height would be grandfathered and would not be calculated in the total square footage provided it does not exceed three feet above ground.
3.  Front porches. A portion of the front porch space would be exempt from the square footage requirements provided that it is not enclosed, heated or air conditioned, and does not have a second story above it, etc. which is referenced in the draft. The allowable square footage for exclusion is 250 square feet.

Proposed New Exemption to FAR:

1.  Lots that are from 4,200 to 5,000 square feet would be allowed the same size house, square footage-wise, as would be allowed on lots 5,000 square feet or greater. Lots less than 4,200 square feet would be subject to the percentage FAR which would be .6 FAR.

Proposed Inclusions to FAR:

1.  Height. Maximum is 35 feet. Chimneys are exempted if they are functional.
2.  Roof pitch. Minimum would be 5/12. Above 14 feet, flat roofs and railings would not be permitted.
3.  Cathedral ceilings. In a square room with a ceiling above 12 feet in height, the room would be considered as two floors for purposes of calculating square footage. If there is a sloped ceiling, only the portion at 12 feet would be considered as two floors.
4.  Setbacks. Side setbacks would be 16 feet in the aggregate with six feet minimums. Front setbacks would be 15 feet with no front porch and 10 feet where a front porch is built.
5.  Architectural task force will be charged with looking into the merit of having an architectural review board, and will report back within one year.
6.  Residential and commercial. Where residential is constructed on a commercially zoned property, the setbacks and square footage requirements for residential property would have to be utilized.
7.  Either an owner can opt for the 3,000 square feet or .6 FAR or an owner can opt for .5 FAR above ground which is 2,500 square feet. If the latter option is taken, the owner could construct a 1,000 square feet basement with an eight feet maximum height.

Public Comment:

1.  Mr. Hoyte Decker, 214 Laurel Street - suggested the scheduling of a Workshop for the citizens of the City of Rehoboth Beach.

Mayor and Commissioners Regular Meeting
June 19, 2006
Page 4

2.  Mr. Steven Simmons, 314 Stockley Street - suggested the establishing of an architectural task force before

voting on these issues.

3.  Ms. Linda Kauffman, 206 Laurel Street - requested clarification of the definitions, and asked if the Public would be able to see the draft ordinance before it is adopted.
4.  Mr. Dick Lynam, 19 Maryland Avenue - concerned with underground parking being an inclusion.
5.  Mr. Jay LaGree, 7 Prospect Street - concerned with living in a flood zone and the usage of a basement, and is concerned with abiding by the hurricane resistant building code and construction.
6.  Mr. Eugene Lawson, 12 Hickman Street - commented that green architecture is being eliminated by not allowing flat roofs.
7.  Mr. Stan Mills, 38 Maryland Avenue - concerned with protecting the character of the City, and proposed to table this discussion and implement a task force.
8.  Mr. Bill Payton, 148 Henlopen Avenue - concerned with investigating a problem that does not exist.
9.  Mr. Gregory Oliver, 41 Baltimore Avenue - suggested the proposal of credits for a commercial zone and mixed-use properties.
10. Ms. Bitsy Cochran, 102 N. First Street - questioned if cathedral ceilings are in keeping with the character of the City, and if parking is not encouraged in front of a house.
11. Mr. Scott McBride, 16 Columbia Avenue - supported the .6 FAR, but is now concerned about non-conformities and preserving the character of the City.
12. Ms. Nancy Martin, 87 Henlopen Avenue - concerned with the size of houses and supports the proposed ordinance.
13. Ms. Joyce Lussier, 99 Henlopen Avenue - supports the proposed ordinance.
14. Mr. Chris Riss, 33-B Delaware Avenue - requested clarification of the exclusions and inclusions.
15. Ms. Vicki Warther, 207 Norfolk Street - requested clarification of enclosed accessory buildings.
16. Ms. Pat Coluzzi, 41 Sussex Street - recommended larger dimensions of a front porch to be excluded to encourage building front porches.
17. Ms. Rosalyn Merrell, 15 Columbia Avenue - concerned with the size of houses in reference to Option A or B.
18. Mrs. Nancy Meadows, 502 New Castle Street - commented that the commercial areas would have to be looked at separately; asked if lots on Philadelphia Avenue had been looked at; and requested clarification of mixed-use properties.
19. Mr. Tim Spies, 53 Columbia Avenue - asked what the architectural review task force will be looking at, and suggested that the FAR should be .5.
20. Mr. Guy Martin, 87 Henlopen Avenue - suggested that the 2,500 square feet option should have incentives.
21. Mr. Walter Brittingham, 123 Henlopen Avenue - suggested that parking is a separate issue to be addressed.

Commissioner Barbour will be meeting with City Solicitor Mandalas,        Mr. Murphy and Mr. Kyle Gulbronson of URS, to prepare a draft ordinance. The draft will then be posted to the City website, and will be presented at the next        Workshop Meeting to be held on July 3, 2006.

Mayor and Commissioners Regular Meeting
June 19, 2006
Page 5

# NEW BUSINESS

Mayor Cooper called to adopt Resolution authorizing the issuance of up to $6,000,000.00 General Obligation Bond of the City of Rehoboth Beach, Delaware pursuant to Section 40(s) of the City Charter to finance capital improvements in connection

with the City's Rehoboth Avenue Streetscape Project and to finance certain capital improvements in connection with replacing the First Street Bridge over Lake Gerar. (Copy attached.)

Commissioner Paterson made a motion, seconded by Commissioner Barbour, to adopt Resolution authorizing the issuance of up to $6,000,000.00 General Obligation Bond. (Gossett – aye, McGuiness – aye, Paterson – aye, Cooper – aye, Barbour – aye, DeWitt – aye.) Motion carried unanimously.

Mayor Cooper called for consideration of request by Mr. Paul Lovett, owner of property located at 510 Rehoboth Avenue, to demolish and replace with a new structure of the same size, that portion of the structure that encroaches into the right-of-way of Rehoboth Avenue. Copies from the Board of Adjustment file were distributed prior to the meeting.

Mrs. Cindy Lovett gave her presentation and stated that the decision of the Board of Adjustment at their April 24, 2006 meeting was that the Board approved the re-construction of the building with its attached apartment so long as it was done in accordance with the Lovett's presentation to them which established that the Lovett's intent was to retain the current character of the building. The Board determined that the request to re-construct a non-conforming canopy over the City sidewalk was outside its jurisdiction. The Board expressed a judgment that it would endorse a City decision to allow the porch to be rebuilt. Mrs. Lovett is requesting that she and Mr. Paul Lovett be provided with the appropriate approval of licenses from the City and allow them to    re-construct the porch and canopy over the City sidewalk.

Commissioner Paterson voiced concern about approximately half of the public sidewalk being used by the tenant with shelving units and merchandise reducing the sidewalk to approximately four feet. He also noted that it is a safety issue with the shelves being positioned out to the curb, making it impossible for someone to park and exit the vehicle. He is not concerned with the canopy, but he is concerned with the used of City property being used for retail purposes.

Mr. Murphy stated that within the Code, it refers to the jurisdiction of regulations of sidewalks. He also referred to the sign ordinance.

Mayor Cooper thought there should be a license agreement, and approval could not be given until there is an agreement. The issue is that the canopy is over the right-of-way which is City property. He also thought that the selling of merchandise from the City space is an issue, and that could not be grandfathered.

Commissioner Barbour suggested that the canopy be approved subject to not selling merchandise on City property.

Mayor Cooper called for discussion of proposal by Rehoboth Beach Main Street to allow eating establishments to lease and use sidewalk areas for service of food and drink.

Ms. Fay Jacobs of Mainstreet gave her presentation and stated that the proposed ordinance would allow food establishments to have outdoor dining available. She recommended that a Commissioner, a person from Mainstreet, and a person from the Building and Licensing Department meet to review. What is being proposed is to mark off areas with tape, stanchions, etc. to see how much space there is for seating in the

outdoor dining area. This is no different than patio dining. A seasonal rental fee would be paid to the City. Four feet of walking space is required by ADA.

Commissioner Paterson voiced concern as to the allowable walking space on the sidewalk. Mayor Cooper commented that four feet of walking space is unacceptable.

Commissioner Shreeve supports the concept. Commissioner Gossett also supports the concept, but he is concerned about how to address a liquor license from ABCC, enforcing of this ordinance, and storage of chair and tables in the off-time. Mr. Murphy voiced concern about enforcement of the ordinance and staffing in the Building and Licensing Department.

Mainstreet will continue to work on this project, and will return to the Commissioners at a later date.

## CITY MANAGER'S REPORT

Mr. Ferrese requested a motion to set the real estate tax rate at $1.55 per hundred dollars of assessed value, which would be a 15% increase and would generate approximately $90,000.00 to $95,000.00. The last tax increase was in 1993.

Commissioner Barbour made a motion, seconded by Commissioner McGuiness, to set the real estate tax rate for the year 2006/2007 at $1.55 per hundred dollars of assessed value. (Gossett – aye, McGuiness – aye, Paterson – aye, Cooper – aye,  Barbour – aye, Shreeve – aye.) Motion carried unanimously.

Mr. Ferrese called for the submission for approval as to qualifications of Nominating Petitions for Commissioners.

Ms. Pat Coluzzi is seeking the office of Resident Commissioner of the City of Rehoboth Beach. Her Nominating Petition was submitted on May 31, 2006 at 11:37 a.m., and she has 24 certified voters on her Petition. Ms. Coluzzi has a State of Delaware driver's license and is a resident of the City of Rehoboth Beach. Mr. Ferrese recommended that Ms. Coluzzi's Petition be accepted.

Commissioner McGuiness made a motion, seconded by Commissioner Barbour, to accept the Nominating Petition of Ms. Patricia Coluzzi to run for office of Resident Commissioner in the municipal election on August 12, 2006.  (Gossett- aye, McGuiness – aye, Paterson – aye, Cooper –aye, Barbour – aye, Shreeve – aye.) Motion carried unanimously.

Mr. Paul Kuhns is seeking the office of Resident Commissioner of the City of Rehoboth Beach. His nominating Petition was submitted on March 9, 2006 at 8:52 a.m., and he has 19 certified voters on his Petition. Mr. Kuhns has a State of Delaware driver's license and is a resident of the City of Rehoboth Beach. Mr. Ferrese recommended that Mr. Kuhns' Petition be accepted.

Commissioner McGuiness made a motion, seconded by Commissioner Barbour, to accept the Nominating Petition of Mr. Paul Kuhns to run for office  of Resident Commissioner in the municipal election on August 12, 2006.  (Gossett – aye, McGuiness – aye, Paterson – aye, Cooper – aye, Barbour –aye, Shreeve –aye.)  Motion carried unanimously.

Ms. Kathy McGuiness is seeking the office of Non-Resident Commissioner of the City of Rehoboth Beach.  Her Nominating Petition was submitted on  May 4, 2006  at

Mayor and Commissioners Regular Meeting
June 19, 2006
Page 7

2:50 p.m., and she has 20 certified voters on her Petition. Ms. McGuiness has a State   of Delaware driver's license, and is a non-resident of the City of Rehoboth Beach.       Mr. Ferrese recommended that Ms. McGuiness' Petition be accepted.

Commissioner Paterson made a motion, seconded by Commissioner Shreeve, to accept the Nominating Petition of Ms. Kathy McGuiness to run  for office of Non-Resident Commissioner in the municipal election

on August 12, 2006. (Gossett – aye, McGuiness – abstain, Paterson – aye,     Cooper –aye, Barbour – aye, Shreeve – aye.) Motion carried.

Mr. Ferrese read the report for awarding the bid for repair of wood and painting at the Rehoboth Beach Train Station. He recommended to award the bid to Nelson Construction L.L.C. in the amount of $13,500.00. (Copy attached.)

Commissioner McGuiness made a motion, seconded by Commissioner Gossett, to award the bid to Nelson Construction L.L.C. in the amount of $13,500.00 for the minor repair work and painting of the Railroad Station. (Gossett – aye, McGuiness –aye, Paterson –aye, Cooper –aye, Barbour – absent, Shreeve –aye.) Motion carried.

Mr. Ferrese recommended the approval of the Street Aid expenditures:

Check No.  568                06-09-06       Delmarva Power        $ 7,200.24

Commissioner Shreeve made a motion, seconded by Commissioner Gossett, to approve the Street Aid expenditures.  Motion carried unanimously.

## COMMITTEE REPORTS

There were none.

## CITY SOLICITOR'S REPORT

City Solicitor Mandalas stated that there is a court order for the City to adopt a sign enforcement ordinance by July 15, 2006. He proposed that with the upcoming election there be  a policy directive to address only political signs, and where they can or cannot be placed. Then an ordinance can be adopted that addresses both political and non-political signs with the understanding between the parties that the overall ordinance can be adopted after July 15, 2006. City Solicitor Mandalas also is proposing, at the Special Meeting to be scheduled on July 3, 2006, that the Commissioners vote on a directive or a resolution permitting Mayor Cooper to adopt a directive.

## CITIZEN COMMENTS

Ms. Bitsy Cochran, 102 N. First Street, voiced concern about big trucks and buses using the bridge at Lake Gerar. She also suggested that the public be allowed to speak at the Workshop Meetings, and that a policy should be written for the Bandstand and have it open for rentals. In reference to restaurants and sidewalks, cleanliness needs to be addressed. Ms. Cochran suggested that the city buy a steam power washer to keep the sidewalks clean. Take-out windows and the associated trash fees also need to be addressed.

Mr. Stan Mills, 38 Maryland Avenue, applauded the Fire Department for their response to the fire on First Street recently. The storm drain marking system is still proceeding, but there has been a delay in manufacturing. On June 20, 2006 at 5:30 p.m., the American Red Cross will be hosting a seminar on hurricane preparedness at the Rehoboth Beach Public Library.

Mayor and Commissioners Regular Meeting
June 19, 2006
Page 8

Mr. Walter Brittingham, 123 Henlopen Avenue, commented that the 9-1-1 Dispatch Center is very important.

The Workshop Meeting will be held on Monday, July 3, 2006.

There being no further business, Mayor Cooper declared the meeting adjourned at     10:55 p.m.

Respectfully submitted,

_____

(Kathy McGuiness, Secretary)


<u>HOME</u>

**EXHIBIT "2"**

## DIRECTIVE

## ENFORCEMENT OF CITY OF REHOBOTH BEACH CODE SECTION 74-16

## POLITICAL SIGNS

WHEREAS, Section 74-16 of the Municipal Code of the City of Rehoboth Beach, titled "Posting signs on public property prohibited", states:

> *No person shall keep, maintain or post any private advertisement, poster or sign upon or on any beach or strand or public boardwalk, park, sidewalk, street or other public property or way within the limits of the city.*

WHEREAS, the City of Rehoboth Beach's Annual Municipal election is scheduled to occur on August 12, 2006;

WHEREAS, the City recognizes the constitutional protections afforded speech of a political nature.

NOW THEREFORE, the City shall enforce Section 74-16 according to the following directives:

1. Enforcement of the ordinance with respect to political signs shall be consistent, and without regard to the person, political action group, or candidate responsible for erecting a political sign;

2. Political signs shall be removed no later than 5 days following the Annual Municipal Election;

3. With respect to political signs only, Section 74-16 of the Municipal Code of the City of Rehoboth Beach shall be interpreted to prohibit placement of such signs in the following roadway related areas:

   a. Traffic roundabout, islands and medians; defined as public property bound by public streets;
   b. Where there is no curb and no sidewalk, the area from the edge of the street plus seven (7) feet;
   c. Where there is a curb and no sidewalk, the area from the outer edge of the curb plus seven (7) feet; and
   d. Where there is a sidewalk, the area from the outer edge of the curb where there is a curb, or the area from the outer edge of the street where there is no curb to the sidewalk edge further from the street.

4.   Political signs shall not be affixed to any public structure, including public utility poles;

5.   Political signs shall not obstruct motorists' vision of traffic control signals;

6.   Political signs shall not be placed in public parks, on any public beach or any unquestionably public property; and

7.   In the event of any question or doubt about the public or private nature of property upon which a political sign has been placed, such political sign shall be permitted to remain unless and until such question or doubt has been resolved.

This directive shall be applicable to the 2006 Annual Municipal Election, and shall be void thereafter.

Adopted this  3  day of  July, 2006  pursuant to a Resolution Authorizing The Execution Of A Directive Relating To The Enforcement Of Section 74-16 Of The City Code dated July 3, 2006.


MAYOR SAMUEL R. COOPER

**EXHIBIT "3"**

**MAYOR AND COMMISSIONERS MEETING**
**CITY OF REHOBOTH BEACH**

**July 3, 2006**

The Special Meeting of the Mayor and Commissioners of the City of Rehoboth Beach, was called to order at 7:05 p.m. by Mayor Samuel R. Cooper on Monday, July 3, 2006 in the Commissioners Room in City Hall, 229 Rehoboth Avenue, Rehoboth Beach, DE.

Commissioner Ron Paterson gave the invocation that was followed by the Pledge of Allegiance.

**ROLL CALL**

Commissioner Kathy McGuiness call the roll.

Present:           `       Commissioner  Patrick Gossett
                   Commissioner  Kathy McGuiness
                   Commissioner  Ron Paterson
                   Mayor         Samuel R. Cooper
                   Commissioner  Dennis Barbour
                   Commissioner Patti Shreeve

Also in attendance were:   City Manager Gregory J. Ferrese
                           City Solicitor Glenn Mandalas

The purpose of this Special Meeting is to:

A.  Adopt Resolution setting Public Hearing to amend Chapter 270 of the Municipal Code of Rehoboth Beach, DE 2001 relating to Definitions, Non-conformity and      Height, Density and Area Requirement, and other related subjects.

Commissioner Barbour distributed the proposed Resolution, and explained each section in it.  (Copy attached.)

Section 1.        Definitions of Attic and Height.

Mayor Cooper voiced concern that the definitions should be addressed to eliminate ambiguity.

Section 2.        Clarifies the definition of Height.

Commissioner Barbour commented that the measurement of the height of a building is confusing, but it is reflected in the current Code and is used by the Building Inspector.

Section 3. Discusses Height limitations and architectural embellishments allowed; how height is measured; functional chimneys; and minimum roof pitch.

Section 4. Discusses .5 Option; Lots containing between      4,200 square feet and 5,000 feet; and what is and is not included in Floor Area.

Discussion ensued as to why bay windows were not included in the definitions.

Mayor and Commissioners Special Meeting
July 3, 2006
Page 2

Commissioner Paterson voiced concern about Option 1 & 2 in regard to a 4,200 square feet lot. The FAR would be either .71 or .83 if the house is built to the maximum which is above the .5 that is being proposed. Commissioner Gossett commented that this concern could be addressed at a future time or could be addressed by the Architectural Review Task Force.

After discussion of what shall be included in the Floor Area, the consensus of the Commissioners was to amend the Floor Area Gross to only include the interior first floor space where the ceiling height is 12 feet or greater and is doubled for the purpose of calculating FAR.

Commissioner Paterson voiced concerned about garages being included in the Floor Area. Commissioners Gossett and McGuiness commented that this should be addressed.

Commissioner Paterson did not feel that the exclusion for front porches should not be limited to front porches. Commissioner Gossett commented that the Commissioners are trying to encourage what people want.

Section 5.          Definition of Cellar is deleted.
Section 6. Discusses construction of residential in commercial areas.
Section 7, 8, 9. Discusses Setbacks.

Commissioner Paterson voiced concern that R-2 was eliminated from the proposed Resolution. After discussion, Section 9 will read as R-1 and R-2.

Section 10. Discusses non-conforming structures.

Public Comment:

1.   Mr. Walter Brittingham, 123 Henlopen Avenue, commented that the Public should have input before this goes to Public Hearing.
2.   Mr. Bob Sokolove, 4 Norfolk Street, suggested a working workshop before the Public Hearing.
3.   Mr. Steven Simmons, 314 Stockley Street, congratulated the Commissioners on moving forward with this issue.
4.   Mr. Bob Reed, 31 Olive Avenue, commented that the Commissioners did not think this issue through, and the rules should apply to everyone.
5.   Mr. Tim Spies, 53 Columbia Avenue, supports the Resolution to be taken to Public Hearing.
6.   Mr. Howard Menaker, 16 Dover Street, commented that a Public Hearing with Public Comment is appropriate.
7.   Mr. Paul Kuhns, 125 Stockley Street, commented that a lot of people are concerned that this issue is moving too quickly.

Mayor Cooper stated that he is not prepared to go to Public Hearing with this Resolution because he has an issue with the intent of it. Commissioner Paterson agreed because he felt he did not have enough time  to review the Resolution which was presented to him at the start  of  the  meeting.

Mayor and Commissioners Special Meeting
July 3, 2006
Page 3

Mayor Cooper asked Mr. David Murphy to provide his input on different areas in regard to the Resolution. Mr. Murphy responded that he has concerns about basement, height, embellishments, cupolas, etc.

The Special Workshop Meeting is scheduled for Tuesday, July 11, 2006 at 9:00 a.m. to further discuss the Resolution with Mr. Murphy,              Mr. Kyle Gulbronson of URS and City Solicitor Glenn Mandalas as active participants.

B.   Adopt Resolution pursuant to Section 29(a)(41) of the  City  Charter  authorizing  the execution of a Directive relating to the enforcement of Section 74-16 of the City      Code.

City Solicitor Mandalas stated that the resolution authorizes Mayor Cooper to sign the Directive as to political signs. He read the Directive.  (Copies attached.)

Commissioner Shreeve made a motion, seconded by Commissioner Paterson, to adopt Resolution authorizing the Mayor to sign a Directive relating to the enforcement of Section 74-16 of the City Code regarding political signs.

Commissioner Gossett suggested that the City Solicitor, City Manager, and Mr. Murphy meet with the three candidates after the Directive is put in place, so they have a full understanding of how this is to be enforced and interpreted.

Mayor Cooper called for the vote.  (Gossett – aye, McGuiness – aye, Paterson – aye, Cooper –aye, Barbour –aye, Shreeve – aye.)  Motion carried unanimously.


There being no further business, Mayor Cooper declared the meeting adjourned at      9:15 p.m.


Respectfully submitted,


_____

**(Kathy McGuiness, Secretary)**

**EXHIBIT "4"**

*REPEAL ARTICLE VII OF CHAPTER 270, SIGN SECTION OF ZONING ORDINANCE*
*REPEAL ARTICLE II OF CHAPTER 74, SIGNS*
*ENACT THE FOLLOWING TO REPLACE ABOVE AS INDEPENDENT CHAPTER*

# PROPOSED SIGN ORDINANCE

**CHAPTER ??? SIGNS**

**§ 000-01. Definitions.**

As used in this Chapter, the following definitions shall be applicable unless the context clearly indicates to the contrary:

BANNER SIGN - Any sign intended to be hung, either with or without frames, and possessing characters, letters, illustrations or ornamentations applied to paper, plastic or fabric of any kind. National flags and flags of political subdivisions shall not be considered banners for the purpose of this Chapter.

BENCH SIGN - A sign located on any part of the surface of the bench or seat placed on or adjacent to a public right-of-way.

BILLBOARD SIGN - A non-point-of-sale sign which advertises a business, organization, event, person, place or thing, unless such sign is more specifically defined herein.

BUILDING INSPECTOR - The duly appointed building inspector for the City of Rehoboth Beach.

CHANGEABLE COPY SIGN —A sign that is designed so that characters, letters or illustrations can be changed or rearranged without altering the face of the surface of the sign. This shall also include the changing of copy on billboards.

CONSTRUCTION SIGN - Any sign giving the name or names of principal contractors, architects and lending institutions responsible for construction on the site where the sign is placed, together with other information included thereon.

DIRECTORY SIGN - A sign on which the names and locations of the occupants or the use or products offered for sale on the premises are given. This shall include office buildings and church directories. This sign shall be no more than four square feet in size and shall be installed parallel to the street, projecting no more than two inches from the face of the building and shall be no higher than seven feet from the top of the sign

to the sidewalk. Any glazing used in the construction or makeup of this sign shall be tempered or safety glass.

FREESTANDING SIGN - Any mobile or portable sign or sign structure not securely attached to the ground or to any other structure. This definition shall not include "trailer signs" as defined in this section.

GROUND AND/OR POLE SIGN - Any sign which is supported by structures or supports in or upon the ground and independent of support from any building.

ILLUMINATED SIGN - Any sign illuminated in any manner by an artificial light source.

INTEGRAL SIGN - Memorial signs or tablets, names of buildings and date of erection when cut into any masonry surface or when constructed of bronze or other incombustible materials and mounted on the face of the building.

MARQUEE SIGN - Any sign attached to and made part of a marquee. A "marquee" is defined as a permanent roof-like structure projecting beyond the building's wall and generally designed and constructed to provide protection against the weather.

NONCONFORMING SIGN - Any sign which does not conform to the regulations of this Chapter. Where a Nonconforming sign existed on the effective date of the enactment of this Chapter 000, such date being September 18, 2006, such sign may be continued, subject to the following provisions:

      A.    No such sign may be enlarged or altered in any way which increases its nonconformity.

      B.    If the sign is destroyed by any means to an extent of more than 50% of its size, it shall not be reconstructed except in compliance with the provisions of this Chapter.

POINT-OF-SALE SIGN - Any sign which carries only the name of the firm, major enterprise or products offered for sale on the premises or a combination of these things.

PROJECTING SIGN - Any sign other than a wall sign affixed to any building or wall whose leading edge extends beyond such building or wall.

REAL ESTATE SIGN - Any sign which is used to offer for sale, lease or rent the property upon which the sign is placed.

ROOF SIGN - Any sign erected or constructed wholly upon and over the roof of any building and supported solely on the roof structure.

SIGN - Any device designed to inform or attract the attention of persons not on the premises on which the sign is located; provided, however, that the following shall not be included in the application of the regulations herein:

      A.    Signs not exceeding one square foot in area and bearing only property numbers, post box numbers or names of occupants of the premises.

      B.    Flags and insignia of any government, except when displayed in connection with commercial promotion.

      C.    Legal notices, identification, information or directional signs erected by governmental bodies.

      D.    Integral decorative or architectural features of buildings, except letters, trademarks, moving parts or moving lights.

      E.    Signs directing and guiding traffic and parking on private property, but bearing no advertising matter.

STREET BANNER SIGN - Any banner sign which is stretched across and hung over a public right-of-way.

TRAILER SIGN - Any sign mounted on a vehicle normally licensed by the State of Delaware as a trailer and used for advertising or promotional purposes.

WALL SIGN - Any sign painted on or attached to and erected parallel to the face of or erected and confined within the limits of the outside wall of any building and supported by such wall or building and which displays only one advertising surface.

WINDOW SIGN - Any device displaying words, letters or numbers placed inside or upon a window facing the outside and which is intended to be seen from the exterior and which occupies more than 25% of the window area or any part of which is higher than 12 feet from the ground.

### § 000-02. Signs subject to this Chapter.

      A.    No sign shall be erected or maintained in the City other than signs of the character, size and construction expressly authorized by this Chapter.

      B.    This Chapter shall not apply to signs erected by any governmental agency to aid traffic and pedestrian safety.

C.    This Chapter shall not apply to any sign regulated by the State of Delaware or any of its agencies, departments or divisions.

## § 000-03. Temporary signs.

A.    Announcing signs. One sign per street frontage of a building which is under construction or structural alteration or repair announcing the character of the building enterprise or the purpose for which the building is intended, including names of architects, engineers, contractors, developers, financiers and others, provided that the area of such sign shall not exceed 16 square feet in residential districts or 32 square feet in other districts.

B.    Subdivision signs. One sign per street entrance to the subdivision and located on the property to be subdivided, provided that such sign shall not exceed 32 square feet in area. Such sign may not be erected until the subdivision has been approved by the Planning Commission and may be displayed for a period of one year from the date of erection, which date must be filed with the Building Inspector within 30 days after erection. Erection date will be determined to be the same as the subdivision approval date if not filed within the thirty-day period.

C.    Real Estate Signs.

1.    One sign per street frontage not exceeding four square feet in residential districts or eight square feet in commercial districts, advertising the sale, rental or lease of the premises on which displayed.  This type of sign may be a Freestanding Sign, a Ground and/or Pole Sign or a sign erected on a bracket from the subject premises.  A Real Estate Sign offering a premises for sale shall be removed within 15 days after settlement of the sale of the premises.

2.    Temporary directional signs in conjunction with an open house, not to exceed 2 square feet each, may be erected one hour before the open house and must be removed within one hour after the open house as follows:

a)    up to two such signs on the open house premises;

b)    up to two such signs on the street on which the house faces between the open house premises and the nearest intersection in each direction; and

c)    up to two such signs at the nearest intersection from the premises in each direction.

## § 000-04. Directional or Informational Signs.

Signs of a permanent nature, not exceeding 3 square feet in size, erected by or on behalf of a governmental body or nonprofit organization (including religious institutions) for the purpose of identification or directions shall be permitted provided such signs do not violate § 000-06 relating to Prohibited Signs.

## § 000-05. Political Signs.

Signs pertaining to any candidate or issue in an upcoming election or referendum shall be permitted throughout the City provided that the size of any such sign is not in excess of 6 square feet and further that such sign shall not be erected more than 60 days prior to such election or referendum and shall be removed within 7 days after the election or referendum.

## § 000-06. Prohibited Signs.

The following signs are prohibited in the City:

A.    Signs that are lighted in any manner which may constitute a traffic hazard or be a nuisance.

B.    Signs erected that provide blinking, moving, animation, revolving, chaser lights or moving spotlights.

C.    Signs attached to any vehicle parked primarily for display purposes and Trailer Signs.

D.    Notwithstanding anything to the contrary in this Chapter, no sign shall be permitted that, in the opinion of the Building Inspector, obstructs the view of motorists or pedestrians or in any other manner creates a safety hazard.

## § 000-07. Table of signs.

The table of signs permitted by zoning district is included at the end of this chapter.

## § 000-08. Residential Districts.

The following signs shall be permitted in Residential Districts:

A.    One nameplate sign no larger than 1.5 square feet in area displaying the name and street address of a building.

     B.     One identification sign no larger than two square feet in area for the purpose of identifying a boarding, rooming or tourist home, an apartment house or the name of a building manager or the name of a permitted use.

### § 000-09. Location of signs in Residential Districts.

No signs in Residential Districts shall be placed closer to the front property line than the lesser of:

     A.     five feet; or

     B.     one half the distance from the front property line to the front of the building.

### § 000-10. Commercial districts; permits and fees.

     A.     All signs permitted in any residential district shall be permitted in the commercial districts.

     B.     It shall be unlawful for any person to erect or maintain any sign as defined in this Chapter within the commercial districts for a commercial purpose without first obtaining a permit from the Building Inspector and making payment of the fee as provided in Schedule E, of § 102-6, of this Code.  No permit or fee shall be required for Real Estate Signs or Political Signs.

     C.     All rights and privileges acquired under the provisions of this Chapter, or any amendment thereto, are mere licenses revocable at any time by the Commissioners of Rehoboth Beach, and all such permits shall contain this provision. The Building Inspector is hereby authorized and empowered to revoke any permit upon failure of the holder thereof to comply with any provision of this Chapter.

### § 000-11. Regulations applicable in commercial districts.

The following regulations shall be applicable to any sign located in any commercial district:

     A.     All signs shall be attached to the property to which they pertain and shall advertise a business, commodity, service or entertainment conducted, sold or offered on the same property on which the sign is maintained.

     B.     All signs on Rehoboth Avenue shall be parallel to Rehoboth Avenue. All signs located on the Boardwalk shall be parallel to the Boardwalk.

C.     All signs in any commercial district other than Rehoboth Avenue or the Boardwalk may be perpendicular to the street but may not extend more than five feet from the front of the building to which it is attached and shall be at least 10 feet above the ground.

D.     Each property in a commercial district shall be permitted one Directory Sign and one other permitted sign on each commercial street it faces or on which it has entrance doors for use of the public, provided that such entrance doors open onto a commercial district.

E.     No sign shall be erected which is higher than the top of the first lowest roofline or the top of any false front or above 15 feet, whichever is higher.

F.     The maximum size of such sign in any commercial district shall be 3 square feet for each foot of building frontage on the lot, but not to exceed 100 square feet.

G.     Signs advertising a product for sale on the premises shall be permitted if the advertising of the product forms a part of the sign advertising the business.

H.     A group of stores, not all facing the street, shall be permitted one Ground or Pole Sign naming the center or mall and listing each business in the center or mall. This sign shall not exceed 10 feet in height nor more than 32 square feet in area nor more than 6 square feet for the name of the center nor more than 2 square feet for the name of each store or business conducted on the premises. Each business located in the center or mall shall be permitted one sign which shall be parallel to or perpendicular with the front of the store.  A perpendicular sign shall be no larger than six square feet.

I.     Any sign which projects over the City right-of-way with less than 8 feet clearance from the bottom of said sign to the sidewalk shall project no more than 2 inches from the face of the building to which it is attached.

§ 000-12. Maintenance and removal.

A.     Every sign, including but not limited to those signs for which permits or for which no permits or permit fees are required; shall be maintained in a safe, presentable and good structural material condition at all times, including the replacement of defective parts, painting, repainting, cleaning and other acts required for the maintenance of said sign. The owner of any property on which a sign is located and

those responsible for maintenance of the sign shall be equally responsible for maintenance of the conditions of the area in the vicinity of the sign and shall be required to keep this area clean, sanitary and free from noxious or offensive substances, rubbish and flammable waste materials. The Building Inspector shall require compliance with all standards of this Chapter. If the sign is not made to comply with adequate safety standards, the Building Inspector shall require its removal in accordance with this section.

   B. Abandoned signs. Except as otherwise provided in this Chapter, any sign that is located on property which becomes vacant and is unoccupied for a period of three months or more and any sign which pertains to a time, event or purpose which no longer applies shall be deemed to have been abandoned. Permanent signs applicable to a business temporarily suspended because of a change of ownership or management of such business shall not be deemed abandoned unless the property remains vacant for a period of six months or more. An abandoned sign is prohibited and shall be removed by the owner of the sign or the owner of the premises.

   C. Dangerous or defective signs. No person shall maintain or permit to be maintained on any premises owned or controlled by him any sign which is in a dangerous or defective condition. Any such sign shall be removed or repaired by the owner of the sign or the owner of the premises.

   D. The Building Inspector shall cause to be removed any sign that has been constructed or erected or is being maintained in violation of the provisions of this Chapter or that endangers the public safety, such as an abandoned, dangerous or materially, electrically or structurally defective sign. The Building Inspector shall prepare a notice which shall describe the sign and specify the violation involved and which shall state that if the sign is not removed or the violation corrected within 72 hours, the sign shall be removed in accordance with the provisions of this Chapter.  All notices mailed by the Building Inspector shall be sent by United States mail, postage prepaid. Any time periods provided in this section shall be deemed to commence on the date of mailing. If the notice is not complied with within the time period specified, the Building Inspector shall cause the sign to be removed at the expense of the owner or lessee. If the delay in repairing or removing the sign is occasioned by circumstances beyond the control of

the owner or the lessee, the Building Inspector may grant, in writing, additional time for removal or repair of this sign.

E.    For all signs other than those designated in Subsection D, notice shall be mailed to the owner of the property on which the sign is located as shown on the last equalized assessment roll. A copy of the notice shall be mailed to or delivered to the owner of the sign and the occupant of the property, if known.

F.    Notwithstanding the above, in cases of emergency, the City Manager, or his designee, may cause the immediate removal of a dangerous or defective sign without notice.

## § 000-13. Enforcement.

A.    No sign shall be permitted to be maintained or used in the City contrary to the provisions of this Chapter. The Building Inspector shall enforce the provisions of this Chapter, and he is hereby authorized and directed to cause removal of all signs from areas in which they are prohibited by this Chapter or which are maintained or used contrary to the provisions of this Chapter.

B.    The City's Building Inspector is hereby authorized to issue a citation to any person or persons who violate the provisions of this Chapter, which mandates the payment of the appropriate fine for said violation within 10 days of issuance. If said fine is not paid within this period, the Building Inspector may then file a summons for the arrest of said violator, by the City's police.

C.    This Chapter and all related provisions of the Code shall be enforced in a consistent, non-selective manner.

## § 000-14. Violations and penalties.

A.    Violation of the provisions of this Chapter shall constitute a misdemeanor, punishable by a fine of not less than $25, not to exceed $250 per offense, plus court costs. Whenever such persons shall have been notified in writing by the Building Inspector or by service of a summons in a prosecution or in any other way that they are committing such violation of this chapter, each day that they shall continue shall constitute a separate offense punishable by like fine or imprisonment.

B.     In addition to the fines and penalties herein described, the City may avail itself of any and all equitable remedies for the purpose of stopping continuing offenses of this Chapter.

**EXHIBIT "5"**

## AN ORDINANCE TO AMEND CHAPTER 74 OF THE
## MUNICIPAL CODE OF REHOBOTH BEACH, DELAWARE, 2001
## RELATING TO SIGNS

WHEREAS, it has been determined that there is a need to clarify the manner in which Section 74-16 of the Municipal Code of The City of Rehoboth Beach shall be enforced.

**BE IT ORDAINED** by the Commissioners of The City of Rehoboth Beach, in session met, in the manner following to-wit:

**Section 1.**    Chapter 74, the Municipal Code of The City of Rehoboth Beach, Delaware, 2001 as amended be and the same is hereby further amended by adding a new section 74-17 as follows:

## §74-17. Enforcement.

A.    Enforcement of this Article shall be consistent, and without regard to the individual, natural person, company, partnership, association, society, club, firm, corporation, organization, political action group, or any other group acting as a unit, responsible for keeping, maintaining or posting any private advertisement, poster or sign upon public property.

B.    Any advertisement, poster or sign kept, maintained or posted upon public property may be removed by the City of Rehoboth Beach. The individual or entity responsible for keeping, maintaining or posting any private advertisement, poster or sign upon public property that has been removed pursuant to the provisions of this Article may be required to pay a fine not to exceed $20 and may also be required to pay the reasonable costs of removal and a reasonable charge for storage, not to exceed $5 for each day or part thereof the private advertisement, poster or sign is so stored.

C.    Pursuant to §74-16 of this Article and no other provision, in areas not readily identifiable as public property, any private advertisement, poster or sign not within the following areas shall be permitted to remain unless and until the area is conclusively determined to be public property:

   (1)    Traffic islands, defined as public property bound by public roads;

   (2)    Where there is a road but no sidewalk and no utility pole, the area between the edge of the pavement and eight (8) feet extended perpendicular to the road;

   (3)    Where there is a road and a sidewalk but no utility pole, the area between the edge of the pavement and the furthest edge of the sidewalk; and

   (4)    Where there is a road and a utility pole, the area including the edge of the pavement and the furthest edge of the utility pole.

D.    This Article shall not apply to any private advertisement, poster or sign on public property as of May 1, 2006.

**EXHIBIT "6"**

## MAYOR AND COMMISSIONERS MEETING
## CITY OF REHOBOTH BEACH

### September 18, 2006

The Regular Meeting of the Mayor and Commissioners of the City of Rehoboth Beach, was called to order at 7:00 p.m. by Mayor Samuel R. Cooper on Monday, September 18, 2006 in the Commissioners Room in City Hall, 229 Rehoboth Avenue, Rehoboth Beach, DE.

Commissioner Ron Paterson gave the invocation that was followed by the Pledge of Allegiance.

## ROLL CALL

Commissioner Kathy McGuiness called the roll.

Present:         Commissioner  Patrick Gossett
                      Commissioner  Kathy McGuiness
                      Commissioner  Ron Paterson
                      Mayor         Samuel R. Cooper
                      Commissioner  Dennis Barbour
                      Commissioner  Paul Kuhns
                      Commissioner  Patti Shreeve

Also in attendance was:         City Manager Gregory Ferrese
                                      City Solicitor Glenn Mandalas

## CORRESPONDENCE

There was none.

## APPROVAL OF MINUTES

Minutes of the August 7, 2006 Special Meeting, the August 21, 2006 Regular Meeting, and the August 21, 2006 Reorganization Meeting were distributed prior to the meeting.

Commissioner Patti Shreeve made a motion, seconded by Commissioner Paterson, to approve the        August 7, 2006 Mayor and Commissioners Special Meeting minutes as written.  Motion carried unanimously.

Commissioner Shreeve made a motion, seconded by Commissioner Paterson, to approve the August 21, 2006 Mayor and Commissioners Regular Meeting minutes as written.  Motion carried unanimously.

Commissioner Shreeve made a motion, seconded by Commissioner Paterson, to approve the August 21, 2006 Mayor and Commissioners Reorganization Meeting minutes as written.  Motion carried unanimously.

## REPORT OF THE POLICE DEPARTMENT

(See attached report.)

Police Chief Keith Banks presented the report of the Police Department for the month    of August 2006.  There were 176 criminal and 302 traffic charges made during the month.  Twenty-three vehicle accidents were investigated.  The Dispatch Center handled 665 police incidents, 267 ambulance incidents, 79 fire incidents, assisted other agencies eight times during the month, and 9-1-1 calls totaling 838 were received.  There were 25 false alarms during the month.

**REPORT OF THE BUILDING AND LICENSING DEPARTMENT**

(See attached report.)

Building Inspector David Murphy presented the report of the Building and Licensing Department for August 2006. During the month, 52 building permits were issued for a value of work totaling $1,867,027.80. Fees collected totaled $25,230.81 for the month. No cases were heard by the Board of Adjustment in July. No restaurant application was received in July.    Two stop work orders were issued. Two notices of violation were issued due to contractors working without licenses. Eighteen notices of violation were issued due to contractors working with expired licenses. One notice of violation was issued due to a contractor working without a building permit. One notice of violation was issued for a contractor working before 8:00 a.m. Two sidewalk and two tall grass notices of violation were issued. One notice of violation was issued for speakers on a patio. Two notices of violation were issued for good displayed on sidewalks. Four notices of violation were issued for banner signs.

Commissioner Patrick Gossett noted that Cape Henlopen Elementary School is seeking a Variance to build a 5,200 square feet building which will house four classrooms because of the expansion for all-day Kindergarten.

Ms. Bitsy Cochran, 27 Baltimore Avenue, commented that a year ago she had been having flooding problems from her neighbor's property onto her property. She asked if an ordinance has been worked on to correct problems such as hers. Mr. Murphy responded that it has not been worked on, but it is on the list to be done.

**REPORT OF THE PLANNING COMMISSION**

(See attached report.)

Chairman Preston Littleton presented the report of the Planning Commission Meeting that was held on        September 11, 2006. A Preliminary Review of Application No. 0706-03 requesting a partitioning of a property located at Prospect Street, Lot 1 was held. The administrative documents were approved by the Planning Commission, with an effective date of October 2, 2006. The next scheduled meeting will be held on Tuesday, October 10, 2006 due to the City's observance of Columbus Day.

Commissioner Paterson asked if an updated draft schedule for major subdivision documents is being prepared. City Solicitor Mandalas has not prepared the report of the timeline to date.

Chairman Littleton noted that the Planning Commission is discovering deficiencies in the Code, and will be presenting them to the City Commissioners at a later date.

**PUBLIC HEARING**

Mayor Cooper called for Public Hearing pursuant to Resolution adopted August 21, 2006 proposing the borrowing of $5,000,000.00 to upgrade the City's water wells and water treatment facilities.

Mr. Bob Palmer of Davis, Bowen & Friedel gave his presentation. (Copy attached.) He focused on the City's intent to borrow $5,000,000.00 from the State of Delaware Office of Drinking Water's State Revolving Fund. The City has taken a proactive position with not only the operation of the existing facility and maintenance of it, but also expansion of the facility and setting up funds to help pay for expansion of various components of the water system.  He gave a brief overview of the system. There are three elevated storage tanks  that serve both the City and   Dewey Beach. Two are owned by the City, and one is owned by Sussex County. The County's system backs up the City's system. Three wells will be constructed, and two wells will be abandoned. The Lynch Well facility is being proposed to be upgraded which is the City's primary drinking well facility. Water will come into the facility, will be aerated and will fall into a clear well. The water from the aerators is pumped into carbon filters to affect Lindane removal. After the carbon filtration, chemical injection of chlorine and disinfection will occur along with fluoridation.   Under State mandate, the City was awarded a grant in the amount of $210,000.00 for fluoridation to the water system. Not only will the Lynch Water Treatment Facility be upgraded with fluoride, the other three well sites will be also.   The total projected cost is approximately $8,000,000.00. The City received a settlement of $900,000.00 from DELDOT to have Well No. 1 removed from the Route 1 right-of-way. The Capitalization Fund, which totals $1,700,000.00, was set up by the City for the expansion to the water system. Through the proportioning funds, $1,400,000.00 was the amount that was earmarked to used from the

Capitalization Fund. The remainder of the amount totals $5,000,000.00 which is the amount that the City is seeking referendum support through the Drinking Water State Revolving Fund.

Public Comment:

1.  Ms. Mabel Granke, 1013 Scarborough Avenue Extended – in support of.
2.  Mr.Jay Lagree, 7 Prospect Street – asked what additional expense is incurred with carbon filtration and if there is naturally occurring fluoride in the water. Mayor Cooper responded that the cost would be approximately $20,000.00 per year over a five year period to renew the carbon. Mr. Palmer noted that there is not naturally occurring fluoride in the water in this area.
3.  Dr. Preston Littleton, 300 Laurel Street – referenced favorable borrowing rates from the State. Mr. Palmer responded that the interest rate is 62.5% of the previous month's municipal bond yield.
4.  Mr. Walter Brittingham, 123 Henlopen Avenue – acknowledged that Mr. Palmer was gracious about his comments about how the City takes care of the water system.
5.  Mr. Greg Gause, 207 Bayard Avenue – asked if interest and principle repayment will be covered by water fees and not be a part of the City budget. Mayor Cooper responded that this will be the decision of the Commissioners on a year-to-year basis.

The Public Hearing was closed. Agenda Item No. 8(A) to adopt Resolution ordering that a Special Election be held for the purpose of voting for or against the proposed borrowing of $5,000,000.00 to upgrade the City's water wells and water treatment facilities will be held later in the meeting.

## OLD BUSINESS

Mayor Cooper called for an update on the complaint tracking system and quarterly newsletter .

Commissioner Dennis Barbour suggested that a system be set up for tracking complaints where citizens contact City Hall for intervention because of a specific problem. Remarks have been made that people submit requests, and the requests are unanswered. The idea is to set up a database with City software so everything that comes in is assigned with deadlines for response. An advantage of this is that over time, a sense of what kinds of complaints are coming and what the issues are that need to be addressed. Commissioner Barbour put together          a timeline that by December 1, 2006, the system would be finalized, and the system would be in effect on          January 1, 2007. Commissioner Barbour also suggested a quarterly newsletter. The issues needed to be explored are:  1. How best to forward the information to citizens.  2. Information that citizens like to have. The timeline is to have it set on January 1, 2007. He has been working with Mr. Hoyte Decker and Ms. Pat Coluzzi on these issues.          (Copy attached.)

Mayor Cooper voiced concern with many potential places for input and how to make sure that everybody who might receive it, can log it, etc. He also asked about what rises to the level of something that needs to be tracked.

Commissioner Shreeve suggested that setting up the complaint tracking system for a trial period would be useful.

Commissioner Paterson asked if there would be financial implications for the City. He voiced concerns about two citizens assisting and implementing the system rather than City Staff. Commissioner Barbour responded that the point is to lessen the burden on staff and not to increase it.

Commissioner Gossett suggested the exploration of suggestions for improvement to City services and other citizen input.

Commissioner Paul Kuhns asked who the gatekeeper would be. Commissioner McGuiness responded that the City Manager would receive the information.

Commissioner Barbour pointed out that one of the first things to be done is to define the terminology and issues.

## NEW BUSINESS

Mayor Cooper called to adopt Resolution ordering that a Special Election be held for the purpose of voting for or against the proposed borrowing of $5,000,000 to upgrade the City's water wells and water treatment facilities, which proposed borrowing was the subject of Public Hearing held on Monday, September 18, 2006, and setting the date for said            Special Election.

Mayor Cooper read the Resolution. (Copy attached.) The date for the Special Election is set for            October 21, 2006. The Special Election will be held in the Conference Suite in the Convention Center.            (Copy attached.)

Commissioner Shreeve made a motion, seconded by Commissioner McGuiness, to adopt Resolution setting Special Election in regard to $5,000,000 Bond issuance for the water improvement. (Gossett – aye, McGuiness – aye, Paterson – aye, Cooper –aye, Barbour – aye, Kuhns – aye, Shreeve – aye.) Motion carried unanimously.

Commissioner Kuhns suggested that an explanation of the project be posted to the City Website.            Mayor Cooper also added that the original report be posted. A mailing will also be made to every property in the City.

Mayor Cooper called to consider execution of a license agreement with Steve Sayed for an encroachment into the public right-of-way of a building located on Lot 90 Rehoboth Avenue (mailing address 240 & 242 Rehoboth Avenue).

City Solicitor Glenn Mandalas stated that the license agreement relates to an encroachment onto City property. The building is not recognized as an historic structure and because of that, if the structure is ever destroyed by an act of God or other means, it cannot be reconstructed. He has reviewed the license agreement and does not have any legal problems with it.

Attorney Doug Marshall, representative of Mr. Steve Sayed requested to allow what is encroaching now, to remain under the conditions set forth in the license agreement. The building itself does not encroach into            Rehoboth Avenue. A wooden awning encroaches 2.8 feet over a concrete pad. The City had installed the concrete pad which replaced the original ramp when Streetscape was done. The .2 feet encroachment of the corner of the building on Christian Street is not on the street, but is over the building line at the second story level; and the roof on that same structure projects 2.5 feet over the building line. The encroachments were discovered in preparation for a sale of the property when a survey was done.

Commissioner Shreeve made a motion, seconded by Commissioner McGuiness, to authorize the proper officials to execute the license agreement on September 18, 2006 with Steve Sayed for the encroachment of the building located on Lot 90 Rehoboth Avenue (mailing address 240 & 242 Rehoboth Avenue). (Gossett – aye, McGuiness – aye, Paterson – aye, Cooper – aye, Barbour – aye, Kuhns – aye,            Shreeve – aye.) Motion carried unanimously.

Commissioner Gossett asked if the license agreement will be recorded as part of the deed for the property. Attorney Marshall responded that it will be recorded in Georgetown, DE. It will run with the land and will bind the future purchaser.

Mayor Cooper called for the consideration of Ordinance amending Chapter 74 of the City Code, related to clarifying the manner in which Section 74-16, title "Posting signs on public property prohibited", of the City Code shall be enforced.

City Solicitor Mandalas stated that there is a consent judgment stipulated in the Sokolove vs. The City of Rehoboth Beach case. Under the consent judgment, the City is obligated to pass an ordinance directed to the enforcement of Code Section 74-16. City Solicitor Mandalas proposed an ordinance directed at enforcement only.   He read the ordinance. (Copy attached.)

Public Comment:

1.   Mr. Walter Brittingham, 123 Henlopen Avenue – asked if the ordinance would permit the City to remove a sign if illegally posted. City Solicitor Mandalas responded that nothing in the enforcement ordinance changes the fact that signs are prohibited on public property.
2.   Mr. Hoyte Decker, 214 Laurel Street – commented that the level of the fine seems miniscule. Commissioner Kuhns agreed and suggested that the amount of the fine be increased.

3. Attorney Eugene Lawson, 402 Rehoboth Avenue – suggested that a comprehensive rewrite of the ordinance is better.

Commissioner Kuhns asked if some of the signs on public land along Rehoboth Avenue are grandfathered. City Solicitor Mandalas responded that they are legal non-conforming signs. The grandfathering clause is more a question of equal protection under the Constitution.

Commissioner Gossett commented that in 2002, the City Commissioners requested that Rehoboth Beach Mainstreet review the City sign ordinance and make their recommendations in concert with the current Mainstreet preferred sign program. It was tabled until the completion of Streetscape. Since then, the Mainstreet Design Committee has brought forward a proposal of issues that they wish the Commissioners to address.

Commissioner Gossett made a motion, seconded by Commissioner Shreeve, to adopt the Ordinance amending Chapter 74 of the Municipal Code of Rehoboth Beach, DE 2001 relating to signs. (Gossett – aye, McGuiness – aye, Paterson – aye, Cooper – aye, Barbour – aye, Kuhns – aye, Shreeve – aye.) Motion carried unanimously.

Mayor Cooper called for the confirmation of appointments to the Planning Commission.

Mayor Cooper recommended the appointments of Mrs. Jan Konesey, Mrs. Nancy Meadows and Mr. Tim Spies for new three year terms to the Planning Commission due to their terms expiring. Mayor Cooper also recommended the appointment of Ms. Pat Coluzzi to fill the remainder of Mr. Rick Eisenman's term with one year remaining. Mr. Eisenman resigned in Spring 2006.

Commissioner Kuhns voiced concern that seven members of the Planning Commission are members of a local political action committee, and this makeup does not appear to be representative of the community. He suggested that the appointments be postponed until consideration of the makeup of the Planning Commission has been made.

Commissioner Shreeve made a motion, seconded by Commissioner Barbour, to confirm the three reappointments and one new appointment to the Planning Commission as appointed by Mayor Cooper. (Gossett – aye, McGuiness – aye, Paterson – abstain, Cooper – aye, Barbour – aye, Kuhns – abstain, Shreeve – aye.) Motion carried.

Mayor Cooper called for the confirmation of appointments to the Architectural Review Board Task Force.

Mayor Cooper recommended that the conformation of appointments be postponed to a later date. He met with Mr. Kyle Gulbronson of URS to talk about the charge to the committee. Mayor Cooper suggested that Mr. Gulbronson be the liaison to the committee and Commissioners.

Commissioner Gossett distributed Mr. Gulbronson's draft charge to the Task Force. He requested that the Commissioners review it and address any comments to Mr. Gulbronson by the end of the week, if possible.

## CITY MANAGER'S REPORT

Mr. Ferrese announced that there were no Street Aid expenditures.

Mr. Ferrese recommended to award the Bid for playground equipment for Grove Park to Liberty Parks and Playgrounds from Smyrna, DE in the amount of $74,233.00. Sealed bids were received on August 8, 2006. A $40,000.00 grant was received from the State, and the City has budgeted $40,000.00. Lingo Real Estate donated $2,000.00.

Commissioner Paterson made a motion, seconded by Commissioner Kuhns, to award the contract for the playground equipment for Grove Park to Liberty Parks and Playgrounds in the amount of $74,233.00. (Gossett – aye, McGuiness – aye, Paterson – aye, Cooper – aye, Barbour – aye, Kuhns – aye, Shreeve – aye.) Motion carried unanimously.

Mr. Ferrese and Mr. Allan Kercher of Kercher Engineering recommended to award the Bid for the Street Paving Program to Dixie Construction in the amount of $141,061.00. This year, monies were received from Representative Pete Schwatzkopf in the amount of $50,000.00 and from Senator George Bunting in the amount of $45,000.00. The City budgeted $46,061.00. Sealed

bids were opened on September 7, 2006.

Commissioner Shreeve made a motion, seconded by Commissioner Kuhns, to award Bid to Dixie Construction in the amount of $141,061.00 for this year's paving program. (Gossett – aye, McGuiness – aye, Paterson – aye, Cooper – aye, Barbour –aye, Kuhns – aye, Shreeve – aye.) Motion carried unanimously.

Mr. Ferrese thanked all the employees who worked the day after the storm of   September 1, 2006 to clean up the debris in the City. Numerous trees were downed. Within a week, the City was cleaned up.

Mr. Ferrese stated that a $40,000.00 grant was received from DNREC in regard to the water quality improvement program. There has been an improvement in Lake Gerar. Part of the grant included in kind contributions from the City for the storm drain marking program. Mr. Ferrese thanked Mr. Stan Mills and the volunteers who have invested numerous hours in this program.

**COMMITTEE REPORTS**

Commissioner Paterson noted that in regard to Cable TV, the channels have changed.

Ms. Mary Brusnighan, 12 Henlopen Avenue, noted the two sunken boats that are located in the Canal and asked what could be done about them. Mayor Cooper responded that the Canal is owned by the Federal Government and is under the  Corp of Engineers. If the boats were in the navigable channel, the Coast Guard would be involved. He has talked to DNREC, and it is their position that they do not have any funding to remove the boats.

**CITY SOLICITOR'S REPORT**

City Solicitor Mandalas reported that a Planning Commission Appeals Ordinance is be worked on. Comments from the workgroup members are due back by September 29, 2006. The Planning Commission will review the proposed ordinance, and it will then be forwarded to the Commissioners.

City Solicitor Mandalas has been working with Mr. Murphy to get the International Building Code adopted.

**CITIZEN COMMENTS**

There was none.        .

The Workshop Meeting will be held on Monday, October 2, 2006.

There being no further business, Mayor Cooper declared the meeting adjourned at 9:50 p.m.

Respectfully submitted,

_____
(Kathy McGuiness, Secretary)

Posted to the Internet 10/17/06 10:00 AM DOH

# **HOME**