**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ROBERT SOKOLOVE, ET AL.,          )
                                  )
            Plaintiffs,           )
                                  )
      v.                          )          Civil Action No. 05-514-KAJ
                                  )
CITY OF REHOBOTH BEACH,           )
DELAWARE, ET AL.,                 )
                                  )
            Defendants.           )

**REPLY MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR CONTEMPT**

Defendants' Answer And Opposition to Plaintiffs' Motion For Contempt ("Def. Ans.") is

based on a mistake, a red herring and a complete failure to address the fundamental issue:

whether defendants have violated the terms of the Order, terms which require defendants to

enforce the Ordinance in a non-selective manner, by codifying an enforcement process which

selectively exempts certain preferred signs from the Ordinance. As set forth below, defendants'

have failed to satisfy the terms of the Order and, as a result, they must be found in contempt.

**A.      Defendants' Mistake**

Defendants' mistake concerns their failure to pay plaintiffs the $2,001.00 as required by

the Order. Defendants contend that plaintiffs did not respond to defendants' inquiry regarding to

whom the check should be made out and to whom the funds should be sent. (Def. Ans. ¶ 2, 16).

This is incorrect. After receiving defendants' August 14, 2006 letter (Def. Ans. Ex. A), counsel

for plaintiff Citizens for Rehoboth Beach ("CRB") left two voice mail messages for Daniel

Griffith, defendants' litigation counsel, advising him that a check for $2,001.00 should be made

payable to Wolf, Block, Schorr and Solis-Cohen, LLP and to send the check to CRB counsel.

When that message was not returned or acknowledged, CRB counsel sent an email directing Mr.

Griffith to make the check payable to Wolf Block and to send it to Todd Schiltz. (Ex. 1 attached hereto). Defendants ignored these oral and written responses to their August 14 letter, notwithstanding the fact that they are required to distribute these funds under the clear terms of the Order. Defendants' failure to turn over these funds violates the Order and, consequently, defendants are in contempt.

Defendants may argue that their failure to turn over the $2,001.00 was the fault of counsel and that they should no be held in contempt for his failings. Yet, who caused defendants to be in contempt is not the issue. If defense counsel's failure to respond caused defendants to be in contempt, that is an issue between defendants and their counsel, not plaintiffs or this Court.[1]

---

[1]    Defendants' refusal to return plaintiffs' calls or correspond with plaintiffs or their counsel has been a hallmark of this suit. Indeed, defendants only respond when there is a threat of Court action. For example, pre-lawsuit, defendants did not even return plaintiffs' calls and letters complaining about the manner in which defendants were enforcing Section 74-16, leaving plaintiffs with no alternative but to sue. Once suit was filed, defendants did not respond to plaintiffs' requests that they provide full and complete discovery responses, leaving plaintiffs with no alternative but to file a motion to compel -- a motion which was rendered moot when, on the eve of oral argument, defendants admitted the facts plaintiffs sought to establish in their requests for admission. Once the Order was entered, defendants did not adopt the New Ordinance until plaintiffs advised them that they would file a motion for contempt if action was not taken. Finally, although plaintiffs contend that plaintiffs never complained about the infirmities of Section 74-17 prior to filing the Motion for Contempt (Def. Ans. ¶ 19), in fact, plaintiffs sent defendants a letter advising them that Section 74-17 failed to comply with the Order. (Motion Ex. D). Defendants never responded to this letter. Defendants' latest failure to respond resulted in the filing of the pending Motion for Contempt.

**B.    Defendants' Red Herring**

Defendants' red herring relates to their contention that the Motion for Contempt should be denied to the extent it argues defendants violated the Order by failing to adopt the New Ordinance on or before July 15, 2006. The Order required defendants to adopt the New Ordinance by July 15, 2006, and defendants failed to do this; however, plaintiffs have not moved for contempt on these grounds. Accordingly, this is a non-issue.

**C.    Section 74-17(D) Violates The Order**

The following facts are undisputed:

> 1)    Section 74-16 had no grandfather clause and prohibits the placement of any private sign on public property or right of way in the City;

> 2)    the Art League signs, the Village Improvement Association sign and the Oak Grove Trailer park signs are private signs erected on public property or right of way in the City;

> 3)    throughout these proceedings, defendants left the Art League signs, the Village Improvement Association sign and the Oak Grove Trailer park signs standing notwithstanding the fact the signs violate Section 74-16 and notwithstanding plaintiffs' complaints that the defendants' failure to remove the signs constituted improper selective enforcement;

> 4)    the Order requires the defendants to adopt the New Ordinance and prohibits the defendants from enforcing Section 74-16 or the New Ordinance in a selective manner; and

> 5)    the New Ordinance, specifically Section 74-17(D), exempts signs erected before May 1, 2006, from the terms of Section 74-16, thereby allowing such signs to remain standing notwithstanding the fact they violate the terms of Section 74-16.

As explained in plaintiffs' Motion for Contempt:

> Rather than eliminating selective enforcement of Section 74-16, Section 74-17 codifies it. Specifically, by including subsection D, which provides that "any private advertisement, poster or sign on public property as of May 1, 2006" is exempt from the enforcement mechanism created by Section 74-17, the City has attempted to make certain preferred commercial signs selectively exempt from the terms of Section 74-16. Indeed, if subsection D is allowed to stand, the Art League signs, the

Village Improvement Association sign, the Oak Grove Trailer Park sign, will be exempt from removal even though they all violate Section 74-16.

\*          \*          \*

Section 74-17, which is designed to "clarify the manner in which Section 74-16 . . . shall be enforced," expressly exempts certain signs -- private advertisements, posters or signs on public property as of May 1, 2006 -- from its terms. As a result of this exemption, certain signs which violate Section 74-16 and which defendants have refused to remove -- the Art League signs, the Oak Grove Trailer Park sign, the Village Improvement Association sign -- will not be subject to removal. As some preferred signs which violate Section 74-16 are not subject to removal while other signs which violate Section 74-16 are subject to removal, the City has codified a discriminatory, selective enforcement mechanism which violates the clear terms of the Order: "Defendants shall enforce the Ordinance . . . in a consistent, non-selective manner."

Defendants do not and cannot dispute that Section 74-17(D) expressly allows certain signs to remain standing while other signs will be subject to removal even though both types of signs violate Section 74-16. The Order, which requires defendants to "enforce [Section 74-16] (including [Section 74-17] and any amendment thereto) in a consistent, non-selective manner . . ." precludes defendants from enforcing Section 74-16 in this manner.

Defendants do not even address, let alone rebut, plaintiffs' argument. Rather, in an apparent effort to justify their selective enforcement process, they argue they are not in contempt because Sections 74-16 and 74-17 purportedly create a "content neutral" enforcement mechanism that was adopted with plaintiffs' encouragement and support. Neither point bears scrutiny.

Whether or not the enforcement process codified in Section 74-17(D) is content neutral -- *i.e.*, not conditioned on the issue or topic addressed by the sign -- is of no moment. The Order does not say that Section 74-16 and Section 74-17 have to contain content neutral language or be applied in a constitutionally permissible, content neutral manner. Rather, the Order provides that Section 74-16 and Section 74-17 must be enforced in a consistent, non-selective manner. Plaintiffs insisted that the language requiring "consistent, non-selective" enforcement be included

in the Order in order to put an end to defendants' selective enforcement practices regarding signs and, in particular, their practices regarding the very signs which Section 74-17(D) now attempts to exempt. (Ex. 2 hereto, Affidavit of Eugene M. Lawson ("Lawson Aff.") ¶ 4, 18-19). If the parties had meant "non-selective" to mean "content neutral," they would have used language to this effect, although doing so would have been redundant because constitutional principles already preclude content based enforcement mechanisms. The Order precludes selective enforcement regardless of whether such enforcement is content neutral.[2]

Likewise, defendants' repeated suggestion that plaintiffs participated in and acquiesced to the adoption of Section 74-17 is without merit. First, no one representing Robert Sokolove, David McCarthy or William Shields (the "Individual Plaintiffs") ever spoke to Mr. Mandalas or anyone else at the City about the "Political Sign Directive" or the New Ordinance/Section 74-17. Eugene Lawson, a Delaware lawyer and a board member of and counsel to plaintiff CRB, did communicate with Mr. Mandalas about these issues; however, as set forth in his attached

---

[2]   To the extent Section 74-17 is content neutral, it is content neutral in name only. It cannot go unnoticed that the terms of Section 74-17 allow signs that previously violated Section 74-16 to now be exempt from its provisions and that the defendants' preferred signs -- the Art League signs, the Village Improvement sign, the Oak Grove Trailer Park sign -- are the only signs which fall into this new exemption. (Lawson Aff. ¶ __). These facts completely defeat defendants' effort to cloak Section 74-17 as a permissible, content neutral enforcement mechanism. Ackerly Comm. of Mass. v. City of Somerville, 878 F.2d 513, 518-21, n.14 (1st Cir. 1989) (declaring unconstitutional a new sign ordinance which exempted certain signs from its provisions under a grandfather clause and concluding that city's concern for aesthetics could not serve as a basis to justify grandfathering old signs from the new ordinance).

affidavit, Mr. Lawson was acting on behalf of CRB, not the Individual Plaintiffs. (Lawson Aff.
¶ 2-3, 6-7 and Exs. A and B at 2). Indeed, by the time Mr. Lawson spoke to Mr. Mandalas,
Chase Brockstedt, Esq., another Delaware lawyer, had entered his appearance for the Individual
Plaintiffs and Mr. Brockstedt was representing them with respect to this matter. Defendants
knew the Individual Plaintiffs were represented by Mr. Brockstedt and communicated with him
when they had to speak to the Individual Plaintiffs' counsel. (Lawson Aff. ¶ 6 and Ex. A (June 9,
2006 email directed to Mr. Brockstedt by Mr. Griffith in response to Mr. Mandalas' request that
materials be forwarded to counsel for the Individual Plaintiffs)). Moreover, in his initial
communication with Mr. Mandalas, Mr. Lawson expressly advised Mr. Mandalas that he was
contacting him as a CRB board member and its lawyer and he never advised Mr. Mandalas that
he was representing the Individual Plaintiffs. (Lawson Aff. ¶ 7 and Ex. B at 2). As Mr. Lawson
was not acting for the Individual Plaintiffs and as defendants' acquiescence argument is premised
on actions taken by Mr. Lawson, there is no basis to conclude the Individual Plaintiffs in any
manner approved or endorsed the adoption of Section 74-17.

    Second, regardless of who Mr. Lawson was representing, defendants' statements that
plaintiffs "participated in the drafting of . . . § 74-17" and that defendants acted "in concert with .
. . Mr. Lawson" in adopting Section 74-17 are simply incorrect. Neither CRB nor the Individual
Plaintiffs acquiesced, approved or encouraged defendants' adoption of Section 74-17. To the
contrary, CRB, through Mr. Lawson, insisted that the City undertake a substantial rewrite of its
sign ordinance and when Mr. Mandalas rejected that and suggested a "less enthusiastic
'enforcement' ordinance" which eventually resulted in the adoption of Section 74-17, Mr.
Lawson expressly advised him that this would not be acceptable. (Lawson Aff. ¶ 8-17 and Ex.
F). Likewise, no one representing CRB, including Mr. Lawson, or the Individual Plaintiffs was

privy to the final text of Section 74-17, including its grandfather provision, before it was read (and then subsequently adopted) at a September 28, 2006 meeting of the City Commissioners. (Lawson Aff. ¶ 17). It is difficult to understand how defendants can contend that plaintiffs fully participated in the adoption of Section 74-17 when, in fact, plaintiffs had never seen or heard its terms prior to the moment it was adopted by defendants.

Third, defendants' suggestion that they are not in contempt because a draft ordinance that Mr. Lawson submitted to Mr. Mandalas contained a grandfather/nonconforming clause is also without merit. This clause was one of many terms in Mr. Lawson's proposed rewrite of Section 74-16 and Mr. Lawson included it to make it clear that the City's Convention Center sign could remain standing even if the defendants adopted the proposed rewrite. Mr. Lawson knew that defendants would not agree to any rewrite that required them to remove the Convention Center sign and that any resolution necessarily would require give and take on both sides, so he included this provision in the hope it would induce defendants into negotiating an acceptable resolution of the issue. (Lawson Aff. ¶ 14). Mr. Lawson's effort to negotiate a mutually acceptable resolution was unsuccessful because the defendants elected to adopt a New Ordinance with terms they knew were objectionable. The unsuccessful effort to negotiate a resolution of the issue does not constitute acceptance of the grandfathering clause in Section 74-17 by Mr. Lawson, CRB or the Individual Plaintiffs.

Finally, assuming for the sake of argument that all of the plaintiffs somehow endorsed defendants' adoption of Section 74-17 and its grandfathering provision, this is of no moment. Plaintiffs' supposed endorsement of a grandfathering clause/selective enforcement process does not provide defendants with a basis to violate the Order. The Order says enforcement cannot be selective and no person or entity other than this Court can change its terms or what is required of

defendants. Plaintiffs views on this matter and their conduct leading up to the adoption of the New Ordinance are simply irrelevant to whether or not defendants are in contempt of the Order.

## CONCLUSION

For the foregoing reasons and for the reasons set forth in plaintiffs' Motion for Contempt, plaintiffs respectfully request that the Court enter an Order finding defendants in contempt, directing the City to repeal subsection D of Section 74-17, directing defendants to pay plaintiffs $2,001.00 and granting plaintiffs the reasonable fees, costs and expenses they incurred in bringing this motion.

WOLF, BLOCK, SCHORR and                   MURPHY, SPADARO & LANDON
SOLIS-COHEN LLP


_____           /s/ Chase Brockstedt_____
Shawn P. Tucker (#3326)                      Chase Brockstedt (#3815)
Todd C. Schiltz (#3253)                      1011 Centre Road, Suite 210
1100 North Market Street, Suite 1001      Wilmington, DE 19805
Wilmington, DE 19801                     (302) 472-8109
(302) 777-0312

Attorneys for plaintiff                      Attorneys for plaintiffs
Citizens for Rehoboth Beach              Robert Sokolove, David
                                     McCarthy and William Shields

November 16, 2006

# Exhibit 1

## Schiltz, Todd C.

**From:**    Schiltz, Todd C.

**Sent:**    Monday, September 11, 2006 5:36 PM

**To:**    'Griffith, Dan A.'

**Subject:**  Sokolove v. Rehoboth Beach

Dan,

As you have not returned he voice mail messages I have left you, I thought it would be best to send you an email.

With respect to the question raised in your recent letter as to where the $2,001 should be sent, please make the check payable to my firm and send it to me.

As to the issue of the payment of outstanding attorney fees, as I indicated during our last call, your suggestion of ¨        was unacceptable to plaintiffs.  However, in order to bring this matter to a close, plaintiffs will accept         as payment in full.  Please let me know if this is acceptable.  This offer is subject to Rule 408 of the Federal Rules of Evidence.

Todd C. Schiltz
Wolf, Block, Schorr and Solis-Cohen LLP
1100 N. Market St., Suite 1001
Wilmington, DE 19801
ph:  (302) 777-0312
fax: (302) 778-7812

# Exhibit 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ROBERT SOKOLOVE, ET AL.,                    )
                                            )
                Plaintiffs,                 )
                                            )
        v.                                  )        Civil Action No. 05-514-KAJ
                                            )
CITY OF REHOBOTH BEACH,                     )
DELAWARE, ET AL.,                           )
                                            )
                Defendants.                 )

### AFFIDAVIT OF EUGENE M. LAWSON, JR.

COMMONWEALTH OF VIRGINIA        )
                                )        ss:
COUNTY OF ARLINGTON             )

Eugene M. Lawson, Jr., being duly sworn, states as follows:

1.      I am an adult over the age of eighteen, an attorney in good standing admitted to

practice law in the States of Delaware and Maryland, the Commonwealth of Virginia and the

District of Columbia and state as follows based on personal knowledge.

2.      I am a board member and counsel to plaintiff Citizens for Rehoboth Beach

("CRB"). I have never entered an appearance in this matter on behalf of any of the plaintiffs,

including individual plaintiffs Robert Sokolove, David McCarthy or William Shields

(collectively, "Individual Plaintiffs"). I have never represented the Individual Plaintiffs in this

lawsuit or any other litigation matter.

3.      On or about February 20, 2006, Chase T. Brockstedt, an attorney admitted to

practice in Delaware, entered his appearance in this matter for the Individual Plaintiffs,

substituting for Todd C. Schlitz and Shawn P. Tucker who continue to represent CRB. To the

extent I was representing the Individual Plaintiffs in a non-litigation capacity prior to February 20, 2006, such representation ceased upon Mr. Brockstedt's entry of appearance.

4.    In April and May 2006, CRB, the Individual Plaintiffs and the defendants engaged in settlement discussions which ultimately resulted in the parties signing a Stipulated Consent Order and Judgment ("Consent Order"). Among other things, the Consent Order required the defendants to (i) adopt a new ordinance which would detail the manner in which City of Rehoboth Beach Ordinance 74-16 would be enforced (the "New Ordinance") and (ii) enforce the terms of Section 74-16 and the New Ordinance in a consistent, non-selective manner. (Motion Ex. B, ¶ 3, 5). CRB insisted on including the provision regarding consistent, non-selective enforcement because defendants previously had failed to enforce Section 74-16 in such a manner. Specifically, defendants had allowed certain signs -- the Art League signs, the Village Improvement Association sign, the Oak Grove Trailer Park signs — to remain standing even though they violated the terms of Section 74-16. The provision regarding consistent, non-selective enforcement was inserted in the Consent Order in order to put an end to this practice.

5.    On or about May 26, 2006, the Consent Order was signed by the Court.

6.    On or before June 9, 2006, Glenn C. Mandalas, the new solicitor for defendant City of Rehoboth Beach ("City"), apparently had discussions with plaintiff Robert Sokolove about the New Ordinance. Mr. Mandalas apparently told Mr. Sokolove that he would let him review a draft of such an ordinance. Not knowing who represented Mr. Sokolove, Mr. Mandalas sent the draft to Mr. Griffith, defendants' counsel in this lawsuit, asking Mr. Griffith "[w]ho is representing Bob Sokolove . . ." and "[w]ill you please pass the below message on to his counsel, or let me know to whom it should be forwarded?" (Ex. A hereto). Mr. Griffith did not

respond to these questions but simply forwarded Mr. Mandalas' message to Mr. Brockstedt, the attorney for the Individual Plaintiffs. It was clear from this action that defendants knew that I did not represent the Individual Plaintiffs.

7.      On June 13, 2006, I sent Mr. Mandalas an email advising him that "I am a board member and counsel to Citizens for Rehoboth Beach" and that, as such, I was interested in discussing the proposed terms of the New Ordinance which the City had yet to adopt. (Ex. B hereto at 2). I had never spoken to Mr. Mandalas prior to sending him the June 13, 2006 email. I was not representing the Individual Plaintiffs on June 13, 2006, and I never advised Mr. Mandalas that I was representing them or speaking on their behalf. All of my discussions and efforts regarding the New Ordinance were on behalf of CRB and none were made on behalf of the Individual Plaintiffs.

8.      The Consent Order required the defendants to adopt the New Ordinance by July 15, 2006. As that date approached, it became clear the defendants would not meet the deadline. This was problematic as the City's annual election was scheduled for August 12, 2006, and everyone wanted to avoid further confusion as to where campaign signs could and could not be erected in the City.

9.      To bring clarity to this issue, on July 3, 2006, the Mayor issued a "Political Sign Directive" which spelled out where political signs could be erected in anticipation of the 2006 municipal election. (Defendants' Answer And Opposition To Plaintiffs' Motion For Contempt ("Def. Ans.") Ex. B at Ex. 2). The "Political Sign Directive" applied only to political signs and not to any other type of sign, the "Political Sign Directive" expired and was void following the

2006 municipal election and the "Political Sign Directive" contained no grandfathering or other exceptions for nonconforming signs.

10.    CRB supported the adoption of the "Political Sign Directive" for the 2006 municipal election because, at least for that election, it provided a response to a request I had made of the defendants on July 25, 2005, during the City's 2005 municipal election. Specifically, I had asked that defendants explain the manner in which they were enforcing Section 74-16 as to political signs. (Def. Ans. Ex. D (asking defendants to "supply us with a written version of the City's position concerning the rule of thumb . . . regarding sign placement . . . . ")). Defendants did not respond to this request prior to sending me a draft of the "Political Sign Directive" in June 2006.

11.    At no time did Mr. Mandalas or anyone else representing the defendants advise me that the City was considering or intended to use the terms of the "Political Sign Directive" as a template for the New Ordinance. If I had been so advised, I would not have supported such an approach because CRB's position was, and is, that the City's sign ordinance and the manner in which it is enforced need a comprehensive re-write.

12.    On July 5, 2006, two days after the City adopted the "Political Sign Directive," I sent Mr. Mandalas an email advising him that "I would also like to get started in earnest on the actual sign ordinance re-write." (Ex. C hereto at 3). Mr. Mandalas and I then had a meeting on July 11, 2006, to discuss CRB's ideas with respect to the New Ordinance.

13.    As Mr. Mandalas did not get back to me regarding the New Ordinance for over a month, on August 28, 2006, I sent him an email with a proposed draft of the New Ordinance. (Exhibit D hereto).  The ten page draft proposal is attached as Exhibit 4 to Mr. Mandalas'

Affidavit. (Def. Ans. Ex. B at Ex. 4). Neither the Individual Plaintiffs nor their counsel ever received, reviewed or commented on my proposed draft of the New Ordinance.

14.    On September 2, 2006, I sent Mr. Mandalas an email explaining that my proposed draft New Ordinance was an edited version of the sign section included in the zoning code and "is a careful balance of wins and losses, pluses and minuses or whatever else you may want to call this balancing act. It certainly will draw some negative reactions, but the Mayor and Commissioners must decide what is important and understand that to get what they want, others must get some of what they want as well." (Ex. E hereto at 3). My proposed draft included items that I believed each side would require in order to place the tradeoffs on the table before the negotiating parties. I did include a grandfathering/nonconforming sign clause in my proposed draft. (Def. Ans. Ex. B at Ex. 4 at 2). I included this clause because I knew the City would not agree to remove its Convention Center sign, a sign which was not authorized by any of the other terms of my proposal, and, thus, for there to be any hope of an agreement, the New Ordinance had to include a provision that would allow the Convention Center sign to remain standing. (Ex. D hereto at 1 ("I . . . grandfathered the convention center sign"); Ex. E hereto at 3 (grandfathering/nonconforming sign provision included because it "permits and protects the convention center sign")). This is an example of the give and take that had to occur in order for the parties to reach an acceptable resolution regarding the terms of the New Ordinance.

15.    Given the substantial time that has passed since the entry of the Consent Order on May 26, 2006, my September 2, 2006, email also advised Mr. Mandalas that if defendants did not adopt a New Ordinance by September 18, 2006, then CRB would ask the Court to deal with the lack of movement. (Ex. E hereto at 3). My September 2, 2006, email further stated that an enforcement mechanism that prohibited signs in general but permitted the City's preferred signs -

- the Art League signs, the Village Improvement Association sign, the City Convention Center sign, etc. -- to remain standing, was not constitutional/acceptable. (Id.).

16.     Mr. Mandalas responded on September 5, 2006, stating that the City could not act this quickly on a re-write and asking the following question:

> What are your thoughts on working toward a much less enthusiastic "enforcement" ordinance (I have a working draft) and then considering a comprehensive sign ordinance outside the litigation?

(Ex. F hereto at 1). I responded the same day, advising Mr. Mandalas that CRB would consider the idea but that I was "reasonably certain [an enforcement ordinance] can't fly under the circumstances . . . ." (Id.).

17.     Mr. Mandalas never responded to my September 5, 2006, email and he never sent me a working or final draft of his "enforcement" ordinance, the ordinance that eventually would become City Ordinance Section 74-17. I did receive a draft copy of the enforcement ordinance/Section 74-17 in June 2006 from Mr. Brockstedt after defendant's counsel sent it to him. (Ex. A hereto). The draft I received from Mr. Brockstedt did not include several terms which appear in the final version of the enforcement ordinance, including the provision regarding grandfathering of signs. The final version of Section 74-17 was introduced for consideration and adopted at the September 28, 2006, City Commissioners' meeting. Prior to that meeting, I was not advised by anyone representing defendants that Section 74-17 would be considered at that meeting. The first time I was made aware of the final terms of Section 74-17 was when they were read aloud at the September 28 meeting. I was not provided with a written copy of Section 74-17 at any time during the meeting.

18.    Section 74-17(D) is objectionable to CRB because it codifies the very selective enforcement practices which CRB has been complaining about. Specifically, it allows private signs which violate Section 74-16, and which defendants have refused to remove notwithstanding this violation, to remain standing by exempting them from Section 74-16. CRB believes that the codification of this selective enforcement practice violates the Consent Order, an order which requires defendants to enforce Section 74-16 and Section 74-17 in a consistent, non-selective manner.

19.    I own a home in the City and maintain an office there as well and the only signs of which I am aware that will be exempt from Section 74-16 under Section 74-17(D) are the Art League signs, the Village Improvement Association sign, the Oak Grove Trailer Park signs and the City's Convention Center sign.

20.    Further affiant sayeth not.


_____
Eugene M. Lawson, Jr.


SWORN to before me this 16th day of November, 2006

Notary Public _____

My commission Expires

CARLA M. WHITLOCK
Notary Public
Commonwealth of Virginia
My Commission Exps. April 30, 2009

-7-

# Exhibit A

## Schiltz, Todd C.

**From:**    Chase Brockstedt [chaseb@msllaw.com]
**Sent:**    Monday, June 12, 2006 9:04 AM
**To:**      Schiltz, Todd C.; 'Eugene Lawson'
**Subject:** FW: Draft Sign Enforcement Ordinance

---

**From:** Griffith, Dan A. [mailto:DAGriffith@MDWCG.com]
**Sent:** Friday, June 09, 2006 4:40 PM
**To:** Chase Brockstedt
**Cc:** Mandalas, Glenn C.
**Subject:** FW: Draft Sign Enforcement Ordinance

---

**From:** Mandalas, Glenn C. [mailto:GCMandalas@Prickett.com]
**Sent:** Friday, June 09, 2006 4:38 PM
**To:** Griffith, Dan A.
**Subject:** Draft Sign Enforcement Ordinance

Dan –

Who is representing Bob Sokolove et al. in the Sokolove v. Rehoboth Beach case? I told Bob that I would
let him review the draft enforcement ordinance. However, it may be inappropriate for me to correspond with Bob
directly on this matter. Will you please pass the below message on to his counsel, or let me know to whom it
should be forwarded?

Bob –

A draft ordinance to amend chapter 74 of the Code is attached. I have discussed the ordinance with Dave
Murphy, and have endeavored to incorporate all the several scenarios with which the inspectors are confronted.

The attached ordinance is only designed to identify how the City will enforce Section 74-16 which prohibits signs
on public property. Further, the proposal only details the manner in which to enforce Section 74-16 in instances
where it is not clear where public property ends and private property begins. The proposed ordinance would not
be applied in instances where the land at issue is clearly public.

Best regards --
Glenn

Glenn C. Mandalas
PRICKETT, JONES & ELLIOTT, P.A.
11 North State Street | Dover, Delaware 19901
(302) 674-3841 (tel) | (302) 674-5864 (fax)
gcmandalas@prickett.com

PLEASE NOTE: This e-mail may contain confidential attorney-client communications or may otherwise be privileged and/or confidential. If you believe
that you were not an intended recipient of this e-mail, please do not copy or retransmit this information. Instead, please notify me of the error at your
earliest opportunity and then delete this e-mail, as well as any attachments or hard copies thereof. Thank you for your cooperation.

AN ORDINANCE TO AMEND CHAPTER 74 OF THE
MUNICIPAL CODE OF REHOBOTH BEACH, DELAWARE, 2001
RELATING TO SIGNS

BE IT ORDAINED by the Commissioners of The City of Rehoboth Beach, in session

met, in the manner following to-wit:

Section 1. Chapter 74, the Municipal Code of The City of Rehoboth Beach, Delaware,

2001 as amended be and the same is hereby further amended by adding a new section 74-17 as

follows:

Purpose

The purpose of this ordinance is to clarify the manner in which Section 74-16 of the

Municipal Code of The City of Rehoboth Beach shall be enforced when the boundaries of public

property or public ways within the limits of the City are not clearly recognizable by City

inspectors.

**§74-16. Enforcement.**

Pursuant to §74-16 of this Article and no other provision, the phrase "other public property or

way" shall mean and include, but is not limited to:

A.    Traffic islands, defined as public property bound by public streets;

B.    Where there is a street but no sidewalk and no utility pole, the area including the edge of

the street, or the edge of the street curb where a street curb exists, plus eight (8) feet

extended perpendicular to the street;

C.    Where there is a street and a sidewalk but no utility pole, the area including the edge of

the street, or the edge of the street curb where a street curb exists, to the furthest edge of the sidewalk;

D.   Where there is a street and a utility pole but no sidewalk, the area including the edge of the street, or the edge of the street curb where a street curb exists, to the furthest edge of the utility pole;

E.   Where there is a street and a sidewalk and there is a utility pole between the edge of the street, or the edge of the street curb where a street curb exists, and the nearest edge of the sidewalk, the area including the edge of the street, or the edge of the street curb where a street curb exists, to the furthest edge of the sidewalk; and

F.   Where there is a street and a sidewalk and there is a utility pole beyond the furthest edge of the sidewalk from the street, the area including the edge of the street, or the edge of the street curb where a street curb exists, to the furthest edge of the utility pole.

# Exhibit B

**Eugene Lawson**

| | |
|---|---|
| **From:** | Mandalas, Glenn C. [GCMandalas@Prickett.com] |
| **Sent:** | Wednesday, June 14, 2006 11:20 AM |
| **To:** | Eugene Lawson |
| **Cc:** | Solloway, Lisa S. |
| **Subject:** | RE: Rehoboth Beach |

If you can make it available, I would prefer to visit at your new office (the distractions at City Hall can be overwhelming). I should be in the office most of the afternoon, and look forward to discussing the sign ordinance. In view of the July 15 deadline, I asked the Mayor to include discussion of the ordinance on this Monday's meeting.
Consequently, I appreciate that you have given the draft ordinance your prompt attention.

Best regards -
Glenn

-----Original Message-----
From: Eugene Lawson [mailto:lawson@fhhlaw.com]
Sent: Wednesday, June 14, 2006 11:11 AM
To: Mandalas, Glenn C.
Subject: RE: Rehoboth Beach


Glenn:

Monday at 2:00 would be fine. Where do you want to meet? If City Hall, is there a private place? If not how about my new office (which I hope to have open by July 1) at 402 Rehoboth Avenue?

I have a meeting out of the office until about 3:00 today. If you are going to be in, I would be happy to call you about the sign ordinance.

Gene

-----Original Message-----
From: Mandalas, Glenn C. [mailto:GCMandalas@Prickett.com]
Sent: Tuesday, June 13, 2006 9:18 PM
To: Eugene Lawson
Subject: Re: Rehoboth Beach


Gene-

Thanks for your e-mail. I look forward to meeting you, and working together on the various issues facing the City. I am curious to know your impression of the sign enforcement ordinance.

Are you available at 2:00 pm on Monday?

Best regards -
Glenn
----------------------------

1

Sent by BlackBerry

----Original Message----
From: Eugene Lawson <lawson@fhhlaw.com>
To: Mandalas, Glenn C. <GCMandalas@Prickett.com>
Sent: Tue Jun 13 18:59:36 2006
Subject: Rehoboth Beach

Glenn:

I am sorry we have not had the opportunity to meet yet but hopefully
that will soon be accomplished.  I was forwarded a copy of the draft
sign ordinance and would very much like to discuss it with you at your
convenience.  I assume you know (but perhaps I should not assume) that I
am a board member and counsel to Citizens for Rehoboth Beach, the
political action committee that was one of the plaintiffs in the U. S.
District Court case.  There are a number of other high profile issues in
the City in which I have an interest or clients that we can get to
sometime but I guess the sign ordinance is as good a place to start as
any.

Just so you know, I have a number of clients very interested in the FAR
issue and the voting qualification of revocable living trust owners to
name just a few.  Is there a possibility we could talk sometime soon and
then perhaps meet next Monday since I again assume you will be in town
for the Commissioners meeting, as will I?  I look forward to working
with you in the future for the good of the whole community.

Thank you for your consideration and time.

Gene Lawson

Eugene M. Lawson, Jr.
Fletcher, Heald & Hildreth, P.L.C.
1300 North 17th Street - 11th Floor
Arlington, VA  22209
703-812-0404 direct
703-812-0486 fax
lawson@fhhlaw.com

# Exhibit C

**Eugene Lawson**

**From:** Mandalas, Glenn C. [GCMandalas@Prickett.com]
**Sent:** Friday, July 07, 2006 12:42 PM
**To:** Eugene Lawson
**Subject:** RE: Rehoboth Beach

Glad the date will work for you. I look forward to seeing you on Tuesday.

Glenn

----Original Message----
**From:** Eugene Lawson [mailto:lawson@fhhlaw.com]
**Sent:** Friday, July 07, 2006 12:40 PM
**To:** Mandalas, Glenn C.
**Subject:** RE: Rehoboth Beach

I will be at the Commissioners meeting on Tuesday. I have set aside time after the meeting to meet with you and whomever about the sign ordinance re-write and to meet with you and the City enforcement personnel and the candidates about the enforcement issue. For good or for bad, you have me on Tuesday. I assume the meeting is in the Commissioners meeting room. See you then and thanks again for staying in touch.

Gene

**From:** Mandalas, Glenn C. [mailto:GCMandalas@Prickett.com]
**Sent:** Wednesday, July 05, 2006 4:21 PM
**To:** Eugene Lawson
**Subject:** RE: Rehoboth Beach

My error. Thanks.

----Original Message----
**From:** Eugene Lawson [mailto:lawson@fhhlaw.com]
**Sent:** Wednesday, July 05, 2006 4:12 PM
**To:** Mandalas, Glenn C.
**Subject:** RE: Rehoboth Beach

Sorry, no attachment.

**From:** Mandalas, Glenn C. [mailto:GCMandalas@Prickett.com]
**Sent:** Wednesday, July 05, 2006 4:11 PM
**To:** Eugene Lawson
**Subject:** RE: Rehoboth Beach

Gene –

The executed Directive is attached.

Thanks for your comments on the FAR ordinance.

11/12/2006

Best regards –
Glenn

-----Original Message-----
**From:** Eugene Lawson [mailto:lawson@fhhlaw.com]
**Sent:** Wednesday, July 05, 2006 1:46 PM
**To:** Mandalas, Glenn C.
**Subject:** RE: Rehoboth Beach

Glenn,

I will try to make the 11th work for all of the matters you mentioned.  Not a very reasonable time for a governmental body that wants citizen participation or scrutiny (even the silent attendee type).  Perhaps that is the point.

One thought for the Commissioners to consider is that since this proposal did not go through the Planning Commission, which in most cities would be the place for study and development of substantive findings about the problems and how this will fix them, there is arguably no rational basis for this amendment's restrictions burdening property owners. The prelude is conclusory and without any real substance.  It does not take more than a cursory review of the draft (or attendance at a few of the sessions considering this amendment) to see clearly that some provisions are derived from personal enmity to certain building designs or embellishments rather than a studied reason why some are allowed and some are not and that the result of passing this amendment has a positive effect on the city that is more important than the restriction placed on property owners.  It also has caused me to think about researching the change last year for the same defect. Just food for thought.

I will confirm by Friday the ability to be there on Tuesday.  Thank you for communicating.

Gene                                                                                    !

---

**From:** Mandalas, Glenn C. [mailto:GCMandalas@Prickett.com]
**Sent:** Wednesday, July 05, 2006 11:37 AM
**To:** Eugene Lawson
**Subject:** RE: Rehoboth Beach

Gene -

Thanks for your message.

On the FAR ordinance, the Commissioners scheduled a special meeting for July 11, 2005, from 9am to 11 am for the purpose of further refinement of the ordinance.

The Directive was approved, and the Mayor signed it last evening.  I will send you a pdf of the executed Directive today.  I agree that an instructional session for the candidates is in order.  I wonder if we could hold it on the 11th, after the Mayor and Commissioners meeting?  The 11th may also serve as a good day for us to collectively get to work on the comprehensive sign enforcement ordinance.

I welcome your thoughts on the noise ordinance, and would like to learn the details of the personal experience you mentioned.

11/12/2006

I apologize for the short reply message, but have an 11:30 conference call.

Best regards -
Glenn

-----Original Message-----
**From:** Eugene Lawson [mailto:lawson@fhhlaw.com]
**Sent:** Wednesday, July 05, 2006 11:19 AM
**To:** Mandalas, Glenn C.
**Subject:** Rehoboth Beach

Glenn:

I understand no hearing date was set for the FAR ordinance. Under the circumstances, I am relieved. I would like to discuss this more at length with you soon.

Did the sign directive get approved? I am sorry I was not there but I had family obligations which I could not change. If it was approved, are you still of the opinion that there should be a training session for the enforcing personnel at which I could participate? I need to schedule if that is the case.

I would also like to get started in earnest on the actual sign ordinance re-write. As I mentioned, delay could create some side problems with Dan Griffith and the fee negotiations being at a standstill. When do you think we could meet to outline the questions and decisions which need to be considered by the Commissioners to get the process going?

Not that you need another fight, but I have been contacted about the noise ordinance and potential enforcement which may not be based on the objective measurement standard. I may have mentioned to you that I was charged under the same ordinance in 1994 and successfully argued that the City cannot ignore the objective standard while attempting to use the subjective standard. I would be pleased to share my experience with you on this as well.

Sorry to burden you with so many matters at once. Please call when you have a minute. Thanks.

Gene Lawson

Eugene M. Lawson, Jr.
Fletcher, Heald & Hildreth, P.L.C.
1300 North 17th Street - 11th Floor
Arlington, VA 22209
703-812-0404 direct
703-812-0486 fax
lawson@fhhlaw.com

# Exhibit D

**Eugene Lawson**

| | |
|---|---|
| **From:** | Mandalas, Glenn C. [GCMandalas@Prickett.com] |
| **Sent:** | Monday, August 28, 2006 7:01 PM |
| **To:** | Eugene Lawson |
| **Subject:** | RE: Signs |

Thanks, Gene - I will review as soon as possible.

Best regards -
Glenn

    -----Original Message-----
    **From:** Eugene Lawson [mailto:lawson@fhhlaw.com]
    **Sent:** Monday, August 28, 2006 2:30 PM
    **To:** Mandalas, Glenn C.
    **Subject:** Signs

    <<New Sign Ordinance.EML.2006.08.26.pdf>>
    Glenn,

    Here is the draft I have prepared as the new sign ordinance to replace the sign section of the zoning
    ordinance and the sign section of the advertising ordinance. I have tried to follow, but simplify, the
    format and content of the sign section of the zoning ordinance. Please let me know what you think as
    soon as possible. I would like to share it with some of the commissioners as quickly as I can. I have
    maintained the Art League signs and grandfathered the convention center sign. I look forward to
    hearing from you.

    Gene

    Eugene M. Lawson, Jr.
    Fletcher, Heald & Hildreth, P.L.C.
    1300 North 17th Street - 11th Floor
    Arlington, VA 22209
    703-812-0404 direct
    703-812-0486 fax
    lawson@fhhlaw.com

# Exhibit E

**From:** Mandalas, Glenn C. [mailto:GCMandalas@Prickett.com]
**Sent:** Thursday, August 31, 2006 7:47 PM
**To:** Eugene Lawson
**Subject:** Proposed Sign Ordinance

Eugene -

My initial impressions on the sign ordinance you have proposed are as follows:

(1) The grandfathering clause (Nonconforming Sign) seems fine, but I might set the date as, for example, July 1, 2006 to be sure we do not run into a circumstance where someone goes out and erects signs the night of the adoption of the ordinance and thereafter claims the signs have been grandfathered.

(2) Why did you delete the definition of "snipe sign"?

(3) Section 000-03, dedicated to Real Estate signs, creates rights that do not currently exist in the Code. Consequently, this revision goes a little further than what the Commissioners are required to enact, an "enforcement" ordinance.

(4) Section 000-04 seems overly broad. It seems that there would need to be some sort of approval process for the erection of such signs, although I can envision the possibility for selective enforcement such an approval process would invite.

(5) Section 000-05 is likewise extremely broad, and I doubt the Commissioners would approve it in its current form. This section would, for example, permit political signs to be placed in the lighthouse round-about.

(6) As you know, the City is exempt from the zoning code, consequently, under your proposal, the City would have to comply with the new sign Chapter. That sets up a scenario that would, for example, preclude the City from putting up the current banner signs on Rehoboth Avenue. I expect we will need to find a way to allow for such occurrences before the Commissioners would approved the proposed ordinance.

On a broader notion, I am sure you realize that the creation of a new Chapter will be a harder sell to the Commissioners than something less weighty. I know you originally tried to work on something within the zoning code which would have diffused this concern, but based upon my representation that a zoning code change would not likely be met with enthusiasm, you took the current approach.

Additionally, I expect that if I circulate this version to the Commissioners, they will not be pleased to see the additions to the existing sign ordinance that are not directly related to enforcement (primarily the allowances for Real Estate signs).

Overall, I think the proposal does provide a good starting point. Please consider my comments, and let me know if you think anything I have written has merit. If so, the next step would be to work together on some refinements, and then present a draft to the Mayor and Commissioners.

Best regards -
Glenn

Glenn C. Mandalas
PRICKETT, JONES & ELLIOTT, P.A.
11 North State Street | Dover, Delaware 19901
(302) 674-3841 (tel) | (302) 674-5864 (fax)
gcmandalas@prickett.com

PLEASE NOTE: This e-mail may contain confidential attorney-client communications or may otherwise be privileged and/or confidential. If you believe that you were not an intended recipient of this e-mail, please do not copy or retransmit this information. Instead, please notify me of the error at your earliest opportunity and then delete this e-mail, as well as any attachments or hard copies thereof. Thank you for your cooperation.



mandalas.reply.sign
ord.2006.0...

-----Original Message-----
From: lawson@fhhlaw.com [mailto:lawson@fhhlaw.com]
Sent: Saturday, September 02, 2006 6:08 PM
To: GCMandalas@Prickett.com
Subject: RE: Proposed Sign Ordinance

Glenn,

Here are my thoughts.  I believe we are running out of time to do this in a negotiated
manner.  Any help to get this moving would be appreciated.

Gene

Original Message:
-----------------
From: Mandalas, Glenn C. GCMandalas@Prickett.com
Date: Thu, 31 Aug 2006 19:46:55 -0400
To: lawson@fhhlaw.com
Subject: Proposed Sign Ordinance


Eugene -

My initial impressions on the sign ordinance you have proposed are as
follows:

--------------------------------------------------------------------
mail2web - Check your email from the web at http://mail2web.com/ .

1

Glenn,

Thank you for your responses. I will respond to each in turn but did want to begin by saying that the proposed new ordinance is a careful balance of wins and losses, pluses and minuses or whatever else you may want to call this balancing act. It certainly will draw some negative reactions, but the Mayor and Commissioners must decide what is important and understand that to get what they want, others must get some of what they want as well. Let's discuss this soon. If there is not rapid movement on a negotiated settlement, my folks are pressing to abandon the effort and simply require the City to enact the "enforcement mechanism" by September 18 or we ask the court to deal with the lack of movement. I do not believe it is possible to produce such an enforcement mechanism that will pass constitutional muster because of the irrational insistence on keeping everything (the Art League signs and the Convention Center sign) the City wants. Following are my specific thoughts:

(1)     I have no problem with dating back as you suggest. This is the provision which permits and protects the convention center sign.

(2)     As far as I could tell, the word "snipe sign" never appears substantively again (it only appears in the sign/zoning chart). More importantly, as written, it defines snipe sign in terms that encompasses every sign I could imagine. If it has no purpose, it should not be there.

(3)     Section 000-03 is essentially the same as current law except for Section 000-03 C.2. This is a trade off for protecting the Art League and Convention Center signs. It is very limited (I copied it from sign ordinances in several other municipalities but further restricted the number and location). This is the bone to a vocal element of the City to go along.

(4)     Section 000-04 is expressly to protect the Art League and church signs. This seems to be critically importantly to the Mayor and some Commissioners. I have no problem editing it to tighten it up to avoid abuse.

(5)     Section 000-05 is obviously the most important for our plaintiffs and the court. I should have put in the reference to not violating § 000-06 as I did in § 000-04. I am open to suggestions, BUT any solution cannot permit § 000-04 signs to be on public property and prohibit § 000-05 from being there. I attempted to regulate in § 000-06 any sign that would create a hazard or violate prohibitions in current law.

(6)     While I understand that the City would be covered by the proposed ordinance, it is precisely the City's attempt to restrict public speech selectively in current Chapter 74 § 16 that created the whole problem. The point is, if the City wants to control signs to that extent it MUST enforce such restrictions as written. The Mayor, and at least some Commissioners, are adamant that they will not permit constitutional enforcement. Unless there is some movement on other fronts

(such as described above), I see no way out except by court intervention. I suggest that § 000-04 could be edited to permit a non-profit or the City to erect promotional signs (banners) of a generic nature.

I understand some will not be pleased but, as referenced above, there can be a rational settlement with a give and take on both sides or we can simply let the judge order it. Also as I have related to you before, if you (or anyone else from the City) can produce an "enforcement mechanism" that will guarantee constitutional enforcement, we are prepared to look at it. I believe such a policy could only be possible if the Art League and Convention Center signs are removed, which is unlikely. Please call so we can discuss these issues quickly. If you get this over the weekend, please do not hesitate to call me if you have the time. My home number is 227-1190 and if I am at the office it is 226-3700.

P.S. - You did not mention the explicit prohibition of Trailer Signs and other vehicles used as signs which I added. Some of the examples used in the litigation were truly clutter in the neighborhoods. While referenced in the chart, which is arguably just a recap and not a substantive part of the ordinance, the explicit prohibition makes it clear. Also the provision that requires removal of real estate sale signs after closing is an improvement.

# Exhibit F

**Eugene Lawson**

| | |
|---|---|
| **From:** | Eugene Lawson |
| **Sent:** | Tuesday, September 05, 2006 6:41 PM |
| **To:** | 'Mandalas, Glenn C.' |
| **Subject:** | RE: Proposed Sign Ordinance |

Glenn,

We are open to an enforcement ordinance but are reasonably certain it can't fly under the circumstances, meaning that the sign ordinance outside of the zoning code must be repealed as written. I also believe it will take no longer to review and edit the existing ordinance than it would to do another stop gap which is a rut the City seems to be in for everything. If Patrick is interested in a sign re-write, there are at least four Commissioners to move this. Kathy has stated publicly that she wants changes in the commercial areas and I am confident that Paul and Ron want the Court order followed (and off the City's back) in a real, not hodge podge way. Why does this need to come from the Mayor down? Can't the others simply introduce a new comprehensive ordinance? I appreciate your concern but it is endemic in this City to keep putting important things off, hence we have no zoning map later than 1997.

Any additional thoughts on the proffer on Prospect? Let's talk soon.

Gene

——Original Message——
From: Mandalas, Glenn C. [mailto:GCMandalas@Prickett.com]
Sent: Tuesday, September 05, 2006 6:27 PM
To: Eugene Lawson
Subject: RE: Proposed Sign Ordinance

Gene -

Thanks for the clarifications. I have forwarded your proposal to the Mayor for his thoughts.

I understand that your team in the sign litigation wants some movement on this, but they have to understand that the comprehensive ordinance you have proposed simply will not get done as rapidly as they would like. What are your thoughts on working toward a much less enthusiastic "enforcement" ordinance (I have a working draft) and then considering a comprehensive sign ordinance outside of the litigation? I understand at least Commissioner Gossett, and maybe others, have interest in revising the code provisions relating to signs.

Best regards -
Glenn

——Original Message——
From: lawson@fhhlaw.com [mailto:lawson@fhhlaw.com]
Sent: Saturday, September 02, 2006 6:08 PM
To: Mandalas, Glenn C.
Subject: RE: Proposed Sign Ordinance

1

Glenn,

Here are my thoughts. I believe we are running out of time to do this in a negotiated manner. Any help to get this moving would be appreciated.

Gene

Original Message:
----------------
From: Mandalas, Glenn C. GCMandalas@Prickett.com
Date: Thu, 31 Aug 2006 19:46:55 -0400
To: lawson@fhhlaw.com
Subject: Proposed Sign Ordinance

Eugene -

My initial impressions on the sign ordinance you have proposed are as follows:

--------------------------------------------------

mail2web - Check your email from the web at http://mail2web.com/ .

2

## CERTIFICATE OF SERVICE

I, Todd C. Schiltz, hereby certify that on November 16, 2006, a copy of the Reply Memorandum in Support of Plaintiffs' Motion for Contempt was served upon the following counsel of record:

### VIA E-FILING AND HAND-DELIVERY

Daniel A. Griffith, Esquire
Marshall, Dennehey, Warner, Coleman & Goggin
1220 North Market Street, 5th Floor
P.O. Box 8888
Wilmington, DE 19899-8888

Chase Brockstedt, Esquire
Murphy, Spadaro & Landon
1011 Centre Road, Suite 210
Wilmington, DE 19805

Todd C. Schiltz (No. 3253)

DATED: November 16, 2006

WIL:62984.1