# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ROBERT SOKOLOVE, ET AL.,      )
                                  )
          Plaintiffs,      )
                                  )
        v.                  )      Civil Action No. 05-514-KAJ
                                  )
CITY OF REHOBOTH BEACH,      )
DELAWARE, ET AL.,            )
                                  )
         Defendants.     )

## PLAINTIFFS' OPENING BRIEF IN SUPPORT OF
## THEIR MOTION FOR COSTS AND ATTORNEYS' FEES

WOLF, BLOCK, SCHORR and         BIFFERATO GENTILLOTTI, LLC
    SOLIS-COHEN LLP


Shawn P. Tucker (#3326)           Chase Brockstedt (#3815)
Todd C. Schiltz (#3253)            119 East 3rd Street
1100 North Market Street, Suite 1001    P.O. Box 90
Wilmington, DE 19801           Lewes, Delaware 19958
(302) 777-0312               (302) 644.0302

Attorneys for plaintiff           Attorneys for plaintiffs
Citizens for Rehoboth Beach       Robert Sokolove and David
                                McCarthy

September 21, 2007

## Table of Contents

Table of Authorities ................................................................................................................ ii

INTRODUCTION .................................................................................................................1

STATEMENT OF FACTS .....................................................................................................3

     A.     The Parties .........................................................................................3

     B.     Plaintiffs Seek Clarification As To Where Signs Can Be Erected .........................3

     C.     Plaintiffs' Campaign Signs Are Removed ............................................5

     D.     Plaintiffs File Suit .................................................................................6

     E.     The Rules of Thumb ........................................................................7

     F.     The Preliminary Injunction Hearing ..............................................10

     G.     Defendants Continue To Selectively Enforce Section 74-16 ...............................12

     H.     Plaintiffs Move For Partial Summary Judgment ...................................14

     I.     Discovery Reveals That Political Signs Are Exempt From Section 74-16 ...........15

     J.     Defendants Admit Certain Commercial Signs
           Continue To Violate Section 74-16 ...................................................16

     K.     The Prospect Of Being Deposed Forces Defendants To Engage In
           Settlement Talks And Sign A Consent Judgment...................................17

     L.     Post Consent Judgment Activities ......................................................20

     M.     Plaintiffs' Costs And Attorneys' Fees....................................................21

ARGUMENT ........................................................................................................................21

I.     PREVAILING PARTIES ARE ENTITLED TO ATTORNEYS' FEES ..........................22

II.     THE FEES SOUGHT ARE REASONABLE.................................................................23

     A.     The Hourly Rate Is Consistent With The Community...........................................23

     B.     The Fees Incurred Are Reasonable ....................................................24

CONCLUSION.....................................................................................................................28

**Table of Authorities**

## CASES

Albertson v. Winner Automotive,
   2004 WL. 2435290 (D. Del. Oct. 27, 2004) ........................................................................24

Blum v. Stenson,
   465 U.S. 886 (1984)..............................................................................................................24

Carey v. Piphus,
   435 U.S. 247 (1978)..............................................................................................................22

Central Delaware Branch of NAACP v. Dover,
   123 F.R.D. 85 (D. Del. 1988) ...............................................................................................24

Hensley v. Eckerhart,
   461 U.S. 424 (1983)........................................................................................................21, 23

Pennsylvania Environmental Defense Foundation v. Canon-McMillan Sch. District,
   152 F.3d 228 (3d Cir. 1998)..................................................................................................23

Public Interest Research Group of New Jersey, Inc. v. Windall,
   51 F.3d 1179 (3d. Cir. 1995).................................................................................................23

Riverside v. Rivera,
   477 U.S. 561 (1986)..............................................................................................................22

Texas State Teachers Association v. Garland Independent Sch. District,
   489 U.S. 782 (1989)..............................................................................................................22

Truesdell v. Philadelphia House. Authority,
   290 F.3d 159 (3rd Cir. 2002) ................................................................................................22

Washington v. Philadelphia County Court of Common Pleas,
   89 F.3d 1031 (3rd Cir. 1996) ................................................................................................23

## STATUTES AND ORDINANCES

42 U.S.C. § 1983................................................................................................1, 5, 20, 27

42 U.S.C. § 1988................................................................................................2, 17, 20

City of Rehoboth Beach Ordinance § 74-16.................................................... *passim*

City of Rehoboth Beach Ordinance § 74-17.................................................... *passim*

**<u>INTRODUCTION</u>**

This case involves violations of plaintiffs' rights under the First and Fourteenth Amendments to the Constitution of the United States and the Civil Rights Act of 1971, 42 U.S.C. § 1983 arising from defendants' unconstitutional, selective enforcement of City of Rehoboth Beach Ordinance § 74-16 ("Section 74-16"). The clear terms of Section 74-16 preclude the placement of any private sign on public property or right-of-way within the limits of the City of Rehoboth Beach ("City"). Defendants did not enforce Section 74-16 in accordance with its terms and, instead, consistently enforced it in a selective, discriminatory manner. Defendants' own testimony makes clear that defendants ignored the clear language of Section 74-16 and purportedly employed their own unwritten, undisclosed "rules of thumb" to determine whether or not to remove signs. Application of the "rules of thumb" resulted in selective enforcement which this Court recognized infringed plaintiffs' constitutional rights when it ruled on plaintiffs' motion for a preliminary injunction.

Notwithstanding the Court's conclusions, defendants' selective enforcement continued. In the months following the Court's preliminary injunction opinion, defendants left preferred commercial signs standing in areas which violated not only Section 74-16, but their own "rules of thumb." Defendants' apparent indifference to plaintiffs' constitutional rights, which was demonstrated fully through their failure to follow the initial direction of the Court and enforce Section 74-16 in a consistent manner, was made clear by their lawyer, Daniel Griffith. Mr. Griffith told plaintiffs that (i) he had advised defendants that they almost certainly would not prevail on the merits of the suit, and (ii) defendants were not particularly concerned about the merits of the suit and that the only issue they were concerned about was the extent of any attorneys fees that plaintiffs would recover.

Although defendants knew they were not properly enforcing Section 74-16 no later than July 2005 and were advised by their lawyer that their conduct was improper, defendants refused to acknowledge their impropriety until May of 2006 when they entered a Stipulated Consent Judgment and Order ("Consent Judgment").  The Consent Judgment was entered as an Order of this Court on May 26, 2006, and provides, among other things, that (i) judgment is entered in favor of plaintiffs; (ii) defendants will pay plaintiffs $2,001.00; (iii) defendants will adopt a new ordinance which details the manner in which Section 74-16 will be enforced; (iv) defendants will enforce Section 74-16 and the new ordinance in a consistent, non-selective manner; (v) plaintiffs are prevailing parties as that term is used in 42 U.S.C. § 1988 ("Section 1988") and entitled to seek an award of attorneys' fees from the Court; and (vi) the Court retains jurisdiction to enforce the terms of its order and consider any application for attorneys' fees.  Hence, defendants have now recognized the impropriety of their conduct.

In accordance with the Consent Judgment, plaintiffs now seek an award of costs and attorneys' fees in the amount of $171,095.  While it appears defendants hoped that this suit would just go away, plaintiffs' diligence and perseverance eventually compelled defendants, with the assistance of this Court, to acknowledge that they were not enforcing Section 74-16 in a constitutionally permissible manner and justifies awarding plaintiffs all of their fees.  Such a result is particularly appropriate given that defendants' conduct has caused a substantial increase in plaintiffs' fees.

## STATEMENT OF FACTS[1]

### A.     The Parties

Plaintiff Robert Sokolove is a resident of the City of Rehoboth Beach, Delaware and unsuccessfully ran for mayor of the City in a August 13, 2005 municipal election.    Mr. Sokolove's opponent was Mayor Samuel Cooper, a fifteen year incumbent.    Plaintiffs David McCarthy and William Shields ran for the two City Commissioner seats which were up for election in 2005.    Mr. McCarthy and Mr. Shields were running against two candidates who endorsed Mayor Cooper and ran on his platform.    Plaintiff Citizens for Rehoboth Beach is a political action committee which supported the individual plaintiffs' campaign efforts and generally seeks to bring about change in City government.  (Ex. 1 at 5-8).

Defendant City of Rehoboth Beach, Delaware is a municipal corporation located in Sussex County, Delaware.   The City conducted an election on August 13, 2005.   Defendant Gregory Ferrese is the current City Manager for the City of Rehoboth.   Mr. Ferrese has held the position as City Manager since 1983.  (Ex. 1 at 114).

### B.     Plaintiffs Seek Clarification As To Where Signs Can Be Erected

To promote their candidacies, plaintiffs decided to erect campaign signs.   Plaintiffs heard rumors that City sanitation workers were removing campaign signs so they had their lawyer, Melissa Cargnino, call Mr. Ferrese to determine where, if anywhere, the City deemed it inappropriate to place campaign signs.  Mr. Ferrese advised Ms. Cargnino that the only place that

---

[1]     The facts set forth herein are drawn from the record in the underlying dispute, including the depositions taken in anticipation of plaintiffs' motion for a preliminary injunction and the transcript of the hearing on plaintiffs' preliminary injunction motion.   All exhibits referred herein are attached as Exhibits to the Compendium Of Exhibits Submitted In Support Of Plaintiffs' Opening Brief In Support Of Their Request For Attorneys' Fees And Expenses, submitted contemporaneously herewith.

the City asked candidates not to erect signs was down the middle of Rehoboth Avenue.  (Ex. 1 at 5-6, 12-14, 80-88).

Consistent with Mr. Ferrese's advice, plaintiffs placed their campaign signs on the private property of the individual plaintiffs and their supporters as well as on public property and rights-of-way adjacent to streets and sidewalks.  The signs erected on public property and rights-of-way were placed near the signs of other candidates in the 2005 election, including those of incumbent Mayor Cooper, as well as near the signs for commercial establishments, community organizations, and neighborhoods.  (Ex. 2 at ¶ 10).

Mr. Ferrese acknowledges that he spoke to Ms. Cargnino, but denies that he told her that campaign signs could be erected throughout the City.  Rather, he contends that "I told her that we do not permit signs on City-owned property and in the right of way."  (Ex. 1 at 118).

In its ruling on plaintiffs' motion for a preliminary injunction, the Court accepted the testimony of Ms. Cargnino over that of Mr. Ferrese.  (Ex. 3 at 3).  Whether Ms. Cargnino or Mr. Ferrese is correct is not material.  What is material is that neither witness testified that Mr. Ferrese advised plaintiffs about the "rules of thumb" - the rules that the City supposedly employed to determine whether or not signs could remain standing on pubic property and right-of-way.  Why Mr. Ferrese would fail to advise Ms. Cargnino about the "rules of thumb" is not clear.[2]

---

[2]     One possible explanation for Mr. Ferrese's failure is that the "rules of thumb" did not exist at the time he spoke to Ms. Cargnino and that the rules were crafted only after plaintiffs' campaign signs were removed and this lawsuit was filed.  Other evidence in this case - including discrepancies as to who developed the "rules of  thumb," when such rules purportedly were created, what the rules actually are, the absence of any pre-suit writing evidencing such rules, and the failure of the City to apply such rules pre-suit - all suggest that defendants crafted the rules after the filing of this suit as a means of justifying their conduct.

### C.    Plaintiffs' Campaign Signs Are Removed

Prior to 11:00 a.m. on July 9, 2005, many of plaintiffs' campaign signs were removed from public property and rights-of-way by City employees.  After the signs were found in the back bed of a City truck, Mr. Sokolove retrieved them and replaced them in the community before 4:00 p.m. on July 9.  Between 6:00 p.m. and 11:30 p.m. on July 9, plaintiffs' campaign signs again were removed from the public right-of-way by City employees.  Approximately thirty-five signs were removed during this period.  (Ex. 1 at 10-12, 27, 29, 37-40, 52-54, 68, 109, 135-36).  When a police officer contacted Mr. Ferrese about the removal of the signs, he advised the officer that "'the signs should not have been picked up, and he did not know why they had been.'"  (Ex. 3 at 4).

While plaintiffs' campaign signs were removed from the public right-of-way on two separate occasions, campaign signs erected in the public right-of-way endorsing Mayor Cooper and candidates supporting him were not removed.  (Ex. 1 at 23-26, 93-101, 104-06, 140-42; Ex. 4-10; Ex. 11 at 40-42, 48-49, 53).  Likewise, the City left standing various other private commercial signs, all of which are erected on public property or right-of-way.  (Ex. 1 at 101-04, 153-55; Exs. 12-18).

Following the removal of plaintiffs' campaign signs, plaintiffs sent Mr. Ferrese (with a copy to the City Solicitor) two letters asking for an explanation why plaintiffs' campaign signs were removed and advising defendants that such removal violated the United States Constitution. (Ex. 3 at 5).  Defendants never responded to plaintiffs' letters.  Mr. Ferrese explained that he "didn't respond to them because I felt that this was headed to court, and that is exactly where we are today.  So I didn't respond to [plaintiffs'] letters."  (Ex. 1 at 130).

Of course, by failing to respond to plaintiffs' letters and never explaining why plaintiffs' campaign signs were removed while other campaign, commercial and community signs erected

in the same places remained standing, Mr. Ferrese ensured that a lawsuit would go forward. If he had responded to the letters and advised plaintiffs of what rules to follow, this entire lawsuit could have been avoided.

    **D.    Plaintiffs File Suit**

Although defendants never responded to plaintiffs' letters, plaintiffs' counsel did speak to defense counsel about the removal of plaintiffs' campaign signs before the filing of this suit. Plaintiffs' counsel told defense counsel that suit would be filed unless they agreed not to selectively remove plaintiffs' campaign signs. Defendants' lawyer stated that City Ordinance Section 74-16 gave the City the right to remove plaintiffs' campaign signs. (Ex. 3 at 5). Defendants made no mention of the "rules of thumb" during this conversation.

Section 74-16 provides that "No person shall, keep, maintain or post any private advertisement, poster or sign upon or on any beach or strand or public boardwalk, park, sidewalk, street or other public property or way within the limits of the city." (Ex. 3 at 5). Defendants provided no explanation of how this ordinance was enforced or how it allowed defendants to remove plaintiffs' campaign signs while not removing other candidates' campaign signs and commercial signs.

Having received no response to their selective enforcement concerns, on July 21, 2005, plaintiffs filed suit in order to put an end to defendants' selective removal of their campaign signs. The purpose of the suit was not to recover damages for defendants' wrongful conduct. Rather, plaintiffs were looking to protect their right to free speech guaranteed by the First and Fourteenth Amendments to the Constitution of the United States and the Civil Rights Act of 1971, 42 U.S.C. § 1983 and to obtain injunctive relief putting an end to defendants' selective

enforcement of Section 74-16.[3]  To this end, contemporaneously with the filing of the complaint, plaintiffs also filed a motion for a temporary restraining order and accompanying brief seeking to enjoin defendants wrongful conduct.  The Court converted plaintiffs' motion into one for a preliminary injunction and scheduled an evidentiary hearing on the matter for July 26, 2005. (Ex. 3 at 2).

### E.    The Rules of Thumb

Between July 22 and July 25, 2005, the parties engaged in expedited discovery in anticipation of the July 26 hearing.  In addition to producing documents and responding to interrogatories, the parties took depositions with plaintiffs deposing two representatives of the City and defendants deposing all of the individual plaintiffs.

Discovery revealed that the City did not enforce Section 74-16 as written and, instead, selectively enforced it in accordance with unclear "rules of thumb."  The arbitrary "rules of thumb" bear no relation to the language of Section 74-16, were unwritten and known only to select City insiders and their enforcement resulted in the removal of some, but not all, private signs which violate Section 74-16.

Alexander Onizuk, the City's Code Enforcement officer and the individual responsible for removing signs that purportedly do not comply with Section 74-16, described how the City enforced Section 74-16's prohibition on the erection of private signs on public property or right-of-way as follows:

> Q:    What has been your rule of thumb during that one-year period related to determining where the public property ends or the right-of-way ends and the private property starts.

---

[3]    The relief plaintiffs requested in their amended complaint - including a request for a permanent injunction and the award of nominal damages - makes clear that their principal objective was to obtain some form of injunctive relief and not to recover any monetary damages they might have incurred as a result of defendants' conduct.  (Ex. 2).

A:    We normally went by the sidewalk. Anything after the sidewalk is public property.

Q:    And if there is no sidewalk and there is a utility pole, how do you use the utility pole to determine that?

A:    Well, the utility pole is on the easement. It is not on private property. And you can tell anything past the utility pole is private property.

Q:    Do you ever do any enforcement action on the backside of a telephone pole?

A:    No, I would not.

\*      \*      \*

Q:    Let me ask the question. It is important. What do you do in that instance? What do you do in an instance where there is a street, there is no utility poles, and no sidewalks.

A:    Then I would say I am going to leave those signs alone. They might be on somebody's private property.

Q:    You would not remove those signs?

A:    I would not remove them. If I have any doubt, I won't touch them.

(Ex. 19 at 6-7, 80, 84).

Mr. Ferrese confirmed that the City did not try to determine where the public property and right-of-way begin and end when enforcing Section 74-16, and, instead, used "rules of thumb" to determine if a sign violates the ordinance. The "rules of thumb" are unwritten and unknown to outsiders and provide that a sign is on private property so long as it is behind a sidewalk, a utility pole or a parking space located on the subject property. (Ex. 1 at 44-46, 116, 119-21, 128-29, 147-48, 150-51).

Mr. Ferrese and David Murphy, the City's Building Inspector, both recognized that the "rules of thumb" policy resulted in the City removing some signs that violate Section 74-16 but leaving in place other non-complying signs.

Q:    Okay.  Let me try again.  You have a public right-of-way.  Let's say it is 10 feet wide, hypothetically.  Okay?

A:    Yes.

Q:    There is a utility pole that is five feet into that public right-of-way. It's possible; right?

A:    Yes, its possible.

Q:    Probably not unlikely?

A:    It's possible.

Q:    Okay.  Somebody puts their sign up behind the utility pole, okay? Maybe a foot behind it; right?

A:    Yes.

Q:    It's still in the public right of way?

A:    Yes, sir.

Q:    But  you are not going to remove it?

A:    Right.

Q:    And unless somebody knows about your policy, if they put a sign up on the other side of that utility pole, theirs is going to get removed but somebody's else's isn't?

A:    That's right, sir.

Q:    Even though they are both in the public right-of-way?

A:    Yes, sir.  It exists today.

(Ex. 1 at 150-51).

Q:    If I was running for office, Mr. Murphy, and I put a sign up behind a utility pole, and that utility pole was in the center of the public right-of-way, not on the edge of the public right-of-way, I can have a sign in the public right-of-way but you wouldn't remove it, correct?

A:    I wouldn't take it out from behind the utility pole.  And my officer has been instructed not to remove signs behind utility lines.  That is a grace period that -- area that we have given because, again, some of these pole lines are right at the front edge of property lines, and I'm not going to try and a lot of times decide what is right and what is wrong, location.

(Ex. 11 at 23-24).

In addition to demonstrating that the "rules of thumb" caused the City to remove some candidates' campaign signs while leaving other candidates' signs standing even though both signs violated Section 74-16, discovery also revealed that the City has certain preferred commercial and not-for profit signs which it allowed to remain standing even though they violate Section 74-16 and the "rules of thumb." (Ex. 1 at 89-92, 111-12, 116). In particular, the City allowed signs erected by the Art League, the Oak Grove Trailer Park, the Village Improvement Association and certain realtor and contractor signs to remain standing even though they violated Section 74-16.

Notably, defendants never advised plaintiffs of the "rules of thumb" or the fact that certain preferred signs were not removed even though they violated Section 74-16 and the "rules of thumb" before plaintiffs engaged in discovery.[4]

## F.     The Preliminary Injunction Hearing

On July 26, 2005, the parties appeared before the Court for the preliminary injunction hearing. The parties were before the Court for almost the entire day, presented testimony from four witness, introduced deposition testimony from two other witnesses and introduced over thirty exhibits into evidence. At the conclusion of the hearing, Judge Jordan suggested that the parties reach some understanding as to where signs could be placed.

---

[4]     Who developed the "rules of thumb" and when they were adopted is not clear. Mr. Ferrese testified that the policy has existed for a long time and that City developed it years ago. (Ex. 1 at 116, 148). In comparison, Mr. Murphy testified that he created the "rules of thumb" after becoming a City employee in early 2004 and that prior to July 2005 Mr. Ferrese was not aware of these benchmarks. (Ex. 11 at 4-5, 79-80).

On July 27, 2005, plaintiffs sent defense counsel an email memorializing a conversation between the parties wherein plaintiffs asked defendants to set forth in writing defendants' position as to where signs could and could not be erected. In pertinent part, the email stated:

> I informed you that our clients would very much like to comply to the extent possible with the City's current position concerning signs until we get a decision from the court. We discussed that Mr. Ferrese explained to the court about the "rule of thumb" for determining whether or not a sign was in the right of way but that his rule was not entirely consistent with those of Mr. Onizuk and Mr. Murphy whose rules articulated in the depositions also were not entirely consistent with each other. I suggested to [defense counsel] that you supply us with a written version of the City's position concerning the rule of thumb as soon as possible and we would convene our clients to review it and see if we can both move forward toward the election with objective criteria regarding sign placement . . . . We would appreciate receiving that written compilation of the rules as soon as possible.

(Ex. 46).

On July 28, 2005, the Court issued its opinion on plaintiffs' motion for a preliminary injunction finding that plaintiffs "have sufficiently demonstrated a likelihood of success on their claim that [Section 74-16] has been arbitrarily and unconstitutionally applied . . . ." (Ex. 3 at 2). Explaining its holding, the Court stated:

> [T]he City has applied [Section 74-16] in an arbitrary and therefore unconstitutional manner. Indeed, the evidence at this stage is overwhelming that the City has not applied [Section 74-16] according to its terms. It is unrebutted that the City sometimes allows political signs on public rights-of-way . . . .
>
> How far back from a road a sign must be before the City will accept it as appropriately placed, which side of the sidewalk a sign can be placed on, whether signs must be behind an imaginary boundary marked by the line of utility poles when there is no sidewalk, whether landscaping ties are a permissible boundary for determining the placement of signs, whether signs for other non-profit organizations, like the community arts league, are permissible -- all these questions are, it seems, answered by unwritten "rules of thumb" that only the City's cognoscenti know. That may be a satisfactory way of doing business as long as no one objects.

> But it is not a constitutionally valid way of doing business . . . and the day
> that someone would object should have been foreseen.

(Ex. 3 at 15-16).[5]

Notwithstanding the Court's criticism of the defendants' failure to make known its unwritten "rules of thumb," defendants never responded to plaintiffs' July 27, 2005 request for a written statement of such rules. Indeed, defendants did not set forth the supposed rules in writing for months and did so only after entering a Consent Judgment which required them to articulate the standards they apply and only after plaintiffs threatened them with contempt for failing to abide by the terms of the Consent Judgment.

### G.    Defendants Continue To Selectively Enforce Section 74-16

In light of the Court's ruling on the preliminary injunction motion, it was clear defendants had applied Section 74-16 in an unconstitutional manner and that they could not continue to enforce Section 74-16 as they had in the past. As the ultimate outcome of the dispute seemed clear, plaintiffs approached defendants to see if there was any interest in resolving the matter.

Plaintiffs proposed resolving the matter by defendants agreeing to either enforce Section 74-16 as written or amend the ordinance so that its terms were consistent with the City's enforcement practices. Plaintiffs also advised defendants that any settlement would require the payment of a portion of plaintiffs' litigation costs pursuant to Section 1988 and that plaintiffs' litigation costs to that point exceeded $55,000. Plaintiffs realized that they would have to discount their fees in order to settle the matter and expressly advised defendants that they were willing to reduce their fee demand. (Ex. 39 at ¶ 2).

---

[5]    Subsequent to July 28, 2005, the City tendered this case to its insurance carrier and counsel retained by the carrier entered his appearance on behalf of defendants. (D.I. 22).

Defendants rejected plaintiffs' settlement offer.  As to the attorneys fees issue, defendants said their own litigation costs were less than plaintiffs and that they were unwilling to discuss a settlement which included a significant payment of fees.  (Ex. 39 at ¶ 2).

After the August 13, 2005 municipal election, plaintiffs' and the other candidates' campaign signs were taken down.  Numerous other commercial signs, including the Art League signs which are permanently affixed to street signs in the City, the Oak Grove Trailer Park signs, the Village Improvement Association and several contractor and realtor signs about which plaintiffs complained in this suit, remained standing.  (Ex. 15-18, 20-36).

The commercial/community signs that remained standing violated both the express terms of Section 74-16 and the "rules of thumb."  Many of these signs were permanent and had previously been identified by plaintiffs as violating Section 74-16 and the "rules of thumb." Examples of such signs include the signs for the Art League, the Oak Grove Trailer Park and the Village Improve Association.  (Exs. 15-18, 20-21).  Others were semi-permanent or temporary, clearly violated the ordinance and the "rules of thumb" and yet remained standing for weeks or months at a time.  (Exs. 22-37, 45).  For example, the defendants left standing for over 3 months an approximately 5 foot tall Alesi construction company sign that was planted in the ground on a 4 inch by 4 inch wooden pole and that was erected in the grass between the curb and the sidewalk, an area defendants have made clear is public property/right-of-way.  (Ex. 37; Ex. 11 at 15).

Photographs of various signs that defendants left standing after the Court issued its opinion on the preliminary injunction motion have been submitted as Exhibits 15-18, 20-37 and 45.  Defendants left these signs standing for lengthy periods of time even though Mr. Ferrese testified that Section 74-16 "prohibits all signs, not just political signs" and that the "rules of

thumb" apply to "[a]ll types of signs" and even though defendants purport to enforce Section 74-16 by patrolling all of the City's streets every day of the year.     (Ex. 1 at 115, 116; Ex. 11 at 77; Ex. 19 at 46, 71; see also Ex. 11 at 70 (Mr. Murphy testifying that Mr. Ferrese "told me, he says if [signs] are in the right-of-way or on City property that they are to be removed, regardless of who they are, whose signs they are").

### H.      Plaintiffs Move For Partial Summary Judgment

As defendants were unwilling to discuss settlement and as defendants continued to selectively enforce Section 74-16, plaintiffs took steps to prepare their case for trial.  Among other things, plaintiffs filed a motion for partial summary judgment seeking a ruling that defendants had selectively enforced Section 74-16 both pre and post-election and that this selective enforcement was unconstitutional.

Notably, defendants' answering brief in opposition to the motion for partial summary judgment did not respond to plaintiffs' arguments that defendants had engaged in impermissible selective enforcement of Section 74-16 pre-election.   (Ex. 38).   As to the argument that defendants' selective enforcement continued post-election, defendants' answering brief made no attempt to explain why the commercial signs that remained standing, including the Art League signs, the Oak Grove Trailer Park signs and the Village Improvement Association sign, did not violate Section 74-16.   Rather, defendants ignored this central issue and sought to avoid judgment by arguing that a material issue of fact precluded the Court from ruling in plaintiffs' favor.  The only "evidence" defendants submitted as proof that a factual dispute exists was a two page, self-serving affidavit of Mr. Ferrese which simply concluded that "Since the issuance of the Court's Memorandum Opinion, City Ordinance § 74-16 . . . governing the allowable locations and placements of signage throughout the City of Rehoboth Beach, Delaware, has been enforced in accordance with its terms and the terms of the Court's Memorandum Opinion."  (Ex.

38 at Ex. F, ¶ 5).  Of course, Mr. Ferrese's affidavit contained nothing more than a conclusion regarding the very issue the Court was being asked to address:  whether the defendants enforced Section 74-16 in accordance with its terms or in a selective, unconstitutional manner after the election.

In December 2005, Todd Schiltz, counsel for plaintiffs, was discussing the summary judgment motion with Daniel Griffith, counsel for defendants.  In the course of that discussion, Mr. Griffith said that he repeatedly had advised defendants that they most likely would not prevail on the issue of whether or not they violated plaintiffs' rights by selectively enforcing Section 74-16, that defendants were not particularly concerned about the merits of the suit and that the only issue they were concerned about was the extent of any attorneys fees that plaintiffs would collect under Section 1988.  (Ex. 39 at ¶ 4).

I.    **Discovery Reveals That Political Signs Are Exempt From Section 74-16**

In the fall of 2005, plaintiffs also served requests for the production of documents and requests for admissions on defendants.  Among the responsive documents defendants produced were the minutes of an August 1995 meeting of the City Commissioners at which Section 74-16 was approved as former City Code Section 3-18.

The meeting minutes reflect that, at the time the Commissioners approved Section 74-16, one Commissioner questioned whether the ordinance included political signs within its scope.  In response to this question, Mayor Cooper stated:

> [T]he City can't prohibit them unless they are obstructing the view, etc.  It is freedom of speech.

(Ex. 40 at 2).[6]

_____

[6]    Prior to the preliminary injunction hearing, plaintiffs served formal discovery requests on defendants asking them to produce all documents identifying why the City adopted Section 74-16 and any policies, procedures or guidelines the City followed to enforce the ordinance.  Notwithstanding these requests, the minutes from the August 1995 City

Plaintiffs' campaign signs were removed even when they did not obstruct any view.  As a result, defendants' enforcement practices violated the City Commissioners' expressed intent when passing the ordinance:  do not remove political signs unless they obstruct the view because otherwise you are violating a right to free speech.  The City Commissioners' intent is consistent with the City's past practice regarding campaign signs erected on public property and right-of-way:  such signs were not disturbed and were left standing.  (Ex. 1 at 91-92).

### J.     Defendants Admit Certain Commercial Signs Continue To Violate Section 74-16

The requests for admission plaintiffs served sought to establish that certain private, commercial signs in the City were erected on public property or right-of-way and, as a result, violated Section 74-16.  In particular, plaintiffs asked if the Art League signs, the Oak Grove Trailer Park sign, the Village Improvement Association sign and other commercial signs, all of which remained standing after the election and the ruling on the preliminary injunction, depicted in certain photographs were erected on public property or right-of-way within the City.  With respect to each of these requests for admission, defendants answered as follows:

> Answering Defendants cannot vouch for the authenticity or accuracy of the photograph referenced in the Request inasmuch as Answering Defendants did not take the photograph.  Nevertheless, Defendants admit that the area shown in the photograph appears to be located on public property or right-of-way within the limits of the city.

---

Commissioner meeting were not produced before the preliminary injunction hearing and were only produced in response to plaintiffs' later document requests.

(Ex. 41 at response 9-12).

Defendants' answers were not responsive to the requests for admission. The request for admission asked defendants to admit whether the sign in each picture is located on public property or right-of-way, not whether the picture shows an area of public property or public right-of-way. Defendants' responses appeared to be calculated to avoid the direct question.

In order to compel a direct answer to the question asked, plaintiffs scheduled a hearing and submitted a letter to the Court asking that defendants be compelled to answer the question presented. Approximately one hour before the hearing with the Court, defendants conceded that all the signs at issue were erected on public property or right-of-way and that they would stipulate that the requests for admission were deemed admitted. (Ex. 42). Defendants offered no explanation for why they did not simply admit the requests for admission in the first instance or why they forced plaintiffs to go through the expense and burden of seeking to compel accurate responses. Moreover, notwithstanding these admissions, defendants never removed the non-conforming signs.

### K. The Prospect Of Being Deposed Forces Defendants To Engage In Settlement Talks And Sign A Consent Judgment

As the discovery deadline approached, plaintiffs noticed defendants' depositions. Although defendants had not discussed settlement for several months, two days before defendants were to be deposed, defendants suggested that the parties discuss settlement and indicated that they might be willing to enter into a consent judgment. The parties postponed defendants' depositions in order to explore a possible settlement.[7]

---

[7] The deposition of Mr. Ferrese, both individually and as the City's 30(b)(6) designee, was initially scheduled to occur on April 12, 2006. Defendants proposed the parties enter a consent judgment on April 10, 2006, after plaintiffs' counsel already had prepared for that deposition. When the settlement discussions did not progress, the parties agreed to reschedule Mr. Ferrese's deposition for May 4, 2006. Plaintiffs' counsel again prepared

The parties settlement discussions ultimately were successful and they filed a Stipulated Consent Judgment with the Court on May 26, 2006. The Consent Judgment provides, in pertinent part, as follows:

1.   Judgment is entered in favor of Plaintiffs;

2.   Defendants shall pay plaintiffs $2,001.00;

3.   Defendant City of Rehoboth Beach, Delaware shall adopt, on or before July 15, 2006, an ordinance ("New Ordinance") which sets forth and clarifies the manner in which [Section 74-16] will be enforced;

4.   Once the New Ordinance is adopted, defendant City of Rehoboth Beach, Delaware shall change the manner in which it enforces [Section 74-16] only by amending the terms of the New Ordinance;

5.   Defendants shall enforce [Section 74-16] (including the New Ordinance and any amendment thereto) in a consistent, non-selective manner;

6.   Plaintiffs retain the right to apply to the Court for an award of costs and attorneys fees pursuant to 42 U.S.C. § 1988;

7.   Plaintiffs shall be considered "Prevailing Parties" for, including but not limited to, purposes of this Action and any application made pursuant to 42 U.S.C. § 1988; and

8.   The Court shall retain jurisdiction over the parties and this Action for purposes of enforcing the terms of this Stipulated Consent Judgment and Order and determining any application for attorneys' fees and costs.

---

for this deposition. On May 1, 2006, Mr. Griffith advised plaintiffs that Mr. Ferrese would be in Poland attending his son's wedding and unavailable on May 4. Mr. Ferrese's deposition was rescheduled for May 23, 2006, and as this date approached, plaintiffs' counsel had to again prepare for the deposition. Mr. Ferrese's deposition did not occur on May 23. Defendants unilaterally cancelled it before the parties had reached final agreement on a settlement. The parties reached agreement on the final terms of the consent judgment at approximately 5:30 on May 23, 2006.

(Ex. 43).  The Court subsequently entered the Consent Judgment as an Order of the Court.

The Consent Judgment was a complete victory for plaintiffs.  The purpose of the lawsuit was to put an end to defendants' selective enforcement of Section 74-16.  The Consent Judgment mandates that defendants enforce Section 74-16 in a consistent, non-selective manner.  As the Consent Judgment permanently enjoined defendants from enforcing Section 74-16 in a discriminatory manner, plaintiffs obtained the exact relief they sought through the lawsuit.

Moreover, the relief plaintiffs obtained through the Consent Judgment mirrors the settlement terms plaintiffs proposed in 2005 following the issuance of the Court's opinion on the motion for a preliminary injunction.  At that time, plaintiffs proposed resolving the matter by defendants agreeing to either enforce Section 74-16 as written or amend the ordinance so that its terms were consistent with the City's enforcement practices.  By requiring defendants to adopt a new ordinance which spells out the manner in which Section 74-16 will be enforced, the Consent Judgment embodies the second of these alternatives.

If defendants had agreed to this relief following the issuance of the preliminary injunction opinion and not forced plaintiffs to prepare their case for trial - including the preparation of written discovery, motions for partial summary judgment, a motion to compel complete responses to the written discovery and preparation to examine defendants' witnesses - plaintiffs' attorneys' fees and expenses would be less than half what they seek in this motion.  Simply put, defendants' approach to this suit has significantly increased the amount and extent of the fees plaintiffs seek.  Although defendants will argue plaintiffs should not recover a substantial portion of their fees, defendants should not be rewarded for (i) their delay in following the advice of their attorney who advised them they would lose on the merits, or (ii) their tactical decisions not to settle this case early, to force plaintiffs to pursue their claims and incur additional fees and, in the

end, to resolve the case on terms which were identical to those plaintiffs proposed at the earlier stage of the proceedings.

**L.      Post Consent Judgment Activities**

Although the Court approved Consent Judgment required the City to adopt a new ordinance by July 15, 2006, the City did not meet this deadline.  Rather, the City did not adopt a new ordinance, City Ordinance § 74-17 ("Section 74-17"), until September 2006, after plaintiffs advised the City that plaintiffs would file a motion for contempt if the City did not comply with the Consent Judgment.

Section 74-17 purported to set forth the manner in which defendants will enforce Section 74-16.  Essentially, defendants attempted to codify the rules of thumb which they contend are used to determined whether or not a sign should be removed.  Notably, although plaintiffs had asked defendants to set forth in writing the rules of thumb on July 27, 2005, it was not until September of 2006 when defendants adopted Section 74-17 that this occurred.  Why it took defendants over a year to set forth the rules of thumb in writing is not clear.

What was clear was that Section 74-17 was ambiguous and did not eliminate selective enforcement of Section 74-16.  As a result, plaintiffs filed a motion for contempt arguing that the adoption of Section 74-17 violated the terms of the Consent Judgment.  The issues raised by that motion were the subject of a May 7, 2007 mediation session before Magistrate Judge Thynge during which the parties discussed rescinding Section 74-17 and adopting a revised version of Section 74-16 which set forth clearly the manner in which the ordinance would be enforced.  As this proposal involved revisions to the City Code, it had to be submitted to the City Commissioners for their review and approval at an appropriately noticed meeting.

In July 2007, the City Commissioners effectively approved the settlement reached on the motion for contempt when they adopted new resolution which (i) rescinded Section 74-17 in its

entirety, and (ii) adopted a revised version of Section 74-16 which clearly spelled out the manner in which the ordinance would be enforced.  (Ex. 47).  As defendants had taken steps which rendered the pending motion for contempt moot, the motion was withdrawn.

       **M.**     **Plaintiffs' Costs And Attorneys' Fees**

The fees and expenses plaintiffs have incurred in connection with the forgoing are set forth in Exhibit 39 at Exhibit A and Exhibit 48 of the Compendium of Exhibits submitted in support of this motion.  The rates charged by plaintiffs' counsel are typical of the rates charged by plaintiffs' attorneys and are consistent with the rates charged by attorneys in Wilmington, Delaware providing similar services.  (Ex. 39 at Ex. B).

## ARGUMENT

Section 1988(b) governs awards of attorneys' fees in actions brought under 42 U.S.C. § 1983 and provides, in pertinent, as follows:

> In any action to enforce a provision of [Section 1983] this court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction.

42 U.S.C. § 1988(b).

Pursuant to the Consent Judgment, defendants have stipulated that plaintiffs are "prevailing parties" for purposes of Section 1988.[8]  Thus, the only issue that must be addressed is the amount of fees plaintiffs can recover.

---

[8]    A plaintiff is deemed a "prevailing party" if it "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit." Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).

## I.      PREVAILING PARTIES ARE ENTITLED TO ATTORNEYS' FEES

The law is clear:  attorneys' fees should be awarded to a prevailing party absent special circumstances.  Truesdell v. Philadelphia House. Auth., 290 F.3d 159, 163 (3rd Cir. 2002).  "The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties. . . ."  Texas State Teachers Ass'n v. Garland Independent Sch. Dist., 489 U.S. 782, 792-93 (1989).

Here, the material alteration of the parties' legal relationship as well as the absence of any special circumstances justifying a denial of attorneys' fees mandates granting plaintiffs' fees in full.  The Court need only look at the original relief sought as well as the result ultimately achieved through the signing of a the Consent Judgment to see that plaintiffs achieved their ultimate objective of putting an end to the selective enforcement of Section 74-16 and, as a result, that there has been a material alteration of the parties' legal relationship.

Likewise, this case presents no "special circumstances" justifying a denial of attorneys' fees.  The cases finding "special circumstances" focus on plaintiffs who have sought substantial compensatory and punitive damages for the alleged wrong and who obtain insignificant, technical victories or instances where fee awards produce "windfalls" for attorneys.  See Garland, 489 U.S. at 792; Riverside v. Rivera, 477 U.S. 561, 580 (1986); Carey v. Piphus, 435 U.S. 247, 266 (1978).  In this case, there has been much more than an insignificant, technical victory and there is no windfall.

As a result of signing the Consent Judgment, defendants agreed to and did amend the City ordinances so that the manner in which Section 74-16 will be enforced is now clear.  Prior to the suit no one other than City insiders were aware of how Section 74-16 was enforced and it was enforced in a selective manner.  (Ex. 3).  The revisions to Section 74-16 make clear how the ordinance will be enforced in the future and, pursuant to the terms of the Consent Judgment,

defendants agreed to enforce this newly adopted/published enforcement scheme in a consistent, non-selective manner. Defendants have never enforced Section 74-16 in this manner and the order plaintiffs obtained mandating such conduct materially altered the parties' legal relationship.

Categorizing this case as a "special circumstance" supporting a denial of attorney's fees would be to ignore the ultimate outcome of the case and penalize plaintiffs and their counsel for the hours of work defendants forced them to expend to bring about the desired result. This is particularly true given that the right plaintiffs sought to and did protect, the right to free speech, a right this Court already recognized in this proceeding as "one of the most cherish rights under our Constitution." (Ex. 3 at 7).

## II.     THE FEES SOUGHT ARE REASONABLE

Reasonable fees are measured by the "lodestar" calculation which multiples the number of hours spent in the litigation by a reasonable hourly rate. Hensley, 461 U.S. at 433. The reasonable hourly rate is calculated according to the prevailing market rate in the community. Washington v. Philadelphia County Court of Common Pleas, 89 F.3d 1031, 1035 (3rd Cir. 1996). "The 'starting point' in determining the appropriate hourly rate is the attorneys' usual billing rate." Pennsylvania Envt'l Def. Found. v. Canon-McMillan Sch. Dist., 152 F.3d 228, 231 (3d Cir. 1998) (citing Pub. Interest Research Group of New Jersey, Inc. v. Windall, 51 F.3d 1179, 1185 (3d. Cir. 1995)).

### A.     The Hourly Rate Is Consistent With The Community

The total fees and costs sought in the application are $171,095.00. The hourly rates for plaintiffs' attorneys and paralegals are as follows:

- Andrew Curley, Esq.                $235 per hour

- Heather Pare, Esq.                 $200 per hour

- Todd C. Schiltz, Esq.:             $340 per hour

- Shawn P. Tucker, Esq.:                $340 per hour

- Chase T. Brockstedt, Esq.:            $275 per hour

- Christine E. Keller                   $85 per hour

- Brenda Gallman                        $85 per hour

- J.M. Sekhri                           $100 per hour

- Sharon Clayborne                      $105 per hour

Plaintiffs have attached affidavits from Richard G. Elliot, Jr., Esq. and Lawrence V. Cronin, Esq. stating the hourly rates charged are consistent with the prevailing market in Wilmington. Additionally, as recently as October 27, 2004, this Court approved hourly rates up to $350 in conjunction with a civil rights discrimination case. Albertson v. Winner Automotive, 2004 WL 2435290 (D. Del. Oct. 27, 2004).

**B.    The Fees Incurred Are Reasonable**

Although the applicant bears the burden of proving that the requested fees are reasonable, the burden then shifts to the party challenging the application who must "present specific evidence challenging the reasonableness of the requested rates or the time expended." Central Delaware Branch of NAACP v. Dover, 123 F.R.D. 85, 88 (D. Del. 1988) (citing Blum v. Stenson, 465 U.S. 886, 892 (1984)). To determine the reasonableness of the application, it is necessary to review the evolution of this case chronologically.

Prior to plaintiffs placing signs within the City of Rehoboth Beach, plaintiffs then lawyer, Melissa Cargnino contacted Mr. Ferrese directly. Regardless of what direction was offered by Mr. Ferrese, if the City had adopted an ordinance that was constitutionally enforced or, at a minimum, had explained to Ms. Cargnino the "rules of thumb" used by the City to enforce the ordinance, the lawsuit could have been avoided. More than that though, if after the removal of

the signs, the City had responded to the two letters sent by plaintiffs' counsel to Mr. Ferrese and the City Solicitor addressing the sign removal, litigation may have been avoided. As a result of defendants' removal of plaintiffs' signs, Mr. Ferrese's failure to explain to plaintiffs' counsel the "rules of thumb," and the refusal to respond to plaintiffs' pre-suit correspondence, proceeding with litigation was plaintiffs only available course of action.

Plaintiffs retained Wolf, Block, Schorr and Solis-Cohen on July 18, 2005 to pursue this lawsuit. Over the next 9 days, Wolf Block investigated the facts, conducted legal research, prepared and filed pleadings, including a verified complaint and a motion for a temporary restraining order, propounded and responded to written discovery, participated in five depositions, prepared for the preliminary injunction hearing, participated in the July 26, preliminary injunction hearing, and submitted post hearing evidence in support of plaintiffs' claims. The total fees and expenses sought for this aspect of the case are $58,625.00.

The opinion issued by the Court on July 28, 2005 finding that plaintiffs demonstrated a likelihood of success on their selective enforcement claim provided an opportunity to end the litigation. Plaintiffs' proposal to resolve the matter and their request that the ordinance be re-written or amended so that enforcement was consistent with the "rules of thumb" was rejected in part because any settlement would have required payment of plaintiffs' attorneys' fees (an amount plaintiffs stated would be discounted).

After the preliminary injunction hearing and the August 13, 2005 election, defendants continued to selectively enforce Section 74-16 by permitting commercial signs to remain in prohibited areas of the City. As defendants were unwilling to discuss settlement and as the City continued to selectively enforce Section 74-16, plaintiffs filed a motion for summary judgment seeking an order that defendants' enforcement was selective and therefore unconstitutional.

Despite defendants' recognition of the probable outcome of the summary judgment motion, they were steadfast in their refusal to resolve the case because of the fee issue. (Ex. 39 at ¶ 4).

Plaintiffs propounded requests for admission and production of documents in the Fall of 2005 and the parties engaged in the discovery process. Defendants' refusal to respond to the actual questions posed forced plaintiffs to engage in additional motion practice. Moments before the discovery motion was to be resolved, defendants conceded the issue and admitted that certain commercial signs remained standing in violation of Section 74-16. Just as they refused to answer the written requests, defendants essentially refused to produce Mr. Ferrese for deposition. His deposition was scheduled for three separate occasions. The parties agreed to cancel the first to pursue settlement talks. When those talks did not progress, the parties agreed to reschedule it for a later date. Notwithstanding his commitment to attend on the rescheduled date, Mr. Ferrese did not appear as scheduled because he was in Poland attending his son's wedding. The deposition was noticed again and, consistently, Mr. Ferrese refused to appear.

The Stipulated Consent Judgment, containing the same essential terms plaintiffs proposed in the Fall of 2005, was agreed to in principal later in the day that Mr. Ferrese was scheduled to be deposed. The total fees and expenses plaintiffs incurred litigating the case from the Court's July 28, 2005 Order to the entry of the Consent Judgment are $65,448.00. All of these fees could have been avoided if defendants had accepted plaintiffs settlement offer in September 2005, an offer that mirrored the very terms on which defendants ultimately settled.

Unfortunately, plaintiffs had to incur additional fees after May, 2006 as a result of defendants' adoption of Section 74-17, an ordinance that was hopelessly ambiguous and did not set forth a clear enforcement process. To remedy these deficiencies, plaintiffs filed a motion for contempt. This resulted in further proceedings before Magistrate Judge Thynge and the an

ultimate resolution when defendants agreed to eliminate Section 74-17 and make further revisions to Section 74-16. These further revisions, adopted in July 2007, now make clear the manner in which Section 74-16 will be enforced. It took two years, but defendants finally have published clear, non-selective standards which govern when signs will and when signs will not be removed. The absence of such standards, and defendants' reliance on the unwritten "rules of thumb," has been remedied. The total hours spent in this aspect of the case including the time spent preparing the fee application are $47,022.00.

While defendants almost certainly will argue that plaintiffs should not recover all of their costs and fees, the circumstances of this case, including the following, dictate payment in full: (a) this Court preliminarily determined that defendants' conduct is constitutionally improper; (b) defendants were advised by their lawyer that their conduct is improper; (c) defendants' conduct forced the filing of this suit and has increased substantially the amount of time and effort plaintiffs' counsel has had to expend pursuing the claims; (d) defendants were not concerned with whether or not they violated plaintiffs' constitutional rights; (e) defendants were concerned only about the amount of attorneys' fees they will have to pay; (f) defendants removed plaintiffs' campaign signs notwithstanding the fact the legislative history demonstrates that campaign signs were not to be covered by Section 74-16, and (g) defendants settled the suit on terms they could have obtained earlier in the case and before plaintiffs incurred more than half the fees they seek. Moreover, after the entry of the Consent Judgment, plaintiffs had to take numerous steps - including compelling defendants to adopt a new ordinance as required by the order and moving for contempt when the new ordinance defendants did adopt did not create a clear framework for enforcing Section 74-16. These efforts eventually paid off, after much time and energy, as

defendants ultimately rescinded the new ordinance and revised Section 74-16 so that it could be enforced in a clear, non-selective manner.

An award of less than all of plaintiffs' fees would reward defendants for their improper and fee-enhancing conduct. Conduct of this nature should not be encouraged, particularly when the issue before the Court is the protection of rights guaranteed by the First and Fourteenth Amendments to the Constitution of the United States and the Civil Rights Act of 1971, 42 U.S.C. § 1983.

## CONCLUSION

For the foregoing reasons and for the reasons, plaintiffs respectfully request that the Court enter an Order awarding them their costs and attorneys fees in full.


WOLF, BLOCK, SCHORR and            BIFFERATO GENTILOTTI, LLC
    SOLIS-COHEN LLP


/s/ Shawn P. Tucker                        /s/ Chase Brockstedt
Shawn P. Tucker (#3326)                    Chase Brockstedt (#3815)
Todd C. Schiltz (#3253)                    119 East 3d Street
1100 North Market Street, Suite 1001       P.O. Box 90
Wilmington, DE 19801                       Lewes, DE 19958
(302) 777-0312                             (302) 644-0302


Attorneys for plaintiff                    Attorneys for plaintiffs
Citizens for Rehoboth Beach                Robert Sokolove and David
                                           McCarthy


September 21, 2007