**EXHIBIT "B"**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT SOKOLOVE, DAVID | ) | |
| MCCARTHY, WILLIAM SHIELDS, | ) | |
| and CITIZENS FOR REHOBOTH | ) | |
| BEACH, a policital action | ) | |
| committee, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action |
| v. | ) | No. 05-514(KAJ) |
| | ) | |
| CITY OF REHOBOTH BEACH, | ) | |
| DELAWARE, and GREGORY | ) | |
| FERRESE, individually and | ) | |
| as Manager of the City of | ) | |
| Rehoboth Beach, Delaware, | ) | |
| | ) | |
| Defendants. | ) | |

**OJR**

**JUL 2 6 2005**

30(b)(6) Deposition of CITY OF REHOBOTH BEACH, taken through its corporate designee, ALEXANDER W. ONIZUK, taken pursuant to notice at the offices of Century 21, 19606 Coastal Highway, Rehoboth Beach, Delaware, beginning at 11:41 a.m., on Monday, July 25, 2005, before Eleanor J. Schwandt, Registered Merit Reporter and Notary Public.

WILCOX & FETZER

1330 King Street - Wilmington, Delaware 19801

(302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters



```
 1 | APPEARANCES:
 2 |          SHAWN P. TUCKER, ESQ.
   |     WOLF BLOCK SCHORR AND SOLIS-COHEN, LLP
 3 |          1100 North Market Street, Suite 1001
   |          Wilmington, Delaware  19801
 4 |                    -and-
   |          EUGENE M. LAWSON, JR., ESQUIRE
 5 |     FLETCHER HEALD & HILDRETH, P.L.C.
   |          1300 North 17th Street, 11th Floor
 6 |          Arlington, Virginia  22209
   |          for the Plaintiffs
 7 |
   |          WILLIAM RHODUNDA, JR., ESQ.
 8 |     OBERLY JENNINGS & RHODUNDA
   |          800 Delaware Avenue
 9 |          Wilmington, Delaware  19801
   |                    -and-
10 |          WALTER W. SPEAKMAN, JR., ESQUIRE
   |     BROWN SHIELS BEAUREGARD & CHASANOV
11 |          108 East Water Street
   |          Dover, Delaware 19901
12 |          for the Defendants
13 | ALSO PRESENT:
   |          ROBERT SOKOLOVE
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
```

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

3

```
 1              (Plaintiffs' Deposition Exhibits 1, 2, 3, 4,

 2     5, 6, 7, 8, 9 and 10 were marked for identification.)

 3                    ALEXANDER W. ONIZUK,

 4            the witness herein, having first been

 5            duly sworn on oath, was examined and

 6            testified as follows:

 7                        EXAMINATION

 8     BY MR. TUCKER:

 9         Q.    Good morning, sir, how are you?

10         A.    Fine.  I was.

11         Q.    Your last name is pronounced "Onizuk"?

12         A.    Onizuk.

13         Q.    I want to make sure I get that right.  I know I'm

14     going to have trouble with that today.  Onizuk.  I'll do

15     by best.  Bear with me on that.

16              Has your attorney advised you about how a

17     deposition is handled and what the procedures are?

18         A.    Not entirely.

19         Q.    Okay.  Let me just give you a quick thumbnail

20     sketch of what I'm going to be asking you today and why.

21     I'm going to be asking you questions about items related

22     to the removal of elections signs.

23         A.    Oh, yes, he explained all that.

24         Q.    Okay.  And I'm going to ask questions probably
```

1    for the next hour or so about this incident.

2        A.    Hour or so?

3        Q.    Yes.

4        A.    Not 20 minutes?

5        Q.    Unfortunately, not.

6              Please let me finish my questions before you

7    answer because it will just go better throughout the

8    deposition.

9              Answer them as best as you can, answer them

10   truthfully.

11             Has your attorney advised you as to the

12   penalty if you are to not answer these questions

13   truthfully this morning?  What did your attorney advise

14   you?

15       A.    Actually he didn't.

16             MR. RHODUNDA:  Not on the penalties.

17       A.    Not the penalty part.

18   BY MR. TUCKER:

19       Q.    Let me go through that with you, then I'm going

20   to show you what has been marked as Plaintiffs' Exhibit

21   1.  I'm going to hand this over to you and ask you to

22   take a look at the highlighted versions on page 1 of

23   plaintiffs' 1 and page 2 of plaintiffs' 1.

24             MR. RHODUNDA:  We object to that.  You are



5

1   trying to intimidate the witness by throwing a perjury

2   statute.   He knows he has to tell the truth, but throwing

3   a perjury statute in front of him is harassment.   If you

4   want to ask him if he is aware that's perjury, he knows

5   he is here to tell the truth, but he does not need to see

6   the perjury statute.

7               MR. TUCKER:   For the record, I'm going to

8   advise the witness of the penalties for perjury.   I'm

9   certainly not trying to harass him.   I certainly do want

10  to make sure he understands that it is important he tell

11  the truth today.

12  BY MR. TUCKER:

13      Q.    Under Delaware Code, a person is guilty of

14  perjury in the first degree when the person swears

15  falsely and when the false statement consists of

16  testimony and is material to the action, proceeding or

17  matter in which it is made.   Perjury in the first degree

18  is a Class D felony.   Penalty under Delaware law, from the

19  statute I'm reading from is it can be punished up to

20  eight years in prison.

21              Referring to Plaintiffs' Exhibit 2, which is

22  the sister statute, under federal law, perjury is also a

23  felony under federal law and it is punishable up to five

24  years in prison.



1     Sir, do you understand that it is very

2 important you tell the truth here today?

3   A. Mm-hmm, exactly.

4   Q. Is that "yes"?

5   A. Yes.

6   Q. Now, Mr. Onizuk, can you tell us what your job

7 title is with the City of Rehoboth Beach?

8   A. Code Enforcement Officer.

9   Q. And who is your direct report?

10   A. Dave Murphy.

11   Q. Do you have any other direct report?

12   A. No.

13   Q. So if there is an issue regarding your job

14 duties, Mr. Murphy is the person that you communicate

15 that to?

16   A. Mm-hmm.

17     THE COURT REPORTER:  Is that "yes"?

18     THE WITNESS:  Yes.

19   Q. For the reporter.

20   A. Yes.

21   Q. I know you have never done this before.

22   A. You are right.

23   Q. But yes and no answers are the best.

24   A. Okay.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

7

Q.   If you can answer yes or no.

A.   Okay.

Q.   Can you give us an idea of what your job responsibilities are?

A.   My job responsibility is mainly I go around and check contractors, make sure they are licensed for the City of Rehoboth, they got a permit to do the job.  I go around and check sidewalks.  I check grass, people, uncontrolled, you know, grass.  Signs.

Q.   Okay.  What are your duties in regards to signs?

A.   If they are on City property, pick them up.

Q.   And how long have you had this job?

A.   One year.

Q.   And is there anybody else who has the same job?

A.   I think this is the first time that they created this job.  They have never been this job before, just created it.

Q.   About a year ago?

A.   Yes, a year ago.  It is a new job for them.

Q.   So you are the only person for the City of Rehoboth Beach that performs this job?

A.   Yes.

Q.   Again, let me finish my question.  It will go smoother, and then you can answer.



1            Was there a similar job title before you

2    were employed to do this job?

3        A.    Not that I know of.

4        Q.    Was there a code enforcement officer before you

5    were hired --

6        A.    No.

7        Q.    -- to act in that capacity?  So if there was a

8    problem with a house being built or a sign issue, who

9    would handle that for the City, if you know?

10       A.    The assistant building inspector.

11       Q.    Assistant building inspector?

12       A.    Mm-hmm.

13       Q.    Now, before you held this current job, did you

14   have another job at the City?

15       A.    Yes.

16       Q.    What was that, sir?

17       A.    Custodial.

18       Q.    Okay.

19       A.    I worked, I worked in the -- oh, God, I can't

20   think of it.  In the Convention Center.

21       Q.    At the Convention Center?

22       A.    Yes, we set up tables, what have you.

23       Q.    How long did you have that job, sir?

24       A.    About a year.



9

1    Q.    And besides setting up tables, what other things

2    would you do in that job?

3    A.    We would sweep floor, mop floors, whatever needed

4    to be done.

5    Q.    All right.  And prior to having that job, did you

6    have another job with the City?

7    A.    No.

8    Q.    And where were you employed prior to being

9    employed by the City?

10   A.    I wasn't.  I was retired.

11   Q.    Okay.  And what type of work are you retired

12   from, sir?

13   A.    Federal government, Department of Defense.

14   Q.    I don't know if I can ask you any questions about

15   that, so I won't.

16   A.    No, you better hadn't.

17   Q.    Now, who hired you at the City in your first

18   position as a custodian?

19   A.    Greg Ferrese.

20   Q.    And who hired you in your current position, code

21   enforcement?

22   A.    Dave Murphy.

23   Q.    Now, can you give us an idea of the normal hours

24   that you work in your present position?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1    A.    I work three days a week.

2    Q.    Okay.

3    A.    In the wintertime it is Monday, Wednesday and

4    Fridays; and in the summertime it is Tuesday, Thursdays

5    and Saturdays.

6    Q.    And do you have typical hours you work during

7    those days?

8    A.    Well, 8:30 to 4:30 normally and some Saturdays

9    they make me work nights because of some of the problems

10   they have had with some of the clubs.

11   Q.    Okay.

12   A.    Not his.

13   Q.    Okay.

14        MR. TUCKER:  For the record, the witness

15   pointed to plaintiff.

16   Q.    It is good to know.

17        Now, you mentioned that one of your duties

18   is sign removal.

19   A.    Right.

20   Q.    Can you tell us how many times over the past

21   year, since you have been employed, that you have been

22   asked to remove signs by any City official or employee?

23   A.    None that I recall.

24   Q.    On July 9th, do you recall whether or not you



WILCOX & FETZER LTD.
Registered Professional Reporters

Alexander W. Onizuk

11

1   were asked to remove signs by any City employee?

2       A.    July 9th, what day is that?

3       Q.    That would be a Saturday.

4       A.    Oh, that Saturday, no, nobody asked me.

5       Q.    Nobody asked you to --

6       A.    No, nobody asked me to remove signs.

7       Q.    Okay.  Now, you say you have never been asked to

8   remove signs, correct?

9       A.    No.

10      Q.    How is it that that became one of your duties?

11      A.    It is in the code.

12      Q.    When you say, "It is in the code," what do you

13  mean by that?  Explain that to me, because I don't

14  understand.

15      A.    Any sign that's on City property is supposed to

16  be picked up and, you know, we would pick them up.  If it

17  is a real estate sign, a lot of times I call them ahead

18  of time, let them know that, you know, their sign is

19  going to be picked up.

20            But other signs I just go ahead and pick

21  them up, like construction signs that are on City

22  property, I pick them up.

23      Q.    Okay.  And did you receive any training regarding

24  what signs you could or could not pick up under City



1   statute or ordinance?

2       A.   No.  Pretty clear.  The ordinance says, you know,

3   signs on City property.

4       Q.   Okay.  And how did you know it was your job to

5   enforce what is in the City code?  Who told you to do

6   that?

7       A.   They pretty much give me my -- told me I was code

8   enforcement officer and read the book.

9       Q.   Who told you to do that, sir?

10      A.   Dave Murphy, yes.

11      Q.   And so you have learned how to enforce the code

12  by reading the code; is that right?

13      A.   Yes.  And what I don't know, you know, if I have

14  any doubts, if I ever have any doubts I go to them,

15  because those guys got all the experience in the world.

16  They are very knowledgeable.

17      Q.   When you say "them" who is them?

18      A.   Dave Murphy and Steve Kordak.

19      Q.   And what is Steve Kordak's job?

20      A.   He is assistant to Dave Murphy.

21      Q.   And what is Dave Murphy's title?

22      A.   He is a building inspector, and Steve is

23  assistant building inspector.

24      Q.   Okay.  After reading the code as you were



**WILCOX & FETZER LTD.**

Registered Professional Reporters

```
 1   instructed to do when you were hired, have you ever

 2   inquired with anybody at the City about specific

 3   questions or concerns you may have had?

 4        A.   Oh, my God, especially concerning signs.

 5        Q.   Can you tell us when you first did that?

 6        A.   Oh, Lord.  Always.

 7        Q.   Every day you come to work?

 8        A.   Well, sign ordinance is so vague that, you know,

 9   you know, I have to go and ask them all the time, you

10   know, should I do this, should I do that.

11        Q.   Okay.

12        A.   You know, they got banner signs, they got so many

13   different signs.

14        Q.   Give us an example of a typical situation and how

15   you would handle that.

16        A.   A banner sign?

17        Q.   Any example you would like to give where you

18   sought help.  Tell us how that came about.

19        A.   Well, all -- we had a Hooter's had a banner sign

20   up and they were having their grand opening or what have

21   you, you know, going to have a contest for their opening

22   and they put a big banner sign up.  And, oh, we had a big

23   discussion about that.  And we even got Walt Speakman

24   involved in that one.  And we come about saying that the
```



1    banner signs are banned in the City of Rehoboth.

2        Q.    Okay.  Did you seek assistance on that?

3        A.    Oh, yes, I had to, you know.

4        Q.    How did that come about?  Was there a complaint

5    or did you just see the sign on your own?

6        A.    Somebody complained.  Most of my problems are

7    from complaints.

8                He knows that.

9        Q.    When you say "he" are you referring to --

10        A.    Mr. Sokolove.  I got a complaint about his place.

11        Q.    You got a complaint about his place from whom?

12        A.    From whom?  I can't tell you.  But his gas tank.

13                THE WITNESS:  Remember that?  Came to your

14    house.

15        Q.    Sir, I'm asking the questions.  I don't mean to

16    be disrespectful, but I'm asking the questions here

17    today.  We have a timetable to keep.

18        A.    Yes.  We are leaving at 12:00, I hope.

19        Q.    So getting back to Saturday, July 9th, what hours

20    were you working that day?

21        A.    4:00 to 12:00.

22        Q.    Okay.  Did there come a time on that day, did

23    there come a time on July 9th that you began looking at

24    campaign signs in your travels through the City?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Alexander W. Onizuk

15

1    A.    No.  I just happened to go down that street, see

2  campaign signs on City property.

3    Q.    What street?

4    A.    Lake Avenue.

5    Q.    About what time was that?

6    A.    Oh, Lord.  I was thinking it was starting getting

7  dark.  Maybe around 8:00 I would say.  Eight-ish.

8    Q.    Eight in the evening?

9    A.    Yes, in the evening.  That's what I'm thinking.

10    Q.    When you saw those signs, what did you do?

11    A.    Oh, well, they are on City property so I picked

12  them up.

13    Q.    And when you make that determination as to

14  whether signs are on City property or not, are you

15  relying on the ordinance that you referenced earlier?

16    A.    Well, you pretty much know anything beyond the

17  sidewalk, between the sidewalk and the curb, that little

18  grass area is City property.

19    Q.    And how do you know that?

20    A.    How do I know that?

21    Q.    Yes.

22    A.    Well, property line ends at the sidewalk.

23    Q.    How do you know that?

24    A.    I guess from experience.

1    Q.   Okay.

2    A.   Besides that, we got drawings in there that said,

3    about the sidewalk and how they are laid out, property

4    line stops at the sidewalk, little grass area is...

5    Q.   Okay.  Are you suggesting there is a provision in

6    your code that instructs you as to where private property

7    ends and public property begins?

8    A.   No.  No.  You can almost tell where property ends

9    by the -- most of them got markers.

10   Q.   What kind of markers?

11   A.   Boundary markers.

12   Q.   What do they look like?

13   A.   Some of them pipes in the ground.  Could be any,

14   just about anything.

15   Q.   And using boundary markers, how do you know to do

16   that?  Who told you to do that?

17   A.   Look for boundary markers?

18   Q.   Yes.

19   A.   Harry Homeowner knows everything about boundary

20   markers.

21   Q.   So, are you saying that the determination of

22   where private property is and public property is is

23   something that you have internally decided that --

24   A.   Well, no.  We know that the private property



1    stops at the sidewalk.

2        Q.    How do you know that?  That's my question.

3        A.    How do I know that?

4        Q.    Yes.

5        A.    I guess it is in -- I don't know whether it is in

6    the code book or not.  But talking, you know the guys,

7    Dave and Steve.

8        Q.    So your belief -- I'm sorry I didn't mean to

9    interrupt you --

10       A.    Sometimes I go out on inspections with them, you

11   know.  And they make me aware of everything.

12       Q.    When you say --

13       A.    Between the building code and what have you.

14       Q.    When you say "them," who are you referring to?

15       A.    Dave and Steve.

16       Q.    Dave, last name Murphy?

17       A.    Murphy and Steve Kordak.

18       Q.    So is it your testimony that your knowledge about

19   where private property ends and public property begins

20   comes from those two gentlemen?

21       A.    Pretty much, yes.  Them and the code books.

22       Q.    Okay.  Can you tell me where in the code book you

23   look for guidance on where private property begins and

24   where public property begins?



WILCOX & FETZER LTD.
Registered Professional Reporters

1    A.   Oh, Lord, I can't tell you where the sign

2    ordinance is under.  I would have to go and look them up,

3    you know.  I spend a day looking at things.

4    Q.   On July 9th when you went out and removed signs,

5    did you look at the code book that day?

6    A.   July 9th, no.  We did look at it that night, but

7    during the day, no.  No.

8    Q.   I'll get to that.  Prior to removing the signs

9    did you look at the code book?

10    A.   No.

11    Q.   Now, you mentioned boundary markers and other

12    things that you rely on.  Can you describe for us each

13    sign that you removed on Lake Street --

14         MR. SOKOLOVE:   Avenue.

15    Q.   I'm sorry, Lake Avenue, strike that -- and why

16    you removed it?

17    A.   Each one was in front of a house and each one was

18    in that little grass area, after the sidewalk.

19    Q.   Okay.  If you could bear with us, sir, I'm going

20    to give you a piece of paper, and I'm going to ask that

21    this be marked Exhibit 11.

22         (Plaintiffs' Deposition Exhibit 11 was

23    marked for identification.)

24    Q.   I would ask you to please, to the best of your



1  ability, draw the street for me and show us where you

2  removed signs.

3              MR. RHODUNDA:  Don't you have a diagram or

4  anything of this area?

5              MR. TUCKER:  No, I don't.

6      A.    Okay.  This is the sidewalk.  And this little

7  area is curb.  This is a curb here.  This is a curb.  All

8  the signs were in this area right here.  The houses were

9  back here.

10     Q.    Okay.  Are you familiar with where Mr. Sokolove's

11 business is?

12     A.    Yes, mm-hmm.

13     Q.    And were signs removed from the front of his

14 business?

15     A.    Not that I know of.

16              Now, there was one sign, say his business is

17 right here, there was one sign over in this guy's

18 property right here, in front of his place, and I

19 happened to -- when I was picking the signs up I happened

20 to talk to that guy.  He says, "I want that sign

21 removed."  He said, "I don't like that guy."  He said, "I

22 had an issue with him before over a tree."

23     Q.    What was that gentleman's name?

24     A.    Lord, I don't know.  But I know he lives in





```
 1   Claymont.
 2       Q.    Was this sign in front of Mr. Sokolove's
 3   property?
 4       A.    Not directly in front.  It was on this guy's --
 5   more or less on 63.  He has 59.
 6       Q.    So getting back to my question, were there any
 7   signs directly in front of Mr. Sokolove's property that
 8   you removed?
 9       A.    No, uh-uh, not at all.  None.
10           MR. RHODUNDA:  Clarify that as far as
11   property, Shawn, as far as parking lot versus the
12   building itself.
13       A.    In front of his building?
14       Q.    In front of his building or parking lot, his
15   property.
16       A.    None in front of his property.
17       Q.    Okay.  Can you tell us how many signs were
18   removed on Lake Avenue that day?
19       A.    About six, maybe seven.
20       Q.    And about what time --
21       A.    Now wait.  On Lake itself, well, probably about
22   four maybe, three or four.  Because the other, the other
23   two or three I got in Lake Gerar Park area and the other
24   two were in a medial strip.
```



21

1    Q.    I'll get to those.  Right now I'm focused on Lake

2    how many signs do you think you removed from Lake that

3    day?

4    A.    Maybe three, maybe four.

5    Q.    And none of those were in front of Mr. Sokolove's

6    property?

7    A.    No.

8          Where would he put them in front of his

9    property?

10    Q.    Maybe one day you can take my deposition, but

11    today I'm asking the questions, all right?  Just, it

12    works easier this way, trust me.

13    A.    I don't know where he would put them in front of

14    his property, but hey.  Does he have it attached to his

15    building, do you know?  I don't know where he could put

16    them, believe me.

17    Q.    Show us the location on Plaintiffs' 11 where the

18    three signs were, to the best of your ability, along Lake

19    that you removed.

20    A.    Oh, God.  There was -- I know there is three

21    houses here.  "Sea Witch" I think one of them is called.

22    I don't know what the other two.  And then there was one

23    right here.  Maybe four.  Okay.  There was three -- this

24    woman, I think she owns three houses there.



1              There was one right here.  And his, I'll say

2    his restaurant was right here.

3        Q.   Okay.  Do you know the addresses of those

4    properties?

5        A.   I know this one.  63.  This guy is 63.  Other

6    than that, I don't know what they are.

7        Q.   Okay.

8        A.   They may be 65, 67, 69, I don't know.

9        Q.   So you are thinking it was four signs now?

10       A.   It may have been, yes.

11       Q.   And can you tell us how you determined for each

12   of those signs that they were on public property?

13       A.   They were all right here in this little grass

14   medial strip, right there.

15       Q.   When you say grass area, do you mean the area

16   between the sidewalk and the curb?

17       A.   Between the sidewalk and the curb.

18       Q.   Do you recall a conversation with Mr. Sokolove

19   that day or that evening?

20       A.   Mm-hmm.

21       Q.   And do you recall reviewing portions of the

22   City's code with him?

23       A.   We got the book out, yes, see if I could find

24   anything about political signs.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Alexander W. Onizuk

23

1     Q.    Okay.  And tell us what happened.

2     A.    Couldn't find anything about political signs.

3     Q.    And did you --

4     A.    He told me, he said, I won't find anything in

5 there on political signs because it is a federal thing.

6     Q.    Did you make any statement to Mr. Sokolove about

7 the fact that you didn't know why you were removing the

8 signs because there was nothing in the code regulating

9 political signs?

10    A.    State that again.

11    Q.    Do you recall making a statement to Mr.

12 Sokolove --

13    A.    That I did not know --

14    Q.    -- why you were removing the signs because you

15 couldn't find anything in the code regulating political

16 signs?

17    A.    Well --

18    Q.    Or words to that effect.

19    A.    He told me it was a federal offense, okay.  And I

20 knew we didn't have anything dealing with federal

21 offenses but I knew what we had to do with signs, but

22 federal offenses, I didn't know.  Because he -- you know,

23 federal offense, I don't commit a federal offense.

24    Q.    Let me ask my question again.  I'll try to ask it



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1 a little differently.

2     A.    Make it easy.

3     Q.    Okay.  I'm trying, if you could make it easy,

4 too.

5             Did Mr. Sokolove and you discuss whether or

6 not political signs were regulated by the City's zoning

7 code?

8     A.    Yes, we did.

9     Q.    And at the end of that conversation, did you

10 agree that signs were not regulated as political signs by

11 that zoning code?

12     A.    Probably did, because I didn't know anything

13 about federal offenses, you know.  Political signs, he

14 scared the heck out of me.  I thought, hell, I'm going to

15 jail, you know.

16     Q.    Okay.  So --

17             THE WITNESS:  You did.

18     A.    He tapped on my window; scared me at first.

19     Q.    So is it your testimony that you only agreed

20 because you were afraid?

21     A.    Well, I don't know whether I agreed that it

22 was -- that it was wrong to take -- I may have, you know.

23     Q.    Did you do that out of fear, or did you do that

24 because you believed that political signs --



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Alexander W. Onizuk

25

1    A.    Probably more out of fear than anything.  If I

2    thought I was committing a federal offense -- but I found

3    out the next day it wasn't.  I called my son.

4    Q.    Okay.  We will get to that.  That's a little bit

5    beyond the scope of my question right now, sir.  Okay.

6              So you have a discussion with Mr. Sokolove,

7    correct?

8    A.    Yes.

9    Q.    You agree with him that political signs are not

10   regulated by the --

11             MR. RHODUNDA:  Objection, leading.

12             MR. TUCKER:  Just restating what he said.

13             MR. RHODUNDA:  Well, I'm not so sure what he

14   has really said about it.  He talked about the federal

15   offense.  I think you need to ask him a more broad

16   question than that.

17             MR. TUCKER:  I thought I was restating what

18   he testified.  Rather than backing up and having it read

19   back, I'll ask the question again.

20   BY MR. TUCKER:

21   Q.    Did you or did you not agree with Mr. Sokolove at

22   that time, when he spoke with you, that political signs

23   were not regulated by the city code?

24   A.    I may have, because I couldn't find anything in

1    the code book about political signs.

2    Q.    Okay.  Now, after --

3    A.    But --

4    Q.    Go ahead.  Go ahead.

5    A.    -- signs in general are regulated.

6    Q.    Okay.

7    A.    So, you know.

8    Q.    After you had that discussion with Mr. Sokolove,

9    what did you do next?

10   A.    Gave him his signs back.

11   Q.    And did you discuss your conversation that you

12   had with Mr. Sokolove with anyone?

13   A.    I called my son the next day.

14   Q.    Did you discuss the conversation with anybody who

15   works for the City?

16   A.    Next day, no.  I was off the next day, Sunday.

17   Q.    Did there come a time when you discussed that

18   conversation with anybody from the City?

19   A.    Probably Tuesday -- now, wait.  Let me ask you

20   something.  Are we talking about that Saturday?

21   Q.    You spoke with Mr. Sokolove on July 9th,

22   Saturday, correct?

23   A.    Yes, yes.  Because I was off the next couple days

24   so I didn't speak to anybody about that.



1    Q.    When was the first time after you spoke with

2    Mr. Sokolove that you spoke to anybody at the City about

3    your conversation with Mr. Sokolove?

4    A.    That was a couple days later.

5    Q.    A couple days?

6    A.    Yes.  Well, actually, the policeman stopped in

7    that night.  As soon as he left, the policeman stopped

8    in, Detective O'Bier, O'Bayer.  He stopped in and said I

9    committed a federal offense.  He said there is all kind

10    of commotion going on.

11    Q.    Did he interview you at that time about what

12    happened?

13    A.    Yes, he did.  He said that I committed a federal

14    offense and he didn't know what the federal offense was,

15    he wasn't familiar with it, but...

16    Q.    What did you tell him?

17    A.    I said, well, I didn't mean to commit a federal

18    offense, you know.  I apologized.  Just doing my job.

19    Q.    Is it your testimony that the City of Rehoboth

20    police officer accused you of committing a federal

21    offense?

22    A.    He come in and told me I had committed a federal

23    offense, yes.

24    Q.    What was that officer's name again?



1    A.    Scott O'Bier.

2          MR. SOKOLOVE:  O-B-I-E-R.

3    Q.    What happened after that?

4    A.    I don't know.  He asked me what happened.  I told

5    him what happened and everything.  I think he took -- I

6    don't know whether I wrote that statement that night.

7    But I did leave, I did leave a message to Dave of what

8    happened.

9    Q.    Dave Murphy?

10   A.    Mm-hmm.

11   Q.    Okay.  Was that on his machine or was that in

12   person?

13   A.    That was on -- I put it on my computer and typed

14   it out and gave it to him.  Put it on his desk.

15         MR. SOKOLOVE:  They don't have voicemail.

16   Q.    You made a report that evening?

17   A.    Yes, for Dave Murphy, that if I caused such a

18   commotion.

19   Q.    Did you leave any message for Mr. Murphy the next

20   day or just the document on his desk?

21   A.    Just the document on his desk.

22   Q.    And when you were contacted or spoke to City

23   officials a couple days later, who was that and who

24   contacted who?



Alexander W. Onizuk

29

```
 1      A.    God, who knows?

 2            Probably, probably went in and talked to

 3  Dave Murphy, one thing.  And I think Scott O'Bier came

 4  in.  I think Scott was in there, Detective Scott O'Bier.

 5  I think he came in.

 6      Q.    And were you summoned to come in --

 7      A.    No.

 8      Q.    How did that --

 9      A.    My regular day coming.  I was off Sunday and

10  Monday, and my regular day of work is Tuesday.

11      Q.    So when you came in, how did that meeting end up

12  taking place?

13      A.    I have no idea.  I think Scott just was in there,

14  came in later on and that's how it took place.

15      Q.    And did he approach you, Scott, about discussing

16  this?

17      A.    I think that's when he came in and asked me to

18  make a statement, you know, about what happened.

19      Q.    When you say "Scott," you mean the police

20  officer?

21      A.    Scott O'Bier, Detective O'Bier.

22      Q.    Who was present when you made that statement to

23  the police officer?

24      A.    Just me.  Me and the detective.
```



1    Q.    Okay.  And after you made that statement to the

2    police officer, did you speak to anybody else about this

3    matter?

4    A.    Probably Dave Murphy.

5    Q.    When was that?

6    A.    The same day.  Right after Scott left.

7    Q.    Okay.  What did you tell Mr. Murphy?

8    A.    Oh, Lord.  Lord only knows what I told him.  I

9    told him about what happened.  I picked up the signs and

10   I committed a federal offense.  But I knew it wasn't a

11   federal offense when I talked to him, when I talked to

12   Dave Murphy that day.  I told him it wasn't a federal

13   offense; I knew that.

14   Q.    And when was the next time you spoke to somebody

15   else from the City about this incident?

16   A.    Probably spoke to somebody every day about this

17   incident.

18   Q.    Tell us the folks -- I'm sorry, go ahead.

19   A.    Since then, you know.  It has always been brought

20   up about signs, you know.

21   Q.    Tell me all the people, to the best of your

22   memory, that you have spoken to about this incident

23   since --

24   A.    Just Dave Murphy.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Alexander W. Onizuk

31

1    Q.    -- July 9th.  Dave Murphy is the only person?

2    A.    Yes, yes, I haven't spoken to -- don't ask me

3    about the mayor because I don't even know the mayor.  I

4    have never spoken to the mayor.

5    Q.    I didn't ask you about the mayor.

6    A.    But I haven't spoken to him.  I didn't speak to

7    Greg Ferrese or anybody about it.

8    Q.    So the police officer you spoke to?

9    A.    Yes.

10    Q.    Murphy?  And that's it?

11    A.    Dave Murphy, yes.

12    Q.    Give me one moment, please.

13          In your discussions with Mr. Murphy, did you

14    go over any aspects of the sign code?

15    A.    I don't know.  Probably.

16    Q.    Did you discuss any policies related to the sign

17    code at that time?

18    A.    I think what the -- yes, I think the policy was

19    to -- anything on City property, take.  But anything you

20    have a question about, which if I had any doubt I

21    wouldn't take any signs anyhow.

22    Q.    So you did have a discussion about policies with

23    Mr. Murphy --

24    A.    Yes.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    Q.    -- after this incident?

2    A.    I think it was taboo there for a few days about

3    campaign signs, until we really figured out, you know,

4    what was what with it.

5    Q.    Okay.  So was there some confusion as to what

6    the --

7    A.    Yes, campaign signs, yes, mm-hmm.  Well, somebody

8    said there was a case, you know, in court now or

9    something, they went and looked it up and what have you.

10    Q.    Who said that?

11    A.    I think it was Walt Speakman, actually.

12    Q.    Without telling me what you said, did you speak

13    to Walt Speakman about this matter?

14    A.    Did I?

15    Q.    Yes.

16    A.    No, uh-uh.

17    Q.    How do you know that Walt Speakman --

18    A.    I think Dave Murphy told me.

19    Q.    Let me finish my question.  You are getting a

20    little ahead of me.  Okay?

21    A.    Okay.

22    Q.    Is that the first time you heard of any policy

23    from Mr. Murphy regarding signs?

24    A.    Policy, as to keep our hands off for awhile, yes,

33

1   yes.

2       Q.   Okay.   What was the policy he articulated to you?

3       A.   Oh, he said that for now we are not going to do

4   anything with campaign signs.   We are going to let them

5   be where they are.

6       Q.   Can you give me an approximate date on when he

7   told you that?

8       A.   No, I can't.   It is -- let's see, the 9th was on

9   a Saturday.

10      Q.   Right.

11      A.   10th, 11th -- probably about the 12th, something

12  like that.   That would be the day I worked.

13      Q.   Approximately the 12th, is that fair?

14      A.   Yes, we will say, that's fair.

15      Q.   And did he indicate where that policy came from?

16      A.   I think it came from higher-ups.

17      Q.   Did he say who?

18      A.   Probably Greg, I think Greg.   Greg probably

19  called Walt, you know, Speakman.   I think that's --

20              MR. RHODUNDA:   Testify to what you know.

21              THE WITNESS:   Yes.

22              MR. RHODUNDA:   Don't speculate as to what

23  you think happened.

24              THE WITNESS:   Yes.

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

1      A.    Well, I know that that's where it came from.

2   Greg Ferrese said to keep your hands off the signs,

3   campaign signs for awhile.

4   BY MR. TUCKER:

5      Q.    Did Greg Ferrese tell you that or tell Mr. Murphy

6   that?

7      A.    He told Mr. Murphy.

8      Q.    Who told you?

9      A.    Who told me.

10     Q.    Did Mr. Murphy identify Mr. Ferrese as the one

11  who told him that?

12     A.    Pretty much, yes, I think so.

13     Q.    Any other sign policies of any kind that you have

14  been made aware of since this incident?

15     A.    No.

16     Q.    Now, you may have already answered this, but I

17  just want to back up for a moment.

18           You said initially you determined how to

19  enforce the sign code by reading the sign code, correct?

20     A.    Pretty much, yeah.

21     Q.    And also by going out into the field with two

22  other City employees --

23     A.    Yeah, mm-hmm.

24     Q.    -- determining public versus private property; is



**WILCOX & FETZER LTD.**
Registered Professional Reporters

35

1   that fair?

2       A.    That's fair.

3       Q.    Anything else you relied on in terms of how you

4   enforced the sign code, besides the code and discussions

5   you had with two other City employees regarding how you

6   determined where private and public property are

7   determined?

8       A.    No.

9       Q.    When you spoke with Mr. Sokolove back on the 9th

10  of July, was there a Charles Silverstein present?

11      A.    He had a friend with him, yes.

12      Q.    And did you have any conversation with

13  Mr. Silverstein?

14      A.    I think we -- I know we shook hands, yeah.

15      Q.    Was he present the whole time you spoke --

16      A.    Pretty much, yeah, mm-hmm.  I knew he was from

17  down South somewhere.

18      Q.    Sir, have you had an opportunity to look at the

19  plaintiffs' memorandum in support of motion for temporary

20  restraining order?  It was filed with the court on July

21  21st, 2005.

22      A.    No.  No.

23      Q.    Have you seen this affidavit prepared by Charles

24  Silverstein which is attached to that memorandum at



1    Exhibit 3?  I'm showing the witness that document now.

2         A.    Yes, I did.  Mm-hmm.

3         Q.    Can you tell us who showed you that document?

4              THE WITNESS:  It might have been you.

5         Q.    Mr. Rhodunda?

6         A.    Yeah, mm-hmm.

7         Q.    Without telling us anything the Mr. Rhodunda said

8    to you or you said to Mr. Rhodunda, when was that?

9         A.    Yesterday.

10        Q.    Okay.  And did you read through that affidavit

11   when you were with Mr. Rhodunda?

12        A.    No, uh-uh.

13        Q.    I'll tell you what, I'm going to ask you --

14        A.    Oh, don't ask me that.

15        Q.    -- if you could read it right now while we sit

16   here?

17        A.    This whole thing?

18        Q.    Yes.  It is less than a page.

19        A.    I've been directed by my boss.

20              No, this is not true.

21        Q.    I'm just asking you to read it right now, and

22   then I'm going to ask you a couple questions about it.

23        A.    Okay.

24        Q.    Are you done reading it?



37

A.    Yeah.

Q.    It is your testimony that you did not read this yesterday?

A.    I didn't read it all the way through.

Q.    Do you agree or disagree with that affidavit that I just showed you?

A.    I disagree with it.

Q.    Can you tell me what aspects you disagree with?

A.    Mr. Onizuk stated that Mr. Murphy was directed to remove Bob Sokolove's signs by Mr. Greg Ferrese, I didn't make that statement.

Q.    You disagree; you don't believe you --

A.    I disagree.

Q.    Anything else?

A.    They said Mr. Onizuk stated that he personally removed the campaign sign at the directions of his boss, who asked for them to be removed from City right-of-way, which is a true statement in a way, because I told him, on that Thursday I picked up campaign signs of Bob Sokolove's in the City property. And he said, "Good, pick up all the signs that are in City property."

Q.    Who said that?

A.    Dave Murphy.

Q.    All signs that are in City property?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1      A.    Yes.  He didn't say Bob Sokolove's or Mayor

2  Cooper.  He just said, "Pick up all the signs that are

3  in" --

4      Q.    In City property?

5      A.    -- "City property."

6      Q.    What date was that?

7      A.    Well, I picked them up on a Thursday, which

8  probably would have been the 7th.  And that morning when

9  I went in -- well, no, I didn't.  Now, when was that?

10           Yes, it was on the 7th, yes.

11     Q.    When you were told to pick up all signs --

12     A.    On the City property.  He said, "Good, pick up

13  all signs on City property."

14     Q.    Was there any attempt made to distinguish between

15  political signs and other signs?

16     A.    No, uh-uh.

17     Q.    Just all signs?

18     A.    All signs.

19     Q.    On City property?

20     A.    Yes.

21     Q.    And does City property include City right-of-way,

22  as far as you know?

23     A.    Right.

24     Q.    I think you mentioned one thing in particular you



39

1  disagree with that is in the affidavit that's in front of

2  you.  Anything else?

3           I may have misspoken.  Anything else you

4  disagree with?

5           MR. RHODUNDA:  Well, he has two things he

6  disagrees with he has discussed, Shawn.

7           MR. TUCKER:  I'm not sure what the second

8  thing was, but the record is the record.

9    A.    Well, he said, Also Mr. Onizuk reviewed the sign

10 ordinance and the code book with us and agreed that he

11 saw no recollection regarding political signs and stated

12 he was unsure as to why the City would direct the removal

13 of the signs.

14           Well, nobody directed me to remove the

15 signs, other than, you know, pick up signs that are on

16 City property.

17   Q.    I believe you testified that on 7/7/05 you were

18 directed to pick up signs from City property?

19   A.    On City property, I guess that would be true

20 then, yeah.

21           I guess there were six signs, about that.

22 Six signs.

23   Q.    Now, you had mentioned that Mr. Murphy told you

24 that there would be a policy in place for some period of



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    time where you wouldn't touch any political signs, right?

2        A.    Correct.

3        Q.    How long did that policy last, as far as you

4    know?

5        A.    Oh, probably about four or five days.

6        Q.    And so when, approximately when did you believe

7    it was okay again to remove political signs?

8        A.    I think it was around the 15th or something like

9    that.

10       Q.    Around, give or take a day, the 15th; is that

11   fair?

12       A.    Right, that's fair.

13       Q.    July 15th?

14       A.    Mm-hmm.

15       Q.    After that date you were back to your normal

16   duties regulating signs?

17       A.    Right, after that date we were.

18       Q.    And do you recall the dates that you worked after

19   7/15/05?  I'll tell you what day 7/15 was here in a

20   moment.

21              MR. LAWSON:  15th is on a Friday.

22       A.    Yes, I worked the 16th.

23       Q.    Okay.  Which was a Saturday, correct?

24       A.    Yes, mm-hmm.



Alexander W. Onizuk

41

1     Q.    How about the 17th?

2     A.    No.

3     Q.    How about the 18th?

4     A.    No.

5     Q.    How about the 19th?

6     A.    I worked the 19th.

7     Q.    Now, I'm going to back up for a moment and I'm

8  going to show you Exhibit 4 to the memorandum that I

9  noted earlier that's been filed in District Court of

10  Delaware.  I'm going to show you this Exhibit 4.  It is

11  an affidavit of Robert Sokolove, and ask you to take a

12  look at it and tell me if you recognize it.

13     A.    No I don't recognize it.

14     Q.    You have never seen that document?

15     A.    No.

16     Q.    Can you take a few moments, again it is just a

17  page, and read that to yourself.

18            (Discussion off the record.)

19     A.    Greg Ferrese's name was never brought up.

20     Q.    First just read through it, and then I'll ask you

21  questions about it.

22     A.    Okay.

23     Q.    Okay.  Can you tell us if you agree or disagree

24  with what is set forth in that affidavit?



**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1      A.   Some of it is true.

2      Q.   Can you tell us the portions that you disagree

3  with?

4      A.   I didn't see any signs in flowerbeds.

5      Q.   Again, I want you to take your time --

6      A.   He said placed them on front... I don't know what

7  he is trying to say here.  He said, "Additionally, I

8  placed them in the front lawns of three

9  bed-and-breakfasts," yes.  They were in that grass area.

10  "In and around the street areas, but on the grass, of

11  other landowners with permission."

12             And then he made a statement here, asked --

13  "When asked why such a direction would be given, he

14  stated that Mr. Murphy was directed to do so by City

15  Manager, Greg Ferrese."  I did not make that statement.

16      Q.   Okay.

17      A.   "And it was unclear to him, as he stated, as to

18  why he was directed to remove our political signs."

19             Nobody told me to remove any political

20  signs.  They just told me to pick up signs.

21             And then there wasn't ten signs in the bed

22  of the truck.  Unless he was counting the signs we picked

23  up that morning.

24      Q.   You just said signs that somebody picked up that



43

1    morning.   Who picked up signs in the morning?

2        A.    Mr. Sokolove.

3              I had picked up signs Thursday, and I had

4    them in the back of a truck.   And he told me he had a

5    discussion with the mayor that morning, which was

6    Saturday morning, and he went and got the signs out of

7    the back of the truck.

8        Q.    Your truck?

9        A.    Yeah, mm-hmm.

10       Q.    Okay.   I'm going to show you some pictures,

11   original pictures that, for the record, we have a copy of

12   under Plaintiffs' Exhibit 9, for the record, and ask you

13   if you can take a look at those pictures and tell us if

14   you recognize them.

15       A.    Yes.

16       Q.    What are they pictures of?

17       A.    Back of my pickup truck.

18       Q.    Do you know when they were taken, approximately?

19       A.    When these particular ones were taken?

20       Q.    Yes.

21       A.    No.

22       Q.    Were you present when they were taken?

23       A.    Was I present when these pictures were taken?

24       Q.    Yes.



1       A.    No.

2       Q.    What do they reflect?

3       A.    Reflect that I picked up a lot of signs.

4       Q.    And are they just signs that you picked up in

5  July or are there also signs in there that are older, you

6  had picked up --

7       A.    There is a couple signs that are older in there.

8       Q.    And when you say "older," how old?

9       A.    Well, maybe -- I know one has been in there for

10  about a month.

11       Q.    Okay.  Approximately, looking at those pictures,

12  and given your personal knowledge, how many of those

13  signs do you think predated July 11th -- I'm sorry, July

14  9th, in terms of you picking them up and putting them in

15  your truck?

16       A.    Oh, about three, four of them.

17       Q.    Okay.  And how many total do you think you had in

18  your truck when those pictures were taken?

19       A.    Oh, Lord.  I have no clue.

20       Q.    Do you recall whether or not any of those signs

21  that you've picked up were Mayor Cooper signs?

22       A.    There is none in this particular picture, no.

23  But we did pick up Mayor Cooper signs.

24       Q.    Are there Mayor Cooper signs in your truck there



45

```
 1   that can't be seen in those pictures?  Is that your

 2   testimony?

 3       A.   Well, no.  What I'm saying is that this

 4   particular night I didn't pick up any Mayor Cooper signs

 5   because his signs weren't out then.

 6       Q.   Okay.  All right.  Thank you.

 7            Now, can you give us an idea, when you go

 8   out on sign patrol --

 9       A.   I don't have sign patrol.

10       Q.   Well, you testified that on July 7th you were

11   told to go out and pick up signs, correct?

12       A.   July 7th, no.

13       Q.   You didn't testify under oath just a little while

14   ago --

15       A.   I went out and picked up signs.  I picked up

16   signs, and I told him, I said, "I picked up a lot of Bob

17   Sokolove's signs."  I went and told Mr. Murphy after I

18   did this, after I did this.

19       Q.   I want to back you up for a moment.  Earlier

20   today, actually you were reading the affidavit --

21            MR. RHODUNDA:  He said the same exact thing

22   he just said previously.  There was some confusion,

23   things you are trying to say that he was directed to.

24   You may need to clarify that.  Two times in his
```

1    deposition he said things that could be construed

2    differently about that.

3    BY MR. TUCKER:

4        Q.    On or about July 7th, Mr. Onizuk -- I apologize,

5    I'm having trouble with your last name -- didn't you

6    testify that there was a discussion with you and City

7    officials about picking up signs in the City?

8        A.    After I picked up the signs.  Only after I picked

9    up signs, I made them aware that I picked up signs.

10       Q.    And that was July 7th?

11       A.    If that's on that Thursday, yes.

12       Q.    All right.  Give us an idea when you go out to

13   pick up signs, what do you do?

14       A.    I don't go out to pick up signs.  I go out to

15   look for contractors and whatever, you know, whatever

16   with my job.  And I just happened to see these signs.

17              What really caught my eye was the one on

18   Norfolk Street.

19       Q.    What contractor were you looking for on Norfolk

20   Street that day?

21       A.    I go up and down all the streets.

22       Q.    You go up and down all the streets of the City?

23       A.    Just about every day I go up and down every

24   street.



1    Q.    Okay.  Okay.  So your normal practice is to go up

2    every street when you go out and you work?

3    A.    Except for Saturday nights.  But during the day,

4    yes, I go up and see the contractors working, or anybody

5    working without a permit or what have you.

6    Q.    And why would Saturday nights be different?

7    A.    Contractors -- no contractor's allowed in the

8    City of Rehoboth on Saturdays.

9    Q.    Okay.

10   A.    Now Saturday day, if I was working day, then I

11   would walk around, ride around and see if I can find

12   contractors sneaking in.

13   Q.    But they don't sneak in at night?

14   A.    No, not normally.

15   Q.    So what do you normally do on a Saturday night

16   when you are working 4 to --

17   A.    Well, I got to patrol normally the commercial

18   districts where we have a lot of patio with loud music

19   and what have you going on.

20   Q.    And when you came back to work on the 16th, July

21   16th, that was during the day, correct?

22   A.    What day is the 16th?

23          MR. LAWSON:   Saturday.

24   Q.    Saturday, that's correct.  July 16th.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1     A.   It was on a Saturday.  I don't know whether I

2  worked days or night.  Because in between, when I picked

3  up his signs, the next week I worked days.  Didn't work

4  nights.

5     Q.   Okay.  So does that mean on the 16th you think

6  you were working during the day?

7     A.   I think so.

8     Q.   Now, I'm going to show you --

9     A.   Aren't we done?

10    Q.   No, we are not, sir.  I have some questions I

11 have to ask you.  I appreciate you bearing with us.

12    A.   I'm going to call my wife.  She is going to get

13 you.

14          (Discussion off the record.)

15 BY MR. TUCKER:

16    Q.   I guess we are ready to go back on the record.

17          Sir, have you seen the affidavit, which is

18 attached as Exhibit 2 to the memorandum filed in the

19 Federal District Court on July 21st by plaintiffs, of

20 Joseph B. Hill, with photographs attached A through Q?

21    A.   I have seen some of it.  I didn't read it.

22    Q.   Okay.  So you did not read the affidavit --

23    A.   No.

24    Q.   -- but you have seen the pictures?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

49

1    A.    I've seen the pictures.

2    Q.    All right.

3    A.    I didn't even know who Joseph Hill is.  Didn't

4    somebody say he is a realtor?

5    Q.    All right.  According to Mr. Hill's affidavit,

6    these pictures were taken on July 18th and July 20th.

7    A.    Right.

8    Q.    Now, I'm going to show you --

9    A.    What has he got to do with this?

10   Q.    Sir, again, I ask the questions here today and

11   I'd appreciate if you would answer them as best as you

12   can.

13            Referring to attachment A to Mr. Hill's

14   affidavit, and the picture that's there, I'm going to

15   have you take a look at that and ask you if you can tell

16   us whether or not the signs depicted in that picture are

17   in the public right-of-way or not?

18   A.    I would say they are not.  If I have any doubt,

19   if I have any doubt whatsoever, I don't touch signs.  I

20   don't even think about touching the signs.

21   Q.    Okay.

22   A.    And this is, the picture is doubtful.  I don't

23   know.  I don't think they are.

24   Q.    Okay.  And why not?

1   A.   I can't see any telephone poles.  I can't see

2   sidewalk or anything like that.  If I have any doubts, I

3   wouldn't touch -- I wouldn't pick those campaign signs

4   up.  And I have doubts on those.  I would say they are on

5   private property.  If it is on private property, I won't

6   touch it.

7   Q.   Okay.  I'm going to show you now a picture that's

8   attached as B to Exhibit 2.  I ask you to take a look at

9   that exhibit and tell us whether or not in your opinion

10  those signs are located in the public right-of-way?

11  A.   Well, I can also tell you he has got some signs

12  right up the street near them and --

13  Q.   I know --

14  A.   I'm saying if I have a doubt on them, I think

15  they are on private property, I don't know.  But if there

16  is any doubt, I will just go ahead and leave them sit

17  there.  If there is any doubt to me, I don't touch them.

18  I won't touch anybody's sign.

19  Q.   Okay.

20  A.   It has got to be obvious.

21  Q.   All right.  I'm going to show you Tab C of that

22  same affidavit and ask you if those signs are in the

23  public right-of-way?

24  A.   No, they are not in the public right-of-way.



51

1    Q.    Why not?

2    A.    They are behind the pole, for one thing.

3    Q.    I'm going to show you Exhibit D to that same

4  affidavit and ask you if that sign is in the public

5  right-of-way?

6    A.    No.  It is behind the pole.  It looks like it is

7  somebody's property.

8    Q.    I'm going to show you Exhibit E from that same

9  affidavit and ask you if either one of those signs are in

10  the public right-of-way?

11    A.    No.  I would say they are on private property

12  somewhere.

13    Q.    Why?

14    A.    Well, looks like they are behind the sidewalk

15  there, for one.

16    Q.    It is your testimony that both those signs are

17  behind the public sidewalk?

18    A.    I would think so.  But then again, when you think

19  about it, that could be somebody's property line right

20  there.  You would have to go and look.  But to me, if it

21  is a judgment call, I won't touch them.

22    Q.    Well, I'm going to show you Exhibit F, just so we

23  are clear.  It is a picture of signs again.  In your

24  opinion, are they in the public right-of-way or on



1    private property?

2         A.    They are on private property.

3         Q.    Why do you conclude that?

4         A.    They are behind those landscaping logs, for one

5    thing.

6         Q.    And does that prove to you that they are on

7    private property because they are behind landscaping

8    logs?

9         A.    I would think so.

10        Q.    Is that a City policy or rule that you follow in

11   that regard?

12        A.    If I have any doubt in my mind, I will not touch

13   anybody's sign.

14        Q.    Is there --

15        A.    That's my rule, yes.

16        Q.    Are you aware of any City policy or rule, though,

17   that discusses signs that are behind landscaping markers

18   or things of that nature?

19        A.    Well, to me, that's on private property.  I'm not

20   going to touch somebody's campaign sign on private

21   property.

22        Q.    So you are not aware of any policies on this

23   issue?

24        A.    No.



53

1    Q.    I'm going to show you what is marked on the

2    affidavit at Tab G, which is a picture, tell us if you

3    recognize that.

4    A.    Yes, I do.

5    Q.    What is that?

6    A.    That's a directional sign for the City.

7    Q.    Okay.  Is that located on public right-of-way?

8    A.    Sure is.  That's municipal sign.

9    Q.    And you called it a directional sign; is that

10    correct?

11    A.    I guess.  It gives you all kinds of information,

12    informational sign.

13    Q.    Informational sign, not just directional?

14    A.    Yeah, sometimes it has directions.  It all

15    depends on what is printed on there.

16    Q.    On this particular day --

17    A.    It is an informational sign telling you about

18    "Oklahoma" and Convention Center's there.

19    Q.    What is, if you know, "Oklahoma," July 19th, 8:00

20    p.m., do you know what that is?

21    A.    Do I know what that was?

22    Q.    Yes.

23    A.    Yes.

24    Q.    What is that?



1    A.    They had a show there of, I guess it is

2  singing-and-dancing-type show.

3    Q.    Okay.  Is there a fee charged to get into that

4  show, do you know?

5    A.    I would assume, yeah.  At the Convention Center,

6  yes, probably.

7    Q.    Was that something the City had put on, if you

8  know, or was that private?

9    A.    Private.  As far as I know.  The City didn't put

10  it on.

11    Q.    I'm going to show you what has been marked as

12  Exhibit H to the affidavit and ask you if you recognize

13  that sign.

14    A.    I recognize the sign but I have never seen it.

15    Q.    Is that sign located in the public right-of-way?

16    A.    I would say -- I would say, yeah, that is.

17    Q.    Okay.

18    A.    It is behind --

19    Q.    I'm sorry.

20    A.    It is -- there is the pole right there.

21    Q.    Okay.

22          (Mr. Speakman is present at this time.)

23    A.    Yeah.  I have never really seen that sign.  I

24  probably would have taken that sign if I saw it.



WILCOX & FETZER LTD.
Registered Professional Reporters

Alexander W. Onizuk

55

1     Q.   I show you what has been marked as Exhibit I to

2  the affidavit and ask you if that sign is in the public

3  right-of-way?

4     A.   Well, that's questionable.  I'm not even going

5  to -- I didn't take it.  I would say it is -- well, it is

6  definitely behind the pole.

7     Q.   I'm talking about the blue sign.

8     A.   Which one?

9     Q.   The blue sign, sir.

10    A.   Yes, it is -- I would say it is on the public.

11    Q.   Okay.

12    A.   It looks like a telephone pole right there.  Pole

13  to pole.  But I didn't take it.

14    Q.   I show you Exhibit J and ask you if those signs

15  are in the public right-of-way?

16    A.   Public right-of-way?  They are on public

17  property.  They are on City park.

18    Q.   Okay.  So they are on public property?

19    A.   Mm-hmm.  The City.  It is City stuff.

20    Q.   Okay.  And I'm going to show you Exhibit K, ask

21  you if that sign is on public property?

22    A.   Lord, I don't know.  It looks like it is behind

23  the sidewalk.  There is the sidewalk right there.

24    Q.   Okay.



1    A.    So it is on the other side of it.

2    Q.    So in your opinion, is that in the public

3  right-of-way or not?

4    A.    No.

5    Q.    I'm going to show you Exhibit L and point you to

6  the sign that says "Art League" on that exhibit and ask

7  you if that's in the public right-of-way?

8    A.    That's, yes, that's a directional sign for the

9  Art League.

10    Q.    Is the Art League a City entity or private

11  entity?

12    A.    I have no clue.  Probably a private.  But those

13  signs have been there forever.

14    Q.    Okay.  And do you know if that pole is owned by

15  the City?

16    A.    Yes, the pole is owned by the City.

17    Q.    I'm going to show you Exhibit M, ask you the same

18  question about the Art League sign:  in the public

19  right-of-way or not?

20    A.    On City property, isn't it?  Yes.

21    Q.    Public right-of-way?

22    A.    Yeah, it is a directional sign for the Art

23  League.  If they didn't have it up there, they would

24  never find it, would they?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    Q.    Approximately how many of those Art League signs

2  do you think are in the public right-of-way in the City?

3    A.    Two that I know of.

4    Q.    In your travels have you encountered any others?

5    A.    I don't pay any attention to the Art League

6  signs.  Those are the only two I know of.

7    Q.    Would it surprise you if there is more than 50?

8    A.    No, not at all.

9    Q.    I'm going to show you Exhibit N, as in Nancy, and

10 ask you if those signs are in the public right-of-way?

11    A.    They are on a public park, looks like.

12    Q.    And is that top sign on that pole, is that --

13    A.    "Tree City U.S.A."?

14    Q.    Yes.  What is that?

15    A.    I would say that's a City sign, wouldn't you?

16    Q.    Well, I'm asking your opinion.

17    A.    I would think it is a City sign.  Tree City

18 U.S.A., something they must be proud of.

19    Q.    I'm going to show you Exhibit O, ask you if that

20 sign is in the public right-of-way?

21    A.    This has been here longer than, almost as long as

22 the City itself.  Private property probably.

23    Q.    You don't think that's in the public

24 right-of-way?



58

1    A.   I would have to go and see where the -- I can't

2 tell by that.

3    Q.   You said earlier you did have a chance to review

4 these pictures?

5    A.   Yes.

6    Q.   When was that?

7    A.   This morning we went over a couple of them.

8    Q.   First time this morning?

9    A.   Yes.

10    Q.   I show you Exhibit P, as in Paul.  Let me see if

11 you recognize this sign, if that's in the public

12 right-of-way?

13    A.   That sign doesn't -- that's not even on City

14 property.  That's on Henlopen Acres.

15    Q.   Is it on public right-of-way?

16    A.   Don't ask me.

17    Q.   I'm asking you, do you know?

18    A.   I don't know.  I would say that's -- you will

19 have to ask Henlopen Acres about that.  I don't know.

20          MR. SPEAKMAN:  I think you need to clarify

21 whose right-of-way you are asking about.

22    A.   That's not part of the City of Rehoboth.

23    Q.   For the record, I asked if this was in the public

24 right-of-way?



1    A.    That's not in the City of Rehoboth's right-of-way

2    anyway.

3    Q.    That property is not within the incorporated

4    municipality of the City of Rehoboth Beach?

5    A.    This, no.

6    Q.    I'm going to refer you to Exhibit Q, which is the

7    last exhibit in that affidavit, and ask you if you know

8    if that sign is in the public right-of-way?

9    A.    That's the back of the other sign.  And that's in

10   Henlopen Acres.  That's not even City of Rehoboth's

11   property.

12   Q.    When you say it is not public right-of-way, how

13   do you know it is not public right-of-way?

14   A.    I didn't say it was not public right-of-way.  It

15   may be that's not City of Rehoboth sign.

16            MR. RHODUNDA:  He didn't believe it is in

17   the City of Rehoboth property, is what he is saying.

18            THE WITNESS:  That's not City of Rehoboth

19   sign.

20   Q.    I didn't ask you if it was the sign.  I asked you

21   if it was in the public right-of-way?

22   A.    I have no clue.

23   Q.    You testified earlier when you are not sure about

24   things, you go and you ask your supervisor, correct?



60

1    A.   As far as signs go?

2    Q.   Yes.

3    A.   If I'm not sure about the particular sign, a lot

4 of -- sometimes, yes.

5    Q.   Okay.

6    A.   But normally if I'm not sure about a sign, I

7 won't even mess with it.  Especially a campaign sign.

8    Q.   Those pictures that I just showed you, A through

9 Q, did you discuss any of those signs with your

10 supervisors?

11    A.   No.  Well, I can't say no.

12    Q.   Well, what can you say?  Take your time and think

13 about it.  It is an important question.  You can't confer

14 with your attorney.

15         THE WITNESS:  Can I bring up what Greg

16 Ferrese said?

17         MR. RHODUNDA:  No, well --

18    Q.   Yes, you can bring up what Mr. Ferrese said.

19         MR. RHODUNDA:  You can just answer what, if

20 any, of the discussions you've had about the signs.

21         MR. SPEAKMAN:  Not where attorneys are

22 present.

23         MR. RHODUNDA:  Yes.

24         MR. TUCKER:  You know, he is not supposed to

Alexander W. Onizuk

61

1    be conferring in a deposition.  I'm not asking for

2    attorney/client.

3            MR. SPEAKMAN:  If it occurred in the

4    presence of an attorney that would be asking for that.

5            MR. TUCKER:  If it is privileged.

6            MR. SPEAKMAN:  It is privileged.

7            MR. TUCKER:  We don't even know what he is

8    going to say.

9            MR. RHODUNDA:  Well, it is a privileged

10   comment.

11           Restate your question.  Maybe there is a

12   question he could answer about it.  You are asking, I

13   guess, whether or not he explored whether or not these

14   signs were within the right-of-way.  Is that your --

15           MR. TUCKER:  My question was had he ever

16   discussed any of these signs I just showed him today,

17   Exhibits A through Q?

18           THE WITNESS:  I didn't discuss anything with

19   him, no.  I was just shown -- I was shown those signs

20   this morning.

21   BY MR. TUCKER:

22       Q.   Okay.  I'm just exploring this.  Were you in a

23   room where Mr. Ferrese made comments about these pictures

24   that you heard?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1      A.   Yes.

2      Q.   Okay.   Were Mr. Rhodunda or Mr. Speakman present

3  during that conversation?

4      A.   Yes.

5           MR. TUCKER:   Is it your position,

6  Mr. Rhodunda and Mr. Speakman, that was a privileged

7  conversation?

8           MR. RHODUNDA:   Yes.

9           MR. SPEAKMAN:   Yes.

10 BY MR. TUCKER:

11     Q.   Now, earlier you had made mention that you went

12 down Norfolk and something caught your eye, words to that

13 effect.   What was that?

14     A.   A sign on City property.

15     Q.   Whose sign?

16     A.   Mr. Sokolove's.

17     Q.   Where was it located?

18     A.   Across the street from his house.

19     Q.   And was that sign removed by you?

20     A.   Mm-hmm.

21     Q.   Do you recall what date that was?

22     A.   7th, more likely.

23     Q.   July 7th?

24     A.   I think that went on on the 7th.



63

1     Q.    Okay.  And why did you conclude that was on

2  public property?  What was it about that sign?

3     A.    It was between the sidewalk and the curb, that

4  little grass area.  As a matter of fact, I think it was

5  right next to the fireplug.  It was within that area.

6     Q.    Now, today we were provided with a memorandum, it

7  is marked as Plaintiffs' Exhibit 6, that was prepared by

8  Mr. Murphy, who is your boss, correct?

9     A.    Mm-hmm.

10    Q.    I ask you to take a look at that and tell me if

11  you recognize that.

12    A.    I read some of it.  I didn't read it all.

13    Q.    Were you involved in the preparation of that

14  report?

15    A.    No.

16    Q.    Not at all?

17    A.    He made the report up.

18    Q.    Did he have conversations with you regarding that

19  report?

20    A.    He probably come in and asked me about it, but I

21  didn't even know he was making a report up, to tell you

22  the truth.

23    Q.    I want you to tell me the truth.  It is

24  important.



1    A.    Yeah.

2    Q.    I'm going to direct you to the last page in

3  particular regarding, looks like regarding the numbers of

4  signs that were collected.   I want to ask you to review

5  that and tell us if you agree with those numbers.

6    A.    I guess 19 of Sokolove's, probably, they are

7  counting the ones I got on Thursday and Saturday, and

8  whatever the other time.   Probably true.

9         I know I returned -- he picked up about ten

10  out of my truck.   Five that one night, five or six one

11  night, and that same morning picked up some.

12   Q.    Do you agree with those numbers that are on page

13  3 of that exhibit?

14   A.    Oh, I couldn't verify, you know.   Sounds about

15  right.

16   Q.    Were you the only one that would have been

17  picking up signs in the City during that period?

18   A.    Dave and I went out and picked up signs one day.

19   Q.    Mr. Murphy went with you?

20   A.    Dave and I both did, yes.

21   Q.    When you pick up a sign and remove it, do you

22  document where and when?

23   A.    We did the last time.   We took pictures of it.

24   Q.    You took pictures of the signs?   On what day?



1    A.    15th, something like that.

2    Q.    15th of July?

3    A.    Yeah.

4    Q.    Now, wasn't that during the period, though, when

5    there was a policy that you weren't going to enforce --

6    A.    I think that was the morning -- the day the

7    policy went off.

8    Q.    It was the 15th?

9    A.    It was opened, yes.

10    Q.    And you took pictures of signs that day you

11    removed?

12    A.    Yes, we did.

13    Q.    Prior to that you did not take pictures?

14    A.    Right.

15    Q.    Do you know what steps, if any, the City took to

16    notify people that they were not removing election signs

17    for some period of time?  Is that no?

18    A.    What was the question again?

19    Q.    Do you know if the City made any attempt to

20    notify people that there was going to be a period of time

21    during which they were not going to remove election

22    signs?

23    A.    Not that I know of.  I'm not aware of it.

24    Q.    Now, let me refer you to Plaintiffs' Exhibit 5,



1    which is the notice of deposition, Mr. Rhodunda.  And

2    just for the record, before we started Mr. Rhodunda

3    indicated you may have some answers to some of the

4    questions that are asked under our Rule 30(b)(6) notice

5    of deposition.  And I want to go through some of those

6    questions with you, but first I want to ask you if you've

7    had an opportunity to look at Schedule A attached to

8    Plaintiffs' Exhibit 5?

9        A.   Oh, me?

10       Q.   Yes, sir.  Have you seen that document?

11       A.   I never saw this document.  Did you want me to

12   read it.

13            MR. TUCKER:  Can we go off the record for a

14   second?

15            (Discussion off the record.)

16   BY MR. TUCKER:

17       Q.   Why don't we go back on the record, and let's

18   start, sir, if I could ask you to read 5 -- I'm sorry?

19            MR. RHODUNDA:  Maybe it is confusing.  If

20   you just take out, we basically are enforcing only the

21   City ordinance, and you may just want -- I'm trying to

22   make this as easy as possible so he understands, because

23   you list the federal, state in there as well.  Maybe it

24   will cut to the chase to just ask him the question

1  directly without removing some of these other things to

2  try and help him understand the question better.

3           MR. TUCKER:  I'll tell you what,

4  Mr. Rhodunda, can he look at your copy while I look at

5  mine?

6           MR. RHODUNDA:  Yes.  What are we looking at,

7  5(b)?

8           MR. TUCKER:  5(b), and this is Plaintiffs' 5

9  which is the notice of deposition to Mr. Rhodunda under

10 Rule 30(b)(6), which I believe Mr. Rhodunda has an

11 identical copy in front of him that the witness is now

12 looking at.

13 BY MR. TUCKER:

14    Q.   Question 5(b) reads, "who decides when to enforce

15 federal, state, county or City ordinance, code, statute

16 or regulation, including, without limitation, City

17 Ordinance Section 74-16, which the City contends

18 authorizes it to removes signs, posters or advertisements

19 from public property or rights-of-way within the City

20 limits."

21    A.   Who decides when to enforce it?

22    Q.   Yes, sir.

23    A.   Me, I guess.  I'm the Code Enforcement Officer.

24    Q.   Okay.  So over the past year it has been at your



1  complete and total discretion?

2      A.    When to pick up signs?

3      Q.    Yes, sir.

4      A.    Pretty much, yes.

5      Q.    Have you responded to complaints in removing

6  signs?

7      A.    Yes.

8      Q.    So in part it is driven by complaints?

9      A.    A lot of complaints, a lot of, a lot of signs I

10  pick up, like contractor signs.  They do have an

11  ordinance about too many signs in one area, you know,

12  like if you have got two -- one contractor and three

13  subcontractors, the subcontractor can't have their signs

14  there.  So you give them fair warning, you know, to

15  remove their signs.  And a lot of times the subcontractor

16  is already gone, so you go in and pick their signs up.

17      Q.    Is this driven primarily by complaints or by your

18  own observations?

19      A.    Both.  Mostly on signs it is more or less me.

20      Q.    Okay.  And on July 9th did you have any

21  complaints about signs?

22      A.    Was that on Saturday?

23      Q.    Yes.

24      A.    No.



69

Q.    No complaints?

A.    Un-un.

Q.    Reading from subparagraph (c), "who decides
whether or not a particular sign, poster or advertisement
violates the federal, state, county or City ordinance,
code, statute or regulation, including, without
limitation, City Ordinance 74-16, which the City contends
authorizes it to remove signs, posters or advertisements
from public rights-of-ways within the City limits," who
decides?

A.    Me.

Q.    That's your sole discretion?

A.    Sure.

Q.    You testified earlier that you also discuss, I
believe your testimony was, questionable issues with
Mr. Murphy and his assistant?

A.    Yeah, mm-hmm, yeah.

Q.    So it is not just you, correct?

A.    Yes, well, you are right.  If I have any
question, I definitely go to them.  I don't take it upon
myself, you know, to know everything.  They know.  They
are the ones that help me most.

Q.    And on occasions when you are unsure and they
give you guidance, do you follow their guidance?  When I



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    say "they," I mean Mr. Murphy and his assistant.

2        A.    Yes.

3        Q.    On July 9th, Saturday, did you receive any

4    guidance from Mr. Murphy or his assistant?

5        A.    No.   Not at all.   They weren't even there.

6        Q.    You had no complaints?

7        A.    No, no complaints, no guidance, no nothing.   It

8    was all me.   I called that.

9        Q.    Earlier when you testified about July 7th, which

10   I think is the first day you were talking about going out

11   and picking up signs --

12       A.    Right.

13       Q.     -- who were those discussions with?

14       A.    Mr. Murphy.   After I picked up the signs, I went

15   and told him what I did.

16       Q.    Okay.

17       A.    And he was -- they are so busy in that office,

18   believe me, they are so busy that I don't even know

19   whether he fully understood what I was telling him.   But

20   he just said, "Pick up all the signs."

21       Q.    On July 7th Mr. Murphy instructed you to pick up

22   all signs?

23       A.    Anything on public property, pick up signs.

24       Q.    Did he limit you in any way in the City or did



71

1    you take that to mean any place in the City?

2        A.    No, he didn't limit anything.    Anything on public

3    property, he said pick up.

4        Q.    Okay.    So --

5        A.    He just didn't say Lake Street or Lake Avenue.

6        Q.    So on July 9th you were still following that

7    directive, correct?

8        A.    Right, mm-hmm.

9        Q.    Question (d) is how often does the City enforce

10    federal, state, county or City ordinances, codes,

11    statutes or regulations including, without limitation,

12    City Ordinance 74-16," how often?

13        A.    Every day.

14        Q.    (E) reads, "how often are signs removed as a

15    result of alleged violations of federal, state, county,

16    City, statutes, regulations, including, without

17    limitation, City Ordinance 74-16," how often?

18            MR. RHODUNDA:    How often are signs removed?

19        A.    All the time.

20        Q.    So I'm clear, it is enforced all the time?

21        A.    Yes.

22        Q.    Signs are removed all the time?

23        A.    Right, right.

24        Q.    Is that correct?



1    A.    Right.  Now, sometimes, like I said, on realtor

2    sign, I will give them fair warning, I call them up.  If

3    they are not directly in front of the house, they are in

4    that grass area, I say, "Look, I'm going to remove your

5    sign.  You better come and get it."

6              Or sometimes I pick them up and take them to

7    them.  Especially -- a lot of Lingo's.  They are forever

8    picking them up.

9    Q.    Let's go on to question 6, which your attorney

10   indicated you might be able to answer for us today.  "The

11   removal of any campaign signs by the City from private

12   property or public property or rights-of-way within the

13   City limits since July 1 '05."  Since July 1, '05 who has

14   decided certain campaign signs would be removed and

15   others would be left standing?

16   A.    July 1, '05?

17   Q.    Since that time.

18   A.    No one.

19   Q.    Would you agree from the pictures that I showed

20   you that were attached to Exhibit 2 to the Memorandum A

21   through Q, some of those pictures established that there

22   still are signs in the right-of-way within Rehoboth

23   Beach?

24   A.    Possibly.  I'm not going to -- just by looking at

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1   the pictures, I can't really tell for sure. But it could

2   be. They look like they could be on private property,

3   you know.

4      Q.   Okay.

5      A.   If I have any doubt, I don't pick a sign up.

6      Q.   So is it your testimony that campaign signs that

7   you believe were on private property you would not have

8   picked up?

9      A.   I would not have picked up any campaign sign on

10  private property.

11     Q.   If you believed a campaign sign was on public

12  property, would you have picked it up?

13     A.   Yes, I would pick it up.

14     Q.   Did you have any discussions with Mr. Murphy or

15  his assistant, or anybody else with the City, about

16  campaign signs that you had questions about?

17     A.   I didn't have any questions about these

18  particular campaign, campaign signs I picked up. They

19  were right there on public property.

20     Q.   I'm not talking about just the ones you picked

21  up. I'm talking about ones that maybe you didn't pick

22  up.

23     A.   No, uh-uh. No. To me, there wasn't any

24  question, they were on private property. I didn't, I

1    didn't pick them up.

2        Q.    Okay.

3        A.    I didn't question any signs.

4        Q.    And the Art League sign that we showed you

5    earlier in your deposition, it is also attached to

6    Exhibit 2 to the memorandum, those signs such as that

7    weren't removed.    Why?

8        A.    Tell you the truth, I hardly ever see them.

9        Q.    Why would you not remove a sign like that?

10       A.    I think they are grandfathered in.

11       Q.    What does that mean?

12       A.    It means they have been there longer than the

13   code has been made up.

14       Q.    Okay.    How did you make that determination?

15       A.    How did I make that determination?

16       Q.    Yes, sir.

17       A.    I didn't.

18       Q.    Well, then where is that coming from?

19       A.    Mr. Murphy and Mr. Kordak.    We talk about things

20   being grandfathered in, you know, longer than the code.

21       Q.    Did you have any specific discussion with

22   Mr. Murphy or his assistant about grandfathering of

23   signs?

24       A.    No, uh-uh, but I did have about other things, you



W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

1    know, being grandfathered.

2        Q.    Can you tell me where in the code any of the

3    signs that I showed you that are attached to Exhibit 2 to

4    our memorandum, can you show me in the code where they

5    are grandfathered?

6        A.    No.   I couldn't show you.   If I -- I would have

7    to go and ask somebody else.

8        Q.    Okay.   So is it your testimony then that you

9    didn't remove those signs, that is, the Art League signs,

10   because, why?

11       A.    I don't pay any attention to Art League signs.

12       Q.    Why not?

13       A.    I miss them.   I see the stop sign.   But I never

14   see the Art League sign until you showed them to me.

15       Q.    You had no idea --

16       A.    Well, I'm oblivious to it.   I probably seen it a

17   dozen times, you know, a million times, but never paid

18   any attention to it.

19       Q.    Would you agree that they are private signs?

20       A.    I would think they are private signs.   But they

21   have been there forever.

22       Q.    Would you agree that they are in the public

23   right-of-way?

24       A.    Right.



1    Q.    But they have not been removed; is that correct?

2    A.    They have not been removed.

3          We are done?

4    Q.    We are done when we get done with the questions,

5    sir.  I'm doing my best.

6          MR. TUCKER:  Bill, I just need a couple

7    minutes.  I got a lot of information at the last moment

8    here.  Let's go off the record.

9          (Discussion off the record.)

10         (Recess taken.)

11         MR. TUCKER:  Let's go back on the record.

12   BY MR. TUCKER:

13   Q.    Sir, you had mentioned earlier during your

14   testimony that there was a banner sign that Hooter's had

15   out that you had taken off because banner signs --

16   A.    I didn't take it off, no.

17   Q.    I stand corrected.  You had mentioned earlier, I

18   believe, that Hooter's had a banner sign up that's not

19   permitted under the code; is that correct?

20   A.    Yes.

21   Q.    Are you aware of a banner sign that the City had

22   put up in the past couple of weeks?

23   A.    Uh-uh.

24   Q.    Never saw any banner sign by the Convention



Alexander W. Onizuk

77

1    Center put out by the City of Rehoboth?

2        A.    Uh-uh.

3        Q.    If they had put out a banner sign, would that

4    have been unlawful?

5        A.    No.

6        Q.    Why not?

7        A.    The City put it out.

8        Q.    So the City is exempt?

9        A.    But City don't put out banner sign.

10       Q.    For purposes of my question, just assume that

11   they did.  If they did, would that have been unlawful?

12       A.    Would it have been unlawful?

13       Q.    Yes.

14       A.    Anything the City does, it is all right.

15             MR. RHODUNDA:  Do you mean in regard to the

16   statute?  What do you mean in reference to?

17       Q.    Unlawful in general.  Would you take that down?

18       A.    Would I take it down?

19       Q.    Yes, sir?

20       A.    Not if the City put it up I wouldn't take it

21   down.

22       Q.    If the sign was for a private event at the

23   Convention Center but was but up by the City, would it

24   violate the code or not violate the code?



**WILCOX & FETZER LTD.**

Registered Professional Reporters

1    A.    Yes.

2    Q.    It would violate the code?

3    A.    If it was for a private event?

4    Q.    Yes, put up by the City.  Would that violate the

5    code?

6    A.    I would think so.

7    Q.    Now, do you treat the boardwalk like a sidewalk?

8    A.    Do I?

9    Q.    Yes, sir, in terms of enforcement?

10    A.    Yes.

11    Q.    Do you consider the whole boardwalk public

12    right-of-way from the north end to the southern end?

13    A.    Oh, yes.

14    Q.    Do you have any knowledge as to in terms of

15    whether or not any of that is private property or not?

16    A.    Oh, I have no idea.

17    Q.    What do you believe it to be?

18    A.    The boardwalk?

19    Q.    Yes, sir.

20    A.    Itself?

21    Q.    Yes, sir.

22    A.    I think that's City property.

23    Q.    And the property that the boards are on top of,

24    do you also believe that's City property?



79

1    A.   Well, I did have one guy tell me he owned all the

2    way down to the end of the beach, so evidently the

3    City -- boardwalk is on private property.

4    Q.   Do you believe that?

5    A.   I would think, yes.

6    Q.   Did you have those discussions with Mr. Murphy or

7    his assistant?

8    A.   No, uh-uh.  I had that with Mr. Capano.

9    Q.   Mr. Capano.  And you accepted his word on that?

10   A.   Hey, he told me he owned halfway down to the

11   beach and I took him for his -- at his word.

12   Q.   You believe to this --

13   A.   I want to tell you one thing, this is Gerry

14   Capano.  I don't believe half the stuff he tells me.

15   Q.   I think I might leave that one alone.

16        Let me ask you something about the practice

17   you have about determining where there are public

18   right-of-ways versus private property and how you

19   distinguish between the two.  What if you have a road,

20   like Lake, where there are no sidewalks, and there are no

21   utility poles?

22   A.   And no utility poles?  That would be a good one.

23   Q.   What would you do in that case, sir?  How many

24   feet can you be within, close to the road with a sign?



1    How many feet do you get?

2         A.    Well, right across the street, on Lake Avenue

3    there is a, big flower pots sitting in the parking lot,

4    with his signs in it.

5         Q.    You say "he" --

6         A.    Mr. Sokolove's signs.  I did not touch those

7    signs because I have doubts.  If I have any doubt, I

8    don't touch anybody's signs.

9         Q.    That wasn't my question.  And I know you are

10   trying to help.

11        A.    No, no.

12        Q.    Let me ask the question.  It is important.  What

13   do you do in that instance?  What do you do in an

14   instance where there is a street, there is no utility

15   poles, and no sidewalk?

16        A.    Then I would say I'm going to leave those signs

17   alone.  They might be on somebody's private property.

18        Q.    You would not remove those signs?

19        A.    I would not remove them.  If I have any doubt, I

20   won't touch them.

21        Q.    Have you ever spoken to Mr. Murphy or his

22   assistant about what to do in those situations?

23        A.    No.

24        Q.    Are you aware where the private property lines





Alexander W. Onizuk

81

1    run along Lake?

2        A.    Some, yeah.

3        Q.    Do they run in a straight line; that is, do the

4    property lines run perpendicular to -- I'm sorry,

5    parallel to the road?

6        A.    Parallel, I would say they would.

7        Q.    Based on the ones you are aware of?

8        A.    Yes.

9        Q.    Can you tell us which ones they are, what

10   properties they are, if you know?

11       A.    Well, Mr. Sokolove's, for one.

12       Q.    Runs parallel?

13       A.    Mm-hmm.

14       Q.    And do you know whether or not the lots on Lake,

15   their private property lines run parallel to one another?

16       A.    I would say they do.

17       Q.    And what do you base that belief on?

18       A.    Well, looking down there you can see where the

19   sidewalks are and you can just about see, you know, tell

20   everybody's property.  You can see, that's obvious.

21       Q.    So you rely on the sidewalk to try to determine

22   where the public right-of-way is?

23       A.    To determine, yes, mm-hmm.

24       Q.    In front of Mr. Sokolove's business, is there a



1    sidewalk?

2        A.    That's a good question.  He has got a brick

3    sidewalk, I think, in front of his place.

4        Q.    Do you know whether that's private or public?

5        A.    Actually I do know.

6        Q.    What is it?

7        A.    That's public.

8        Q.    How do you know that?

9        A.    I got his plot out and looked at it.

10       Q.    His plot.  Is that his deed or is that something

11    else?

12       A.    It is a recording of his land.

13       Q.    Deed?

14       A.    I guess it is the deed.

15       Q.    When did you pull that out and look at it?

16       A.    The other day.

17       Q.    Why did you do that?

18       A.    To see exactly where -- because I was accused of

19    taking signs from in front of his place.

20       Q.    Okay.

21       A.    And flower pots too.

22       Q.    That's why you pulled it?

23       A.    Well, I wanted to see what it looked like, yeah.

24       Q.    You testified you didn't remove any signs from



83

1    the front of his place?

2        A.    No, I did not.  I don't see how he could put a

3    sign in front of his place.

4        Q.    So why would it matter where the public

5    right-of-way was in front of his place if you didn't

6    remove any signs from in front of his place?

7        A.    Just curious.

8        Q.    Was that your idea to pull that document?

9        A.    Yes.

10       Q.    Where did you pull it from?

11       A.    We got files over there and I can look it up.

12       Q.    So you have a copy of Mr. Sokolove's deed --

13       A.    Mm-hmm.

14       Q.    -- in a public file --

15       A.    Mm-hmm.

16       Q.    -- at the City of Rehoboth?

17       A.    Right.

18             MR. RHODUNDA:  It is not a deed.

19       A.    It is not a deed.  It is not a deed.

20             MR. RHODUNDA:  I'll share that.  I'll review

21    that with him in a moment.

22             MR. TUCKER:  Why don't we go off the record

23    for a moment.

24             (Discussion off the record.)



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1                MR. TUCKER:  I think we are done.

2                (Discussion off the record.)

3                   EXAMINATION

4  BY MR. RHODUNDA:

5     Q.    Mr. Onizuk, just to follow up quickly.  You have

6  been the code inspector for the City of Rehoboth for how

7  long?

8     A.    One year.

9     Q.    What has been your rule of thumb during that one

10  year-period related to determining where the public

11  property ends or the right-of-way ends and the private

12  property starts?

13     A.    We normally went by the sidewalk.  Anything after

14  the sidewalk is public property.

15     Q.    And if there is no sidewalk and there is a

16  utility pole, how do you use the utility pole to

17  determine that?

18     A.    Well, the utility pole is on the easement.  It is

19  not on private property.  And you can tell anything past

20  the utility pole is private property.

21     Q.    Do you never do any enforcement action on the

22  backside of a telephone pole?

23     A.    No, I would not.

24     Q.    Have you ever taken any campaign signs off of



**WILCOX & FETZER LTD.**

Registered Professional Reporters

85

```
 1   private property?

 2       A.   No, not to my knowledge, not at all.

 3               (Defendants' Deposition Exhibit No. 1 was

 4   marked for identification.)

 5       Q.   I'm showing you Defendants' Exhibit 1.  We've had

 6   a lot of discussion about Mr. Sokolove's restaurant; is

 7   that correct?

 8       A.   Mm-hmm.

 9       Q.   Is this his restaurant?

10       A.   Yes, it is.

11       Q.   These were taken yesterday; is that right?

12       A.   Yes.

13       Q.   There are two "Sokolove" signs in the back

14   planting area behind the sidewalk?

15       A.   Yes, look like in the flowerbed there.

16       Q.   Are they lawfully placed there?

17       A.   Yes.

18       Q.   Is that consistent with the City code?

19       A.   Yes.

20       Q.   Have you ever removed any signs from that

21   location?

22       A.   No, never.

23       Q.   Did you ever move any signs from this area --

24       A.   Yes.
```



1    Q.    -- far end of the parking lot?

2    A.    I removed signs right here.

3    Q.    Can you mark with my pen where you removed the

4  sign from.

5    A.    Right back in here.

6    Q.    Mark it real heavy, if you would.

7    A.    This grass area back in here.

8    Q.    Okay.  Now, that's one sign that you removed from

9  the area of his restaurant?

10   A.    Right.

11   Q.    What is the street address of this home right

12 there?

13   A.    That home right there.

14   Q.    Where is 63 Lake Avenue?

15   A.    63 is on the left side of that.

16   Q.    Okay.  Now, were there any signs removed from

17 where the "X" is marked on Defense Exhibit 1 and the far

18 end of his restaurant building?

19   A.    Yes, there was a sign on the other side of his.

20          MR. RHODUNDA:  Now, if I could have this

21 marked as Defense Exhibit 2, please.

22          (Defendant's Deposition Exhibit 2 was marked

23 for identification.)

24          MR. TUCKER:  Bill, can we interrupt just for



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Alexander W. Onizuk

87

1    a second just to see this.

2              MR. RHODUNDA:  And Exhibit 3, please.

3              (Defendant's Deposition Exhibit 3 was marked

4    for identification.)

5        Q.    I'm going to show you what is Defense

6    Exhibit Number 2, and this is basically a plot plan that

7    shows the property where the restaurant 59 is located; is

8    that correct?

9        A.    Right, mm-hmm.

10       Q.    And Exhibit 3 is a defense photograph, No. 3,

11   that shows the front of the 59 building; is that correct?

12       A.    Yes, mm-hmm.

13       Q.    Now, when you look at the plot plan, it depicts

14   three steps coming out of the front of the building; is

15   that correct?

16       A.    Mm-hmm.

17       Q.    Do you see the three steps coming down in front

18   of the building?

19       A.    Yes.

20       Q.    And do you see the sidewalk brick area in front

21   of this restaurant?

22       A.    Right.

23       Q.    Now, when you looked at this plot plan that's in

24   the City files, is the sidewalk for Mr. Sokolove's



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1   restaurant on private property or public property?

2       A.   It looks like it is on public, public property to

3   me.

4       Q.   Now, if you look down between Exhibits 1 and 3,

5   you see the "Sokolove" signs that are located in the

6   landscaped area?

7       A.   Right.

8       Q.   And you have testified already these are lawfully

9   in place; is that correct?

10      A.   Yes, they are, yeah.

11      Q.   Now, were the X marks the spot and you have

12  removed that sign, could you please mark on Defense

13  Exhibit 2 where that is?

14      A.   That was over in this area right here.  Right in

15  there.

16      Q.   And you would state that that was actually

17  located on the same area as the sidewalk in front of the

18  business if you went straight down?

19      A.   I'd say it is, sure, exactly.

20      Q.   Did you remove any signs from the front of this

21  59 restaurant?

22      A.   No, I didn't.

23          MR. RHODUNDA:   Can I have this marked as

24  Exhibit 4, please.

89

1           (Defendant's Deposition Exhibit 4 was marked

2    for identification.)

3        Q.    Now, I believe that this actually may be on the

4    other end of the restaurant property; is that correct?

5        A.    Right.

6        Q.    And you indicated previously you removed the sign

7    from that area; is that correct?

8        A.    That was over here.

9        Q.    Could you please mark on this photograph an "X"

10   where you removed the sign.

11       A.    Here.    That area.

12       Q.    Now, I see a "Sokolove for Mayor" sign that's in

13   a different location from where you marked the X; is that

14   correct?

15       A.    Right, mm-hmm.

16       Q.    Is that in a position now that's consistent with

17   the City code?

18       A.    I would think so, yes.

19       Q.    And why would you say that?  What is it that you

20   are looking at --

21       A.    I was looking at where I picked it up before.  It

22   was out in the medial strip between the sidewalk and the

23   curb.  And the owner over there is the one kind of helped

24   me out on it anyhow.  He did not want it there.



1      Q.    But now this is a lawful location?

2      A.    To me it is a lawful location.  Now, I don't know

3  whether that is on that guys's fence or not.

4              MR. TUCKER:  Just a housekeeping matter,

5  Bill.  You obviously don't have copies for us, so if we

6  can just kind of look at them so we can get a reference.

7              MR. RHODUNDA:  Oh, yes.

8              Can I have this marked as Exhibit 5, please.

9              (Defense Deposition Exhibit 5 was marked for

10  identification.)

11  BY MR. RHODUNDA:

12      Q.    Now, I have a corner across the street from 59

13  restaurant.  Do you recognize that corner?

14      A.    Mm-hmm, right.

15      Q.    That picture was taken yesterday.  Did you remove

16  a sign from that location?

17      A.    Yes, I did.

18      Q.    Where did you remove that from?

19      A.    It was on this side of -- right in this area

20  here.

21      Q.    Was it located in the front of the telephone

22  pole?

23      A.    Yes.  In the green, grass area.

24              MR. RHODUNDA:  If I could have these marked



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Alexander W. Onizuk

91

1    as Exhibits 6 and 7, please.

2              (Defense Deposition Exhibits 6 and 7 were

3    was marked for identification.)

4        Q.    Thank you.  Mr. Onizuk, I'm showing you Exhibits

5    6 and 7.  You previously testified at length about these

6    bed-and-breakfasts --

7        A.    Right.

8        Q.    -- that are close to the restaurant.  You have

9    removed some signs from in front of those, didn't you?

10       A.    Right.

11       Q.    Could you mark with my pen where you removed them

12   from.

13       A.    Both pictures?

14       Q.    Yes.  If they depict locations where you removed

15   them from.

16       A.    All of them were in front of the building, in the

17   grass area.  See, this is a big building here.

18              The other one would be way down here.

19              (Defense Deposition Exhibit 8 was marked for

20   identification.)

21       Q.    Now, with reference to Defense Exhibit 6 and 7, I

22   do see some "Sokolove for Mayor" signs that are on the

23   other side of the sidewalk now?

24       A.    Mm-hmm.



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1     Q.   Are those consistent with the City code?

2     A.   Yes, they are private property, mm-hmm.

3     Q.   Would you ever remove them if they were in that

4 position?

5     A.   No, never.

6     Q.   Now, Defense Exhibit 8 shows two "Sokolove for

7 Mayor" signs across the street from the

8 bed-and-breakfast.  Do you recognize those signs?

9     A.   Yes, I recognize those signs.

10    Q.   Did you leave those signs there?

11    A.   Yes.

12    Q.   Did you see those signs and make an analysis as

13 to whether those should be removed or not?

14    A.   I saw those signs and I said well, they are on

15 private property, as far as I'm concerned, they are

16 behind the easement, the pole line and everything.

17    Q.   So you left those signs there?

18    A.   I left those signs.  Private property, you know.

19 If I have any doubt I leave them.

20          MR. RHODUNDA:  Okay.  Exhibit 9.

21          (Defendants' Deposition Exhibit 9 was marked

22 for identification.)

23    Q.   Now, these are "Sokolove for Mayor" signs that

24 are located behind the sidewalk.  Are those legal



Alexander W. Onizuk

93

1  positions?

2      A.   To me they are legal, yes.

3               (Defendant's Exhibit 10 was marked for

4  identification.)

5      Q.   Number 10 is a fire hydrant on Norfolk Street; is

6  that correct?

7      A.   Mm-hmm.

8      Q.   You testified there was a sign removed from

9  there?

10     A.   Yes.

11     Q.   Did you remove that sign?

12     A.   Yes, I did.

13     Q.   Could you mark where you removed that from?

14     A.   Somewhere in that area right there.

15     Q.   Why did you remove that?

16     A.   It was within City right-of-way.

17     Q.   Now, all the photographs we have gone through so

18  far were all taken yesterday, right?

19     A.   Right.

20     Q.   And you were present when they were taken?

21     A.   Right.

22     Q.   And they accurately depict the subject matter of

23  what they were taken of?

24     A.   Right.



1        Q.    We will continue to go through yesterday's

2    photographs.

3              (Defendants' Deposition Exhibit 11 was

4    marked for identification.)

5        Q.    Defense Exhibit 11 is a "Sokolove for Mayor" sign

6    located right on the corner of an intersection very close

7    to the roadway.  Is that a legal sign?

8        A.    I would say it is a legal sign, yes.

9        Q.    And is that because it is behind the sidewalk?

10       A.    Yes.

11             (Defendants' Deposition Exhibit 12 was

12   marked for identification.)

13       Q.    Defense Exhibit 12 looks like a commercial

14   business with the "Sokolove for Mayor" sign in front of

15   that.  Is that a legal sign?

16       A.    I would say it is legal, a legal sign, next to

17   their house and everything.  Or it might be a store.

18       Q.    Looks like a store, doesn't it?

19       A.    Yes, mm-hmm.

20             (Defendants' Deposition Exhibit 13 was

21   marked for identification.)

22       Q.    Defense Exhibit 13 shows a park.  Do you remember

23   the name of this park?

24       A.    Lake Gerar or Gerard.



Alexander W. Onizuk

95

```
1      Q.    Lake Gerar?

2      A.    Yes.

3      Q.    Did you remove some signs from Lake Gerar that

4  were Sokolove signs?

5      A.    Yes.

6      Q.    Can you mark on here where you removed them from?

7      A.    About in this area right here.  Around that area

8  somewhere.

9      Q.    This is Lake Gerar, which is a park; is that

10 correct?

11     A.    Park, right, City park.

12     Q.    How many political signs have you seen within the

13 Lake Gerar boundaries?

14     A.    Only the one.

15               (Defendants' Deposition Exhibit 14 was

16 marked for identification.)

17     Q.    When you say only one sign, I'm talking about all

18 the candidates running for office.

19     A.    Right.  That's the only one.

20     Q.    Exhibit 14 shows a median across the street from

21 Lake Gerar?

22     A.    Right.

23     Q.    Did you remove some signs from this median?

24     A.    Yes, I did.
```



1    Q.    Can you mark where you --

2    A.    Yeah.  There was one on this end.  Well, I would

3  say around in here.  There was -- the one up in the other

4  end of it, which is, you can't see but it was way back in

5  there.

6    Q.    Okay.  So basically Exhibit 14, Defense

7  Exhibit 14 is across from Lake Gerar.  It is a very wide

8  grassy median with a lot of landscaping and it helps

9  define the roadways and area?

10    A.    Exactly.

11         MR. TUCKER:  Let's let the exhibit speak for

12  itself.

13    Q.    So you have two signs removed from there?

14    A.    Right.

15    Q.    How many other candidates had signs within this

16  grassy area?

17    A.    None.

18         (Defendants' Deposition Exhibit 15 was

19  marked for identification.)

20    Q.    Defense Exhibit 15 shows an intersection.  That

21  was across from Bad Hair Day, isn't it?

22    A.    Yes.

23    Q.    That reminds me of myself every day.

24         MR. TUCKER:  If you were lucky.



Alexander W. Onizuk

97

1          (Discussion off the record.)

2          MR. RHODUNDA:  We are on 15 I think.

3          (Record read.)

4  BY MR. RHODUNDA:

5     Q.    Defense Exhibit 15 shows two "Sokolove for Mayor"

6  signs, and they are fairly close to the roadway.  Are

7  these legal signs?

8     A.    I would say they are legal.  There is a telephone

9  pole right there.  I would say it is on the other side of

10  it.  And this one looks like it is on the other side of

11  the sidewalk.  There is a little sidewalk in there.

12     Q.    You would not take these down?

13     A.    No, I would not take these down.

14          (Defendants' Deposition Exhibit 16 was

15  marked for identification.)

16     Q.    Defense Exhibit 16 is a picture of a Bad Hair

17  Day, and are there some signs in front of this business?

18     A.    They are on private property.

19     Q.    Okay.  How do you --

20     A.    I wouldn't -- if there is any question, doubt in

21  my mind, I wouldn't even touch them.

22     Q.    Why are these on private property?

23     A.    Well, there is the sidewalk there.  And I would

24  say they are over there, but there is no sidewalk here,



1    but still, it looks like private property to me.

2        Q.   So the first 15 exhibits then or 16 exhibits are

3    all pictures that were taken yesterday; is that right?

4        A.   Right, exactly.

5              (Defendants' Deposition Exhibit 17 was

6    marked for identification.)

7        Q.   Now, Exhibit 17 was taken I believe by Dave

8    Murphy but you were present?

9        A.   Dave Murphy, mm-hmm, I picked this sign up.  It

10   was right on the City property.

11       Q.   Do you know what date it was when that was taken?

12       A.   It might have been the 15th.

13       Q.   15th?

14       A.   Yes.

15       Q.   We have another one of our exhibits, actually

16   just shows a fire hydrant where you marked the box where

17   this was located; is that correct?

18       A.   Right, yes.

19       Q.   And then this is the actual sign that you

20   removed?

21       A.   Yes.

22       Q.   That's Exhibit 17.

23             (Defendants' Deposition Exhibit 18 was

24   marked for identification.)



Alexander W. Onizuk

99

1    Q.    Defense 18 is actually another picture of those

2    two flower pots across from the bed-and-breakfast area;

3    is that correct?

4    A.    Yes.

5    Q.    And so on July 15th when you went around and

6    looked to take down signs, you saw these two signs,

7    didn't take them down?

8    A.    We didn't take them down because they were on the

9    other side of the telephone pole.

10    Q.    And there is still --

11    A.    They are still there.

12    Q.    They are still there right now; they were there

13    yesterday when you took a picture of them?

14    A.    Yes, mm-hmm.

15         (Defendants' Deposition Exhibit 19 was

16    marked for identification.)

17    Q.    Now, Exhibit 19 is also Bad Hair Day, and this

18    was a picture that was taken on July 15, and it shows

19    some "Sokolove for Mayor" signs.  Is this one that you

20    removed when you were there on July 15?

21    A.    Yes, we removed that one because it is on the

22    other side of the telephone pole.  We looked down the

23    lines and saw that it was definitely on City property.

24    Q.    So one of your practices would be to look down



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1  the street to see where the telephone pole is lining up?

2      A.   Yes, mm-hmm.

3      Q.   Mr. Tucker referred to Mr. Hill's affidavit with

4  attached pictures earlier?

5      A.   Mm-hmm.

6      Q.   Do you recall looking at these pictures?

7      A.   Yes.

8      Q.   There are two pictures located at items 11 -- I'm

9  sorry, L and M, and they are Art League signs?

10     A.   Yes.

11     Q.   Is there any sort of directional symbol on the

12  Art League sign?

13     A.   Yes, there is an arrow on each sign.

14     Q.   Now, Exhibit G to Mr. Hill's affidavit is the

15  City of Rehoboth Beach Convention Center sign.  Do you

16  see -- it may be hard to see in this photograph.  Do you

17  see a directional item on the sign?

18     A.   No.

19     Q.   Well, do you see where it says "Convention

20  Center" --

21     A.   Convention Center, oh, yes it does have an arrow,

22  yes, I didn't see that.

23     Q.   What does that arrow point to?

24     A.   The Convention Center.



101

```
 1        Q.    It points to the Convention Center?

 2        A.    Yes, mm-hmm.

 3        Q.    That's the Convention Center sign?

 4        A.    Right.

 5        Q.    That's a City Convention Center?

 6        A.    Yes, it is.  Never took notice to that arrow.

 7        Q.    What involvement, if any, did Mr. Ferrese have

 8  regarding taking down the Sokolove signs --

 9        A.    Mr. Ferrese?

10        Q.    Mr. Ferrese on July 7th --

11              MR. SPEAKMAN:  Ferrese, excuse me.

12        A.    Nothing.  He had nothing to do with it.

13        Q.    Did he direct you to take down the signs?

14        A.    No.

15        Q.    Was it conveyed to you through some other third

16  party that he had directed the signs be taken down?

17        A.    No.

18        Q.    Did you ever say that to Mr. Silverstein or

19  Mr. Sokolove, that Mr. Ferrese was involved with taking

20  these signs down?

21        A.    No.  I forgot who Mr. Silverstein was.

22              MR. RHODUNDA:  Mr. Tucker, do you have the

23  exhibit marked with the two photographs in the back of

24  the truck?  Thank you.
```



1     Q.    Plaintiffs' Exhibit Number 9 is the photograph of

2  the back of your truck you have already testified about?

3     A.    Yes.

4     Q.    And actually, there are two Polaroids of the back

5  of your truck?

6     A.    Right.

7     Q.    Please identify for me the types of signs that

8  are in the back of the truck at the time these pictures

9  were taken.

10     A.    Well, I got about six campaign signs, political

11  signs, one auction sign, two auction signs, a Pep Up

12  Heating and Air Conditioning sign.  I know I have a -- I

13  know I got a real estate sign in there.  But this is what

14  I can read right now.

15     Q.    Does it appear there are a large number of signs

16  piled on top of each other?

17     A.    Yes.

18     Q.    Is it fair to say there may be other signs

19  underneath the signs that you can see?

20     A.    Oh, there is a lot of signs underneath those.

21     Q.    Now, the sign ordinance that you are relying on

22  to remove the signs, does it make exceptions for any

23  types of signs?

24     A.    No, it doesn't.

Alexander W. Onizuk

103

Q.   So political signs were not an exception?

A.   No.

       MR. RHODUNDA:   Let me just have a moment.
Be right back.

       (Recess taken.)

BY MR. RHODUNDA:

Q.   I just have a couple follow-up questions for you.

       Has anyone associated with the City singled
out Mr. Sokolove's signs for removal?

A.   No.

Q.   And the removal of signs, is that done year-round
or just during summertime?

A.   Year-round, yes.

Q.   During those efforts to remove signs on a
year-round basis, just give me the types of categories of
signs that you would be removing.

A.   Real estate signs, no campaign signs -- let's
see, real estate signs, contractor signs, subcontractor
signs, and a rental sign.  Rental signs like private
person put up a rental sign on the City property.

Q.   You have identified some businesses here as well,
auction houses?

A.   Yes, auction signs.  What he will do, he will put
them on City property and leave them there for two or



1    three days.

2                    MR. RHODUNDA:    I have no further questions

3                    EXAMINATION

4    BY MR. TUCKER:

5        Q.    Sir, I'm sorry, but your lawyer has raised some

6    issues and I have some more questions for you.    I

7    apologize, but I'm going to have to ask you some more

8    questions.

9                    I'm going to show you what has been marked

10   as Defense Exhibit 19 Mr. Rhodunda was just reviewing

11   with you.    I'll ask you to look at that.    Would you agree

12   that that sign depicted in that exhibit is located within

13   landscaping?

14       A.    Mm-hmm.

15       Q.    Now, I'm going to show you Exhibit 2, Tab E from

16   Plaintiffs' Memorandum in Support of Motion For Temporary

17   Restraining Order that I had shown you previously during

18   this deposition.    Do you remember seeing that exhibit

19   maybe a half hour, an hour ago?

20       A.    Yes.

21       Q.    Do you recall the explanation you gave for why

22   you did not remove those signs?

23       A.    They were behind the logs.

24       Q.    The landscaping logs you referred to?

Alexander W. Onizuk

105

1     A.    The landscaping logs.

2     Q.    Can you explain for us then why on Defendants'

3  Exhibit 19 you removed a sign that was behind or within

4  landscaping, and when it came to Tab E to Exhibit 2 your

5  explanation was that you wouldn't remove that because it

6  was questionable I believe because it was landscaping?

7     A.    Yeah, well, this particular sign was pointed out

8  to me by Mr. Murphy.  We were riding around.  That's why

9  he got a picture of my truck.  But this is -- this sign

10 and particular sign up there is on the other side of the

11 poles, so we picked them up.

12    Q.    Where are the poles that you can see in that

13 picture?

14    A.    Where can I see them in the picture?  I can't.

15 But this is definitely on the -- that would be on City

16 property, because it is on the other side of the

17 sidewalk, for one thing.

18    Q.    Sir, again, Defendants' 19 I don't see the

19 sidewalk.  Can you point me to the sidewalk that's in

20 that picture?

21    A.    Right there.

22    Q.    Is it your testimony that that little strip there

23 is a sidewalk?

24    A.    Yes.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1      Q.    So the rule that you don't take down signs that

2   are within landscaping doesn't apply then if there is a

3   sidewalk as well?

4      A.    Well, see, this is on the other end of this

5   sidewalk.  And we discussed it and he said this is

6   definitely --

7      Q.    When you said "we discussed it," who is "we"?

8      A.    Mr. Murphy.  This is on City property.

9      Q.    So you and Murphy -- I'm sorry, go ahead.

10     A.    We discussed it and we picked it up, said it was

11  on City property.

12     Q.    You had a very specific discussion about that

13  with Mr. Murphy?

14     A.    Right.

15     Q.    And you jointly decided that was on City

16  property?

17     A.    Right, mm-hmm.

18     Q.    That was based on exactly what, for the record?

19     A.    I guess on the sidewalk and the -- we picked up a

20  lot of them.  I don't remember, but I think it was based

21  on -- I don't see any poles there.  It has to be on the

22  sidewalk.  To be honest with you, I don't, I don't see

23  any poles.  But that's the end of the sidewalk there, so

24  it was probably based on that.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Alexander W. Onizuk

107

1      Q.    You said you picked up a lot of signs.

2      A.    That morning?

3      Q.    Generally, I think you said?

4      A.    Oh, generally.

5      Q.    Is that what you meant when you said you picked

6  up a lot of signs?

7      A.    We picked up about five or six that morning, yes.

8      Q.    Mr. Rhodunda has shown you all these pictures

9  that he has marked Defendants' I think probably 1 through

10  19.  Have you seen this pictures before today?

11      A.    Yes.

12      Q.    When did you first see them?

13      A.    Probably yesterday.

14      Q.    And who did you review them with?  Your

15  attorneys?

16      A.    Yes.

17      Q.    And these marks that you have put on these

18  pictures, 1 through 19, Defendants' 1 through 19, are you

19  absolutely certain beyond any doubt that those are the

20  exact locations that you removed signs?

21      A.    The ones I marked, yes.

22      Q.    Beyond any doubt?

23      A.    Right.

24      Q.    Over ten days later you are certain of that?



1    A.    I know exactly where they were.

2    Q.    Did you go back out to the sites and look to

3  confirm?

4    A.    No.

5    Q.    You are relying exclusively on the pictures?

6    A.    On the pictures?

7    Q.    Yes.

8    A.    Yes.

9    Q.    When were Mr. Cooper's three signs picked up?

10    A.    Mr. Cooper's?

11    Q.    Mayor Cooper's?

12    A.    Yeah.  When were they?

13    Q.    Yes, sir.

14    A.    The same day that one was, the 15th.

15    Q.    The same day the one in Defendants' 19 was picked

16  up?

17    A.    Yes, mm-hmm.

18    Q.    So that was after the signs of Mr. Sokolove were

19  first picked up, correct?

20    A.    That's -- yes, after -- that was on the 15th or

21  something like that.

22    Q.    Do you recall if this sign was removed more than

23  once by you?

24    A.    No.  I don't recall.  I think it was only that

Alexander W. Onizuk

109

1    one time.

2        Q.    Do you recall when you spoke to Mr. Sokolove

3    about the signs that were located in the back of your

4    truck on the 11th?

5        A.    Mm-hmm.

6        Q.    Do you recall what you said to him about losing

7    your job?

8        A.    About losing my job.

9        Q.    Yes.

10        A.    No.

11        Q.    You don't recall ever making a statement to him

12    about fearing for losing your job?

13        A.    No.

14        Q.    You never made that statement?

15        A.    Uh-uh.

16        Q.    You are absolutely certain?

17        A.    Yes.  I asked him if he gets to be mayor, the

18    first thing I want him to do is fire me, but other than

19    that, I didn't -- wasn't worried about my job.  That's

20    the last thing I'm worried about.

21        Q.    Say that again.  I didn't follow that.  What did

22    you say to Mr. Sokolove?

23        A.    I said, "When you get to be mayor, I want the

24    first official thing for you to do, I want you to fire



1   me."

2     Q.   Why did you say that?

3     A.   Joke.

4     Q.   Had you thought you had done something wrong?

5     A.   No.  Well, had I thought I done something wrong?

6   Well, yes, he told me I committed a federal offense.

7     Q.   Okay.  And you thought you should be fired for

8   that if he became mayor?

9     A.   Well, it was a joke.  I wasn't afraid of losing

10  my job.  God, that's the last thing I was worried about.

11     Q.   Do you recall speaking to Detective O'Bier about

12  that statement?

13     A.   No.  Why would I be afraid to lose my job?  I'm

14  retired.

15     Q.   Sir, I'm just asking you why you said it.  You

16  are the one who made the statement.

17     A.   I didn't say -- I did not say that.

18     Q.   Now, is it your testimony that the reason you did

19  not remove the Convention Center sign is because it was a

20  directional sign?

21     A.   Pardon me again?

22     Q.   Mr. Rhodunda asked you about the Convention

23  Center sign, the very large one on Rehoboth Avenue?

24     A.   Yes.



Alexander W. Onizuk

111

1  Q.  And I believe he pointed out to you that there

2 was an arrow on it --

3  A.  Yes, there is.

4  Q.  -- and pointed.  Is it because of the arrow that

5 you did not cite that sign or remove that sign?

6  A.  No, because it is City sign, City sign.

7  Q.  Are you aware of another sign that's located in

8 front of the Convention Center which also points to it

9 that's much smaller?

10  A.  Convention Center.

11  Q.  Yes, sir.

12  A.  I'm sure there is.

13  Q.  Mr. Rhodunda was also asking you about signs that

14 were in the back of your pickup truck that were shown on

15 Plaintiffs' Exhibit 9.

16  A.  Mm-hmm.

17  Q.  I believe you testified earlier that some of

18 those signs had been in your truck from a previous date

19 that you had picked up signs?

20  A.  Mm-hmm.

21  Q.  Is that correct?

22  A.  Mm-hmm.

23  Q.  I want to turn to this plot plan that

24 Mr. Rhodunda has provided us, and I think --



1        MR. RHODUNDA:  I think we have one marked

2    already.

3        MR. TUCKER:  No, I was looking for one that

4    was marked.

5        THE WITNESS:  He has got one marked.  Right

6    there.

7        MR. RHODUNDA:  There you go.

8    BY MR. TUCKER:

9    Q.    All right.  I'm going to refer you to Defendants'

10   Number 2.  I'm also going to refer you to Defendants' 4

11   as well.  I'm going to point you to lot 61 on Defendants'

12   2, okay, and I'm going to refer you to the picture which

13   is Defendants' 4 where you put an X where you said you

14   removed a sign.

15   A.    Mm-hmm.

16   Q.    I'm going to ask you, if Mr. Rhodunda doesn't

17   have an objection, to use my pen, which is not green, it

18   is black, and mark on Defendants' 2 where you believe the

19   green X would be that you have marked on Defendants' 4.

20   A.    Well, it is obviously not on the driveway.  This

21   is all driveway here.  So it has got to be in a grassy

22   area.  Around that area somewhere.

23   Q.    Why do you believe it is on public property?

24   A.    Well, it is pretty obvious.  It is on grass area.

Alexander W. Onizuk

113

1    Q.    Sir, if where you put the X on Defendants' 4 was

2    actually private property and not public property, would

3    you have removed that sign in error?

4                MR. RHODUNDA:    If it was private property.

5    Q.    Yes.

6    A.    If it was on private property and I removed it,

7    it would be an error.

8    Q.    Okay.    Now, looking at the plot plan in

9    Defendants' 2, you referred to a private sidewalk in

10   front of our client's restaurant, which is on lot 59,

11   correct?

12   A.    Yes.

13               MR. RHODUNDA:    On a public sidewalk is what

14   he talked about.

15   Q.    Public sidewalk, I stand corrected.

16               Tell me on this plot plan where it indicates

17   that that is a public right-of-way.

18   A.    Well, this is the end of his -- I would say his

19   line, wouldn't you think?

20   Q.    I'm asking you.

21   A.    Right there.    That's the end of his line right

22   there.    His line stops right there.

23   Q.    Is there any notation on that plot plan that you

24   relied upon, that it is a public right-of-way?



1    A.   Any indication?

2    Q.   Yes.

3    A.   You can see where his line ends and this says

4   "Rehoboth Avenue," well this is along Lake Avenue.

5    Q.   Well, I see a dash where it says "Rehoboth

6   Avenue" that I'm pointing to.

7    A.   I mean Rehoboth Avenue is down the street there.

8         MR. RHODUNDA:   That's an arrow.

9    A.   That's an arrow, actually.

10    Q.   Okay.  How do you know for certain that where you

11   put the X on Defendants' 4 is on Rehoboth Avenue and not

12   within the boundary --

13    A.   It is not on Rehoboth Avenue.  It is on Lake

14   Avenue.

15    Q.   Let me finish -- - and is not on Lake Avenue or

16   was on Lake Avenue and not on lot 61?  How do you know

17   that from looking at this plot plan for sure?

18    A.   That was on Lake Avenue and not on Rehoboth

19   Avenue?

20    Q.   No.  How can you know for sure that the location

21   that you put the X on in green on Defendants' Exhibit 4

22   is located on Lake Avenue or on the right-of-way and is

23   not located within the private property known as lot 61?

24    A.   Lot 61, just by looking at this, I would say it



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Alexander W. Onizuk

115

1    has no grassy area.

2        Q.   Wouldn't you need a survey to know that for sure,

3    sir?

4        A.   Probably.  But I would think this would be

5    adequate.

6        Q.   How can you tell where that property line for lot

7    61 ends without a survey?

8        A.   Well, you know what?  This guy that lives in 63,

9    he said, "Get that sign out of the front of my house."

10       Q.   So you relied on a neighbor to tell you where the

11   boundary was?

12       A.   Well it is on, on the green area too, after the

13   sidewalk.

14       Q.   Okay.  But it is your testimony that you could

15   rely on a plot plan like Defendants' No. 2 and make that

16   determination?

17       A.   Well, I can -- well, no.

18       Q.   Okay.

19       A.   I've determined that just by looking at it right

20   there, that green area.

21       Q.   In fact, you didn't even have Defendants' No. 2

22   when you were out in the field, did you?

23       A.   I didn't have this with me?

24       Q.   Right.



A.    Of course not.

Q.    Okay.

A.    You don't carry these around.  I don't -- not very often I get to see these.

Q.    Okay.  So is it your testimony that this exhibit helps establish that --

A.    Yes.

Q.    -- the sign in Defendants' 4 was taken from the right-of-way?

A.    I thought it might help us out, yes.

Q.    Do you still feel that way?

A.    Mm-hmm.

Q.    Can you tell me what on this exhibit you are relying on that makes you feel more confident that that sign was removed from public property and not private?

A.    Well, I know for a fact just by looking at this, his property line stops right here.  All commercial vehicles -- commercial property stops.  They can build right up to the property line.  And his steps are right there.  It goes all the way down.

Q.    Well, sir, there is a sidewalk --

A.    There is also an iron pipe right there.

Q.    Right.

A.    An iron pipe right there that says his...



Alexander W. Onizuk

117

1    Q.    And I see there is a sidewalk shown in front of

2    lot 59, correct?

3    A.    Right.

4    Q.    But there is not in front of 61, correct?

5    A.    No.

6    Q.    So does that mean the sidewalk is within lot 61?

7    A.    The sidewalk is in lot 61?  I would say the

8    sidewalk is in, according to this, is in 59.

9    Q.    So you can't tell from looking at Defendants' 2

10   whether where you put the X is inside lot 61 or not, can

11   you?

12   A.    Well, I would say this says "pavement," hell, I

13   can't put a sign in -- there is no sign in the pavement,

14   is there?  Concrete pavement at that.

15   Q.    I also see a rectangle here.  What is that?

16   A.    What rectangle?

17   Q.    Right here.  What is that?

18   A.    I don't know.  I have no clue.  What is it?

19   Q.    Could that be the strip coming out that you have

20   the X marked on in green?

21   A.    Could be.  But I would doubt it.  Wouldn't you

22   say that would be -- that is on somebody's property

23   there?

24   Q.    I'm asking you.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1  A.   Wouldn't you say that's on somebody's property.

2  Q.   I'm asking your opinion, sir.

3  A.   That's on somebody else's property.

4          MR. RHODUNDA:  He has given his answer

5  numerous times.  This property matches up with this

6  because this sidewalk and this sidewalk match up.  You

7  cannot answer that question anymore.

8          MR. TUCKER:  I just asked --

9          THE WITNESS:  You can't beat a dead dog.

10         MR. SPEAKMAN:  You are getting

11 argumentative.

12         MR. TUCKER:  Mr. Speakman, I am not getting

13 argumentative.  I haven't gotten argumentative at all.  I

14 have been asking questions very politely.  Your witness

15 is asking me questions, which is inappropriate.  I've

16 cautioned him probably six times today not to do that.

17 If you didn't want to prep your witness and your witness

18 doesn't want to listen to me, that's not my fault, sir.

19 I'm trying my best to get through this.  But I am not

20 getting argumentative with your witness.

21 Q.   Sir, I'm going to show you Defendants' No. 13

22 that your lawyer marked, Mr. Rhodunda.  You put a big X

23 in green on that one, correct?

24 A.   Yes.



Alexander W. Onizuk

119

1    Q.    Is it possible that the sign you removed was not

2    from where you marked the X?

3    A.    It could have been.

4    Q.    But closer?

5    A.    Could have been down there, yes.

6    Q.    Could it have been closer to the sign, the

7    directional sign up here with the arrow, where you buy

8    your parking stickers?

9    A.    Oh, I don't know.

10    Q.    It could have been, though?

11    A.    Yeah.  But I think if it wasn't here it was

12    down -- it's somewhere in that area.  I just wanted to

13    make a point that it was in that part.

14    Q.    Okay.  For the record, I just want to be clear,

15    make sure I understand that you are not 100 percent

16    certain where you have put these X's is exactly where you

17    removed these signs; is that fair?

18    A.    In the front of those houses I was.  But in this,

19    it could have been anywheres in that, around that trash

20    can and that park.

21    Q.    Okay.

22    A.    I put the X because it was around the trash can.

23    That's where the sign was, near that trash can, around

24    that area.



**WILCOX & FETZER LTD.**

Registered Professional Reporters

1    Q.    Okay.  So when we look at this picture and look

2    at where you put the green X --

3    A.    Yes.

4    Q.    -- it could be exactly there, it could be around

5    there; is that fair?

6    A.    Yes, it could be right in front of that thing,

7    for all I know, you know.

8    Q.    Is it fair you can say that about the other

9    pictures where you put the X's too, it is not exact?

10   A.    Yes, they are exact.

11   Q.    You are certain of that?

12   A.    Yes.

13   Q.    You didn't go out to the site and walk these off,

14   correct?

15   A.    I walked them -- when I picked those signs up, I

16   walked and picked them up.  I didn't go ride along in my

17   truck and picked them up.  I walked that and picked them

18   all up.  I know exactly where they were.  They were right

19   in front of each one of those houses where I put the X.

20             Now, that park is a big park.  In front of

21   somebody's house, you kind of narrowed the area there.

22   Q.    I'm going to show you Defendants' 14 where you

23   have marked X's.

24   A.    Yes.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Alexander W. Onizuk

121

1      Q.    Absolutely certain that's exactly where those

2    signs were located?

3      A.    One of them was right in there, and the other

4    ones were -- now I said we don't see the other end of

5    this park.  They were at the other end of the park.

6      Q.    Again, those X's are not exact, it is the general

7    vicinity?

8      A.    General vicinity.  Like I said, if we showed a

9    picture of the other end of the park, I can show you.

10   But that doesn't show the other end of the park.

11     Q.    I'm just referring to where you put the X's that

12   your attorney said --

13     A.    I said they are in that area.

14           MR. TUCKER:  Well, I think we are done.

15           (Discussion held off the record.)

16   BY MR. RHODUNDA:

17     Q.    I have three quick follow-ups for you.

18           In regard to where you marked the X on the

19   Gerar Park --

20     A.    Yes.

21           MR. SPEAKMAN:  Identify the photograph

22   number.

23     Q.    Photograph 13, was the sign located on the far

24   side of the sidewalk?

1    A.    Far side of the sidewalk.

2    Q.    Are you sure about that?

3    A.    Yes.

4    Q.    And then as far as these signs on Exhibit 14, the

5    large median strip that's landscaped and whatnot, were

6    those signs within that median area?

7    A.    Yes, they were.

8    Q.    And in regard to Defendants' Exhibit 19, there is

9    a telephone pole right here.

10    A.    I couldn't make out for sure, but I thought it

11    was.

12    Q.    If you looked at that telephone pole and looked

13    back --

14    A.    Yes.

15    Q.    -- was that sign in front of the telephone pole?

16    A.    Sure it is.  Way in front of it.

17    Q.    And does this --

18         MR. TUCKER:  Wait, I'm sorry.  Is there a

19    telephone pole in that picture?

20         MR. RHODUNDA:  Yes, right here.  You can see

21    the wires going across the street.

22    BY MR. RHODUNDA:

23    Q.    In addition to the landscaping shown on the

24    exhibit where the signs are behind the landscape screen,

1    that landscape marker, the signs are behind that?

2        A.    Along the --

3                MR. TUCKER:   I'm going to object, only that

4    Mr. Rhodunda is leading this witness.   If he wants to ask

5    him a question about what the picture shows, I'm fine

6    with that.

7    BY MR. RHODUNDA:

8        Q.    We have a landscape marker; is that right?

9        A.    Landscape log.

10       Q.    What is behind the landscape log?

11       A.    The signs, all three signs were behind the

12   landscape log.

13       Q.    What is behind the landscape log?

14       A.    Trees.

15       Q.    What is behind that?

16       A.    It is somebody's house.

17       Q.    Now, in regard to this landscaped area where

18   "Sokolove" sign was removed, is it the same situation as

19   in this picture?

20       A.    No.

21       Q.    Or is it a little island that --

22       A.    They got a little island that is probably on City

23   property.

24       Q.    It extends out into the road; is that right?



1          A.   Yes, it does.  We have a lot of those little

2     islands in town that, which we are trying to clear up a

3     little bit at a time.

4                MR. RHODUNDA:  Nothing further.  Thank you.

5                MR. TUCKER:  I have nothing further.

6                (Proceedings conclude at 2:25 p.m.)

7                     I N D E X

8     Deponent:  Alexander W. Onizuk            Page

9     By Mr. Tucker.............................   3

10    By Mr. Rhodunda...........................  84

11    By Mr. Tucker.............................  104

12    By Mr. Rhodunda...........................  121

13                     - - - - -

14                   E X H I B I T S

15    Plaintiffs':                             Page

16    1   Subchapter VI Offenses                  3

      2   Title 18; Section 1621                  3

17    3   Letter dated 7/11/05                    3

      4   Letter dated 7/13/05                    3

18    5   Complaint                              3

      6   City of Rehoboth Report 7/15/05         3

19    7   Zoning Map of City of Rehoboth Beach    3

      8   Initial Crime Report 7/9/05             3

20    9   Photographs                            3

      10  Letter dated 7/12/05                    3

21    11  Diagram                                18

22                     - - - - -

23

24



**WILCOX & FETZER LTD.**
Registered Professional Reporters

125

| 1  | Defendants': |  | Page |
|----|----|----|----|
| 2  | 1  | Photograph | 85 |
|    | 2  | Plot Plan | 87 |
| 3  | 3  | Photograph | 87 |
|    | 4  | Photograph | 89 |
| 4  | 5  | Photograph | 90 |
|    | 6  | Photograph | 91 |
| 5  | 7  | Photograph | 91 |
|    | 8  | Photograph | 91 |
| 6  | 9  | Photograph | 93 |
|    | 10 | Photograph | 93 |
| 7  | 11 | Photograph | 94 |
|    | 12 | Photograph | 94 |
| 8  | 13 | Photograph | 95 |
|    | 14 | Photograph | 95 |
| 9  | 15 | Photograph | 96 |
|    | 16 | Photograph | 97 |
| 10 | 17 | Photograph | 98 |
|    | 18 | Photograph | 99 |
| 11 | 19 | Photograph | 99 |

12          - - - - -
13
14
15
16
17
18
19
20
21
22
23
24

1
2
3
4         REPLACE THIS PAGE
5         WITH THE ERRATA SHEET
6         AFTER IT HAS BEEN
7         COMPLETED AND SIGNED
8         BY THE DEPONENT.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1   State of Delaware )

2   New Castle County )

3

4               CERTIFICATE OF REPORTER

5

6          I, Eleanor J. Schwandt, Registered
    Professional Reporter and Notary Public, do hereby
    certify that there came before me on the 25th day of

7   July, 2005, the deponent herein, ALEXANDER W. ONIZUK, who
    was duly sworn by me and thereafter examined by counsel

8   for the respective parties; that the questions asked of
    said deponent and the answers given were taken down by me

9   in Stenotype notes and thereafter transcribed by use of
    computer-aided transcription and computer printer under

10  my direction.

11         I further certify that the foregoing is a
    true and correct transcript of the testimony given at

12  said examination of said witness.

13         I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise

14  interested in the event of this suit.

15

16                  *Eleanor J. Schwandt* /sct

17             Eleanor J. Schwandt

18             Certification No. 125-RPR

19             (Expires January 31, 2008)

20

    DATED: 07-25-05

21

22

23

24



**WILCOX & FETZER LTD.**
Registered Professional Reporters